IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., DEMOCRACY NASHVILLE-DEMOCRATIC COMMUNITIES, THE EQUITY ALLIANCE, and THE ANDREW GOODMAN FOUNDATION,<br><br>    Plaintiffs,<br><br>v.<br><br>TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, HERBERT SLATERY III, in his official capacity as Attorney General of the State of Tennessee, the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, GREG DUCKETT, MIKE MCDONALD, JIMMY WALLACE, TOM WHEELER, and KENT YOUNCE, in their official capacities as members of the State Election Commission,<br><br>    Defendants. | Civil Action File No. |

## **COMPLAINT**

Plaintiffs Tennessee State Conference of the NAACP, Democracy

Nashville-Democratic Communities, The Equity Alliance, and The Andrew

1

Goodman Foundation (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendants Tre Hargett in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; Herbert Slatery III, in his official capacity as Attorney General of the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce, in their official capacities as members of the State Election Commission, (collectively, "Defendants") allege as follows:

## **INTRODUCTION**

1.  This action challenges Tennessee's new Third-Party Voter Registration Law ("the Law"), signed into law by Governor Bill Lee on May 2, 2019, which places onerous, unnecessary, burdensome, and unconstitutional obstacles upon on people who want to help others register to vote, subjects such people to harsh civil and criminal penalties based on vague and overbroad terms and standards, all of which violate the due process clause of the Fourteenth Amendment and have a chilling effect on the exercise of fundamental First Amendment rights.

2.  "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  The

2

right to vote is a "fundamental political right" that is "preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

3.    Voter registration is the prerequisite to exercise this cherished franchise. Helping someone register to vote not only furthers the essence of our democracy, but also implicates the fundamental First Amendment rights of the person helping the voter register.  "The interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society."  *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006).  "Because the collection and submission of voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006).

4.    In many communities, voter registration is done in conjunction with everyday social activities.  It takes place at town halls, church events, door-to-door canvassing, in front of supermarkets, at the mall, in laundromats, on party buses, and at a range of community events.  A voter registration worker meets the voter where they are, and this face-to-face interaction facilitates civic engagement.

5. Voter registration activities are viewed in many communities as a way to build alliances, bring in members who are on the fringes of the community, work in a nonpartisan manner, and encourage a larger engagement in our democracy. This is particularly true of minority communities, who historically have had stumbling blocks placed in their way of registering to vote.

6. Many voter registration groups, including Plaintiffs Tennessee State Conference of the NAACP, Democracy Nashville-Democratic Communities, The Andrew Goodman Foundation, and The Equity Alliance, also work and communicate directly with prospective voters prior to and on Election Day, advising voters on how to register, helping voters look up their registration status, and sharing information on voter registration on their websites, through social media, live events, and town hall trainings.

7. The Law imposes criminal penalties for failure to pre-register and receive training before embarking on voter registration drives, but the Law is unconstitutionally vague in key provisions, failing to define adequately who is and who is not subject to such requirements and what conduct comes within the scope of the statute. The Law leaves Plaintiffs and others who want to engage in voter registration activities uncertain as to what steps, if any, they must take to comply with the Law, discourages Plaintiffs and others who want to engage in voter registration activities from undertaking activities protected by the First

4

Amendment, and creates an unacceptable risk that they will be subject to arbitrary and discriminatory law enforcement.

8.  The Law subjects a selected group of persons—paid voter registration volunteers and staff—to criminal penalties for failure to follow a host of requirements, including pre-registration and training, without any justification for singling them out, thus violating their First Amendment associative rights.

9.  The Law imposes stiff financial penalties for the submission of 100 or more "incomplete" registration applications, but does not adequately define what constitutes an "incomplete" application, and leaves Plaintiffs and others engaging in voter registration drives at the risk of civil fines no matter what actions they take with respect to a registration application.

10.  In addition, the Law imposes criminal penalties for any "public communication regarding voter registration status" unaccompanied by a disclaimer that the communication is not made in conjunction with or authorized by the State. The vagueness and overbreadth of this prohibition could bring within its ambit virtually every statement made by Plaintiffs relating to "voter registration." The Law is an impermissible content-based regulation that compels Plaintiffs to speak a specific state-imposed message in violation of their First Amendment rights.

11. Because of their vagueness, overbreadth, and undue burden, these provisions will chill Plaintiffs' voter registration efforts, which have focused on traditionally disenfranchised communities—African-Americans and other minorities, college students, and low-income voters.

## JURISDICTION AND VENUE

12. This action arises under the First Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

13. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (jurisdiction over civil rights actions).

14. This Court has authority to grant both declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 (authority to grant declaratory relief) and § 2202 (authority to grant relief ancillary to declaratory judgment), in addition to its authority under the Civil Rights Act and its inherent equitable powers.

15. This Court has personal jurisdiction over Defendants Secretary Tre Hargett, Coordinator Mark Goins, Attorney General Herbert Slatery III, the State Election Commission, and the members of the State Election Commission because their principal offices are in Nashville, Tennessee.

