**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

TENNESSEE STATE CONFERENCE OF
THE N.A.A.C.P., DEMOCRACY
NASHVILLE-DEMOCRATIC
COMMUNITIES, THE EQUITY ALLIANCE,
and THE ANDREW GOODMAN
FOUNDATION,

          Plaintiffs,

v.

TRE HARGETT, in his official capacity as
Secretary of State of the State of Tennessee,
MARK GOINS, in his official capacity as
Coordinator of Elections for the State of
Tennessee, HERBERT SLATERY III, in his
official capacity as Attorney General of the
State of Tennessee, the STATE ELECTION
COMMISSION, and DONNA BARRETT,
JUDY BLACKBURN, GREG DUCKETT,
MIKE MCDONALD, JIMMY WALLACE,
TOM WHEELER, and KENT YOUNCE, in
their official capacities as members of the State
Election Commission,

          Defendants.

Case No. 3:19-cv-00365
Judge Aleta A. Trauger

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ............................................................................... 1

FACTUAL BACKGROUND ................................................................ 4

      A.    Challenged Provisions of the Law ......................................... 4

      B.    Plaintiffs' Voter Registration Activities ............................... 6

            1.    Tennessee NAACP ..................................................... 7

            2.    Democracy Nashville ................................................. 8

            3.    TEA ............................................................................ 10

            4.    AGF ............................................................................ 12

ARGUMENT ....................................................................................... 13

   I.    LEGAL STANDARDS GOVERNING PRELIMINARY
       INJUNCTIVE RELIEF ............................................................. 13

   II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...... 14

      A.    Plaintiffs Have Standing to Raise Their Claims. ................... 15

      B.    The Law Is Unconstitutionally Vague. .................................. 18

            1.    The Fundamental Thresholds for Applicability of Key Provisions
               of the Law Are Unconstitutionally Vague. .................................. 19

                  a.    "Voter Registration Drive" and "Attempts to Collect" Are
                     Vague. .......................................................................... 19

                  b.    "Paid" and "Unpaid" Are Vague. ..................................... 20

             2.    The Completeness Requirement Is Unconstitutionally Vague. .... 21

             3.    The Compelled Disclosure Requirement Is Vague ...................... 23

      C.    The Law Impermissibly Burdens Plaintiffs' First and Fourteenth
          Amendment Activities. ............................................................. 24

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 2 of 52 PageID #: 321

1.   Subjecting Organizations that Pay Individuals to Register Voters to the Law's Provisions Impermissibly Burdens Plaintiffs' Constitutionally Protected Activities. ........................................... 26

2.   The Preregistration and Training Provisions Impermissibly Burden Plaintiffs' Constitutionally Protected Activity. ........................... 27

3.   The Completeness Requirement Impermissibly Burdens Plaintiffs' Constitutionally Protected Activity ............................................... 29

D.   The Compelled Disclosure Requirement Is Unconstitutional ................. 32

1.   The Compelled Disclosure Requirement Is an Unconstitutional Content-Based Restriction On Speech and Impermissibly Burdens Plaintiffs' Constitutional Activity................................................. 32

2.   The Compelled Disclosure Requirement Is Not Narrowly Tailored Because of its Vagueness and Overbreadth ................................. 36

III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF. .......................................... 37

IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PLAINTIFFS INJUNCTIVE RELIEF. ........................................... 39

CONCLUSION .................................................................................................. 40

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 3 of 52 PageID #: 322

# TABLE OF AUTHORITIES

**CASES**                                                                                                   **Page(s)**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)...................................................................................................24

*Armstrong v. D.C. Pub. Library*,
    154 F. Supp. 2d 67 (D.D.C. 2001) ...........................................................................37

*Belle Maer Harbor v. Charter Twp. of Harrison*,
    170 F.3d 553 (6th Cir. 1999) ....................................................................................19

*Buckley v. Am. Constitutional Law Found.*,
    525 U.S. 182 (1999).............................................................................................15, 27

*Burdick v. Takushi*,
    504 U.S. 428 (1992)...................................................................................................25

*City of Chicago v. Morales*,
    527 U.S. 41 (1999).....................................................................................................18

*Cty. of Suffolk, New York v. First Am. Real Estate Sols.*,
    261 F.3d 179 (2d Cir. 2001)......................................................................................18

*Doe by & through Frazier v. Hommrich*,
    No. 3-16-0799, 2017 WL 1091864 (M.D. Tenn. Mar. 22, 2017)...........................37

*Elrod v. Burns*,
    427 U.S. 347 (1976)...................................................................................................37

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................................18

*Feed The Children, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
    330 F. Supp. 2d 935 (M.D. Tenn. 2002)..................................................................39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
    528 U.S. 167 (2000)...................................................................................................15

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ....................................................................................39

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................................................................................18

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 4 of 52 PageID #: 323

*Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*,
    56 F.3d 710 (6th Cir. 1995) ....................................................................18

*Green Party of Tenn. v. Hargett*,
    767 F.3d 533 (6th Cir. 2014) ..................................................................16

*Jones v. Caruso*,
    569 F.3d 258 (6th Cir. 2009) .................................................................. 39

*League of Women Voters of Fla. v. Browning*,
    575 F. Supp. 2d 1298 (S.D. Fla. 2008) ..................................................31

*League of Women Voters of Fla. v. Cobb*,
    447 F. Supp. 2d 1314 (S.D. Fla. 2006) ........................................ *passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................15

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) ..................................................................37

*Meyer v. Grant*,
    486 U.S. 414 (1988)................................................................................14

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)................................................................................33

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)..........................................................................15, 40

*Nat'l Rifle Ass'n of Am. v. Magaw*,
    132 F.3d 272 (6th Cir. 1997) ..................................................................16

*Nat'l Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)................................................................33, 34, 35

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................14

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ..............................................13, 25, 37, 39

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 5 of 52 PageID #: 324

**TABLE OF AUTHORITIES**
(continued)

*Pennell v. City of San Jose*,
    485 U.S. 1 (1988) .................................................................................................16

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Ohio 2006) ........................................................ *passim*

*Reed v. Town of Gilbert, Ariz.*,
    135 S. Ct. 2218 (2015) ..........................................................................................33

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997) ..............................................................................................18

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) ...................................................................................32, 33, 34

*Roe v. Snyder*,
    240 F. Supp. 3d 697 (E.D. Mich. 2017) .............................................................16

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) ...............................................................................13

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..............................................................................................39

*Springfield Armory, Inc. v. City of Columbus*,
    29 F.3d 250 (6th Cir. 1994) .................................................................................18

*Susan B. Anthony List v. Driehaus*,
    814 F.3d 466 (6th Cir. 2016) ...............................................................................32

*Tenn. Black Voter Project v. Shelby Cty. Election Comm'n*,
    No. CH-18-1476 (Tenn. Ch. 30th Judicial District, Memphis Am. Pet. filed
    Oct. 23, 2018). ......................................................................................................22

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ..............................................................................................33

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l
    Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) ...............................................................................24

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ..............................................................................................17

*Vill. of Schaumburg v. Citizens for a Better Env't,*
    444 U.S. 620 (1980) ............................................................................34

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ................................................................................39

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................13

**REGULATIONS**

Ga. Comp. R. & Regs. 183-1-6-02 ............................................................29

Md. Code Regs. 33.05.03.06 ......................................................................29

**STATUTES**

Del. Code Ann. tit. 15, § 2063 ..................................................................29

La. Stat. Ann. 18:1461.7 ...........................................................................29

N.M. Stat. Ann. 1-4-49(B) ........................................................................29

Nev. Rev. Stat. § 293.5235(13) ..................................................................30

Ohio Rev. Code Ann. § 3599.11 ................................................................30

S.D. Codified Laws § 12-4- 3.2 .................................................................30

Tenn. Code Ann. § 2-2-109(a) ...................................................................31

Tenn. Code Ann. § 2-2-116 .......................................................................22

Tenn. Code Ann. § 2-19-104 .....................................................................26

Tenn. Code Ann. § 2-19-107 ................................................................26, 27

Tenn. Code Ann. § 2-19-109 .....................................................................26

Tenn. Code Ann. § 40-35-11.111(e)(1) ........................................................5

Tex. Elec. Code Ann § 13.042 ...................................................................30

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 7 of 52 PageID #: 326

Wash. Rev. Code § 29A.84.050..................................................................................30

**OTHER AUTHORITIES**

Act of May 9, 2019, Pub. Ch. 250, §§ 2-2-142, 2-2-143, 2-19-145 (2019)
(amendment to SB971 by Senator Dickerson,
http://www.capitol.tn.gov/Bills/111/Amend/SA0345.pdf).....................................6

Ctr. For Info. & Res. On Civic Learning & Engagement, *Final Analysis of State-by-State Youth Voter Turnout Across the Country* (May 20, 2019),
https://civicyouth.org/final-analysis-of-state-by-state-youth-voter-turnout-shows-increases-across-the-country/?cat_id=6.........................................................4

Election Performance Index, *State Profiles: Tennessee*, MIT Election Data and
Science Lab (2018), https://elections.mit.edu/#state-TN.........................................1

Tre Hargett, *Tennessee Must Reform Voter Registration Drive Laws to Preserve Election Integrity*, Tennessean, Mar. 22, 2019, https://www.tennessean.com/story/opinion/2019/03/23/tennessee-must-reform-voter-registration-drive-laws/3225676002/ ...............................................................................................28

Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen.
Assemb., Reg. Sess. (Tenn. 2019) (statement of Mark Goins, Tennessee
Coordinator of Elections),
http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123............21

Merriam Webster Dictionary, *Incomplete Definition*, https://www.merriam-webster.com/dictionary/incomplete ...........................................................................21

Merriam Webster Dictionary, *Lack Definition*, https://www.merriam-webster.com/dictionary/lack ........................................................................................22

Neb. Sec'y of State, *Nebraska Voter Registration Background*,
http://www.sos.ne.gov/elec/voter-registration-bg.html .........................................30

S.B. 971, 111th Gen. Assemb., Reg. Sess. (Tenn. Apr. 25, 2019) (statements of
legislators referring to applications as "deficient"), http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17308.....................................21

