IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., DEMOCRACY NASHVILLE-DEMOCRATIC COMMUNITIES, THE EQUITY ALLIANCE, and ANDREW GOODMAN FOUNDATION,** | ) ) ) ) ) ) | |
| | ) | **Case No. 3:19-CV-00365** |
| **Plaintiffs,** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, HERBERT SLATERY III, in his official Capacity as Attorney General of the State of Tennessee, the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, GREG DUCKETT, MIKE MCDONALD, JIMMY WALLACE, TOM WHEELER, and KENT YOUNCE, in their official capacities as members of the State Election Commission,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

**RESPONSE IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION**

The Attorney General, on behalf of the above-captioned defendants, in their official capacities only, responds in opposition to Plaintiffs' Motion for Preliminary Injunction. Because Plaintiffs cannot demonstrate a likelihood of success on the merits or irreparable harm, an injunction would constitute irreparable harm to Tennessee, and the public interest is better served

1

with a voter registration process that requires third-party voter registration drives to complete training, timely mail collected voter registration forms, disclose that they are not affiliated with the State of Tennessee, and not submit incomplete voter registration forms, this Court should decline to order the extraordinary relief of a preliminary injunction enjoining the implementation of Public Chapter 250 (the "Act")—particularly where the law is not presently in effect and there is no indication of whether the speculative harms Plaintiffs envisage will come to pass.

## BACKGROUND

On May 2, 2019, Governor Bill Lee signed the Act into law. As pertinent to the allegations of the Complaint, the Act provides for the creation of three new sections in Title 2 of the Tennessee Code.

The first new section, Tenn. Code Ann. § 2-2-142, provides:

> (a) A person or organization who has not been designated by the county election commission under § 2-2-111 and who conducts a supplemental voter registration drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people must comply with the following conditions:
>
> (1) Prior to conducting a voter registration drive, the person or agent of an organization shall:
>
> (A) Provide the coordinator of elections with the name, address, and contact phone number of the person conducting the voter registration drive or the names, addresses, and contact phone numbers of the officers of the organization conducting the voter registration drive;
>
> (B) Provide the names of the county or counties in which the voter registration drives will be held;
>
> (C) Complete training, which is administered by the coordinator of elections, on the laws and procedures governing the voter registration process;

(D) File a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters; and

(E) Ensure that individuals, whether volunteer or paid, who conduct voter registration drives for an organization have completed the training administered by the coordinator of elections; and

(2) The person or organization shall deliver or mail completed voter registration forms within ten (10) days of the date of the voter registration drive; provided, that if the date of the voter registration drive is within ten (10) days of the voter registration deadline, the completed forms must be delivered or mailed no later than the voter registration deadline.

(b) Any person or organization conducting a voter registration drive is prohibited from copying, photographing, or in any way retaining the voter information and data collected on the voter registration application, unless the applicant consents. However, the social security number provided on the voter registration application is confidential and must not be retained by any person other than election officials in their official capacity.

(c) No person or organization shall employ or compensate any person, nor shall any person receive any wages or compensation for registering voters based on the number of voters registered. Nothing in this section prohibits a person from being paid on an hourly or salaried basis to register voters.

(d) No person or organization shall establish quotas or a minimum number of completed voter registration forms to be collected by individuals conducting a voter registration drive.

(e) The coordinator of elections may adopt policies or procedures to effectuate the provisions of this section, including, but not limited to, a form on which the required information may be provided and certified by interested parties. The form adopted by the coordinator of elections may be provided electronically. The coordinator of elections shall, at a minimum, offer the training online and shall not charge a fee for the training.

(f) Any person who intentionally or knowingly violates any provision of this section commits a Class A misdemeanor and each violation constitutes a separate offense.

Case 3:19-cv-00365   Document 41   Filed 08/30/19   Page 3 of 27 PageID #: 497

(g) This section does not apply to individuals who are not paid to collect voter registration applications or to organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications.

Pub. Ch. 250, § 1.

The second new section, Tenn. Code Ann. § 2-2-143, provides:

(a) If any person or organization conducts voter registration drives under § 2-2-142 and, within a calendar year, files one hundred (100) or more incomplete voter registration applications with one (1) or more county election commissions, the person or organization is subject to a civil penalty under the procedures of this section.

(b) For purposes of this section, "incomplete voter registration application" means any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature. A person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission.

(c)(1) The state election commission may impose a civil penalty for a violation of this section as provided in this subsection (c).

(2) The county election commission shall file notice with the state election commission, along with a copy of each voter registration application deemed to be incomplete and identifying information about the person or organization that filed the incomplete applications.