16. Venue lies in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b) because all Defendants are residents of Tennessee, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred and will occur in this judicial district.

17. An actual and justiciable controversy exists between Plaintiffs and Defendants.

## PLAINTIFFS

18. Plaintiff Tennessee State Conference of the NAACP (hereinafter, "Tennessee NAACP") is a nonpartisan, interracial, nonprofit membership organization headquartered in Nashville. The mission of the Tennessee NAACP is to eliminate racial discrimination through democratic processes and to ensure the equal political, educational, social, and economic rights of all persons, in particular including African Americans. The Tennessee NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach. A considerable amount of the Tennessee NAACP's work and resources are devoted to promoting voter registration, voter education, get-out-the-vote efforts, election protection, and census participation. The Tennessee NAACP, along with its 44 adult chapters and 22 youth and college councils regularly conducts year-round voter registration drives and other activities to help Tennesseans in both urban and rural parts of the State to vote absentee or in person throughout Tennessee. Many

7

events hosted by the Tennessee NAACP has a voter registration component.  As an example, Tennessee NAACP works with faith-based groups across and the religious community to host voter registration drive Sundays.  The Tennessee NAACP and its local branches anticipate that they will attempt to register more than 100 voters in the upcoming year.

19.  As a result of Tennessee's burdensome and vague Third-Party Voter Registration Law, including its harsh criminal and civil penalties, the Tennessee NAACP will be forced to significantly reduce or halt altogether its voter registration activities.  The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-registration requirements, and does not and cannot know what conduct will result in civil and criminal sanctions.  In addition, it is unclear how or to what extent the Law will apply to the Tennessee NAACP.  Although some Tennessee legislators indicated during floor debates before the Law's passage, that the Law would not apply to the organization, the Tennessee NAACP uses a network of paid and unpaid volunteers to collect voter registration applications, which would appear to make it ineligible for the Law's exemption for unpaid volunteers.  The Tennessee NAACP's unpaid volunteers that collect voter registration applications are ultimately supervised by paid staff, and it is again unclear whether having paid staff would disqualify the organization from the Law's exemption of unpaid

8

volunteers.  The Tennessee NAACP also issues many public communications concerning voter registration status generally, which may subject the Tennessee NAACP to criminal sanctions depending on how the public communication compelled disclosure provision is construed.  As the Law now stands, the Tennessee NAACP does not know whether and which of its public communications about voter registration status are subject to the public communications compelled disclosure provision.

20.  Plaintiff Democracy Nashville-Democratic Communities (hereinafter, "Democracy Nashville") is a nonpartisan organization registered under Tennessee law as a public benefit corporation.  Democracy Nashville raises donations from citizens through GoFundMe, relies on grants, and receives funding from the Tennessee NAACP to conduct civic engagement activities, including to conduct voter registration drives and collect voter registration applications in primarily African-American communities in Nashville.  When it is financially able, it pays staff on a salaried basis to run canvassing drives in the African-American community.  Democracy Nashville has a network of paid and unpaid volunteers who help voters register to vote at petition drives, coalition events, churches, and door-to-door canvassing events.  Registering voters has become a critical part of its town hall and outreach events.  As part of its door-to-door strategy, Democracy Nashville takes paper registration forms to register low-income voters of color in

9

the housing projects of Nashville, where many residents do not have access to computers.  Democracy Nashville views voter registration work as an essential element of its program of social activism and engagement.  Democracy Nashville anticipates that it will attempt to register more than 100 voters in the upcoming year.

21.   As a result of Tennessee's burdensome Third-Party Voter Registration Law, Democracy Nashville will be forced to significantly reduce or halt altogether its voter registration activities.  The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-registration requirements, and does not and cannot know what conduct will result in civil and criminal sanctions.  Because Democracy Nashville has a network of paid and unpaid volunteers who collect voter registration applications, it is unclear how or whether the Law will apply to the organization, which may subject the organization to civil or criminal sanctions.  In addition, Democracy Nashville issues many public communications concerning voter registration status generally, which may subject the Democracy Nashville to criminal sanctions depending on how the public communication compelled disclosure provision is construed.  As it stands, Democracy Nashville does not know whether and which

10

of its public communications about voter registration status are subject to the public communications compelled disclosure provision.

22. Plaintiff The Equity Alliance is a nonpartisan, grassroots organization registered under Tennessee law as a public benefit corporation. The Equity Alliance seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action on issues affecting their daily lives. The Equity Alliance aims to expand the electorate by engaging low propensity voters and disenfranchised communities to participate in the democratic process. It educates communities of color about the political process, relevant economic, social, and political issues, and the impact of impending legislation on their lives. Year-round voter registration activities lie at the heart of The Equity Alliance's work. Its staff meets voters where they are—at laundromats, churches, clubs, their homes, and the supermarket—in pursuing its voter registration activities including collecting voter registration applications. The Equity Alliance also uses a text-messaging platform that links voters to the Secretary of State's website so that they can check their voter registration status, as well as an online portal that links voters to the Secretary of State's voter registration website. The Equity Alliance has received grant funding to carry out its organizational mission, which allowed the Equity Alliance to hire organizers who work on its civic program, which includes

11

voter registration.  The Equity Alliance anticipates that it will attempt to register more than 100 voters in the upcoming year.