Tenn. H. Elections & Campaign Fin. Subcomm. Hearing on H.B. 1079 (Mar. 27,
2019) (statement of Mark Goins, Tennessee Coordinator of Elections),
http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=16954............36

Case 3:19-cv-00365   Document 39-1   Filed 08/16/19   Page 8 of 52 PageID #: 327

Tenn. Sec'y of State, *Election Statistics—Voter Turnout*,
  https://sos.tn.gov/products/elections/election-statistics ...........................................................2

Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 4,
  2014 Election as Submitted by the Counties*, https://bit.ly/31VsbFq...................................2, 4

Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 6,
  2018 Election as Submitted by the Counties*, https://bit.ly/31VsbFq.......................................2

U.S. Census Bureau, *Voting and Registration in the Election of November 2014*,
  https://www.census.gov/data/tables/time-series/demo/voting-and-
  registration/p20-577.html; ................................................................................................4

U.S. Census Bureau, *Voting and Registration in the Election of November 2018*,
  https://www.census.gov/data/tables/time-series/demo/voting-and-
  registration/p20-583.html......................................................................................................4

U.S. Election Assistance Commission, *The Election Administration and Voting
  Survey, 2016 Comprehensive Report,* https://www.eac.gov/
  assets/1/6/2016_EAVS_Comprehensive_Report.pdf ...........................................................31

## INTRODUCTION

Helping people register to vote is a quintessential First Amendment right, vital to facilitating participation in the political process by those individuals who have been historically excluded from the franchise. Plaintiffs are four nonprofit organizations dedicated to expanding the opportunity for all Tennessee citizens, in particular African-Americans and other minorities and students, to exercise their right to vote through, among other means, voter registration. Plaintiffs ask this Court to preliminarily enjoin provisions of a new Tennessee law, Public Chapter 250 (the "Law"), due to take effect on October 1, that places undue and unnecessary burdens on Plaintiffs' voter registration activities and threatens them with severe civil and criminal penalties for violation of the Law. In fact, the looming effective date of the Law has already caused them to cut back on their voter registration activities, immediately and irreparably chilling their constitutional rights and harming the public interest.

Tennessee lags far behind its sister states in terms of voter registration and turnout.[1] Going into the 2018 election cycle, Plaintiffs made a concerted effort to register thousands of eligible Tennessee citizens in communities of color and other underserved populations, including low-income and rural citizens who face the greatest hurdles in registering to vote.[2] Plaintiffs' activities are often the only way to reach such potential voters, many of whom lack access to computers or the technical expertise required to register on the web, or face hardship in traveling to state offices that provide on-site registration opportunities. Thus, Plaintiffs dedicate a

---

[1] Over the past decade, Tennessee has ranked forty-fifth out of fifty states nationally in voter registration, with only 78.52% of all eligible voters registered, and forty-ninth in terms of voter turnout, with only 51.19% of registered voters actually casting votes. *See* Election Performance Index, *State Profiles: Tennessee*, MIT Election Data and Science Lab (2018), https://elections.mit.edu/#state-TN.

[2] Declaration of Gloria Jean Sweet-Love ("Sweet-Love Decl.") ¶¶ 16, 28, Exhibit 1; Declaration of Charlane Oliver ("Oliver Decl.") ¶ 45, Exhibit 3.

1

significant amount of time and resources to meeting, educating, conversing with, and registering community members at local churches, community breakfasts, barbeques, college campus events, homes, expungement clinics, and a variety of other events.

In part, as a result of Plaintiffs' efforts, coupled with heightened voter interest, the 2018 midterm election in Tennessee experienced the highest midterm turnout rate in twenty-four years.[3] Midterm voter engagement in Tennessee increased nearly twenty percentage points overall compared to the 2014 midterm.[4] It was against this backdrop of increased voter registration and voter turnout that the Tennessee legislature enacted the Law. Instead of encouraging Plaintiffs and similar organizations to continue to work to increase voter registration, the state passed a law to suppress and penalize civic engagement groups' good faith efforts to register voters that the state otherwise chooses to ignore.

The Law imposes preregistration requirements, enforced by criminal penalties, that will make it much harder, if not impossible, to register voters on short notice as soon as Plaintiffs learn of a person's need for assistance—often the most effective mode of voter registration. The Law is the only one in the nation that penalizes third-party groups for turning in "incomplete" forms. It imposes exorbitant civil penalties for submitting applications deemed "incomplete" because they are "lacking" specified information, when the legislative history of the Law indicates that "lacking" may encompass not just the absence of information, but inaccurate information that is beyond Plaintiffs' ability to verify, and when the trigger for the penalties is

---

[3] Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 6, 2018 Election as Submitted by the Counties*, https://bit.ly/31VsbFq [hereinafter *Nov. 6, 2018 Turnout Statistics*]; *see generally* Tenn. Sec'y of State, *Election Statistics—Voter Turnout*, https://sos.tn.gov/products/elections/election-statistics.

[4] Tenn. Sec'y of State, *Statistical Analysis of Voter Turnout for the November 4, 2014 Election as Submitted by the Counties*, https://bit.ly/31VsbFq [hereinafter *Nov. 4, 2014 Turnout Statistics*].

only 100 "incomplete" applications compared to the potential thousands gathered by Plaintiffs in past years. The Law imposes these requirements only on individuals who are "paid" to register voters, making it difficult for Plaintiffs to recruit and protect workers, when there is no rational basis for singling out "paid" individuals. The provision moreover makes it difficult for grassroots issue-based campaigns which operate with a mix of paid staff, stipend-volunteers, and/or unpaid volunteers, to protect all those involved in good faith voter registration efforts.

There is more. The Law makes it a crime to communicate about "voter registration status" without including a disclaimer that the communication is not authorized by the state. This vague and overbroad compelled-disclosure requirement interferes with Plaintiffs' exercise of their right to unencumbered free speech. Overall, the Law's pervasive vagueness as to who is covered (what is meant by "paid" registration worker); what conduct is covered (what is meant by "voter registration drive" and "attempt" to register more than 100 voters); and what activity is prohibited (what is meant by "lacking" certain information), renders Plaintiffs subject to stiff civil and criminal penalties without fair notice, in violation of due process.

Whether viewed separately or cumulatively, the Law's burdensome and unnecessary requirements and prohibitions violate Plaintiffs' First and Fourteenth Amendment rights of freedom of association and speech. In the absence of immediate relief, the Law irreparably harms Plaintiffs' core mission of registering historically disenfranchised voters, leaving thousands of otherwise-eligible Tennessee citizens unable to vote. Even before the October 1 effective date, the threat of enforcement has curtailed Plaintiffs' voter registration efforts. With upcoming local elections this year, and national and statewide elections in 2020, Plaintiffs are already hampered in their ability to obtain funding for these efforts. They are left with the choice of either placing a complete moratorium on voter registration or significantly scaling back their efforts because of

the financial risks and exposure to criminal prosecution. For the reasons set out below, the Court should enjoin the challenged portions of the Law pending final resolution on the merits.

## FACTUAL BACKGROUND

The Law was introduced in the General Assembly as House Bill 1079, on February 6, 2019 and signed into law by the Governor on May 2, 2019. The Law was enacted against the backdrop of an increase in voter registrations during the 2018 midterm elections due, in large part, to Plaintiffs' efforts. In the months leading up to the November 2018 general election, The Equity Alliance, for example, in conjunction with their coalition partners, submitted approximately 35,000 applications in Davidson County.[5] In part, as a result of these mobilizing efforts, voter turnout for the 2018 midterm elections greatly increased, with participation increasing from 35.97% in the 2014 midterms to 54.46% in the 2018 midterms.[6] Turnout among African-American voters rose during the same time period from 30.7% to 44.3%.[7] Turnout among youth voters more than doubled, from 9.2% in 2014 to 22.3% in 2018.[8]

### A.     Challenged Provisions of the Law

The Law requires that any individual or organization that intends to "conduct" a "supplemental voter registration drive" and "attempts to collect" voter registration applications of 100 or more people must register in advance with the Coordinator of Elections, § 2-2-142(a)(1)(A); complete training administered by the Coordinator of Elections before

---

[5] Oliver Decl. ¶¶ 45, 61, Ex. 3; Sweet-Love Decl. ¶ 28, Ex. 1; Declaration of Sekou Franklin ("Franklin Decl.") ¶ 17, Exhibit 2.
[6] *Nov. 4, 2014 Turnout Statistics*, *supra* note 4; *Nov. 6, 2018 Turnout Statistics*, *supra* note 3.
[7] U.S. Census Bureau, *Voting and Registration in the Election of November 2014*, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html; U.S. Census Bureau, *Voting and Registration in the Election of November 2018*, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html.
[8] Ctr. For Info. & Res. On Civic Learning & Engagement, *Final Analysis of State-by-State Youth Voter Turnout Across the Country* (May 20, 2019), https://civicyouth.org/final-analysis-of-state-by-state-youth-voter-turnout-shows-increases-across-the-country/?cat_id=6.

4

commencing the drive, § 2-2-142(a)(1)(C); ensure that all individuals who are going to participate in the drive have completed the state's training, § 2-2-142(a)(1)(E); and file a sworn statement attesting that the organization will obey all state laws and procedures regarding the registration of voters, § 2-2-142(a)(1)(D). Section 2-2-142 also provides that all forms collected by the organization must be delivered or mailed within ten days of the date of the drive, § 2-2-142(a)(2), and that the persons or organization must obtain consent prior to retaining for its own use any of the voter information collected on the registration forms, § 2-2-142(b). Any intentional or knowing violation of this section is a Class A misdemeanor, and "each violation constitutes a separate offense." § 2-2-142(f).[9]

The Law imposes substantial civil penalties on persons or organizations that submit more than 100 or more "incomplete" voter registration applications in a calendar year. § 2-2-143(a), (c). It defines an "incomplete" application as one that "lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature," § 2-2-143(b), and provides that the person or organization "is not required to file the application" if it "only contains a name or initial." *Id*. In calculating whether penalties are due, the State Election Commission may combine the number of "incomplete" forms filed in multiple counties, § 2-2-143(c)(3), and may impose a penalty in each county in which a violation occurred, § 2-2-143(c)(4)(A). The penalties range from $150 to $2,000 for an organization submitting between 100 and 500 "incomplete" applications, which can be imposed in each county in which the violation occurred, and range up to $10,000 per county for an organization that submitted more than 500 incomplete applications.