(3) The state election commission shall review each voter registration application presented by the county election commission and shall make a finding on the number of incomplete forms filed. Based on the finding, the state election commission may impose civil penalties for Class 1 and Class 2 offenses. The state election commission may combine the number of incomplete forms filed by a person or organization in multiple counties when determining the total number of incomplete forms filed.

(4) As used in this section

(A) "Class 1 offense" means the filing of one hundred (100) to five hundred (500) incomplete voter registration applications. A Class 1 offense is punishable by a civil penalty of one hundred fifty dollars

4

($150), up to a maximum of two thousand dollars ($2,000), in each county where the violation occurred; and

(B) "Class 2 offense" means the filing of more than five hundred (500) incomplete voter registration applications. A Class 2 offense is punishable by a civil penalty of not more than ten thousand dollars ($10,000) in each county where the violation occurred.

(5) For any offense, the state election commission shall send, by return mail, receipt requested, an assessment letter to the person or organization in a form sufficient to advise the person or organization of the factual basis of the violation, the maximum penalty and the date a response to the letter must be filed. Failure to timely claim an assessment letter sent by return mail, receipt requested, constitutes acceptance of the assessment letter.

(6) To request a waiver, reduction, or to in any way contest a penalty imposed by the state election commission, a person or organization shall file a petition with the state election commission. Such petition may be considered as a contested case proceeding under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5.

(d) Penalties imposed under this section by the state election commission must be deposited into the general fund of the county or counties in which the violation occurred. When there are multiple counties involved, the penalty money must be divided pro rata based on the number of incomplete registration applications submitted in each county.

(e) This section does not apply to individuals who are not paid to collect voter registration applications or to organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications.

(f) The state election commission may promulgate rules and procedures to implement the provisions of this section.

Pub. Ch. 250, § 2.

The third new section, Tenn. Code Ann. § 2-19-145, provides as follows:

(a)(1) A public communication regarding voter registration status made by a political committee or organization must display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state.

5

(2) As used in this subsection (a), "public communication" includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites.

(b)(1) A person or organization that establishes a website for voter registration purposes must display on such website a disclaimer that the voter registration is not made in conjunction with or authorized by the secretary of state.

(2) A person or organization that establishes a voter registration website and captures or collects the voter's information or data must disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected.

(3) Voter registration includes any method by which a voter may attempt to register to vote or change information on an existing voter registration.

(c)(1) A person or organization that establishes a voter lookup website must display on such website a disclaimer that the voter lookup is not made in conjunction with or authorized by the secretary of state.

(2) A person or organization that establishes a voter lookup website and captures or collects the voter's information or data must disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected.

(3) Voter lookup includes any method by which a voter may check the voter's registration status or polling location.

(d) The disclaimer must be clear and conspicuous and prominently placed. A disclaimer is not clear and conspicuous if it is difficult to read or hear, or if its placement can be easily overlooked.

(e) Any person who intentionally and knowingly violates any provision of this section commits a Class A misdemeanor and each violation constitutes a separate offense.

(f) This section does not apply to a county election commission website.

Pub. Ch. 250, § 6.

Each of these new sections will take effect on October 1, 2019.  Pub. Ch. 250, § 9.

On May 2, 2019, Plaintiffs filed their Complaint seeking a declaration that provisions of the Act violate the First and Fourteenth Amendments and an injunction prohibiting enforcement of the Act.  (DE 1, p. 37-38).

## ARGUMENT

Plaintiffs request that the Court issue a preliminary injunction prohibiting the State from implementing the Act. When evaluating a request for preliminary injunction, a court must evaluate four factors:

> (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998) (quoting *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)); *see McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012); *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995).

These four considerations are "factors to be balanced and not prerequisites that must be satisfied."  *McNeilly*, 684 F.3d at 615 (quoting *Am. Imaging Servs., Inc. v. Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992)).  Because a preliminary injunction is an extraordinary remedy, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion."  *McNeilly*, 684 F.3d at 615 (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).  The moving party bears the burden of justifying such extraordinary relief, "including showing irreparable harm and likelihood

7

of success." *McNeilly*, 684 F.3d at 615 (citing *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 441 (1974)).

Plaintiffs cannot meet this burden and thus are not entitled to injunctive relief.

## I. PLAINTIFFS CANNOT SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

The first factor for injunctive relief requires that the Court evaluate the merits of the movant's legal claims.

### A. The Complaint is Not Justiciable.

#### 1. Plaintiffs Lack Standing

Plaintiffs are not entitled to preliminary relief because—as discussed in Defendants' Motion to Dismiss—they do not have standing to bring this claim. Standing requires (1) an injury in fact that is more than "conjectural" or "hypothetical;" (2) a causal connection between the injury and the complained-of conduct; and (3) the injury must be redressable. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102-04 (1998). Plaintiffs bear the burden of demonstrating standing and must plead each of these components with specificity. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

Plaintiffs' alleged injury is one that is hypothetical in nature, not one that is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Plaintiffs whose fears are "imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 (1971).