23.  As a result of Tennessee's burdensome Third-Party Voter Registration Law, The Equity Alliance will be forced to significantly reduce or halt altogether its voter registration activities.  The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-registration requirements and does not and cannot know what conduct will result in civil and criminal sanctions.  Because The Equity Alliance has a network of paid and unpaid volunteers who collect voter registration applications, it is unclear how or whether the Law will apply to the organization, which may subject the organization to civil or criminal sanctions.  The Equity Alliance also issues many public communications concerning voter registration status generally, which may subject The Equity Alliance to civil or criminal sanctions depending on how the public communication compelled disclosure provision is construed.  As it stands, The Equity Alliance does not know whether or which of its public communications about voter registration status are subject to the public communications compelled disclosure provision.

24.  Plaintiff the Andrew Goodman Foundation (hereinafter, "AGF") is a nonpartisan, nonprofit organization with the mission of making young voices and votes a powerful force in democracy.  AGF was founded by the mother of Andrew

12

Goodman, one of the three young men (along with James Chaney and Michael Schwerner) who were killed in 1964 in Mississippi, where they had traveled to help a voter registration drive. AGF's Vote Everywhere initiative is a national, nonpartisan, civic engagement movement of student leaders ("Student Ambassadors") and university partners. The program provides extensive training and resources, as well as a peer network to support its Student Ambassadors while they work to register voters, remove voting barriers, organize Get Out The Vote ("GOTV") activities, and tackle important social justice issues on their college campuses. Vote Everywhere is located on 59 campuses in 24 states plus the District of Columbia, impacting approximately one-million students across the country, including students at Tennessee State University—the largest and only state-funded historically black university in Tennessee. As part of its program, AGF enters into contracts with university administrators and pays stipends to students to conduct voter registration work. At the Tennessee State University campus, Vote Everywhere pays two Student Ambassadors to help carry out voter registration, including regularly setting up tables at the student center and residence halls, registering students during high-interest events such as freshman orientation, Homecoming, and National Voter Registration Day, and institutionalizing voter registration on campus. AGF maintains an online voter registration portal which includes a link that directs students to the Secretary of

State's website to both check their registration status and/or to register to vote. In conjunction with the web portal, AGF is rolling out a texting program to all 59 campus partners in Fall 2019. At each participating campus, students can sign up to receive text message reminders geared toward voters on that campus. The AGF Vote Everywhere team on each participating campus will draft reminders with information relevant to their campus, such as when and where to vote, available transportation from campus to the polls, and other civic engagement opportunities beyond voting. AGF is planning to launch a base in Tennessee to further assist its statewide efforts here, as part of its wider Southeast regional efforts. To achieve its mission, AGF devotes substantial time, effort, and resources to training and supporting Student Ambassadors, who work with their home campuses to encourage voting, register voters, and advocate for the voting rights of their communities. AGF anticipates that it will attempt to register more than 100 voters in the upcoming year.

25. As a result of Tennessee's burdensome Third-Party Voter Registration Law, AGF's organizational mission of making young voices and votes a powerful force in democracy has and will continue to suffer injury, as will the voting rights of the student voters whom AGF serves to champion and protect. AGF will be forced to significantly reduce or halt altogether its voter registration activities. The organization does not and cannot know what constitutes an incomplete application,

14

does not and cannot know how to comply with the pre-registration requirements and does not and cannot know what conduct will result in civil and criminal sanctions. Because AGF has a network of paid and unpaid volunteers who collect voter registration applications, it is unclear how or whether the Law will apply to the organization, which may subject the organization to civil or criminal sanctions. AGF also issues many public communications concerning voter registration status generally, which may subject AGF to civil or criminal sanctions depending on how the public communication compelled disclosure provision is construed. As it stands, AGF does not know whether or which of its public communications about voter registration status are subject to the public communications compelled disclosure provision.

## **DEFENDANTS**

26. Defendant Tre Hargett is the Secretary of State of the State of Tennessee and is sued in his official capacity. In that capacity, he appoints the Coordinator of Elections, who is the state's chief election officer and who serves "at the pleasure of the secretary of state." Tenn. Code Ann. § 2-11-201(a). The Coordinator, "subject to the concurrence" of the Secretary, has the authority to make rules and

15

regulations as necessary to carry out the provisions of the Election Code.  *Id.* § 2-11-201(c).