_____

[9] A Class A misdemeanor is punishable by up to 11 months and 29 days in jail, and fines up to $2,500. Tenn. Ann. Code § 40-35-11.111(e)(1). Other Class A misdemeanors include child abuse, assault, theft, and driving under the influence.

The preregistration and completeness requirements described above include identical carve-out exemptions (Sections 2-2-142(g) and 2-2-143(e)), added on the floor of the Tennessee Senate through a late amendment,[10] which provide that these requirements do not apply to individuals who are "not paid to collect voter registration applications," or to organizations that "use only unpaid volunteers to collect" applications.

Finally, the Law requires that any organization that makes a "public communication regarding voter registration status" must include a disclaimer in each such communication that it is "not made in conjunction with or authorized by the secretary of state." § 2-19-145(a)(1). The statute's definition of "public communication" is broad and includes many communications that would not ordinarily be considered "public" at all. It "includes" phone calls, text messages, emails, or websites, in addition to printed materials in newspapers or magazines. § 2-19-145(a)(2). The same requirement applies to voter registration or voter lookup websites. § 2-19-145(c). The required disclaimer must be "clear and conspicuous and prominently placed." § 2-19-145(d). An intentional and knowing violation of this compelled disclosure requirement is a Class A misdemeanor, and each violation is a separate offense. § 2-19-145(e).[11]

### B.  Plaintiffs' Voter Registration Activities

Plaintiffs—the Tennessee State Conference of the N.A.A.C.P ("Tennessee NAACP"), Democracy Nashville-Democratic Communities ("Democracy Nashville"), The Equity Alliance ("TEA"), and The Andrew Goodman Foundation ("AGF")—are four organizations that have been actively engaged in voter registration activities in Tennessee, especially in the African-American communities and on college campuses.

---

[10] *See* Act of May 9, 2019, Pub. Ch. 250, §§ 2-2-142, 2-2-143, 2-19-145 (2019) (amendment to SB971 by Senator Dickerson, *available at* http://www.capitol.tn.gov/Bills/111/Amend/SA0345.pdf).

[11] The Law will be codified in the Tennessee Code as Sections 2-2-142, 2-2-143, and 2-19-145.

6

### 1. Tennessee NAACP

The Tennessee NAACP is a nonpartisan, interracial, nonprofit membership organization headquartered in Jackson. Sweet-Love Decl. ¶¶ 6–7, Ex. 1. For more than 100 years, the Tennessee NAACP has sought to advance the political, educational, social, and economic equality of minority groups. It incorporates voter registration as an integral part of its activities. *Id.* ¶¶ 7–8. The Tennessee NAACP uses several models of voter registration—they canvass door-to-door, set up voter registration tables at events unrelated to voting, and hold voter registration drives targeted towards the African-American community. *Id.* ¶¶ 21–22.

Each branch has a civic engagement chair and other experienced voter registration volunteers, generally unpaid, but sometimes paid by a cash stipend or reimbursements for meals and travel. *Id.* ¶¶ 17–18. Civic engagement chairs are usually veteran members of the organization who have been registering voters for years. *Id.* ¶ 44. The civic engagement chair is also responsible for voter education, outreach, registration, and recruitment of volunteers, a combination of paid and unpaid, to help register voters. *Id.* ¶ 18. Prior to registering voters, volunteers go through training usually led by an experienced voter registration worker or volunteer—at these trainings, volunteers are taught to highlight all the fields on a voter registration form and remind the voter that they must complete the highlighted fields. *Id.* ¶¶ 19–20, 43. Once the form is complete, the Tennessee NAACP provides the applicant the option of turning it in themselves or handing it to one of the volunteers to give to the event coordinator who then delivers it to the appropriate election commission. *Id.* ¶ 44. At the end of a registration event or canvassing, volunteers and workers are instructed to check that all fields on the forms are completed and then deliver all forms to a central location designated by the event coordinator. *Id.* ¶ 43. Before delivering the forms to the local election commission, the event coordinator again reviews all applications to ensure that highlighted fields are completed. *Id.* ¶

7

44. When forms have excessive blanks and incomplete fields, the civic engagement chair makes a discretionary assessment as to whether the form can be turned in. *Id.* If for example, the chair notices that the county portion is missing, they will make a phone call to the voter and confirm the county and ask the voter if they can fill in only that blank portion of the form. *Id.* Usually, they err on the side of caution and turn in most forms because they do not want to prevent a potential applicant from voting. *Id.*

The Tennessee NAACP does not maintain its own voter registration site and directs community members to the Proud Voter Portal that helps visitors check their voter registration status, register to vote, and set election reminders for themselves. *Id.* ¶ 53. The Tennessee NAACP also sends individual texts and larger group texts as well as emails and distributes flyers encouraging individuals to register to vote and get out to the polls on election day. *Id.*

In 2018, the Tennessee NAACP applied and received grant funding to conduct voter registration and other activities such as election protection and get-out-the vote ("GOTV") work. *Id.* ¶¶ 38–39. It used part of this grant funding to provide stipends to voter registration workers ahead of the midterms. *Id.* ¶ 37. The Tennessee NAACP may seek grant funding opportunities in 2019 and had planned to seek funding opportunities in 2020, but is considering significantly scaling back on the number of grant applications, the recruitment of volunteers, and planning voter registration specific events because of concerns about the Law. *Id.* ¶ 38. The Tennessee NAACP currently does not have the funds to monitor, ensure compliance with, and guard against potential fines under the Law. *Id.* ¶¶ 49–50.

### 2.  Democracy Nashville

Democracy Nashville is a nonprofit, non-partisan organization based in Nashville. Franklin Decl. ¶ 5, Ex. 2. It has actively engaged in voter registration and election protection as tools to increase its engagement with the communities it serves, mobilizing voters through its

8

non-partisan, issue-oriented petition drives concerning police accountability, redistricting, and workers' rights. *Id.* ¶¶ 7–8. Democracy Nashville works in coalition with other groups to canvass door-to-door or at community events where they educate potential voters on issues that impact their communities. *Id.* ¶ 9. During these interactions with potential voters, Democracy Nashville volunteers or workers convey the message that voting is important, ask whether the person is registered to vote, and if they are not registered, offer to help them register. *Id.* ¶ 27. Democracy Nashville trains its volunteers and workers before each registration effort. *Id.* Usually, the voter registration volunteer hands the applicant a form and lets the applicant fill it out. *Id.* ¶ 28. Once the form is completed, the volunteer looks it over to see if all the fields have been filled out, and if they have not been filled out, they remind the voter to fill in any fields left blank. *Id.* ¶ 29. Democracy Nashville gives the voter the option of turning the form in or offers to deliver the form to the appropriate election commission. *Id.* ¶ 30. After a canvassing effort, volunteers are instructed to turn in all forms collected to the leader of the effort who then checks the forms one last time before delivering at the election office. *Id.* ¶ 31.

Democracy Nashville shares Facebook posts and sends text messages and emails and publicized radio advertisements to encourage recipients and listeners to register to vote. *Id.* ¶¶ 33–34. For text messages in particular, Democracy Nashville sends an automatic limited-character text message to recipients, and then if the recipient responds, they send a follow-up text to make sure the recipient registered and provide directions on how to register. *Id.* ¶ 33.

Democracy Nashville has applied for and received grants in the past to conduct voter registration and education—they will often use grant funding to pay small cash, meal, or gas stipends to leaders who oversee canvassing events and collect forms, and in some cases, to volunteers who help collect forms and turn them into the leader for delivery. *Id.* ¶¶ 42–43.

9

Democracy Nashville may seek funding opportunities in 2020 for petition drive activities and as a corollary, for voter registration. *Id.* ¶ 62. The organization is considering significantly scaling back on the number of grant applications, the recruitment of volunteers, and planning voter registration specific events in anticipation of the Law. *Id.* Democracy Nashville currently does not have the funds to monitor, ensure compliance with, and guard against potential fines under the Law. *Id.* ¶ 59.

### 3. TEA

TEA is a nonprofit, non-partisan organization launched in January 2017. Oliver Decl. ¶ 5, Ex. 3. Its mission is to advocate for African-Americans and other communities of color so that they have a fair opportunity to realize the American dream. *Id.* TEA pursues that goal, in part, by working to expand the electorate to include these voices. *Id.* ¶ 6. TEA uses several models of voter registration—including registering individuals at their own events concerning issues the community cares about, registering individuals on short notice at events hosted by other community groups, and canvassing door-to-door. *Id.* ¶¶ 16–17. TEA puts out a call for volunteers ahead of an event either by word-of-mouth, emails, or text messages. *Id.* ¶ 18. Usually, an experienced TEA board member or staff will lead voter registration activities. *Id.* Volunteers are invited to a pre-meet prior to the event where they are trained on how to assist others to register. *Id.* ¶¶ 19–20. TEA leaders share a list of dos and don'ts and review each line of the voter registration form with their volunteers to ensure their familiarity with the meaning and significance of each field. *Id.* ¶ 22. Once the volunteer goes out into the community, they answer questions of registration applicants and check whether all requisite fields are filled out. *Id.* ¶ 21. They give the applicant an option of turning the form in to the election commission or offer to deliver the form to the election commission. *Id.* ¶ 24. Volunteers collect the forms from the applicant. *Id.* At the close of an event, volunteers return the forms to the event leaders who

10

then submit the forms to the local election commission. *Id.* ¶¶ 24–25. In the past, if TEA has forms that do not have all requisite fields filled in, they have alerted the election commission and separated fully filled-in forms from partially filled-in forms. *Id.* ¶ 64. TEA, based on advice from local election commissioners, has been informed that they must turn in all applications collected as required by Tennessee law. *Id.* ¶ 26.