The Act about which Plaintiffs complain has yet to take effect. No one has ever been prosecuted or penalized under the Act and will not be for some time. The State Coordinator of Elections and State Election Commission have not promulgated rules or procedures to determine

8

how they will exercise their discretion to enforce the provisions of the Act.[1] The Coordinator of Elections and State Election Commission also represent that they do not intend to penalize organizations or individuals under the Law prior to the promulgation of said rules and procedures.[2] The rulemaking process will take at least five months to complete. [3]

In detail, Tenn. Code Ann. § 2-2-142 makes it a Class A misdemeanor to "intentionally or knowingly" violate the provisions of the section. Plaintiffs do not allege an intent to knowingly or intentionally violate §142's provisions. Instead, Plaintiffs take the (seemingly contradictory) position that §142's training requirement would be "overly burdensome," despite Plaintiffs' admissions that they *already* train their volunteers. *See*, *e.g,* DE 39-2 at ¶ 19, 29, 41, DE 39-3 at ¶ 26-27, DE 39-4 at ¶ 21, DE 39-4 at ¶ 39. If Plaintiffs already train their volunteers, then requiring them to do so in the manner prescribed by the State cannot be overly burdensome. Accordingly, Plaintiffs have not alleged an intent "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" as standing requires. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).

Plaintiffs speculate needlessly about all of the hypothetical obstacles a potential volunteer might face in trying to complete this training. For example, Plaintiff NAACP fears "it will be cumbersome for [volunteers] to find transportation to a local election commission" for the training while ignoring the plain language of §142, which *mandates* that the training be available online. DE 39-2 at ¶ 42. The State Elections Coordinator is vested with the authority to create rules and

---

[1]      *See* Goins Decl. (Ex. 1 at ¶ 7), Barret Decl. (Ex. 2 at ¶ 8), Blackburn Decl. (Ex. 3 at ¶ 8), Duckett Decl. (Ex. 4 at ¶ 8), McDonald Decl. (Ex. 5 at ¶ 8), Wallace Decl. (Ex. 6 at ¶ 8), Wheeler Decl. (Ex. 7 at ¶ 8), and Younce Decl. (Ex. 8 at ¶ 8).
[2]      *See* Ex. 1 at ¶ 10, Exs. 2-8 at ¶ 11.
[3]      *See* Ex. 1 at ¶ 9, Exs. 2-8 at ¶ 10.

9

procedures to determine exactly what the training will entail. These rules and procedures have not yet been promulgated. Ex. 1 at ¶ 7. Yet, Plaintiffs, without any factual basis, assume the worst and ask this Court to enjoin the training requirement based solely on their fears about what it *might* require. For example, Plaintiffs speculate that online training will be difficult for elderly or rural volunteers and apparently assume that there will be no procedure or alternative for drives where internet connectivity is an issue. But hypotheticals and speculations that have not yet come to pass are insufficient for injunctive relief.

Tenn. Code Ann. § 2-2-143 establishes the possibility that the State Election Commission "may impose a civil penalty" upon an organization, if that organization files more than 100 incomplete voter registration forms. Tenn. Code Ann. § 2-2-143(c). Plaintiffs have provided some statistics about the number of registration forms they have collected in the past (*e.g.,* the NAACP's *largest* drive in 2018 collected only 134 forms DE 39-1 at ¶ 26, AGF's TSU campus team collected approximately 300 forms in the 2018-2019 school year DE 39-5 at ¶ 40) but have submitted no evidence that any of them have ever filed more than 100 incomplete forms or demonstrated that they inevitably will do so in the future. On the contrary, Plaintiffs have described the efforts they take to ensure each form is complete. *See e.g.* DE 39-2 at ¶ 43, 44, DE 39-3 at ¶ 29, DE 39-4 at ¶ 21. Plaintiffs have thus not demonstrated that they intend to violate or are likely to unintentionally violate this provision. Accordingly, their injury with regard to §143 is not sufficiently imminent for the purposes of standing.