27.   Defendant Mark Goins is the Coordinator of Elections of the State of Tennessee and is sued in his official capacity.  The Coordinator is "the chief administrative election officer of the state."  *Id.* § 2-11-201(b).  The Coordinator "[g]enerally supervise[s] all elections" and has a myriad of responsibilities including "prepar[ing] instructions for the conduct of registration" and "[a]uthoritatively interpret[ing] the election laws for all persons administering them."  *See id.* §§ 2-11-201, 2-11-202, 2-2-115.  The Coordinator is further authorized to investigate or have investigated "the administration of election laws."  *Id.* § 2-11-202(a)(5)(A)(1).  In conducting an investigation, the Coordinator is authorized to "issue subpoenas and summon witnesses, administer oaths to such witnesses, take the depositions of witnesses, compel the production of documents, exhibits, records or things, and require testimony on any issue related to the investigation or review."  *Id.* § 2-11-202(a)(5)(B).

28.   Defendant Herbert Slatery III is the Attorney General of the State of Tennessee and is sued in his official capacity.  The Attorney General and district attorney generals can investigate or prosecute any violation of the Election Code, or request that the Coordinator conduct an investigation.  *Id.* § 2-11-202(a)(5)(A)(1)-(C).  More specifically, "if a state or county official determines

16

that there is a pattern of fraudulent registration, or any activities on the part of any individuals to vote who are not qualified voters, the Coordinator can request that the attorney general within whose district these actions may occur, to bring action." *Id.* § 2-2-115(b)(6).

29.    Defendant the State Election Commission and its individual members Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are sued in their official capacity. Under the Law, the State Election Commission has the authority to review any "incomplete" voter registration application submitted by county election commissioners, review each application presented, make a finding on the number of incomplete applications, and, based on that finding, "may impose civil penalties for Class 1 and 2 offenses." Tenn. Code Ann. § 2-2-143(c)(3). Under the Law, the State Election Commission can combine the number of "incomplete" forms submitted in each county to calculate the total number of "incomplete" forms. *Id.* For any offense, the State Election Commission is authorized to send an assessment letter detailing the violation and penalty, review waiver requests from violators, and promulgate all rules necessary to implement the provisions of the Section. *Id.* §§ 2-2-143(c)(5)-(6), 2-2-143(e).

## FACTUAL ALLEGATIONS

### Plaintiffs' Voter Registration Activities Strengthen Democracy

30.   A substantial number of Tennessee citizens who register to vote each year are registered with the assistance of private citizens and groups engaging in voter registration drives, including Plaintiffs.

31.   Tennessee has a voter registration rate of 78.52 percent, which currently ranks 45th in the Nation in voter registration.  Tennessee ranks 49th in the nation for voter turnout, according to Pew's Election Performance Index.  Pew Charitable Trusts, *Elections Performance Index*, Pew (2016),

https://elections.mit.edu/#indicator;  Pew Charitable Trusts, State Profiles, Pew (2016), https://elections.mit.edu/#state-TN.

32.   Voter registration rates among Tennessee citizens who live in predominantly low-income and minority communities are lower than those for more affluent citizens and lower than the statewide average.  Citizens in predominantly low-income and minority communities tend to change addresses more frequently, visit state motor vehicle offices (where many Tennessee citizens register to vote) less frequently, have lower literacy rates, less internet access (and thus less ability to obtain voter registration applications online), and are more dependent on public transportation (making it more difficult to travel to register at a government office). *See generally* Thom File, *Characteristics of Voters in the Presidential Election of*

18

*2016*, U.S. Census Bureau (Sept. 2018), *8-9,

https://www.census.gov/content/dam/Census/library/publications/2018/demo/P20-582.pdf.

33.  According to the Census Bureau, people of color and individuals aged 18-29 report at higher rates than other demographic groups that they are not registered to vote because they did not know where or how to register.  *Id.* at 15.

34.  Plaintiffs' voter registration activities focus on these communities because they rely more on third-party voter registration drives than do other communities.

35.  Plaintiffs' voter registration activities have resulted in a significant expansion of the franchise in Tennessee.

### Plaintiffs' Voter Registration Activities Are Core Political Speech and Associational Activity

36.  Plaintiffs and other similar organizations rely on voter registration activity to reach citizens who otherwise would likely not participate in the democratic process.

37.  Plaintiffs have conducted and wish to continue conducting voter registration activities to engage diverse communities in the democratic process, including through face-to-face interactions at the supermarket, laundromat, peoples' homes, religious services, shopping malls, housing projects, college campuses, and a variety of other places.

19

38. These voter registration activities, in which Plaintiffs interact with the community and encourage civic participation, expand the franchise and strengthen democracy in Tennessee. These activities are protected by, and indeed are at the core of the activities protected by, the First Amendment to the U.S. Constitution.

**Challenged Provisions**

39. On May 2, 2019, Governor Bill Lee signed into law the Third-Party Voter Registration Bill ("the Law).

40. Section 2-2-142 of the Law requires that any person or organization that conducts "voter registration drives" in Tennessee "that attempt to register one hundred (100) or more people to vote" must comply with a set of requirements, including pre-registration, the completion of a training program and the requirement that they file a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters. Knowing and intentional violation of each requirement of this provision is a Class A misdemeanor punishable by 1 year in jail and/or a $2500 fine.