TEA frequently communicates with community members through texts, Facebook posts, tweets, radio ads, podcasts, and other means, asking them if they have checked their voter registration status, encouraging them to get-out-the vote, and conveying the message that voter registration is important. *Id.* ¶¶ 18, 36, 70. TEA does not operate its own website but directs potential voters to the Proud Voter Portal to look up registration status or polling place information. *Id.* ¶ 36.

In the past, TEA has applied for and received grant funding to carry out voter education, registration and GOTV work. *Id.* ¶¶ 12–14. TEA often uses the money from grants to pay stipends to its staff or some of its volunteers for registering voters. *Id.* ¶¶ 43–44. Stipends may be in the form of reimbursements for food or travel or cash. *Id.* ¶ 11. TEA plans to seek funding opportunities in 2019 and 2020 for voter mobilization which includes registration work but is considering either placing a complete moratorium on voter registration or significantly scaling back on the number of grant applications, the recruitment of volunteers, and planning voter registration specific events. *Id.* ¶ 15. If TEA continues registering voters, it has considered setting aside funds to hire a compliance officer who will be able to ensure the group's compliance with the Law. *Id.* ¶ 49. TEA currently does not have the funds to monitor, ensure compliance with, and guard against potential fines under the Law. *Id.*

### 4. AGF

AGF is a nonpartisan, nonprofit organization founded in 1966 to honor the memory of Andrew Goodman, a young college student who along with two fellow activists James Chaney and Michael Schwerner went to Mississippi during Freedom Summer in 1964 to register African-Americans to vote. Andrew Goodman and his fellow activists were murdered by Ku Klux Klan members. Declaration of David Goodman ("Goodman Decl.") ¶¶ 5–6, Exhibit 4.  As a way to honor the memory and work of Andrew Goodman during Freedom Summer and his premature death, AGF's mission is to make youth voices and votes a powerful force in democracy, and does so, in part, by promoting civic engagement among college students in twenty-four states (including Tennessee) and the District of Columbia through the Vote Everywhere program. *Id.* ¶ 5. The Vote Everywhere program pays stipends to its volunteer student AGF Ambassadors to conduct and organize civics programming and voter registration drives on college campuses. *Id.* ¶¶ 15–16.

In Tennessee, AGF partners with Tennessee State University ("TSU") and pays a $500 stipend per semester to one or two students as AGF Ambassadors. *Id.* ¶ 36. In the past, Ambassadors have set up voter registration tables during homecoming and other high-impact events, door-to-door canvassing, election watch parties, and other events where students are encouraged to register and vote. *Id.* ¶ 38. AGF Ambassadors train other volunteer students prior to the registration event on the basics of filling out the voter registration application. *Id.* ¶ 39. As part of the training, volunteers are instructed to turn in the forms they collect to the AGF Ambassador who then hand delivers collected applications to the appropriate election office. *Id.*

AGF uses limited-character text messaging and emails to students on campus providing them with information on how to vote, check their voter registration status, and get transportation

to the polls. *Id.* at 32–35. AGF maintains an online voter registration portal with a link to the Secretary of State's website to check voter registration status and/or register to vote. *Id.* ¶ 31.

AGF is considering significantly scaling back its voter registration work on TSU's campus in anticipation of the Law. *Id.* ¶ 11. At present, AGF has a Tennessee-based regional program manager, a salaried employee of the organization, who oversees Tennessee's campus Vote Everywhere programs and manages partnerships with TSU and other universities in the state. *Id.* ¶¶ 19, 42. The Law will chill the regional manager's work to expand AGF's presence on other universities, now wary of the Law's implications for campus administrators who may also be held liable for its students' voter registration efforts. *Id.* ¶¶ 19, 27, 49. In order to promote compliance with the Law, AGF has considered hiring a compliance officer in Tennessee which will require additional budgeting that AGF currently does not have. *Id.* ¶¶ 57–58. AGF must continue to expend resources monitoring developments in the Law and changing its course of action accordingly. *Id.* ¶ 57. Even if AGF does not place a moratorium on all of its voter registration activities, it anticipates scaling back significantly or having to hire additional personnel to allow its Tennessee regional manager to maintain existing and new partnerships with Tennessee universities and recruit AGF Ambassadors to carry out voter registration on their respective campuses. *Id.* ¶¶ 48, 56, 61.

## ARGUMENT

## I. LEGAL STANDARDS GOVERNING PRELIMINARY INJUNCTIVE RELIEF.

A preliminary injunction requires a movant to establish (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008); *see also Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). As the Sixth Circuit instructed, "these are

13

factors to be balanced, not prerequisites to be met." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). In challenges raising constitutional violations, "the likelihood of success on the merits often will be the determinative factor," *Obama for Am.*, 697 F.3d at 436, because "irreparable injury is presumed" where "constitutional rights are threatened or impaired." *Id*. When preliminary injunctive relief is sought against the government, the balance of the equities and the public interest "merge" because both the government and the public benefit from ensuring that state action is lawful. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to prevail on the merits of their claims because the Law impermissibly infringes on core voting, speech, and associational rights in violation of the First and Fourteenth Amendments. Providing voter registration assistance implicates Plaintiffs' right to free speech because, in helping fellow community members register to vote and engaging them in conversations about civic participation, Plaintiffs express a clear political and civic message that registering to vote and voting are essential to meaningful participation in our democracy. To bolster this message, Plaintiffs circulate voter registration applications, have the potential voter fill them out on the spot, collect those applications, and submit them to the local county election commission. Ahead of an election, Plaintiffs also engage in election protection work to help voters at the polls determine whether they are registered to vote or whether they are at the correct polling location. This is quintessential free speech activity. *See Meyer v. Grant*, 486 U.S. 414, 422 (1988) (striking down a law restricting petition-circulating activity because the restriction necessarily burdened the speech associated with such activity). *See* Sweet-Love Decl. ¶¶ 19–20, 43–44, 52, 54 Ex. 1; Franklin Decl. ¶¶ 22, 27–31, 32, Ex. 2; Oliver Decl. ¶¶ 10, 22–26, Ex. 3; Goodman Decl. ¶ 39, Ex. 4.

14

In conducting voter registration activities, Plaintiffs are also exercising their First Amendment right to associate with each other and with potential voters to engage in political conversations about voting and to broaden the public's participation. *See Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 215 (1999) (holding a Colorado statute requiring ballot-initiative petition circulators to register with a political party, wear identification badges, and be at least eighteen years old, violated their right to "associate for political purposes" and freely engage with members of the public, because these restrictions decreased the pool of potential petition circulators and discouraged participation in the process). In other contexts as well, such as where an organization is compelled to make public its membership lists, the Supreme Court has consistently held that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

In this context of the threat to their fundamental rights of speech and association, Plaintiffs address their standing and their substantive challenges to the Law.

### A. Plaintiffs Have Standing to Raise Their Claims.

Standing, for Article III purposes, requires (1) an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and (3) that it is "likely" the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Each of these factors is easily met here. As set forth in their declarations, and summarized above, Plaintiffs have demonstrated that, as a result of the threat of the Law's criminal and civil penalties, absent immediate relief, Plaintiffs will be forced to significantly

curtail or terminate their year-round voter registration activities which are essential to fulfillment of their core missions; that the Law's pervasive vagueness fails to provide them with the requisite notice of what is required and what is prohibited; that the burdens imposed by the Law will make it difficult for them to register voters on short notice; that the Law subjects them to severe civil penalties arbitrarily, out of proportion to the regulated conduct; and that the vague and overbroad compelled disclosure provision will undercut their protected messaging and subject them to criminal penalties.

Plaintiffs' allegations that they would face a substantial risk of civil penalties and potential criminal prosecution were they to continue their voter registration activity gives them standing to challenge the Law. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("likelihood of enforcement . . . is a sufficient threat of actual injury to satisfy Art. III's requirement"). The Sixth Circuit recently made clear that to support standing in a case involving constitutionally-protected political rights, it is sufficient that Plaintiffs have "articulated 'a factual showing of perceptible harm' resulting from the state's regulations." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014); *see also Roe v. Snyder*, 240 F. Supp. 3d 697, 704 (E.D. Mich. 2017) ("[A]n actual arrest or prosecution is not necessary to establish standing when the credible threat of such is sufficiently imminent") (internal quotation omitted).

This is particularly so when, as here, the challenged statute will chill activity protected by the First Amendment. *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 285 (6th Cir. 1997) ("Parties not yet affected by the actual enforcement of the statute are allowed to challenge actions under the First Amendment in order to ensure that an overbroad statute does not act to chill the exercise of free speech and expression, a constitutionally protected right.") (internal quotation omitted.

16

As discussed above, courts have uniformly recognized that voter registration activity implicates the First Amendment free speech rights of those who, like Plaintiffs, expend substantial efforts going out into the community, spreading the message that voting is crucial, and helping fellow community members register to vote. *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006) ("The interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society."); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1333 (S.D. Fla. 2006) (noting that law restricting third-party voter registration activity "reduced the total quantum of speech" because "as part of their voter registration drives, [the plaintiffs] persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions"). As the court explained in *Project Vote*: "the Court is satisfied that participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment. These rights belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls." *Id.* at 700.

Finally, by creating a distinction between "paid" and "unpaid" voter registration workers, the Law infringes not only the rights of Plaintiffs who rely on paid participants to expand their registration efforts, but also the rights of paid voter registration workers. The Law is clear that Plaintiffs can assert the rights of those individuals who receive stipends or expense money and may arguably be considered "paid" workers under the Law, because these workers are volunteer

17

members of Plaintiffs' organizations who enhance Plaintiffs' voter registration work. *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 717–18 (6th Cir. 1995).