Last, Tenn. Code Ann. § 2-19-145 requires a brief, factual disclaimer when individuals or organizations communicate with potential voters about their registration status or host an online voter registration look-up website. Plaintiff AGF is the only plaintiff that alleges it operates a voter look-up page. DE 39-5 at ¶ 30. If a user uses this tool to check to see whether he/she is

10

already registered, the page suggests the user check directly with the Secretary of State's website if they are a recent registrant.[4]  However, Plaintiffs claim that a disclaimer stating they are not affiliated with the Secretary of State would cause users to "question the truth and accuracy" of their message.  DE 39-1 at 35.  The argument is disingenuous, as AGF's own disclaimer *already* suggests a lack of affiliation with the Secretary of State.  One wonders how making an accurate statement would cause users to "question the truth and accuracy" of their message.  However, it is clear that the imagined risk is too speculative and minimal to support extraordinary injunctive relief.  As to other communications, Plaintiffs again imagine the worst, expecting "voter registration status" will be interpreted beyond the ordinary meaning of the words to encompass practically any statement made about elections.  Again, Plaintiffs' fears are much too speculative to present an imminent harm for this Court to review.

### 2.    Plaintiffs' Claims are Not Ripe for Review.

For many of the same reasons, Plaintiffs' claims are also not ripe for review.  The effects of the Act have not been "felt in a concrete way" by Plaintiffs.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  Plaintiffs have not been penalized under the Act, and as outlined above, Plaintiffs have failed to demonstrate that they will *ever* be penalized under the Act.  Any possible future injury is purely speculative.  For purposes of ripeness, Plaintiffs cannot rely on future events that may never occur.  *Texas v. United States*, 523 U.S. 296, 300 (1998).

Plaintiffs also insist their speech rights are already encumbered because they are having to change their plans for future drives.  Plaintiffs' choice to alter their conduct now is just that—their choice.  Even if the Act were in effect, it would still leave Plaintiffs "free to organize and run"

---

[4] MY.VOTEEVERYWHERE, "Am I already registered?"
https://andrewgoodman.org/myvoteeverywhere/tennessee-state-university/?pg=am-i-already-registered-tennessee-state-university (last visited Aug. 30, 2019).

registration drives, "persuade others to register to vote, distribute registration forms, and assist others in filling them out." *Voting for Am. v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013). The Act does not prevent them from advocating or hosting drives, rather it "simply regulates an administrative aspect of the electoral process—the handling of voter registration applications.…" *League of Women Voters of Fla. v. Browning*, 575 F.Supp.2d 1298, 1322 (S.D. Fla. 2008). In other words, the aspects of Plaintiffs' activities that are potentially expressive (and thus possibly constitutionally protected) are not burdened by the Act. The Act only imposes obligations on registration drives where those drives assume the additional *administrative* (*i.e.*, non-expressive) responsibility of collecting and filing voters' registration forms. Accordingly, Plaintiffs have failed to present this Court with an issue fit for review or demonstrate a hardship from the Court withholding its consideration. *Abbott*, 387 U.S. at 149.

Because neither standing nor ripeness are present here, this Court lacks jurisdiction. Plaintiffs thus cannot demonstrate a likelihood of success on the merits and a preliminary injunction cannot issue.

**B.     Plaintiffs' Claims Fail as a Matter of Law.**

**1.     Count 1-Vagueness.**

For their first count, Plaintiffs strain to divest themselves of their ordinary understanding of language in order to argue that they cannot comprehend several parts of the Act. For example, Plaintiffs cannot parse "individuals who are not paid to collect voter registration applications" and "organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications." (DE 1, ¶ 64). They also allegedly cannot comprehend the words "incomplete" and "lacking," (DE 1, ¶ 67), even though "incomplete voter

12

registration application" is a defined term and the word "lacking" appears nowhere in the Act. *See* Pub. Ch. 250, § 2 (future Tenn. Code Ann. § 2-2-143).

Plaintiffs also cannot apparently understand:

- The sentence "A person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission." (DE 1, ¶ 68)

- The word "complete" when compared to its opposite in the defined term "incomplete voter registration application." (DE 1, ¶ 69).

- The phrase "public communication regarding voter registration status." (DE 1, ¶ 71)

- The phrase "public communication" even though it is defined by the Act. (DE 1, ¶ 71)

- The phrase "regarding voter registration status." (DE 1, ¶ 71).

- And finally, the word "includes." (DE 1, ¶ 72).

Despite the relatively straightforward vocabulary chosen here by the General Assembly[5] (to be made even easier to digest with future rulemaking once the law becomes effective), Plaintiffs contend that this language is vague—and unconstitutionally so.