41. Section 2-2-143 imposes a civil penalty ranging from $150 to $2000 for any person or organization filing 100 to 500 "incomplete" voter registration applications within a calendar year. For any person or organization filing more than 500 "incomplete" voter registration applications within a calendar year, the penalty provision is a maximum of $10,000. "Incomplete" is defined as any

20

application "lacking" the "applicant's name, residential address, date of birth, declaration of eligibility, or signature." The statute further states that "[a] person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission." The Law authorizes the State Election Commission to combine the number of "incomplete" forms filed by a person or organization in multiple counties when determining the total number of "incomplete" forms filed for the purpose of assessing civil sanctions.

42. Section 2-19-145 prohibits "any public communications regarding voter registration status by a political committee or organization" if it does not "display a disclaimer that such communication is not made in conjunction with or authorized by the Tennessee Secretary of State. A "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites." Any person who "intentionally or knowingly" violates this provision is subject to a Class A misdemeanor—punishable by 1 year in jail and/or a $2500 fine.

43. The statute exempts "individuals who are not paid to collect voter registration applications" and "organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications" from complying with any of the requirements in Sections

21

2-2-142 (preregistration) and 2-2-143 ("incomplete" forms) and from the criminal and civil penalties.

**Vagueness and Over-breadth of the Law and Burdens Placed by the Law**

    *A. The "Unpaid Volunteer" Exemption*

44.  The statute's exemption of "individuals who are not paid to collect voter registration applications" and "organizations that are not paid to collect voter registration applications and use only unpaid volunteers to collect voter registration applications" effectively establish the statutory threshold for determining which individuals or organizations are subject to the primary substantive requirements of the Law—namely Sections 2-2-142 and 2-2-143, that subject violators to civil and criminal penalties.

45.  The Law does not define what is meant by "individuals who are not paid" or "organizations that are not paid . . . and only use unpaid volunteers" to collect voter registration applications. On the face of the Law, it is unclear whether it applies to any of the following situations: organizations that receive grants to conduct their activities generally and that may include sending volunteers to collect voter registration applications as a minor part of these activities; organizations that use unpaid volunteers to collect applications, but may give those volunteers gifts to thank them; organizations that provide basic stipends to volunteers to conduct voting-related activities which may include collecting voter registration

22

applications; or organizations that use only unpaid volunteers to engage directly with prospective voters and collect voter registration applications, but rely on paid staff or a mix of paid and unpaid staff to supervise, coordinate, manage or direct the collection of voter registration forms.

46. There is no basis for the Law to differentiate between paid and unpaid voter registration workers with respect to mandating compliance with the requirements of Sections 2-2-142 and 2-2-143.

### B. The Civil Penalty for Submission of "Incomplete" Forms

47. The Law's imposition of penalties for "incomplete" voter registration applications—defined under Section 2-2-143 as applications "lacking the applicant's name, residential address, date of birth, declaration of eligibility, or signature"—is vague, as it is unclear whether the term is intended to cover only applications that contain missing information or is also intended to apply to applications that contain incorrect information. The Law also fails to make clear what defects in the information provided on the application are sufficiently significant to make the application "incomplete." While the text of the statute refers to "incomplete" applications, an earlier version of the bill included the word "deficient" instead of "incomplete," and comments on the Senate Floor upon passage of the Law suggest that lawmakers themselves are unclear on what the term "incomplete" means. The vagueness of the term "incomplete" was

23

exacerbated by the comments of Senator Jackson, the sponsor of the initial bill, during debate on the Senate floor on April 25, 2019. Senator Jackson repeatedly used the term "deficient" to refer to the provision of the Law providing for penalties for the submission of "incomplete" forms, and repeatedly gave examples of inaccurately filled-out forms as the sort that would trigger the civil penalties even if they were not incomplete.

48. In addition, those charged with implementing the Law have suggested that "deficient" should be construed broadly, as including not only missing, but also incorrect information. For example, Defendant Goins, who will be responsible for implementing the Law, testified before the Senate State and Local Committee that he interprets "deficient" to mean incomplete or incorrect. Senate State and Local Committee, Hearing (Apr. 9, 2019),

http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123.

49. the legislative history of the Law indicates that the Legislature construes the word "incomplete" as synonymous with "deficient."

50. H.B. 1079 and S.B. 971, the bills that ultimately became law, initially provided that the civil penalty would apply to 100 or more "deficient" applications. "Deficient" was defined in the bills as "lacking information required" by the statute containing the voter registration form. Before passage, H.B. 1079 and S.B. 971 were amended, replacing "deficient" with "incomplete," and again defining

24

"incomplete" as "lacking" information statutorily required on the state voter registration form, the only difference being that specific information required by the statute (as opposed to all of the required information) was spelled out in the amendment: applicant's name, residential address, date of birth, declaration of eligibility, or signature. The Law is unconstitutionally vague as to whether or not the statutory term "incomplete" includes "incorrect" or "inaccurate" information, and if so, what is the degree of incorrectness or inaccuracy that would give rise to penalties under the Law. For example, if a registrant has listed his nickname ("Jim") instead of his given name ("James"), it is not clear from the Law whether the application would be deemed "incomplete" because it is missing the applicant's legal name; whether it may be inaccurate but not "incomplete" under the Law's definition; or whether it would be viewed as accurate and complete. Similarly, if a registrant has listed her business address, but not her residential address, it is not clear from the Law whether the application would be deemed incomplete, i.e., missing the proper address necessary for voting eligibility or whether the application may be considered inaccurate but not incomplete.