### B.  The Law Is Unconstitutionally Vague.

In Counts I and III of the Complaint, Plaintiffs challenge the Law as unconstitutionally vague. The Due Process Clause of the Fourteenth Amendment requires (1) that ordinary people are given notice of the conduct prohibited and (2) that laws are drawn sufficiently narrowly to preclude arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (requiring explicit standards so that policy matters are not left to "policemen, judges, and juries for resolution on an ad hoc and subjective basis"); *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

When, as here, a vague law "interferes with the right of free speech or of association," however, an even "more stringent vagueness test" applies. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–254 (2012) (requiring "rigorous adherence" to the void-for-vagueness doctrine "[w]hen speech is involved"). Moreover, because the Law threatens to chill constitutionally protected activity through the threat of criminal penalties and potentially enormous civil fines, the Due Process Clause demands that the Law's requirements be spelled out clearly in advance, in a manner sufficient to put Plaintiffs on fair notice of what they can and cannot do when conducting voter registration efforts. *See Reno v. ACLU*, 521 U.S. 844, 871–872 (1997); *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (applying a "relatively strict test" for vagueness challenges where criminal penalties at issue); *Cty. of Suffolk, New York v. First Am. Real Estate Sols.*, 261 F.3d 179, 195 (2d Cir. 2001) (due process requires that before "significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited").

18

1. **The Fundamental Thresholds for Applicability of Key Provisions of the Law Are Unconstitutionally Vague.**

The Law is unconstitutionally vague as to what conduct and whose conduct trigger enforceability of the Law. The Law provides that its criminally-enforced preregistration and training provisions apply to any individual or organization that intends to conduct a "supplemental voter registration drive" that "attempts to collect" voter registration applications of 100 or more people. § 2-2-142(a)(1). The Law states that these organizations and individuals must register in advance with the Coordinator of Elections. § 2-2-142(a)(1)(A). Further, the Law carves out from these requirements, and from the civilly enforced completeness requirements of Section 2-2-143, individuals who are "not paid to collect voter registration applications," or organizations that "use only unpaid volunteers to collect" applications. §§ 2-2-142(g) and 2-2-143(e). Each of these phrases is unconstitutionally vague.

a. **"Voter Registration Drive" and "Attempts to Collect" Are Vague.**

Plaintiffs engage in many activities in which voter registration may be a part—ranging from simply setting up a voter registration table on short notice at a community event lasting a few hours, to participating in door-to-door canvassing, to organizing coordinated campaigns lasting several days or weeks. Sweet-Love Decl. ¶¶ 21–27, Ex. 1; Franklin Decl. ¶¶ 9–10, 25–27, Ex. 2; Oliver Decl. ¶¶ 8, 16, 20, Ex. 3; Goodman Decl. ¶¶ 37–38, Ex. 4. Is each such activity a separate "drive"? Is the intent to "attempt[]" to collect applications of 100 or more people formulated for each such "drive" or for the activities of an organization over some period of time? And, if it is the latter, over what period of time? And how far in advance must notice be given?

The answers to these questions may be the difference between being guilty or innocent of a crime. They cannot be left to speculation. *Belle Maer Harbor v. Charter Twp. of Harrison*, 170

19

F.3d 553, 559 (6th Cir. 1999) ("[T]he court cannot conclude that a person of ordinary intelligence could determine from this standard the proscribed conduct which could lead to criminal sanctions").

<strong>b.     "Paid" and "Unpaid" Are Vague.</strong>

The distinction between "paid" and "unpaid" individuals and organizations is central to the enforcement of both the civil and criminal provisions of the Law. As such, the vagueness of these terms proves fatal to the entire Law. *See Project Vote*, 455 F. Supp. 2d at 704 ("[T]he restrictions pose extreme complications because the legislation does not clearly define what it meant by 'compensated' individuals").

Plaintiffs have a number of sources of organizational funding, including grants, individual contributions, and in-kind donations. Some mandate that the money be directed towards voter registration activities, though not for any particular "drive." Others earmark funding for civic engagement generally, which may be used to conduct voter registration drives. It is unclear whether either or both types of funding mean that the organization is being "paid to collect voter registration applications."  *See* Sweet-Love Decl. ¶¶ 32–35, Ex. 1; Franklin Decl. ¶¶ 37–43, 49, 52, Ex. 2; Oliver Decl. ¶¶ 12–15, 37, 42, Ex. 3; Goodman Decl. ¶¶ 9–11, Ex. 4.

Similarly, Plaintiffs have salaried employees who may be involved in supervising voter registration activities as part of their regular duties. Goodman Decl. ¶ 19, Ex. 4. It is unclear whether these workers are "paid" to collect voter registration applications. It is also unclear whether the actions of "paid" or "unpaid" volunteers within the network will be attributed to these salaried employees. And on the level of the individual volunteer, Plaintiffs may provide modest benefits even if they do not pay them on an hourly or daily basis. For example, it is unclear whether a volunteer who participates in a voter registration drive and is given a lunch voucher or receives bus or gas fare is "paid" for purposes of the Law. And it is unclear if  a

20

volunteer who receives a modest stipend for civic engagement, of which voter registration is only one component, is "paid" for purposes of the Law.

Underscoring the Law's uncertainty, members of the General Assembly were themselves unable to define the difference between "paid" and "unpaid" workers. During a Senate Committee hearing, Defendant Goins stated that an organization that receives "grant funding" to register voters would not be exempt, even if all registration activities were conducted by unpaid volunteers. This statement contradicted his earlier statements that organizations using unpaid workers would not be subject to the Law's preregistration and completeness requirements, regardless of whether they received funding to conduct voter registration.[12]

### 2. The Completeness Requirement Is Unconstitutionally Vague.

The Law imposes substantial civil penalties on persons or organizations that submit more than 100 or more "incomplete" voter registration applications in a calendar year. § 2-2-143(a), (c). The Law defines an "incomplete" application as one "lacking the applicant's name, residential address, date of birth, declaration of eligibility, or signature," § 2-2-143(b), and provides that the person or organization "is not required to file the application" if it "only contains a name or initial." *Id*. The words "incomplete" and "lacking" render the provision vague, as it is not clear whether what is prohibited is the complete absence of the required information or information that is not fully accurate. "[D]eficient" is also a synonym for "incomplete." Merriam Webster Dictionary, *Incomplete Definition*, https://www.merriam-webster.com/dictionary/incomplete (last visited Aug. 15, 2019). Dictionary definitions define "lack" as not only "missing," but also include "to be deficient" or "wanting" or "needing."

---

[12] *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123 [hereinafter *Goins Testimony*].

Merriam Webster Dictionary, *Lack Definition*, https://www.merriam-webster.com/ dictionary/lack (last visited Aug. 15, 2019). The result is a great danger that state election authorities will deem voter registration applications that include incorrect information as "incomplete," even though Plaintiffs have no ability to verify whether the information provided by an applicant is incorrect. Those charged with implementing the Law have suggested that "incomplete" should be construed broadly, as including not only missing information, but also incorrect information. For example, Defendant Goins, who will be responsible for implementing the Law, testified before the Senate State and Local Government Committee that he interprets incomplete to mean inaccurate or deficient.[13]

In fact, the Law's legislative history provides strong reason to believe that state authorities may interpret "incomplete" to include "deficient" applications, and to deem applications "lacking" correct information to be "incomplete." As initially drafted, HB1079 would have imposed civil penalties on the submission of "deficient" voter registration forms, with "deficient" defined as "lacking" certain information on the permanent registration record form as outlined in Tennessee Annotated Code § 2-2-116. Before enactment, the bill was amended to substitute the word "incomplete" for "deficient," also adding language that an application would be "incomplete" if "lacking the applicant's name, residential address, date of birth, declaration of eligibility, or signature," which information was essentially that outlined in § 2-2-116. However, even after that, the bill's sponsors continued to refer to the section as covering "deficient" not merely "incomplete" applications.[14]

---

[13] *Id.*
[14] S.B. 971, 111th Gen. Assemb., Reg. Sess. (Tenn. Apr. 25, 2019) (statements of legislators referring to applications as "deficient"), http://tnga.granicus.com/MediaPlayer.php?view _id=414&clip_id=17308.

22

In addition, it is impossible to know how election authorities will enforce the penalty for "incomplete" applications. In 2018, election authorities deemed an application that did not check off "Mr." or "Ms," to be "incomplete."[15] This raises the possibility of multiple scenarios— whether an application that lacks a ZIP Code, or one that uses a nickname ("Mike" or "Liz") as opposed to the voter's legal name ("Michael" or "Elizabeth"), or one that includes the right street address but fails to list an apartment number—would be deemed incomplete. Plaintiffs cannot know. And many of the ways in which an application may be deemed incomplete, such as in the instance of an applicant using their nickname or a different street address, are beyond Plaintiffs' ability to spot or correct. Sweet-Love Decl. ¶ 51, Ex. 1; Goodman Decl. ¶¶ 48–50, Ex. 4; Oliver Decl. at ¶ 66, Ex.3.

The vagueness of the statute, exacerbated by the murky legislative history leading up to its passage, opens the door to a substantial danger of arbitrary and discriminatory enforcement by state authorities charged with interpreting and implementing the statute. Moreover, given the enormity of the penalties for submitting "incomplete" applications, this provision is unconstitutionally vague.

### 3. The Compelled Disclosure Requirement Is Vague.

The Law's compelled disclosure requirement provides that any organization that makes a "public communication regarding voter registration status" must include a disclaimer in each such communication that it is "not made in conjunction with or authorized by the secretary of state." § 2-19-145(a)(1). First, the key term "voter registration status" is vague. Although it would most reasonably be construed as relating to only information about an individual's

---

[15] *Tenn. Black Voter Project v. Shelby Cty. Election Comm'n*, No. CH-18-1476, at *20 (Tenn. Ch. 30th Judicial District, Memphis Am. Pet. filed Oct. 23, 2018), https://drive.google.com/file/d/1Hem1JrAIVl8ZY6-64HgWo8jVQkU42c5W/view.

registration status, the context renders that construction improbable. The Law defines "public communications" extraordinarily broadly, sweeping in newspapers and magazines and mass mailings—none of which would have anything to do with a particular voter's registration status—and indicating that the statute apparently intends to cover *any* communication—both oral and written—that has anything at all to do with voter registration generally. The definition includes many forms of communication—like text messages, phone calls, and emails—that are not "public" at all. And while Section 2-19-145(a)(2) states that a "'public communication' *includes* communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," (emphasis added), this list is not exclusive, and therefore additional unknown conduct may also be covered.