To succeed on a vagueness challenge, Plaintiffs must demonstrate either that the Act (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; or (2) "authorizes or even encourages arbitrary and discriminatory

---

[5] As this Court recently noted, "the first step in construing a statute is to 'look to the plain language of [the] statute and give effect to the ordinary meaning of the words.'" *Embraer Aircraft Maintenance Services, Inc. v. AeroCentury Corp.*, 363 F.Supp.3d 850, 858 (M.D. Tenn. 2019) (quoting *State v. Denton*, 149 S.W.3d 1, 17 (Tenn. 2004)).

enforcement." *Johnson v. United States*, 135 S.Ct. 2551, 2566 (2015). But courts should not go so far as to require "perfect clarity and precise guidance," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010), because laws marked by "flexibility and reasonable breadth, rather than meticulous specificity" are not vague. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 246 (6th Cir. 2018). "The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id*. at 498-99. A statute will be struck down as facially vague only if the plaintiff has "demonstrate[d] that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Estates*, 455 U.S. at 497. Furthermore, a litigant raising a vagueness challenge must show that the statute in question is vague as applied to his own conduct, without regard to its potentially vague application in other circumstances. *U.S. v. McKinnon Bridge Co., Inc*. 514 F.Supp. 546, 548 (M.D. Tenn. 1981) (citing *Parker v. Levy*, 417 U.S. 733, 755-56 (1974); L. Tribe, *American Constitutional Law*s 12-29 (1978)).

In their response to the Motion to Dismiss, Plaintiffs countered that the vagueness standard should be strict scrutiny because the Act purportedly chills conduct protected by the First Amendment. But a factual disclaimer is not political speech and does not require strict scrutiny. *Discount Tobacco City & Lottery, Inc. v, U.S.*, 674 F.3d 509, 554 (6th Cir. 2012). Further, the Act does not implicate protected speech or association. It permits Tennessee citizens to band together, register to vote, and vote on issues important to them the same way as before the Act. It merely requires that voter registration organizations—that voluntarily assume the great responsibility of

14

serving as a middle-man for voter registration forms—undergo training and ensure that they perform their function in compliance with Tennessee law. Plaintiffs, who cannot vote, lack standing to assert the right to vote, and as the Act does not implicate protected speech or association, the vagueness standard of strict scrutiny argued by Plaintiffs is incorrect.[6]

It is abundantly clear what each of the challenged terms mean. The language is neither complex nor confusing, and is either defined in *Black's Law Dictionary* or by the Act itself. And while Plaintiffs can argue hypotheticals, that is not constitutionally sufficient: almost all statutes are "susceptible to clever hypotheticals testing its reach." *Platt*, 894 F.3d 235 at 251. It is incomprehensible how Plaintiffs can use the word "includes" fifteen times in their Complaint and yet not understand its meaning within the Act.

If Plaintiffs require further assistance to cure their misapphrension, Tennessee can provide it; Plaintiffs can avail themselves of upcoming training, Pub. Ch. 250, § 1, or participate in the rulemaking process, Pub. Ch. 250, § 2. Based upon a plain reading of the Act, without improperly isolating terms, Plaintiffs have failed to adequately allege the Act is vague as applied to their own conduct, let alone potentially vague in other circumstances. *McKinnon Bridge Co., Inc*. 514

---

[6] Plaintiffs strain to apply *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182 (1999), to avail themselves of strict scrutiny review, which is typically strict in theory, fatal in fact. (DE 31, p. 9, 10). But *Meyer* and *Buckley* simply do not apply here. As noted by the Supreme Court in *Buckley v. Am. Const. Law Found., Inc.*, for *Meyer* to apply, the restrictions in question must significantly inhibit communication with voters about proposed political change." 525 U.S. 182, 192 (1999). In *Meyer*, the Supreme Court struck down a law forbidding payment of circulators of initiative proposals. The Supreme Court found that circulating such a petition "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421.

Here, the Act does not inhibit communication or a discussion of a political issue—it does not exist in the sphere of political association and speech but in voter registration and election regulation. Collecting a voter registration form in this context is neither speech nor association in the same way that signing a petition seeking pollical change is. *Meyer* and *Buckley* thus do not apply, and neither does strict scrutiny

15

F.Supp. 546, 548 (M.D. Tenn. 1981).   Plaintiffs can demonstrate no likelihood of success on the merits of this count because it fails as a matter of law.

### 2.      Count 2-First Amendment Rights for Paid Workers and Paying Organizations.

In count 2, Plaintiffs complain that they will be subject to burdensome pre-registration and trainings that violate their "First Amendment rights of paid voter registration workers and the organizations, such as Plaintiffs, with whom they are affiliated."  (DE 1, ¶ 78).

First, Plaintiffs do not enjoy standing to assert the rights of paid voter registration workers. They are not individual workers, but organizations.  (DE 1, ¶ 18-25).  Parties can only assert their own legal rights, so Plaintiffs again lack standing to argue as to the voter registration workers.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

Second, Plaintiffs do not identify, in their Complaint, the First Amendment right that they claim the Act allegedly infringes.  The First Amendment contains a number of distinct fundamental rights, and Defendants should not be required to guess which one applies or properly answer whether the Act violates an unidentified right.  Absent identification of the right, Defendants cannot assume the appropriate constitutional standard and this Court could not, without great assumption, begin to analyze the constitutional claims.  Thus this count fails to satisfy the standard in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (requiring that the pleading contain more than labels and conclusions and must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Regardless, the First Amendment does not prohibit differentiating between groups, nor does it require a rational basis for enactments.  Plaintiffs cannot demonstrate a likelihood of success on the merits for this claim.