51. These concerns are heightened in connection with efforts to register college students. For example, it is entirely unclear how and whether the Law would apply to situations where a student fills out her dormitory name as her residence, rather than listing the dormitory's street address; where she overlooks listing her dorm

25

room number on her voter registration form; or where she accidentally inverses the address information by listing her dorm as her mailing address and her campus mailbox as her residence.

52.  In addition, there is no way for a voter registration volunteer to know whether the information provided by the voter is completely correct for each and every voter registered. If the Law extends the definition of "incomplete" to include inaccurate information, it is unfair to penalize an individual or organization that has no way of evaluating the accuracy of the information the registrant has included on the form.  The threat of penalty for the submission of these forms would impose an unconstitutional burden on this constitutionally protected activity.

53.  The Law's inclusion of "declaration of eligibility" in the list of requirements that must be met for an application not to be deemed "incomplete" raises additional issues of vagueness.  Under governing federal law, voters may register to vote by using either the Tennessee voter registration form or the federal voter registration form.  The Tennessee voter registration form contains a separate "declaration of eligibility" requirement, requiring applicants to swear that they plan to remain at their residence for an "undetermined period of time," But there is no similar "declaration of eligibility" on the federal voter registration form.  Thus, the Law could penalize Plaintiffs using the federal form that does not include the Tennessee

26

form's "declaration of eligibility." *See* Tennessee Secretary of State, *Tennessee Mail-In Application for Voter Registration*, https://sos-tn-gov-files.s3.amazonaws.com/forms/ss-3010.pdf.

54. Moreover, the Law could unfairly penalize Plaintiffs using the state form because "undetermined period of time" is vague and does not comport with the legal requirements for the determination of residency for purposes of voter registration under Tennessee law. This could particularly impact high-mobility voters, who tend to be lower income, people of color, young voters, and students. *See* Tennessee Secretary of State, *Guidelines for Determining Residency*, https://sos.tn.gov/products/elections/guidelines-determining-residency.

55. These vagueness issues are exacerbated because the officials responsible for implementing the Law have required third-party voter registration groups, such as Plaintiffs, to deliver *all* "complete" applications to state election officials. Tennessee regulations require that "voter registrations which are complete upon receipt [by the county election commission] or those which have been completed by inquiries on or before the deadline . . . will be considered as persons registered to vote in the election." Tenn. Comp. R. & Regs. 1360-02-11-.08(1). Defendant Goins has construed this regulation as requiring third-party voter registration groups to deliver all "complete" applications. Hearing (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/

27

MediaPlayer.php?view_id=439&clip_id=17123.  This places the burden on Plaintiffs to determine what constitutes a "complete" application, at risk of violating the law if they fail to turn in any "complete" applications but also be in violation of the law if they turn in more than 100 applications later deemed to be "incomplete" within a calendar year.

56.  The Law's inclusion of a provision that a person or organization that collects an application which has only the applicant's name or initials is not required to file the application with the State Election Commission does nothing to cure the vagueness of the Law's reference to "incomplete" applications, and indeed only increases the ambiguity in the Law.  It is unclear, but this provision can be read to mandate by implication that a voter registration worker <u>is</u> required to file all other "incomplete" applications, even though the individual or organization may be penalized under the Law for doing so.

### C. The Restrictions on "Public Communications Regarding Voter Registration Status"

57.  Section 2-19-145(a)(1)'s prohibition against political committees or organizations making "any public communications regarding voter registration status" unless that communication is accompanied by a disclaimer that it is not made in conjunction with or authorized by the Tennessee Secretary of State is both vague and overbroad, and imposes an unconstitutional burden on Plaintiff's First Amendment rights.  By compelling political committees and organizations to

convey a particular message, Section 2-19-145 impermissibly alters the content and effectiveness of Plaintiffs' speech and constitutes compelled speech in violation of the First Amendment.

58.  Under the Law, "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites."  Tenn. Ann. Code § 2-2-145(a)(2).

59.  Plaintiffs expend substantial efforts to educate the public on how to register to vote and how to check their voter registration status, including dissemination of written information through mailings, handouts and otherwise, posting statements on their websites, and making other forms of public communication.

60.  It is unclear from the face of the Law whether the phrase "voter registration status" includes any general discussion of "voter registration" or is limited to the discussion of the "voter registration status" of a particular individual.

61.  The Law is overbroad because it could subject to criminal penalties Plaintiffs or any organization that referred to voter registration status in any way, including in Plaintiffs' public education communications, if they fail to include the required disclaimer.