Nor is Section 2-19-145(d)'s requirement that the disclaimer "must be clear and conspicuous and prominently placed" sufficiently definite, as there is no guidance as to what that requirement means or how it might be applied to communications made in newspapers, text messages, websites, and other media. The uncertainty that pervades the compelled disclosure requirement leaves "an impermissible degree of discretion" to state election officials. *See, e.g.*, *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) (finding vague language vested too much discretion in officials determining whether an advertisement is prohibited under regulatory scheme).

### C. The Law Impermissibly Burdens Plaintiffs' First and Fourteenth Amendment Activities.

In Counts II and IV of the Complaint, Plaintiffs claim that the Law imposes impermissible burdens on their voter registration activities, chilling their constitutional right to convey the message that voting is important and, in turn, to associate with community members. This core free speech and free associational activity is, per *Anderson v. Celebrezze*, 460 U.S.

24

780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), protected under both the First and Fourteenth Amendments.

Under the *Anderson–Burdick* framework, courts apply a flexible standard of review, depending on the strength of the state's interests and the extent of the burden imposed on Plaintiffs' rights. The Court must first assess the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. The Court then must weigh that asserted injury against "the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule," examining not only "the legitimacy and strength of each of those interests" but also "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* If the burden imposed by the state regulation is severe, the Court should apply strict scrutiny, under which the state will have to demonstrate that the Law is narrowly drawn to advance a compelling state interest. *Burdick*, 504 U.S. at 434. If the burden is substantial, but not severe, the Court must weigh the relative strength of the state's interests and the burden imposed on Plaintiffs' rights. *Obama for Am.*, 697 F.3d at 429 (6th Cir. 2012).

Here, the burdens imposed by the Law on Plaintiffs' protected activity are severe. They mandate, with the threat of criminal penalties, that Plaintiffs comply with preregistration requirements that create enormous obstacles to their undertaking the sort of ad hoc voter registration conduct that has been a mainstay of their voter registration work; they make it difficult for Plaintiffs to recruit volunteers for this work; and they subject Plaintiffs to potentially bankrupting civil penalties for submitting "incomplete" forms that are neither properly defined nor proportional to any legitimate state interest. However, even if viewed as "substantial" rather than "severe," cumulatively or separately, the burdens of the Law fail any of the applicable

*Anderson-Burdick* tests. *See Project Vote*, 455 F. Supp. 2d at 704 (holding similar preregistration and training requirements "problematic from a constitutional standpoint").

<strong>1. Subjecting Organizations that Pay Individuals to Register Voters to the Law's Provisions Impermissibly Burdens Plaintiffs' Constitutionally Protected Activities.</strong>

The Law's imposition of significant burdens on "paid" voter registration workers alone is an independent basis for striking down these provisions of the Law, as Plaintiffs allege in Count II of the Complaint. This provision of the Law burdens the First Amendment expressive and associational rights of organizations like Plaintiffs and their paid members because it requires them, but not organizations that use only volunteers, to preregister, receive online training, and monitor the number of incomplete forms they submit. And it does so without any justification. To the extent that the state justifies the differential treatment of these two groups as necessary for fraud prevention, the court in *Project Vote* explained, in striking down a similar Ohio law, that the apparent assumption "that compensated voter registration workers are more prone to fraud than volunteers is insufficient as a matter of law to justify legislation . . . that imposes substantial burdens on the First Amendment rights of those compensated workers and the entities with whom they are affiliated." *Id.* at 704–05. "There appears to be no rational basis for the differentiation between compensated and uncompensated voter registration workers." *Id.* at 705. *See also Cobb*, 447 F. Supp. 2d at 1336 (granting preliminary injunction against statute regulating voter registration activity in part because it covered only non-partisan groups, reasoning that "the record in this case does not include any salient difference between non-partisan groups and political parties").

While preventing voter registration fraud is an important state interest, simply invoking that interest does not give the state the right to impose any burdens of any kind, such as those

imposed under the Law.[16] There is no justification for subjecting only "paid" individuals to the Law's principal provisions, and, for that reason alone, Plaintiffs have a likelihood of success on their claims that the challenged provisions of Sections 2-2-142 and 2-2-143 must be enjoined.

### 2. The Preregistration and Training Provisions Impermissibly Burden Plaintiffs' Constitutionally Protected Activity.

The Law's preregistration and training requirements—providing names of the organization's officers to the Coordinator of Elections, signing a sworn oath, ensuring that all volunteers complete training or face a criminal penalty—make it all but impossible for Plaintiffs to engage in ad hoc voter registration activity, one of the most effective means of grassroots voter registration. These provisions reduce the ability of organizations like Plaintiffs to hold ad hoc or impromptu events and meet potential voters where they are. By placing substantial burdens on organizations like Plaintiffs, these provisions of the Law infringe on Plaintiffs' First Amendment expressive and associational rights. In particular, the Law makes it much more difficult for organizations like Plaintiffs to help register voters at ad hoc or last-minute events, of the sort detailed in Plaintiffs' declarations. It also impedes organizations like Plaintiffs from recruiting necessary volunteers on short notice.

---

[16] The state already has "an arsenal of safeguards," *Buckley*, 525 U.S. at 205, to combat voter registration fraud, including laws that make it a crime if a person knowingly makes a false entry on an official registration form or attempts to register when not entitled to do so. *See* Tenn. Code Ann. §§ 2-19-104, 2-19-107, 2-19-109; *Buckley*, 525 U.S. at 204–05 (finding that Colorado could not discourage the public's participation in the petition circulation process by "forcing name identification without sufficient cause" in the name of protecting the "the integrity of the initiative process, specifically, to deter fraud and diminish corruption" given that it has already provided for an "array of process measures" in aid of "efficiency, veracity, or clarity"). More to the point, the Law itself makes it unlawful to compensate anyone registering voters based on the number of voters registered, a more direct method of preventing fraud. § 2-2-142(c). That same provision states that "[n]othing in this section prohibits a person from being paid on an hourly or salaried basis to register voters." *Id.* Plaintiffs are not challenging that provision of the Law and that provision of the Law provides the necessary measures and safeguards to prevent fraud.

27

Weighed against these severe burdens, the preregistration and training provisions are not substantially related, let alone narrowly tailored, to furthering the state's alleged interests—"election integrity," preventing "fraud" and "voter confusion" as claimed by its proponents.[17] Although these may be legitimate state interests, the training and registration requirements at issue here have nothing to do with them. Moreover, Tennessee election law already imposes criminal penalties for voter registration fraud, Tenn. Code Ann. § 2-19-107, which provides a means for protecting the integrity of the election system and controlling against fraud. There is no reason to believe that that criminal prohibition is not up to the task of combatting fraud without imposing additional burdens on legitimate voter registration activity.

Secretary Hargett has given another reason for these requirements: to control administrative costs by reducing the number of registration applications. As Secretary Hargett lamented, for example, "the two largest counties in Tennessee . . . experienced a last-minute surge in voter registration applications," which cost them "tens of thousands of taxpayer dollars" to process.[18] Taken at face value, this can only mean that the purpose of these requirements is to reduce voter registration applications—whether or not they are legitimate applications. That

---

[17] *See* Tre Hargett, *Tennessee Must Reform Voter Registration Drive Laws to Preserve Election Integrity*, Tennessean, Mar. 22, 2019, https://www.tennessean.com/story/opinion/2019/03/23/tennessee-must-reform-voter-registration-drive-laws/3225676002/. These various justifications may have been pretextual. The legislative history strongly suggests that the purpose of the Law was to limit organized voter registration drives that sought to increase African-American registration and to penalize the organizations responsible for the substantial increase in African-American voter registrations in the 2018 elections. For example, Speaker Pro Tempore Bill Dunn explained that the bill was a response to "an attack on the election system last year," and Representative Rick Tillis stated the bill was crafted in response to the "group that did this." Senator Jackson frequently referenced an unnamed "voter activist group" in his remarks on the necessity of the bill, and Election Commissioner Goins remarked the bill's aim is "to go after" groups whose mission is to register voters. *Goins Testimony*, *supra* note 12. Plaintiffs reserve their right to amend their Complaint to assert a claim of intentional discrimination.
[18] Hargett, *supra* note 17.

28

cannot be a constitutional justification.[19] Increased voter engagement is a result to be celebrated, not a problem to be eliminated. The observations of the Florida district court in *Cobb* are equally true here: "[T]he evidence in this case does not demonstrate a significant problem with voter registration applications stemming from third party voter registration organization"; rather "the evidence demonstrates that a large part of that difficulty arose from the general increase in the number of voter registration applications received that year and the lack of preparation on the part of the supervisors of elections offices." *Cobb*, 447 F. Supp. 2d at 1337.

For the reasons above, the state cannot burden Plaintiffs' constitutional rights and Plaintiffs clearly have a likelihood of success on this issue.

### 3. The Completeness Requirement Impermissibly Burdens Plaintiffs' Constitutionally Protected Activity.

The potential for imposition of exorbitant penalties renders the completeness requirement unconstitutional as it infringes on Plaintiffs' First Amendment rights to expression and association. The Law provides for fines of $150 to $2,000 in each county for an organization that submits more than 100 "incomplete" forms statewide, and fines of up to $10,000 in each county for an organization that submits more than 500 "incomplete" applications statewide. § 2-2-143(c). In determining the number of "incomplete" applications, the Law explicitly authorizes the State Election Commission to "combine the number of incomplete forms filed by a person or organization in multiple counties when determining the total number of incomplete forms." § 2-2-143(c)(3). But in assessing fines for that statewide conduct, the Law permits the civil penalties

---

[19] Although Coordinator Goins and others complained about the large number of applications filed on the last day before the registration deadline, *see Goins Testimony*, *supra* note 12, this should have come as no surprise. A "predictable 'crescendo' in activity" is expected "immediately preceding the book closing deadline for both the primary and general elections," that will cause a "predictable spike in the number of applications submitted at that time." *Cobb*, 447 F. Supp. 2d at 1328–29.