### 3.    Count 3-Free Speech Clause.

Plaintiffs in this count argue that the disclaimer that will be required by future-Tenn. Code Ann. § 2-19-145 (Pub. Ch. 250, § 6) violates the Free Speech Clause of the First Amendment.  (DE 1, ¶ 79-84).  They argue that strict scrutiny is the appropriate constitutional test.  (DE 1, ¶ 81). They are wrong on both counts.

First, strict scrutiny is the incorrect standard here because the disclosure required by the Act is not opinion speech but factual, commercial speech.  Our Constitution differentiates between requiring a person or organization to affirmatively state a specific opinion and requiring a person or organization to state a fact.  *Discount Tobacco City & Lottery, Inc. v, U.S.*, 674 F.3d 509, 554 (6th Cir. 2012) (contrasting compelled speech under *Wooley v. Maynard*, 430 U.S. 705 (1977) with commercial-speech under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985)).  Our constitution also distinguishes between laws that restrict speech and laws that require disclosures.  *Id.* at 509 (comparing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) to *Zauderer*, 471 U.S. 626).

Here, the Act does not restrict speech.  It merely requires that public communications regarding voter registration status and voter registration websites display a disclaimer that informs the viewer that the website/communication is not affiliated with or authorized by the Secretary of State.  Pub. Ch. 250, § 6.  This information is plainly factual; it does not hinder the speaker from stating opinion or otherwise engaging in free speech.  Under the Sixth Circuit's precedents, this is not considered compelled speech but commercial speech; thus, the appropriate test is rational-basis review.  *See Discount Tobacco*, 674 F.3d at 559 (factual and accurate disclosures require rational-basis review under *Zauderer*).

17

The disclosure requirement certainly has a rational basis in law. Under rational-basis review, a law is presumed constitutional, and "[t]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotations omitted); *see also Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001) (stating that a statute is subject to a "strong presumption of validity" under rational-basis review and will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis.").

A court conducting a rational-basis review does not sit "as a super legislature to judge the wisdom or desirability of legislative policy determinations" but asks only whether there is some conceivable rational basis for the challenged statute. *Heller,* 509 U.S. at 319. Under rational-basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlays the legislative decision.'" *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)). In enacting the Act, the General Assembly had "absolutely no obligation to select the scheme" that a court might later conclude was best. *Nat'l R.R. Passenger Corp. v. A.T. & S.F.R. Co.*, 470 U.S. 451, 477 (1985). *See McGowan v. Maryland*, 366 U.S. 420, 425-426 (1961) ("State legislatures are presumed to have acted within their constitutional power despite the fact that in practice, their laws result in some inequality."). And Tennessee "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).

Again, a court does not review a statute's wisdom or desirability but considers only whether it has a rational basis. To conclude otherwise is to impose one's own view of what a State *ought*

18

to do.  *See Bruning*, 455 F.3d at 867-68 ("Whatever our personal views regarding this political and sociological debate, we cannot conclude that the State's justification 'lacks a rational relationship to legitimate state interest.'") (internal quotations omitted).

Here, the disclosure is designed to limit the risk of disenfranchisement by voters who could mistakenly believe that by completing a voter registration form with a third-party organization they are all set to vote in Tennessee.  For example, a qualified voter must register at least 30 days prior to an election.  The election commission will process any voter registration form that has been postmarked at least thirty days before an election.  Tenn. Code Ann. § 2-2-109.  But what if a Tennessee prospective voter waits until the last day to register and mails a form to a third-party voter registration organization under the misapprehension that the organization is part of, or connected to, the secretary of state?  Or if a third-party voter registration organization creates an unofficial voter lookup that prospective voters rely upon to see if they are eligible to vote even though there might be errors?  Tennessee citizens may be disenfranchised.

That outcome is unconscionable.  And the disclosure requirement is intended simply as a safeguard against such a situation by ensuring that a prospective voter does not rely upon a voter registration organization by believing that it is synonymous with the election commission and the secretary of state.  Indeed, Plaintiff AGF apparently also has determined that informing prospective voters to go to the source is a good idea, since its voter look-up website affirmatively tells the user to check directly with the Secretary of State's website if they are a recent registrant.  DE 39-5 at ¶ 30, *see also* n. 4, *supra*.