29

## COUNT I

### 42 U.S.C. § 1983

**Infringement of the Due Process Clause in Violation of the Fourteenth Amendment as to Sections 2-2-142, 2-2-143, and 2-19-145**

62.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

63.  The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits laws that imposes penalties but fail to provide a person of ordinary intelligence fair notice of what is prohibited, or fail to set standards that are sufficient to guard against the arbitrary deprivation of rights. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

64.  The phrase "individuals who are not paid to collect voter registration applications" or "organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications" as used in Sections 2-2-142 and 2-2-143 of the Law are vague and provide Plaintiffs with no reasonable opportunity to determine whether and under what circumstances they are subject to the provisions of Sections 2-2-142 and 2-2-143 of the Law and provide no standards to guard against arbitrary application of the Law.

65.  Violations of Section 2-2-142 of the Law are subject to criminal penalties.

66.  Violations of Section 2-2-143 of the Law are subject to civil penalties.

30

67.   The phrases "incomplete" and "lacking," as used in Section 2-2-143 of the Law are vague and provide Plaintiffs with no reasonable opportunity to determine under what circumstances their conduct would be subject to the provisions of Section 2-2-143 of the Law and provide no standards to guard against arbitrary application of the Law.

68.   The provision that an individual or organization that collects an application "contain[ing] only a name or an initial" is not "required to file the application with the election commission" is vague because it fails to make clear whether it refers only to forms that contain no other information besides a name or initial or whether it mandates the filing of any form that contains any other information in addition to a name or initial, regardless of the completeness of the application in other respects, and provides no guidance as to what constitutes a "complete" application.

69.   Section 2-2-143 of the Law subjects Plaintiffs to the threat of civil penalties for conduct they are compelled to undertake, i.e., the submission of "complete" registration forms, when the forms may be deemed "complete" under Tennessee regulations but "incomplete" under Section 2-2-143, depending on how the vague term is construed.

70.   Section 2-2-143 of the Law subjects Plaintiffs to the threat of civil penalties for conduct which they are compelled to undertake, i.e., the submission of

31

"complete" registration forms, when they have no ability, control and/or opportunity to cure any deficiencies.

71.  Section 2-19-145's prohibition against political committees or organizations making a "public communication regarding voter registration status" unless that communication is accompanied by a disclaimer that it is not made in conjunction with or authorized by the Tennessee Secretary of State violates the Due Process Clause because the phrases "public communication" and "regarding voter registration status" are vague.

72.  In addition, "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites."  The use of "includes" indicates that this list is not exhaustive.  The Law is therefore vague and violates the Due Process Clause.

73.  Violation of Section 2-19-145 may subject Plaintiffs to criminal penalties.

74.  Sections 2-2-142, 2-21-143, and 2-19-145 violate the Due Process Clause of the Fourteenth Amendment.

## COUNT II

### 42 U.S.C. § 1983

### Infringement of First Amendment Rights of Paid Voter Registration Workers and Organizations Using Paid Voter Registration Workers

75.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

32

76.  Sections 2-2-142 and 2-2-143 would subject paid individuals, and potentially individuals that volunteer for organizations that are paid to collect voter registration applications, to burdensome pre-registration, training, and affirmation processes, and make them subject to civil and criminal penalties for violations of these sections.

77.  There is no rational basis for differentiating between paid and unpaid voter registration workers for purposes of the Law.

78.  To the extent that Defendants claim that the differentiation between paid and unpaid individuals is necessary to stop fraud, there is no evidence that paid voter registration workers are more prone to commit fraud than unpaid volunteers. The Law imposes substantial burdens on the First Amendment rights of paid voter registration workers and the organizations, such as Plaintiffs, with whom they are affiliated.

## COUNT III

### 42 U.S.C. § 1983

### Infringement of the Free Speech Clause of the First Amendment as Incorporated in the Fourteenth Amendment as to Section 2-19-145

79.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

80.  By compelling political committees and organizations to add a particular state-imposed message every time they make a public communication about voter registration status, Section 2-19-145 alters the content of their speech and

33

impermissibly compels speech in violation of the First Amendment. *See Nat'l Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).

81.   Such laws compelling speech are subject to strict scrutiny. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015).

82.   A strict scrutiny test applies in particular to infringements on speech in the elections context. *See*, *e.g.*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 461 (2007); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 658 (1990), *rev'd on other grounds, Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

83.   Section 2-19-145 of the Law is not narrowly tailored to serve a compelling governmental interest. On its face, it would require Plaintiffs to add the required disclaimer any time they make any "'public communication' regarding voter registration status," including general statements about voter registration Plaintiffs routinely make as part of Plaintiffs' voter education and voter outreach programs

84.   Section 2-19-145 is a content-based regulation, compelling speech in a manner that violates the Free Speech Clause of the First Amendment.