29

to be assessed "in each county where the violation occurred." § 2-2-143(c)(4). Moreover, the Law incentivizes local election authorities to find "incomplete" applications with the promise of substantial financial rewards. *See* § 2-2-143(c)(2) (providing that county election commissions shall file notice with the State Election Commission as to "each voter registration application deemed to be incomplete"); § 2-2-143(d) (providing that the receipts of any fine imposed "must be deposited into the general fund of the county"). As noted above, no other state has enacted a law that penalizes third-party groups for turning in "incomplete" forms.[20]

The Law penalizes coordinated voter registration efforts across the state and exposes organizations that launch large-scale efforts to severe financial liability, as organizations like Plaintiffs may operate in all of Tennessee's 95 counties. One of the Law's most problematic features is that it imposes penalties based on the *number* of allegedly incomplete applications, regardless of how low the organization's error rate may be and then multiplies the penalties by the number of counties where there may have been a single incomplete form. If an organization

---

[20] Defendant Goins testified that the section of the law was "unique" to Tennessee. *See Goins Testimony*, *supra* note 12. While states that regulate voter registration drives have some sort of provision that requires third parties to submit to the local board of elections the voter registration application forms they collect within a certain period of time, none penalize the submission of incomplete forms. For example, Delaware requires an "entity conducting a voter registration drive" to "deliver all completed applications, unused applications, voided or damaged applications, completed forms and all excess materials" but no penalty for delivery of incomplete applications. Del. Code Ann. tit. 15, § 2063; *see also* Ga. Comp. R. & Regs. 183-1-6-02 (prohibiting the refusal to transmit "completed" application, but no penalty for transmission of incomplete application); *and see* La. Stat. Ann. 18:1461.7; Md. Code Regs. 33.05.03.06; N.M. Stat. Ann. 1-4-49(B); Ohio Rev. Code Ann. § 3599.11; S.D. Codified Laws § 12-4- 3.2; Tex. Elec. Code Ann § 13.042; Wash. Rev. Code § 29A.84.050 (all requiring third parties to deliver completed applications, but no penalty for delivery of incomplete applications); *and cf.* Neb. Sec'y of State, *Nebraska Voter Registration Background*, http://www.sos.ne.gov/elec/voter-registration-bg.html (optional and unregulated volunteer system with risk of delivery on applicant); Nev. Rev. Stat. § 293.5235(13) (only requirement is that third party's mailing address and signature be provided).

submits more than 10,000 applications in the 2020 elections—not at all an unrealistic number—it could have an "incomplete" rate of as low as 1%—a fraction of the average rate—and still be subject to devastating fines.[21]

There is no justification for this draconian threat. It is neither substantially related to nor narrowly tailored to prevent fraud; rather, it penalizes "incomplete" applications, not those that are fraudulent. And while the State has a valid interest in encouraging organizations engaged in voter registration drives to be careful in submitting voter registration applications, and to try to make them as complete and accurate as possible, organizations like Plaintiffs have the same interest in making their applications complete and accurate. They want the applications they submit to be accepted – that is the whole point of their voter registration efforts. Further, the State has a legal obligation to *accept* incomplete applications and to notify applicants of the application's deficiency, so that the applicant may correct it. *See* Tenn. Code Ann. § 2-2-109(a). As noted above, State cannot justify imposing substantial burdens on voter registration organizations as a way of avoiding its own obligations.

The potentially exorbitant fines go far beyond furthering any legitimate state concern, and will make it impossible for organizations like Plaintiffs to conduct registration drives on any large scale and still hope to remain financially sustainable. In *Cobb*, the court granted a preliminary injunction enjoining the enforcement of a Florida law imposing stiff penalties on the late or non-delivery of registration applications, because of the "strict liability" set by the law

---

[21] Plaintiffs have not had access to data showing "incomplete" rates in Tennessee. However, in 2016, Tennessee reported to the U.S. Election Assistance Commission that 70.07% of new registrations it received were valid, *see* U.S. Election Assistance Comm'n, *The Election Administration and Voting Survey, 2016 Comprehensive Report,* https://www.eac.gov/ assets/1/6/2016_EAVS_Comprehensive_Report.pdf, which means that approximately 30% of the applications received were invalid (although not necessarily "incomplete," depending on how that term is applied).

and the heavy civil fines, which provided for "no exceptions, even for groups or individuals that have exercised all reasonable care." 447 F. Supp. 2d at 1323. Especially for non-profit organizations' "limited budgets," *id.* at 1338, "such steep fines" are overly punitive. *Id.* at 1339. It was only after the Florida legislature, responding to the court's ruling, made "substantial revisions" to the law, "significantly reducing the amount of fines" by fifty percent to eighty percent, and capping the annual fine at $1000, that the court allowed the law to be implemented. *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1305 (S.D. Fla. 2008).

But *Cobb* and *Browning* involved conduct over which the regulated organizations had complete control—when to deliver the applications—and even there the law had to be completely rewritten in order to pass constitutional muster.[22] Here, the Law regulates—and renders organizations like Plaintiffs strictly liable for—conduct over which they have no control: whether the information provided by the applicant is "incomplete." Moreover, there is no cap on the total amount of fines that can aggregate against Plaintiffs that operate all over the state in multiple counties. The state cannot burden Plaintiffs' constitutional rights with this civil penalty regime. Plaintiffs clearly have a likelihood of success on this issue.

### D. The Compelled Disclosure Requirement Is Unconstitutional.

#### 1. The Compelled Disclosure Requirement Is an Unconstitutional Content-Based Restriction On Speech and Impermissibly Burdens Plaintiffs' Constitutional Activity.

In Count III of the Complaint, Plaintiffs challenge the Law's compelled disclosure section as violating their First Amendment right to free speech by requiring them to utter a state-mandated message. But the First Amendment does not permit Tennessee to put words in its citizens' mouths. A long line of Supreme Court decisions have made clear that such compelled

---

[22] The Florida legislature also eliminated the distinction between partisan and non-partisan registration activity that the court also found constitutionally problematic.

speech is a content-based restriction on speech, which is "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling State interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015); *see also Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (laws prohibiting dissemination of false information are content-based restrictions subject to strict scrutiny because they "only govern speech about political candidates during an election"). Thus, in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the Supreme Court held unconstitutional a North Carolina statute that required solicitors of charitable contributions to disclose to all potential donors the percentage of funds they had collected over the past year that were actually turned over to charity. As the Court explained, "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," and is therefore "a content-based regulation of speech." *Id*. at 795. The Court made clear that "the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Id*. at 796–97 (emphasis in original). Similarly, as the Court explained in *Turner Broadcasting Systems, Inc. v. F.C.C*., 512 U.S. 622 (1994), "[g]overnment action . . . that requires the utterance of a particular message favored by the [g]overnment[ ] contravenes this essential [First Amendment] right." *Id.* at 641; *See also*, *e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding unconstitutional statute that required newspaper to print an editorial reply).

The Supreme Court re-emphasized this basic principle just last year, in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"). In *NIFLA*, the Court struck down a California law which required licensed "crisis pregnancy centers," opposed to abortion as a means of resolving an unwanted pregnancy, to disseminate a government-drafted

notice—by posting it in the waiting room, and distributing it to all visitors—advising them of California's public programs that provide free or low-cost family planning services, and the phone numbers of the local social services office. *Id*. at 2369. Unlicensed facilities were required to provide all visitors, and to include on all published materials, a government-drafted notice that the facility was not licensed by the state as a medical facility and had no licensed medical provider on site, and were also required to "conspicuously" post this notice at the entrance to the facility and in a waiting area. *Id*. at 2370. The Court held that these were unconstitutional content-based regulations that compelled the centers to communicate a state-sponsored message—indeed, one that the centers were dedicated to opposing—and "plainly 'alter[ed] the content'" of their speech. *Id*. at 2371 (quoting *Riley*, 487 U.S. at 795).

Here, the Law's mandate that "any public communications regarding voter registration status," or any "voter lookup website" or "voter lookup method," be accompanied by an express state-dictated disclaimer that the communication is "not made in conjunction with or authorized by the secretary of state," § 2-19-145, is a classic example of unconstitutional compelled speech. Because the compelled disclosure requirement "compels" covered organizations to "speak a particular message" in line with "a government-drafted script" that alters how the organization's message would have otherwise been expressed, it is "presumptively unconstitutional" and must satisfy strict scrutiny. *See NIFLA*, 138 S. Ct. at 2371.

Plaintiffs' communications regarding voter registration status constitute core First Amendment expression. Plaintiffs use these communications to interact with voters, to encourage them to register and vote, and to spread the message that voter registration and voting are integral to the functioning of a democratic society and essential to protecting their common interests. Sweet-Love Decl. ¶¶ 53–54, Ex. 1; Franklin Decl. ¶¶ 56–57, 60, Ex. 2; Oliver Decl. ¶¶

34

69–70, Ex. 3; Goodman Decl. ¶¶ 29, 31–35, Ex. 4. There is no question that speech of this kind is entitled to the highest constitutional protection. See *Riley*, 487 U.S. at 795–98 (rejecting argument that charitable solicitations were "commercial speech" and subject to relaxed standard); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (same); *Cobb*, 447 F. Supp. 2d at 1332–33 (restrictions on voter registration activities "reduced the quantum of political speech and association"). But the compelled disclosure requirement would require Plaintiffs to alter their speech—in text messages, phone communications, published fliers, on websites, signs, and every other media platform—to add this State-mandated disclaimer, and to do so in a way that ensures that the State's message is "prominently" displayed. § 2-19-145(d). Not only would that disclaimer change Plaintiffs' message, but it would also impermissibly undermine that message (like the state-mandated message in *NIFLA*) and call its truth and accuracy into doubt. The recipient of a text message that says, for example, "Please make sure that you're registered to vote this November, so the General Assembly will hear your voice. The deadline to do so is coming up in the next few weeks!" may naturally question the truth and accuracy of that message if, without context, the message continues: "THIS MESSAGE HAS NOT BEEN MADE IN CONJUNCTION WITH OR AUTHORIZED BY THE SECRETARY OF STATE."