Avoiding disenfranchisement of Tennessee voters is clearly a legitimate state interest, and the disclosure is rationally related to that outcome.  Plaintiffs can demonstrate no likelihood of success on the merits for this count.

### 4. Count 4-Fundamental Right to Vote.

Plaintiffs lastly argue that the Act violates the First Amendment by restricting the exercise of the fundamental right to vote. (DE 1, ¶ 85-93).

While the right to vote is fundamental, Plaintiffs have no right to vote. They are not individual citizens, but organizations. (DE 1, ¶ 18-25). As only citizens enjoy the constitutionally protected right to vote, *see Reynolds v. Sims*, 377 U.S. 533, 567-68 (1964), Plaintiffs again lack standing to raise this argument. *See Johnson v. Bredesen*, No. 3:07-0372, 2007 WL 1387330 at *1 (M.D. Tenn. May 8, 2007) (finding that since non-profit organization may not exercise a right to vote in any election, organization has no standing to assert the loss of a right to vote if injunction is not granted); *Warth*, 422 U.S. at 498 (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

Moreover, Plaintiffs do not define in their pleadings the First Amendment rights that they claim are compromised by the Act. They characterize what the law does, and argue that it violates "the exercise of First Amendment rights in connection with the fundamental right to vote," (DE 1, ¶ 93), but do not attempt to identify what right under the First Amendment is infringed. Again, the First Amendment contains a number of distinct fundamental rights, and it is incumbent upon the Plaintiffs to plead their specific constitutional injury. Thus this count also fails to satisfy the standard in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (requiring that the pleading contain more than labels and conclusions and must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs can demonstrate no likelihood of success on the merits for this count or any before it. A preliminary injunction is thus inappropriate.

20

## II. PLAINTIFFS WILL SUFFER NO IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

The second factor for preliminary injunctive relief requires the Court to determine whether the movants will suffer irreparable harm in the absence of an injunction. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-7 (1959)).

> [The Sixth Circuit] has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief. Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued.

*Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102-3 (6th Cir. 1982) (citations omitted). Plaintiffs must establish that they are suffering or will suffer an irreparable injury in order to obtain injunctive relief.

To establish irreparable injury, each and every Plaintiff must show that they "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir. 2006). Injunctive relief should not issue to address a threat of injury that is conjectural or hypothetical and based upon subjective fears about possible future adverse action. *Moncier v. Jones*, 939 F. Supp.2d 854, 859 (M.D. Tenn. 2013) (citing *Preiser v. Newkirk*, 422 U.S. 395, 403 (1975)). Injunctive relief is not available unless some real possibility of injury is impending or threatened and can only be averted by protective extraordinary process. *Willett v. Wells*, 469 F.Supp. 748, 753 (E.D. Tenn. 1977), *aff'd* 595 F.2d 1227 (6th Cir. 1979). As described above, Plaintiffs cannot demonstrate standing or ripeness, and thus the

injuries complained of are speculative and hypothetical—and insufficient to demonstrate irreparable injury.

But even assuming *arguendo* that the civil monetary penalties are actually impending, they are far from irreparable. The Supreme Court has demarcated certain types of injuries that are insufficient to constitute irreparable injury warranting injunctive relief. Monetary damages alone are insufficient. *Sampson*, 415 U.S. at 90 (holding that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."). Similarly, reputational damage "falls far short of the type of irreparable injury which is a necessary predicate to issuance of a temporary injunction." *Sampson*, 415 U.S. at 91-92. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of the litigation, weighs heavily against a claim of irreparable harm." *Id*. at 90 (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

When the Act goes into effect, Plaintiffs can avoid it altogether by simply declining to collect the completed forms. Either way, they remain "free to organize and run" registration drives, "persuade others to register to vote, distribute registration forms, and assist others in filling them out." *Voting for Am. v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013). The Act does not prevent them from advocating or hosting drives, rather it "simply regulates an administrative aspect of the electoral process—the handling of voter registration applications.…" *League of Women Voters of Fla. v. Browning*, 575 F.Supp.2d 1298, 1322 (S.D. Fla. 2008). Requiring training and a disclaimer is not harm, requiring that they submit forms timely is not harm, and requiring Plaintiffs to submit completed forms—which they already endeavor to do, DE 39-2 at ¶ 43, 44, DE 39-3 at ¶ 29, DE 39-4 at ¶ 21—is not harm, and certainly not irreparable.

22

In the absence of irreparable harm, Plaintiffs' Motion for Preliminary Injunction should be denied.

## III. THE PUBLIC INTEREST AND POTENTIAL HARM TO THE STATE WEIGH IN FAVOR OF DENYING A PRELIMINARY INJUNCTION.

The final two factors for consideration are whether the balance of harm to the parties and the public interest support injunctive relief. Because the public interest greatly disfavors obstructing a State from enforcing its public policy determinations, a preliminary injunction is disfavored.