## COUNT IV

### 42 U.S.C. § 1983

### Infringement of First and Fourteenth Amendments in Connection with the Fundamental Right to Vote

85.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

86.  A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

87.  The burdens imposed by the Law, specifically the threat of imposition of stiff civil penalties for submission of 100 or more "incomplete" registration forms and the threat of criminal penalties on organizations that make a public communication "regarding voter registration status" without the required disclaimer, constitute severe burdens on Plaintiffs' rights which must be narrowly drawn to advance a state interest of compelling importance.

88.  Section 2-2-143 of the Law subjects Plaintiffs to the threat of civil penalties for conduct they are compelled to undertake, i.e., the submission of "complete"

Case 3:19-cv-00365   Document 1   Filed 05/02/19   Page 35 of 40 PageID #: 35

registration forms, when the forms may be deemed "complete" under Tennessee regulations but "incomplete" under Section 2-2-143, depending on how the vague term is construed.

89.   Section 2-2-143 of the Law subjects Plaintiffs to the threat of civil penalties for conduct which they are compelled to undertake, i.e., the submission of "complete" registration forms, when they have no ability, control and/or opportunity to cure any deficiencies.

90.   The challenged provisions of the Law are not narrowly drawn to advance a state interest of compelling importance and therefore violate the First and Fourteenth Amendments.

91.   Even if a lesser standard is applied to the Law, the challenged provisions of the Law do not further an important or substantial governmental interest and therefore violate the First and Fourteenth Amendments.

92.   Tennessee already has a statute criminalizing the submission of fraudulent voter registration applications, a Class D felony. Tenn. Code Ann. § 2-19-107.

93.   Even if a lesser standard is applied to the Law, the Law violates the First and Fourteenth Amendments because it imposes restrictions on the exercise of First Amendment rights in connection with the fundamental right to vote and has not been drawn in a way that is no greater than essential to the furtherance of that interest.

36

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an order:

(i)     Declaring that Sections 2-2-142, 2-2-143, and 2-19-145 violate the Due Process Clause of the Fourteenth Amendment because they are so vague that they do not allow Plaintiffs to determine whether and how they are subject to their provisions;

(ii)    Declaring that Section 2-19-145 violates the First and Fourteenth Amendments because it impermissibly compels speech and constitutes a content-based restriction on free speech that is not necessary to further a compelling state interest;

(iii)   Declaring that Sections 2-2-142 and 2-2-143 violate the First and Fourteenth Amendments because they impose unreasonable burdens on Plaintiffs relating to the election process that are neither narrowly tailored to further a compelling governmental interest nor drawn in a way that is no more than essential to further an important or significant governmental interest;

(iv)    Preliminarily and permanently enjoining Defendants from enforcing the Law, and specifically Sections 2-2-142, 2-2-143, and 2-19-145, and the civil and criminal penalties contained in those provisions;

37

(v)     Retaining jurisdiction to render any and all further orders that this

        Court may deem necessary;

(vi)    Awarding Plaintiffs their reasonable attorney's fees and costs pursuant

        to statute; and

(vii)   Granting Plaintiffs such additional relief that this Court deems just

        and proper.

        Respectfully submitted this 2nd day of May, 2019.


*/s/ Taylor A. Cates*
TAYLOR A. CATES, BPR No. 20006
BURCH, PORTER, & JOHNSON, PLLC
130 N. Court Avenue
Memphis, TN 38103
(901) 524-5165
tacates@bpjlaw.com
wirvine@bpjlaw.com

JON GREENBAUM*
EZRA D. ROSENBERG*
JULIE HOUK*
POOJA CHAUDHURI*
LAWYERS'COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

IRA M. FEINBERG*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017

38

(212) 918-3509
ira.feinberg@hoganlovells.com

ALLISON M. RYAN*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC  20004-1109
(202) 637-5600
allison.holt@hoganlovells.com

YAEL BROMBERG*
BROMBERG LAW LLC
The Andrew Goodman Foundation
10 Mountainview Road
Upper Saddle River, NJ 07458
(202) 995-1808
yaelbromberglaw@gmail.com

DANIEL AYOADE YOON, BPR No. 028798
2004 8th Ave S
Nashville, TN 37204
(615) 541-5141
danielayoadeyoon@gmail.com

*pro hac vice forthcoming

*Attorneys for the Plaintiffs*

# CERTIFICATE OF SERVICE

I do hereby certify on the 2nd day of May, 2019, that a true and correct copy of the foregoing document was transmitted via the Court's ECF/CM system to the following:

Tre Hargett, Secretary of State
Secretary of State's Office
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Mark Goins, Coordinator of Elections
Secretary of State's Office
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Herbert Slatery III, Attorney General
Attorney General's Office
P.O. Box 20207
Nashville, TN 37202

State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Donna Barrett, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Judy Blackburn, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Greg Duckett, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Mike McDonald, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Jimmy Wallace, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Tom Wheeler, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

Kent Younce, Commissioner
State Election Commission
312 Rosa L. Parks Ave., 7th Fl.
Nashville, TN 37243

_/s/ Taylor A. Cates_
Taylor A. Cates

40