Moreover, the compelled disclosure requirement will also impose substantial and unnecessary compliance costs on Plaintiffs, who could be forced to abandon entirely some forms of communication that have been particularly effective, including text messages. Plaintiffs will now have to reprint all of their materials to include the State's disclaimer and will have to overhaul their websites and other electronic communication interfaces. Accommodating the State-mandated message—15 words spanning 85 characters—will substantially limit Plaintiffs'

35

use of text messages, forcing Plaintiffs to abbreviate or break them apart, or entirely abandon them. The same is true of all electronic and social media that have character-number limitations. Oliver Decl. ¶¶ 67–71, Ex. 3; Sweet-Love Decl. ¶ 53, Ex. 1; Franklin Decl. ¶¶ 56–61; Goodman Decl. ¶¶ 51–55, Ex. 4.

This burden on Plaintiffs' core speech rights can be justified, if at all, only if the State were acting in furtherance of a compelling state interest, and even then only if there were no alternative means to protect that interest. *NIFLA*, 138 S. Ct. at 2371. Defendants cannot come close to making that showing. It is unclear what interest the compelled disclosure requirement is intended to promote. In his testimony before the House Elections & Campaign Finance Subcommittee in March 2019, Coordinator Goins cited two incidents of possible voter confusion that supposedly justified the mandated disclosure,[23] but neither of the two minor incidents he cited amounts to a compelling state interest and the remote possibility of voter confusion does not justify the extraordinarily broad disclaimer requirement enacted by the Law.

### 2. The Compelled Disclosure Requirement Is Not Narrowly Tailored Because of its Vagueness and Overbreadth.

Plaintiffs have demonstrated above the vagueness in this provision, leading to uncertainty in application, exacerbated by the threat of criminal prosecution. That uncertainty is compounded by the overbreadth of the compelled disclosure requirement. The requirement is overbroad because the *only* limitation on the scope of covered "public communications" is that they be "regarding voter registration status." This could apply to a wide variety of communications about voter registration that have nothing to do with any possible concern with voter confusion, actual or imagined, even a communication simply urging people to register to vote. The compelled

---

[23] Tenn. H. Elections & Campaign Fin. Subcomm. Hearing on H.B. 1079 (Mar. 27, 2019), (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=16954.

disclosure requirement's uncertain meaning and sweeping breadth is especially troubling for Plaintiffs, who engage in myriad communications that might be viewed as "regarding voter registration." Indeed, if read broadly, the compelled disclosure requirement could encompass almost every communication that Plaintiffs make as part of their voter registration activities.

Because of this vagueness and overbreadth, the compelled disclosure requirement is not narrowly tailored. *See Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 82 (D.D.C. 2001) ("amorphous" regulation not narrowly tailored because it "provides no articulable standard to guide either government officials or employees who must enforce the regulation, or the public who must conform its conduct to the barring regulation's vague requirements"); *see also McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012).

## III. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Absent preliminary relief, Plaintiffs will suffer severe and irreparable harm. To start, Plaintiffs' harm is irreparable as a matter of law. A fundamental right once lost, even temporarily, cannot be compensated with money damages or otherwise remedied at the end of litigation. Thus, when "constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am.*, 697 F.3d at 436; *see also Doe by & through Frazier v. Hommrich,* No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017) ("[T]he loss of constitutional rights is presumed to constitute irreparable harm"). This is equally true of Plaintiffs' First Amendment rights of speech and association. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Moreover, Plaintiffs have presented substantial evidence that demonstrates their irreparable injury in real terms. Through voter registration drives, door-to-door efforts, and election-awareness campaigns, Plaintiffs play an important role in helping Tennessee citizens, especially minorities, participate in the democratic process. Plaintiffs' efforts help numerous potential voters to register to vote when they otherwise would be unable to do so because of limited computer and internet access, restricted mobility, and other critical barriers. Under the Law, however, Plaintiffs now face the imminent threat of criminal and civil penalties that will cause irremediable harm to their voter registration efforts. *See* Sweet-Love Decl. ¶¶ 41–56, Ex. 1; Franklin Decl. ¶¶ 44–63, Ex. 2; Oliver Decl. ¶¶ 47–75, Ex. 3; Goodman Decl. ¶¶ 43–61, Ex. 4.

The burdens imposed by these provisions are immense and have already had a chilling effect on Plaintiffs' voter registration activities. Plaintiffs admit that they do not have the funds to pay potential fines and that to cover the fines, their individual members or officers would have to pay out of their personal pockets or raise money through fundraisers. Franklin Decl. ¶¶ 45, 48–49, Ex. 2; Oliver Decl. ¶ 49, Ex. 3; Goodman Decl. ¶ 58, Ex. 4; Sweet-Love Decl. ¶ 49, Ex. 1. Plaintiff Tennessee NAACP, which has multiple branches and youth councils all over the state, is concerned that incomplete applications turned in by one local branch would devastate the statewide chapter. Sweet-Love Decl. ¶ 49, Ex. 1. Plaintiff Tennessee NAACP also registers voters in multiple counties and has raised concerns about the aggregation of fines. *Id.* TEA, Democracy Nashville, and AGF have considered setting aside funds normally used for programming to hire a compliance officer. Oliver Decl. ¶ 49, Ex. 3; Franklin Decl. ¶ 49, Ex. 2; Goodman Decl. ¶ 58, Ex. 4.

If the Law is permitted to take effect, Plaintiffs will be forced to reduce or even end critical aspects of their voter registration efforts. The result will be that many otherwise-eligible

38

voters will be denied critical access to the resources Plaintiffs can provide, and will remain disenfranchised. Last-minute registration efforts will not occur because of the Law's advance notice requirements. Heading into the 2020 election cycle, Plaintiffs face great legal uncertainty and risk, as they make key resource-allocation and staffing decisions, including whether to expand or contract their efforts across the state, whether to recruit "unpaid" volunteers or "paid" staff, whether to apply for grant funding, and whether and how to modify or limit their public communications. The possibility of criminal or civil enforcement action that could expose their staff and volunteers to criminal conviction and wipe out Plaintiffs' modest operating budgets has already caused Plaintiffs to delay or forgo entirely certain voter registration efforts. Franklin Decl. ¶¶ 60–63, Ex. 2; Oliver Decl. ¶¶ 70–74, Ex. 3; Goodman Decl. ¶ 67, Ex. 4; Sweet-Love Decl. ¶ 49, Ex. 1.

## IV. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PLAINTIFFS INJUNCTIVE RELIEF.

The State is "in no way harmed by issuance of a preliminary injunction which prevents the State from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "If anything, the system is improved by such an injunction." *Id.* Because the provisions of Tennessee law challenged here are likely to violate Plaintiffs' core speech, associational, and voting rights absent this Court's intervention, "no substantial harm to others can be said to inhere in [their] enjoinment," as "it is always in the public interest to prevent violation of a party's constitutional rights." *Feed The Children, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 330 F. Supp. 2d 935, 942 (M.D. Tenn. 2002) (internal quotations omitted); *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009).

The rights Plaintiffs seek to vindicate here are among those most fundamental constitutional guarantees. The right to vote is a "'precious' and 'fundamental' right" that

precedes all others in a democratic republic. *See Obama for Am.*, 697 F.3d at 428. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The same is true of the speech and association rights protected by the First Amendment. "The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotations omitted). And "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id*. Similarly, it is "beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *See Alabama ex rel. Patterson*, 357 U.S. at 460.

Plaintiffs are entitled to the full and fair exercise of these constitutional guarantees. Yet the Law threatens to deprive Plaintiffs of these rights without any showing that a countervailing state interest justifies that curtailment. And the public at large will suffer harm alongside Plaintiffs, if Defendants are not enjoined from doing so. These factors tip decisively in favor of granting injunctive relief now to prevent the Law's unconstitutional restrictions on voter registration activity from "chill[ing]" core rights "through an unusual and burdensome maze of laws and penalties relating to a major step in the voting process." *Project Vote*, 455 F. Supp. 2d at 708 (granting preliminary injunction where state defendants had "failed to show how preventing enforcement of the regulations at this juncture of the proceedings would cause harm to them or to the citizens of Ohio").

## CONCLUSION

For the reasons explained above, Plaintiffs' motion for a preliminary injunction should be granted, and Defendants should be enjoined from enforcing the challenged provisions of the Law pending a final ruling by the Court on the merits of Plaintiffs' claims.

40

Dated:  August 16, 2019

Respectfully submitted,

/s/ Taylor A. Cates
TAYLOR A. CATES, BPR No. 20006
WILLIAM D. IRVINE JR., BPR No. 35193
BURCH, PORTER, & JOHNSON, PLLC
130 N. Court Avenue
Memphis, TN 38103
(901) 524-5165
tacates@bpjlaw.com
wirvine@bpjlaw.com

JON GREENBAUM*
EZRA D. ROSENBERG*
JULIE HOUK*
POOJA CHAUDHURI*
LAWYERS'COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

IRA M. FEINBERG*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3509
ira.feinberg@hoganlovells.com

ALLISON M. RYAN*
CAROLYN A. DELONE**
KYLE M. DRUDING**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-5600
allison.holt@hoganlovells.com
carrie.delone@hoganlovells.com
kyle.druding@hoganlovells.com

YAEL BROMBERG*
BROMBERG LAW LLC
The Andrew Goodman Foundation
10 Mountainview Road

41

Upper Saddle River, NJ 07458
(201) 995-1808
yaelbromberglaw@gmail.com

DANIEL AYOADE YOON, BPR No.
028798
2004 8th Ave S
Nashville, TN 37204
(615) 541-5141
danielayoadeyoon@gmail.com

*admitted pro hac vice
**to be admitted pro hac vice

*Counsel for the Tennessee State Conference
of the N.A.A.C.P., Democracy Nashville–
Democratic Communities, the Equity
Alliance, and the Andrew Goodman
Foundation*

42

## CERTIFICATE OF SERVICE

The undersigned herby certifies that a copy of the foregoing document has been served via the Court's CM/ECF electronic case filing system to:

ALEXANDER S. RIEGER
Tennessee Attorney General's Office
Assistant Attorney General
Public Interest Division
War Memorial Building, 3rd Floor
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
alex.rieger@ag.tn.gov

KELLEY L. GROOVER
Tennessee Attorney General's Office
Assistant Attorney General
Public Interest Division
War Memorial Building, 3rd Floor
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
kelley.groover@ag.tn.gov

16th day of August, 2019.

*/s/ Taylor A. Cates*
TAYLOR A. CATES

43