Generally, the public interest favors federal courts denying extraordinary injunctive relief that may affect state domestic policy or the good faith functioning of state officials. *See generally Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 351 (1951) (finding "[i]t is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states.")

> Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties. In such circumstances this court has said that an injunction ought not to issue "unless in a case reasonably free from doubt." *Mass. State Grange v. Benton*, 272 U.S. 525, 527 (1926).

*Hawks v. Hamill*, 288 U.S. 52, 60 (1933). As members of the Supreme Court have noted, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable harm." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 571 U.S. __, 2013 WL 6080269, slip op. at 1 (Nov. 19, 2013) (Scalia, J., concurring in denial of application to vacate stay of an injunction) (quoting *Maryland v. King*, 567 U.S. 1, 3 (2012) (Roberts, C.J., in chambers)).

Plaintiffs seek to use this Court to overrule the results of Tennessee's valid democratic process establishing the public policy of this State. But granting a preliminary injunction would cause harm to Tennessee in the form of an affront to its sovereignty. The State's public policy, as expressed by a strong majority of its citizens, is represented by the Act.

And an injunction would also strip Tennessee citizens of the benefits the Act will provide. The Act merely requires that voter registration organizations undergo training and ensure that they obey Tennessee law when they collect voter registration forms for submission.

When a person or group accepts a registration form from an individual, they become the middle-man entrusted with the obligation to ensure that the application is completed properly and submitted timely to the appropriate election official for processing so the applicant can vote. The consequences of failing to do so are dire. Voter registration organizations that mail forms late may disenfranchise voters. As may registration drives that do not follow the rules that are required of any Tennessee citizen. The Act requires training and penalizes organizations that repeatedly fail to comply with rules designed to ensure that voter registration is done properly. The Act protects Tennessee voters from these unconscionable outcomes at a minimal inconvenience to voter registration drives that collect voter registration forms.

Finally, issuance of a preliminary injunction represents a line in the sand. The harms speculated by Plaintiffs and the benefits intended by Defendants will only be disproved/proved by implementation—where all can see and consider the practical effect of the Act. What Plaintiffs want is a *fait accompli*; they want the Court to stop implementation so that the public benefits of the Act can never be demonstrated. Plaintiffs do not want to risk a finding from the Court that their fears were unfounded and that the benefits for Tennessee citizens and elections are real. The best way for Plaintiffs to avoid such a finding is to stop the Act before it begins.

But speculation as to the overall effect of the Act weighs in favor of the Defendants because Plaintiffs are always free to seek another injunction—at a later time—should issues arise during implementation. Plaintiffs should not be permitted to short-circuit the process.

Because enjoining Tennessee's public policy is irreparable harm, and the Act seeks to provide real benefits to Tennessee voters at minimal burden to Plaintiffs, both The Public Interest and potential harm to the State weigh in favor of denying a preliminary injunction.

## CONCLUSION

For the reasons stated, the motion for preliminary injunction should be denied.

Respectfully Submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

JANET M. KLEINFELTER
Deputy Attorney General

/s/Alexander S. Rieger
ALEXANDER S. RIEGER
KELLEY. L. GROOVER
Assistant Attorneys General
Public Interest Division
War Memorial Bldg, 3rd Floor
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
alex.rieger@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing documents have been forwarded electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties named below. Parties may access this filing through the Court's electronic filing system.

TAYLOR A. CATES
BURCH, PORTER, & JOHNSON, PLLC
130 N. Court Avenue
Memphis, TN 38103
(901) 524-5165
tacates@bpjlaw.com
wirvine@bpjlaw.com

JON GREENBAUM
EZRA D. ROSENBERG
JULIE HOUK
POOJA CHAUDHURI
LAWYERS'COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

IRA M. FEINBERG
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3509
ira.feinberg@hoganlovells.com

ALLISON M. RYAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-5600
allison.holt@hoganlovells.com

YAEL BROMBERG
BROMBERG LAW LLC
The Andrew Goodman Foundation
10 Mountainview Road
Upper Saddle River, NJ 07458
(202) 995-1808

yaelbromberglaw@gmail.com

DANIEL AYOADE YOON, BPR No. 028798
2004 8th Ave S
Nashville, TN 37204
(615) 541-5141
danielayoadeyoon@gmail.com

on this 30th day of August, 2019.

/s/Alexander S. Rieger
ALEXANDER S. RIEGER
Assistant Attorney General

Case 3:19-cv-00365   Document 41   Filed 08/30/19   Page 27 of 27 PageID #: 521