# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TENNESSEE STATE CONFERENCE OF )
THE N.A.A.C.P., DEMOCRACY )
NASHVILLE-DEMOCRATIC )
COMMUNITIES, THE EQUITY )
ALLIANCE, and THE ANDREW )
GOODMAN FOUNDATION, )
                                        )
                                        )
Plaintiffs, )
                                        )
v. )     Case No. 3:19-cv-00365
                                        )     Judge Aleta A. Trauger
TRE HARGETT, in his official capacity )
as Secretary of State of Tennessee, )
MARK GOINS, in his official capacity )
as Coordinator of Elections for the State )
of Tennessee, the STATE ELECTION )
COMMISSION, and DONNA BARRETT, )
JUDY BLACKBURN, GREG DUCKETT, )
MIKE MCDONALD, JIMMY WALLACE, )
TOM WHEELER, and KENT YOUNCE, )
in their official capacities as members of )
the State Election Commission, )
                                        )
Defendants. )

## MEMORANDUM

The defendants have filed a Motion to Dismiss (Docket No. 21), to which the plaintiffs

have filed a Response (Docket No. 31), and the defendants have filed a Reply (Docket No. 33).

For the reasons set out herein, that motion will be denied.

# I. BACKGROUND AND PROCEDURAL HISTORY[1]

## A. Voting in Tennessee

Tennessee relies on popular elections to select (or, in a few cases, decide whether or not to retain) many of the state's most important state, local, and federal officials. *E.g.*, U.S. Const. art. I, § 2, cl. 1 (U.S. Representatives); U.S. Const. amend. XVII (U.S. Senators); Tenn. Const. art. II, § 7 (state legislators); Tenn. Const. art. III, § 2 (Governor); Tenn. Const. art. VI, § 3 (state appellate judges); Tenn. Const. art. VI, § 4 (circuit and chancery court judges); Tenn. Code Ann. § 2-15-101 (presidential electors); Tenn. Code Ann. § 5-6-102 (county mayors); Tenn. Code Ann. § 6-3-101(a) (aldermen); Tenn. Code Ann. § 6-20-201(a)(3) (city mayors); Tenn. Code Ann. § 6-31-101(a) (city council members); Tenn. Code Ann. § 16-18-201 (city judges); Tenn. Code Ann. § 49-2-201(a)(1) (local board of education members). Sometimes, Tennessee voters directly change state or local laws via ballot measures. *See, e.g.*, Tenn. Const. art. XI, § 3 (constitutional amendment); Tenn. Const. art. XI, § 9 (municipal home rule); Tenn. Code Ann. § 6-51-105(a) (municipal annexation); Tenn. Code Ann. § 6-51-201(a) (contraction of municipal boundaries); Tenn. Code Ann. § 6-51-403(b) (merger of municipalities); Tenn. Code Ann. § 6-52-202 (abolition of municipal charter); Tenn. Code Ann. § 7-2-106(a) (consolidation of metropolitan government); Tenn. Code Ann. § 49-2-501(a)(2) (abolition of special school district); Metro. Gov't of Nashville & Davidson Cty, Tenn., Charter § 19.01 (charter amendment). But, unfortunately, not all Tennesseans vote. Some do not vote because they choose not to, or they forget, or they do not even think about it. Some Tennesseans do not vote because they do not meet the state's requirements for "qualified voters," due to their age, their citizenship status, or their "infamy" based on a past felony conviction from which they have not

---

[1] Except where otherwise indicated, these facts are taken from the plaintiffs' Complaint (Docket No. 1) and are taken as true for the purposes of Rule 12(b).

Case 3:19-cv-00365   Document 48   Filed 09/09/19   Page 2 of 34 PageID #: 607

had their voting rights restored. *See* Tenn. Code Ann. §§ 2-2-102, 40-20-112, 40-29-202(a). In any given election, however, there are some Tennesseans who are qualified to vote and would like to do so, but who cannot, because "[o]nly qualified voters *who are registered* . . . may vote at elections in Tennessee." Tenn. Code Ann. § 2-1-105 (emphasis added).

The only way to be "registered under" the state's voter registration system is if one "applies to register" with the appropriate county election commission. Tenn. Code Ann. § 2-2-104(1); *see* Tenn. Code Ann. §§ 2-2-101(2), 2-2-303. A person applying to register must complete a form, on which she provides certain information that establishes her identity and qualifications as a voter. The Tennessee General Assembly requires that the form contain the person's name, sex, address of legal residence, mailing address if different from residential address, social security number, date and place of birth, citizenship status, prior place of voter registration, history of felony convictions, and a declaration of permanent residency. Tenn. Code Ann. § 2-2-116. The application can be completed in person at the office of the county election commission or at a number of other state and local government offices that Tennessee or the county has directed to accept applications and transmit them to the commission. Tenn. Code Ann. §§ 2-2-108(a)(1), 2-2-111(a), 2-2-201, 2-2-202. In addition to in-person registration, Tennessee has an online voter registration system, *see* Tenn. Code Ann. § 2-2-112, and allows registration by mail, *see* Tenn. Code Ann. § 2-2-115(a). Unless a prospective voter applies to register at least thirty days before an election day, the voter will not appear on the voter rolls for that election. Tenn. Code Ann. § 2-2-109(a).

A number of organizations and individuals, recognizing that a lack of registration is the only legal obstacle preventing many Tennesseans from voting, engage in activities intended to assist unregistered qualified voters in filing registration applications. Some of those efforts are

small and informal, between friends, family, neighbors, and coworkers. Other efforts to assist in voter registration are larger and directed at the broader public, such as the operation of voter registration desks at schools, community centers, concerts, and other locations frequented by unregistered prospective voters. These efforts historically have involved collecting paper registration forms, although modern technology also allows organizations to assist voters in registering electronically.

Despite those formal and informal efforts to boost registration, the number of registered voters in Tennessee still lags far behind the number of qualified voters. Data compiled by the Pew Charitable Trusts suggests that Tennessee has a voter registration rate of 78.57%, among the worst in the nation. (Docket No. 1 ¶ 31.) That rate is even lower in low-income communities and communities with more racial and ethnic minorities. (*Id.* ¶ 32.) According to U.S. Census Bureau data, people of color and individuals between the ages of 18 and 29 report disproportionately that they are not registered to vote because they do not know how. (*Id.* ¶ 33.)

Voter registration drives are not without risk. For example, it is at least possible that an individual or organization could collect voter registration applications and either never turn them in or turn them in only after waiting an unreasonable period of time, causing people not to be registered in elections in which they wish to participate. A voter registration drive might also collect applications that are incomplete or incorrectly filled out—although, of course, registration applicants could also fill out forms incorrectly on their own, without the assistance of a voter registration drive. In light of the supposed dangers associated with improperly performed voter registration drives, the Tennessee General Assembly, on April 29, 2019, enacted several new provisions governing the operation of drives in the state. ELECTION OFFENSES, 2019 Tenn. Laws Pub. ch. 250 (H.B. 1079) (hereinafter, the "Act"). On May 2, 2019, Governor Bill Lee

signed the Act into law, and its provisions are slated to "take effect" on October 1, 2019. 2019

Tenn. Laws Pub. ch. 250, § 9.

**B. The Act[2]**

*1. Scope*

The Act leaves in place the preexisting state and local government structures for voter

registration and does not purport to govern every situation in which one person helps another

register to vote. The first few of its requirements, which govern how voter registration drives can

be performed, mostly apply to private organizations or individuals who operate voter registration

drives in which they "attempt[] to collect voter registration applications of one hundred (100) or

more people." Tenn. Code Ann. § 2-2-142(a).[3] These requirements include an exception for

"individuals who are not paid to collect voter registration applications or . . . organizations that

are not paid to collect voter registration applications and that use only unpaid volunteers to

collect voter registration applications." Tenn. Code Ann. § 2-2-142(g). An organization is also

excepted if it is the "designee" of the county election commission for the purposes of operating

certain county-supervised voter registration activities. Tenn. Code Ann. § 2-2-142(a). The Act

then establishes a system of potential monetary penalties for entities covered by the new

requirements. Tenn. Code Ann. § 2-2-143. The State Election Commission is empowered to

engage in rulemaking in furtherance of the penalty provisions, but rulemaking is permissive,

---

[2] Several key provisions of the Act contain ambiguities that, the plaintiffs argue, pose significant constitutional problems of their own. The ambiguities identified by the plaintiffs are discussed later in this opinion. For ease of discussion, the court's summary of the Act's provisions may ignore a few ambiguities for the sake of providing a general picture of the structure of the Act.

[3] For ease of reading, the court will cite the Act using the section designations that it will have when included in the Tennessee Code Annotated.

rather than mandatory, and there is no language delaying the Act's requirements until rulemaking takes place. Tenn. Code Ann. § 2-2-143(f).

The Act next sets forth several ethics and conflict-of-interest requirements related to procurement of voting systems, *see* Tenn. Code Ann. § 2-9-118, none of which are at issue in this case.

Finally, the Act imposes a number of requirements on organizations that communicate to the public about voter registration, including, in particular, parties that operate websites that either facilitate voter registration or allow voters to look up individual voter registration information. These requirements, unlike some of the registration drive requirements, apply no matter how many voters, if any, the party attempts to register. *See* Tenn. Code Ann. § 2-2-145. This portion of the Act does not contain any express language empowering the State Election Commission or any other administrative body to engage in rulemaking related to its terms.

*2. Provisions at Issue in this Case.*

**a. Pre-Drive Reporting Requirements.** The Act requires prior registration, with the state's Coordinator of Elections, by private organizations and individuals planning voter registration drives intended to exceed the 100-applicant mark if they do not qualify for one of the exceptions discussed above. Tenn. Code Ann. § 2-2-142(a). Specifically, the organization or individual must, "[p]rior to conducting"[4] the registration drive,

(A) Provide the coordinator of elections with the name, address, and contact phone number of the person conducting the voter registration drive or the names, addresses, and contact phone numbers of the officers of the organization conducting the voter registration drive;

(B) Provide the names of the county or counties in which the voter registration drives will be held; . . . [and]

_____

[4] The Act does not specify a particular amount of time prior to the drive by which a party must register.

6

(D) File a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters . . . .

Tenn. Code Ann. § 2-2-142(a)(1). Violation of any of those requirements, if done "intentionally or knowingly," is a Class A misdemeanor, and "each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-142(f).

**b. Mandatory Government-Administered Training.** Individuals and organizations subject to the reporting requirement are also required to receive voter registration training from the State of Tennessee. Before conducting the drive, the individual or organization must

(C) Complete training, which is administered by the coordinator of elections, on the laws and procedures governing the voter registration process; . . . [and]

(E) Ensure that individuals, whether volunteer or paid, who conduct voter registration drives for an organization have completed the training administered by the coordinator of elections . . . .

Tenn. Code Ann. § 2-2-142(a)(1). The Coordinator of Elections is forbidden from charging a fee for the training and required to "offer the training online." Tenn. Code Ann. § 2-2-142(e). As with the reporting requirements, violation of the training requirement, if done "intentionally or knowingly," is a Class A misdemeanor, and "each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-142(f).

**c. 10-day Mandatory Application Turn-In.** The Act requires any person or organization that performs a voter registration drive for which registration was required to "deliver or mail completed voter registration forms within ten (10) days of the date of the voter registration drive; provided[] that if the date of the voter registration drive is within ten (10) days of the voter registration deadline, the completed forms must be delivered or mailed no later than the voter registration deadline." Tenn. Code Ann. § 2-2-142(a)(2). That requirement applies even

7

if the person or organization knows that the application is deficient because, for example, it is missing some of the required information. The only exception is that "[a] person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission." Tenn. Code Ann. § 2-2-143(b). A knowing or intentional violation of this provision is Class A misdemeanor, with "each violation constitut[ing] a separate offense." Tenn. Code Ann. § 2-2-142(f).

**d. Monetary Penalties for Turning In Incomplete Registrations.** Pursuant to Tenn. Code Ann. § 2-2-143(a), "any person or organization" that "conducts voter registration drives under" the registration scheme is subject to a civil penalty if the person or organization, "within a calendar year, files one hundred (100) or more incomplete voter registration applications." The Act defines "incomplete voter registration application" as "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b). This provision does not include a requirement that the violation be knowing or intentional.

County election commissions are required to "file notice with the state election commission, along with a copy of each voter registration application deemed to be incomplete and identifying information about the person or organization that filed the incomplete applications." Tenn. Code Ann. § 2-2-143(c)(2). The state election commission then "shall make a finding on the number of incomplete forms filed" and "may impose civil penalties for Class 1 and Class 2 offenses." Tenn. Code Ann. § 2-2-143(c)(3). "'Class 1 offense' means the filing of one hundred (100) to five hundred (500) incomplete voter registration applications," and such an offense is "punishable by a civil penalty of one hundred fifty dollars ($150), up to a maximum of two thousand dollars ($2,000), in each county where the violation occurred." Tenn. Code Ann. §

8

2-2-143(c)(4)(A). "'Class 2 offense' means the filing of more than five hundred (500) incomplete voter registration applications," and such an offense is "punishable by a civil penalty of not more than ten thousand dollars ($10,000) in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(B).

**e. Mandatory Disclaimers for Communications.** Pursuant to Tenn. Code Ann. § 2-2-145(a)(1), any "public communication regarding voter registration status made by a political committee or organization must display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state." *Id.* "The disclaimer must be clear and conspicuous and prominently placed. A disclaimer is not clear and conspicuous if it is difficult to read or hear, or if its placement can be easily overlooked." Tenn. Code Ann. § 2-2-145(d). If a "person or organization . . . establishes a website for voter registration purposes" it must display such a disclaimer and, if the site "captures or collects the voter's information or data," it must include an additional notice "disclos[ing] on the website the person's or organization's name and the purpose for which the voter information is captured or collected." Tenn. Code Ann. § 2-2-145(b)(1)–(2). The same is true for a website created to allow users to look up registration information. Tenn. Code Ann. § 2-2-145(c)(1)–(2). "Any person who intentionally and knowingly violates" these provisions "commits a Class A misdemeanor and each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-145(e).

## C. The Plaintiffs

### 1. Tennessee State Conference of the NAACP

The Tennessee State Conference of the NAACP ("Tennessee NAACP") is a Nashville-based nonprofit with a mission of "eliminat[ing] racial discrimination through democratic processes and . . . ensur[ing] the equal political, educational, social, and economic rights of all

persons, in particular including African Americans." (Docket No. 1 ¶ 18.) It has 44 adult chapters and 22 youth and college councils. The Tennessee NAACP conducts voter registration drives continuously throughout the year in both urban and rural Tennessee communities. (*Id.*) Its activities also include advocacy and outreach, which sometimes involves communicating to the public regarding issues related to voter registration. (*Id.* ¶ 19.) The Tennessee NAACP uses both paid and unpaid volunteers to collect voter registration applications. (*Id.*) The Tennessee NAACP anticipates that it will attempt to register more than 100 voters in the upcoming year. (*Id.* ¶ 18.)

### *2. Democracy Nashville-Democratic Communities*

Democracy Nashville-Democratic Communities ("Democracy Nashville") is a Nashville-based public benefit corporation that performs civic engagement, including voter registration drives. Democracy Nashville receives donations from the public, but it also relies on grants and receives funding from the Tennessee NAACP in support of its voter registration efforts. When it is financially able to do so, Democracy Nashville pays staff on a salaried basis to perform canvassing in primarily African-American communities, including public housing projects in Nashville. Democracy Nashville anticipates that it will attempt to register more than 100 voters in the upcoming year. (*Id.* ¶ 20.)

### *3. Equity Alliance*

The Equity Alliance is a Tennessee public benefit corporation that "seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action on issues affecting their daily lives." (*Id.* ¶ 22.) The Equity Alliance is focused, in particular, on "expand[ing] the electorate by engaging low propensity voters and disenfranchised communities to participate in the democratic process." (*Id.*) It engages in year-round voter registration

activities designed to "meet voters where they are," whether that is in their homes, at clubs, at supermarkets, or in a laundromat. (*Id.*) The Alliance uses text messaging to send prospective voters links to the website of the Tennessee Secretary of State, where they can check their voter registration status and follow links to the state's online registration system. (*Id.*) It has received grant money and used that grant money to hire and pay organizers who have worked on its voter registration program. The Equity Alliance engages in public communications related to voter registration and anticipates that it will attempt to register more than 100 voters in the upcoming year. (*Id.* ¶ 20.)

### *4. Andrew Goodman Foundation*

The Andrew Goodman Foundation ("AGF") is a nonprofit organization founded by the mother of Andrew Goodman, who, along with two other young men, was murdered in 1964 in Mississippi, where the men had traveled to assist in a voter registration drive. It has a stated mission of "making young voices and votes a powerful force in democracy." (*Id.* ¶ 24.) AGF runs a nationwide program known as "Vote Everywhere," which operates on 59 campuses across 24 states and in the District of Columbia, including Nashville-based Tennessee State University ("TSU"). The program trains and provides resources to student leaders who register voters, organize get-out-the-vote activities, and engage in issue advocacy on college campuses. As part of the Vote Everywhere program, AGF enters into contracts with universities and provides stipends to its student voter registration workers. Vote Everywhere has two paid student leaders at TSU, who regularly engage in voter registration activities at the school's student center and residence halls, as well as at events such as freshman orientation and Homecoming. AGF also maintains an online voter registration portal that includes a link to the website of the Tennessee Secretary of State. (*Id.*) This Fall, Vote Everywhere is introducing a texting program intended to

be used by its campus partners, including those at TSU. Students will be able to sign up to receive texts from Vote Everywhere directed at them. The Vote Everywhere team on each campus will draft texts to be sent to the students who signed up, including information about when and where to vote and how to obtain transportation from campus to the polls. AGF anticipates that it will attempt to register more than 100 voters in the upcoming year. (*Id.*)

**D. This Litigation**

*1. The Plaintiffs' Claims*

The plaintiffs filed their Complaint on May 2, 2019. (Docket No. 1.) They have pleaded four claims under 42 U.S.C. § 1983. Count I alleges that various provisions of the Act are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 62–74.) Count II alleges that the Act unconstitutionally infringes upon the First Amendment rights of paid voter registration workers and organizations that use paid voter registration workers. (*Id.* ¶¶ 75–78.) Count III alleges that the Act's disclaimer requirement amounts to unconstitutional government-compelled speech, in violation of the First Amendment. (*Id.* ¶¶ 79–84.) Count IV alleges that the Act unconstitutionally infringes upon the fundamental right to vote, in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 85–93.)

*2. The Defendants*

The plaintiffs have named, as defendants, various Tennessee officials who will play roles in administering the Act, each of whom is sued in his or her official capacity only. Tre Hargett is the Tennessee Secretary of State. (*Id.* ¶ 26.) Under the Tennessee Constitution, the Secretary of State is appointed by a joint vote of the General Assembly, whose members are elected. Tenn. Const. art. III, § 17. The Secretary of State, in turn, appoints the state's Coordinator of Elections, who serves at the pleasure of the Secretary. Tenn. Code Ann. § 2-11-201(a). Defendant Mark

Goins is the Coordinator of Elections. (Docket No. 1 ¶ 27.) The Coordinator "is the chief administrative election officer of the state" and is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." Tenn. Code Ann. § 2-11-201(b). Among the Coordinator's responsibilities under the Act is that he is the official who "administer[s]" the mandatory government training, without which individuals cannot participate in a covered voter registration drive, and he is the official with whom individuals and organizations must register. Tenn. Code Ann. § 2-2-142(a)(1).

Herbert H. Slatery III is the Attorney General and Reporter (hereinafter, "Attorney General") of Tennessee. (Docket No. 1 ¶ 28.) Tennessee's Attorney General is appointed by the judges[5] of its Supreme Court, who are, under current law, appointed by the Governor and confirmed by the General Assembly, after which the judges are subject to retention elections. Tenn. Const. art. VI, §§ 3, 5. The plaintiffs maintain that the Attorney General "can investigate or prosecute any violation of the Election Code." (Docket No. 1 ¶ 28.) This allegation is, as far as the court can tell based on the cited provisions, incorrect as a matter of law. Tennessee's election code contemplates that prosecution of election-related crimes will be undertaken by a "district attorney general," like virtually all other criminal prosecutions under the laws of the state. Tenn. Code Ann. §§ 2-11-202(a)(5)(A), 2-2-115(b)(6). In Tennessee, a "district attorney general" is a local prosecutor, who does not work for the Attorney General of the state. Tenn. Code Ann. § 8-

---

[5] The Tennessee Constitution refers to the members of the judiciary who sit on the Tennessee Supreme Court, other than the Chief Justice, as "judges," although the court takes judicial notice that they are all commonly referred to as "justices." The court has used the term "judge" merely to reflect the constitutional text.

13

7-103(1).[6] In any event, the Attorney General is, at least, empowered to request that the Coordinator conduct investigations under the Act. Tenn. Code Ann. § 2-11-202(a)(5)(C).

Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are the members of the State Election Commission. (Docket No. 1 ¶ 29.) Members of the Commission are elected by a joint resolution of both houses of the General Assembly. Tenn. Code Ann. § 2-11-104(b). The Act adds a provision allowing the General Assembly to remove a member for cause or if he or she becomes unqualified. 2019 Tenn. Laws Pub. ch. 250, § 8. Under the Act, the Commission is the body to which incomplete registrations are reported and the body that "may" impose fines based on the incomplete forms. Tenn. Code Ann. § 2-2-143(c).

### 3. The Defendants' Motion

On July 5, 2019, the defendants filed a Motion, under Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the plaintiffs' claims. (Docket No. 21.) Specifically, the defendants argue that the court lacks jurisdiction, either because the plaintiffs lack standing to bring their challenges or because their claims are not ripe. The defendants also argue that, if the court finds that it has jurisdiction, the court should dismiss all of the plaintiffs' claims because the plaintiffs have failed to plead plausible challenges to the constitutionality of the Act.

---

[6] The Tennessee Attorney General does have some very limited general authority to initiate criminal prosecutions of his own accord, as well as power to assist in local prosecutions with the consent of local authorities. *See* Tenn. Code Ann. § 8-6-112(a) (allowing Attorney General to initiate prosecutions of certain officials where the district attorney general would have a conflict); Tenn. Code Ann. § 8-7-106(b)(4) (allowing a district attorney general to cross-designate the Attorney General for purposes of specific prosecutions and investigations).

14

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Gentek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 516. If a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, to the contrary, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true. *Gentek*, 491 F.3d at 330.

### B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487

F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. JURISDICTION

#### A. Injury-in-Fact

The defendants argue that the plaintiffs lack standing to challenge the Act because it has not yet gone into effect and the plaintiffs, therefore, do not yet know how the State Election Commission, Coordinator of Elections, and local district attorneys general will use their discretion under the Act. The plaintiffs respond that the Act has been duly enacted and will, by operation of law, impose obligations in what was, when they filed their Complaint, a few short months and is now less than a month.

16

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). A plaintiff is required to show standing to sue at each stage in the litigation. *Lujan*, 504 U.S. at 561–62. To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case. The defendants' argument that the plaintiffs lack standing because the Act has not yet gone into effect or been wielded against them is a challenge to the plaintiffs' ability to meet the first requirement, an injury-in-fact that is imminent, not merely conjectural or hypothetical.

"[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" the constitutionality of a law regulating an organization's ongoing and expected future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Nor is a plaintiff required to "expose himself to liability before bringing

suit." *MedImmune*, 549 U.S. at 129. A plaintiff may, for example, establish an injury-in-fact based on its "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). The defendants take that principle to suggest that, unless a plaintiff plans on violating a law, he does not have standing to challenge it.

Admittedly, the plaintiffs have not expressly stated an intention to violate the Act. Nevertheless, the plaintiffs have alleged that their intention—but for the Act—would be to behave in ways that the Act proscribes, and the alteration of their behavior may, in an appropriate case, itself be sufficient to confer standing. *See Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding standing where plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). None of the plaintiff organizations has indicated that it would disclose its voter registration activities to the Coordinator of Elections in advance or require every one of its volunteers to receive government-sponsored training unless forced to do so. Similarly, none of the organizations would choose to adopt the Act's disclaimers, on as wide a range of materials as the Act demands, unless required to. Moreover, while the plaintiffs do not specifically intend to incur any fines for turning in incomplete forms, they have pleaded that they will engage in behavior that will, at least, put them at risk of running afoul of the Act's civil fines and, with regard to the rest of the Act, criminal sanctions.

The defendants' position would limit the right to challenge the Act to, at most, people or organizations who plan to defy its requirements or who, after October 1, have actually done so and have been fined or prosecuted. Article III, however, does not require a plaintiff to engage in "costly futile gestures simply to establish standing, particularly when the First Amendment is

implicated." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988); *Clements*, 457 U.S. at 962). The defendants' position that standing should be limited to lawbreakers and aspiring lawbreakers is based on the faulty assumption that a law can only injure the people who disobey it. Following a law, however, can sometimes harm a person just as much as breaking it. That is why the caselaw recognizes that an injury-in-fact can arise not only out of expected enforcement but also "costly, self-executing compliance burdens." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Am. Booksellers*, 484 U.S. at 392 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an injury in fact.") (citing *All. for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)). A plaintiff can establish standing to challenge a law by showing that the law "is directed at [the plaintiff] in particular[,] . . . requires [the plaintiff] to make significant changes in [its] everyday . . . practices[, and] . . . expose[s the plaintiff] to the imposition of strong sanctions" for noncompliance. *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

The burdens created by the Act are no less real simply because the Act is allowing a grace period to elapse before its requirements take effect. The Act is not just a speculative possibility; it is the law. It "bec[a]me law," under Article II, § 18 of the Tennessee Constitution,

19

as soon as it was signed by the Governor. *Compare* Tenn. Const. art II, § 18 (discussing timing of when a bill "becomes law") *with* Tenn. Const. art II, § 20 (discussing timing of when a bill "take[s] effect"). While the Act does not technically ask anything of anyone *right now*, the injury-in-fact requirement does not require it to. The courts routinely consider preenforcement challenges filed in the period between a law's passage and its effective date. As long as the injury to the plaintiffs is imminent—a term that contemplates delays much longer than the few months at issue here—then it can serve as the basis for an injury-in-fact. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 539 (2012) (permitting a challenge filed three years before a provision's effective date); *New York v. United States*, 505 U.S. 144, 175 (1992) (permitting challenge filed six years before statute's effective date).

A concrete injury-in-fact can, moreover, arise when a law "restrict[s] the plaintiffs' political activities within the state" and "limit[s] their ability to associate as political organizations." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014). The injury-in-fact requirement does not force a plaintiff to "choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other." *Driehaus*, 573 U.S. at 168. By making it riskier and more difficult to engage in voter registration activities and communications, the Act has, the plaintiffs allege, imposed meaningful limitations on the plaintiff organizations' rights to engage in political speech and association related to elections. With regard to the plaintiffs' alleged First Amendment harms, moreover, it is particularly unnecessary to wait and see how the Act will be enforced. As the Supreme Court has observed, First Amendment caselaw recognizes "the danger in putting faith in government representations of prosecutorial restraint" where protected speech is concerned. *United States v. Stevens*, 559 U.S. 460, 480 (2010). The courts, accordingly, will

"not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001)). Therefore, even if the Act were to go into effect, and the government enforced it, at first, narrowly (or even not at all), that would be beside the point, because the plaintiffs' challenge to the law itself would still be cognizable by the courts. The court will not dismiss the plaintiffs' claims based on the lack of an injury-in-fact.

## B. Ripeness

The defendants argue next that the plaintiffs' claims are not ripe, citing essentially the same facts and reasoning on which they rely to argue that the plaintiffs have failed to show an actual or imminent injury-in-fact. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). The ripeness requirement exists, in part, in order to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148. The Supreme Court has suggested that the analysis of whether a case is ripe for review is best conducted "in a twofold aspect, requiring the Court 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Magaw*, 132 F.3d at 285 (quoting *Abbott Labs.*, 387 U.S. at 149).

"The ripeness doctrine," as it has traditionally been understood, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Beech v. City of Franklin, Tenn.*, 687 F. App'x 454, 457 (6th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Recent cases have raised

some doubt with regard to whether the latter, purely prudential aspects of ripeness continue to provide an independent basis for dismissing a case. *See Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 n.2 (6th Cir. 2017) (discussing questionable vitality of prudential ripeness in the wake of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014)); *see also Driehaus*, 573 U.S. at 167 (same); *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (same); *but see Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (treating prudential ripeness as an exception to *Lexmark*). For the time being, however, prudential ripeness has never been wholly repudiated by either the Supreme Court or the Sixth Circuit, so the court will use the doctrine's traditional contours here.

As the Sixth Circuit has observed, "[t]he line between Article III standing and ripeness in preenforcement First Amendment challenges" is so slim that it has, in effect, "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Driehaus*, 573 U.S. at 165–67). Indeed, the defendants' own arguments are a testament to that principal, with the non-prudential aspects of their ripeness argument serving as little more than a restatement of their standing analysis. In terms of what the Constitution requires, if the plaintiffs' injuries, in a case such as this, are actual or imminent enough to confer standing, then the plaintiffs' claims are also sufficiently ripe, at least as a constitutional matter.

The only potential obstacle to ripeness, then, is the possibility of some non-constitutional, prudential ripeness issue that would prevent the court's consideration of the plaintiffs' claims. Even if one assumes the continuing validity of prudential ripeness as a doctrine, however, the court sees no grounds for dismissal here. The defendants have provided no persuasive basis for concluding that litigating the Act now, rather than later, would result in an undue hardship to them. Waiting, on the other hand, would be likely to cause significant hardship for the plaintiffs.

22

There is also no reason to doubt that the record necessary to evaluate the plaintiffs' claims can be developed here. The plaintiffs are not challenging how the Act's requirements are going to be enforced; they are challenging what those requirements are. *See Hill v. Snyder*, 878 F.3d 193, 213–14 (6th Cir. 2017) (observing that the Supreme Court has held that "claims are fit for review if they present 'purely legal' issues that 'will not be clarified by further factual development'") (quoting *Thomas*, 473 U.S. at 581). The record necessary to support such a challenge can be assembled now, whether or not any enforcement or rulemaking has taken place. The plaintiffs' claims are, therefore, ripe, and the court will turn to the merits of the plaintiffs' claims.

## IV. MERITS

### A. Unconstitutional Vagueness (Count I)

Count I alleges that the Act is unconstitutionally vague with regard to four sets of provisions. (Docket No. 1 ¶¶ 63–74.) First, the plaintiffs argue that the Act's distinction between paid and unpaid voter registration workers and organizations is not sufficiently well-defined to allow an ordinary individual to know whether the Act's registration requirement and associated rules will apply to a number of common situations. Second, they argue that the Act's definition of "incomplete" forms for the purposes of penalties is unclear, particularly with regard to whether the term "incomplete" includes forms that contain incorrect information. Third, they argue that it is unclear what amounts to a "completed" form subject to the 10-day turn-in requirement. Finally, they argue that the phrase "public communications regarding voter registration status," as used in the disclaimer requirement, includes multiple ambiguities that make it impossible to know whether particular communications will be governed by the Act.

To succeed on a vagueness challenge to a statute, a plaintiff must show that the relevant terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand

23

what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 246 (6th Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'[A] more stringent vagueness test should apply' to laws abridging the freedom of speech . . . ." *Id.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). That standard can be "relaxed somewhat" if the law at issue "imposes civil rather than criminal penalties and includes an implicit scienter requirement." *Id.* (citing *Hoffman Estates*, 455 U.S. at 499). Several of the challenged provisions of the Act, however, impose criminal liability, and those that do not generally lack a scienter requirement.

The question of unconstitutional vagueness largely calls on the court to consider the language of a statute as a legal matter. Nevertheless, there may be factual issues that provide relevant background, particularly with regard to ordinary practices in the governed field—here, voter registration, activism, and elections. The court, therefore, must approach this issue at least somewhat tentatively. Nevertheless, the court can, at least as a preliminary matter, consider the general plausibility of the plaintiffs' linguistic arguments.

With regard to the plaintiffs' first and last instances of ambiguity, the court has little difficulty concluding that they have stated a plausible claim of unconstitutional vagueness. First, the scope of much of the Act is defined in terms of whether organizations or workers are "paid to collect voter registration applications," Tenn. Code Ann. § 2-2-142(g), but, outside of a few clear-cut areas, it is entirely unclear what that term means. The provision, presumably, covers individuals paid an hourly wage to collect registrations and organizations that have entered into contracts specifically to collect registrations for an identified price. It is unclear, however, if the language applies, for example, to individuals receiving a stipend or organizations that receive

24

grants to engage in voter registration activities generally. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707 (N.D. Ohio 2006) (noting difficulty of determining which voter registration workers are "compensated"). It is also unclear how the Act treats voter registration drives with paid staff who assist in logistical aspects of the drive but who are not the ones directly collecting applications. Without some clarity about the types of payment and personnel contemplated by the Act, it is impossible for a person or organization to know if it is covered.

Next, the phrase "a public communication regarding voter registration status," Tenn. Code Ann. § 2-2-145(a)(1), is ambiguous in at least two major ways. The Act explains that "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," Tenn. Code Ann. § 2-2-145(a)(2), but it is impossible to discern what other communications it includes. A conversation between a volunteer and a potential voter in the park, for example, is simply the equivalent of a "phone bank . . . message" without the phone, so there is no assurance, in the statute, that the conversation would be exempt from the disclaimer requirement. The Act also gives no guidance with regard to whether this provision applies to billboards or other signage— an application that might be particularly challenging, given that signage is generally intended to be legible from a distance, and it would be difficult to integrate a disclaimer that would be similarly legible. Even when one resolves the question of whether a communication is public, the phrase "regarding voter registration status" could be read to reach virtually any communication that even touches on the issue of individual voting and eligibility. A person or organization operating under the Act would live with the possibility of arbitrary enforcement with regard to virtually any communication in which voter registration came up, even passingly.

The plaintiffs' argument with regard to the Act's use of the phrase "incomplete voter registration application," in contrast, is less immediately persuasive. The Act defines that term to refer to an application that "lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b). The plaintiffs point out that an application that contains merely *erroneous* information could be said to "lack[] the applicant's" information, in that, for example, an application filled out by John Jones under the name "Steve Smith" does, technically, lack the name "John Jones." The court doubts that Tennessee courts would construe the Act in that way, given that doing so would result in a statute that punished people for turning in forms that they could not possibly have known were defective. A more natural reading of the language would be to conclude that an application only "lacks" a type of information if it does not provide information of that type at all—in other words, that the field has been left blank.[7]

Similarly, while the term "completed" may be unclear in isolation, the Act provides guidance about when forms are subject to the 10-day turn-in requirement by stating that "[a] person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission." Tenn. Code Ann. § 2-2-143(b). By explicitly excepting one type of especially insufficient form, the Act strongly implies that forms that contain *more than* "only a name or initial" must be turned in. *See SunTrust Bank v. Burke*, 491 S.W.3d 693, 697 (Tenn. Ct. App. 2015) (noting that Tennessee courts generally follow the rule of statutory construction that "the expression of one thing implies the exclusion of others") (citing *Rich v. Tenn. Bd. of Medical Examiners*, 350 S.W.3d 919, 927 (Tenn. 2011)). Moreover,

---

[7] The plaintiffs cite legislative history to the effect that some members of the General Assembly originally intended for the civil penalty provision to refer to "deficient," rather than "incomplete," forms. (Docket No. 1 ¶¶ 48–50.) If anything, though, that legislative history would suggest that the General Assembly considered and rejected that standard.

26

an interpretation of the Act that would allow a party to simply refuse to turn in a form that a prospective voter believed to have been complete would arguably conflict with other parts of the election code and could pose a serious risk of disenfranchisement. The election code makes it a misdemeanor to prevent a person from exercising his rights under the state's election laws. *See* Tenn. Code Ann. § 2-19-103. Refusing to turn in a form that represents a good-faith effort to register to vote, merely because the form lacks some minor but necessary piece of information, would arguably violate that provision by obstructing the applicant's attempt to register. Moreover, a person who fills out an incomplete form and believes herself to have completed the steps necessary to become registered is undoubtedly better off if the form is submitted rather than not submitted. Federal law requires election officials to inform applicants of the disposition of their applications, 52 U.S.C. § 20507(a)(2), meaning that a prospective voter will, at the very least, be informed of the form's rejection and have another chance to register. If a form is never submitted, however, the applicant is likely to assume, incorrectly, that she has been registered to vote. The most natural interpretation of the Act, therefore, is that a party must turn in at least all forms that represent or appear to represent a good-faith effort to register, with the exception of forms containing only a name or initial.

Nevertheless, it would be premature to dismiss the aspects of Count I involving incompleteness or completeness of applications at this juncture. Election administration is a specialized field, and the plaintiffs have alleged, for example, that "incomplete" has sometimes been broadly construed in the manner that they suggest. The plaintiffs have similarly alleged that genuine ambiguity exists, in context, around the use of the term "completed." The court, accordingly, could benefit from an evidentiary record regarding the use of those terms in the field of election administration and will not dismiss any aspects of Count I at this stage.

27

**B. Election-Related Speech and Association (Counts II & IV)**

Count II challenges the Act based on its burdens on the First Amendment rights of speech and association. (Docket No. 1 ¶¶ 75–78.) Count IV challenges it based on its burdens on the right to vote. (*Id.* ¶¶ 85–93.) The defendants, in their briefing, advance no substantive defense of the constitutionality of the Act with regard to either challenge. Rather, they make two arguments: (1) that the plaintiffs have failed to "identify the First Amendment right they claim the Act allegedly infringes" and (2) that the plaintiffs are supposedly inappropriate parties for raising these claims because they cannot assert the First Amendment or voting rights of their employees or members. (Docket No. 22 at 15, 19.) Neither argument is persuasive.

"[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (citing *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)). As the plaintiffs write in the third paragraph of their Complaint, "the collection and submission of voter registration drives is intertwined with *speech* and *association*" and therefore "comes within the protections of the First Amendment." (Docket No. 1 ¶ 3 (quoting *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) (emphasis added)). It is, therefore, simply not true that the defendants are being, as they write, "required to guess which [First Amendment right] applies [and] answer whether the Act violates an unidentified right." (Docket No. 22 at 15.) The plaintiffs seek to vindicate the rights of free speech and association,[8] just as

---

[8] The term "association" does not appear in the text of the First Amendment itself, but the Amendment has long been recognized to reach, by extension from the rights specifically enumerated, "the right to associate for the purpose of speaking." *Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 477 (6th Cir. 2018) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006)).

28

they said. The court is, frankly, skeptical that there would have been much mystery about that question, regardless of whether the plaintiffs had been more explicit, but, in any event, the plaintiffs saved the defendants any guessing. The argument that they have insufficiently identified the rights at issue is, therefore, baseless.

The defendants argue next that the plaintiffs' claims should fail because they do not have standing to challenge the Act on behalf of their employees or of prospective voters, whose rights the plaintiffs cite in their statements of Count II and Count IV. The courts have recognized that, in some situations, an organization can bring suit based on injuries suffered by its individual members. Specifically, "[a]n association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim [brought] nor the relief requested requires the participation of individual members in the lawsuit." *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)). The Complaint provides limited detail with regard to the relationships between the various organizations and their respective voter registration workers, so it is not clear which, if any, of the plaintiffs could rely on associational standing to vindicate those people's individual injuries.

As the plaintiffs point out, however, this issue is ultimately beside the point. Counts II and IV assert violations to the First Amendment rights of the organizations themselves, in addition to any individual rights. The defendants have identified no reason why the plaintiffs are unable to assert their own First Amendment rights of speech and association related to voting and elections, nor have the defendants identified any way in which the substantive inquiry for determining the constitutionality of the Act would be any different, depending on whether they

were suing solely based on their organizational rights or also based on members' individual rights. The court, accordingly, will not dismiss Count II or Count IV. The defendants' having raised no substantive objection to either claim, the court will allow those claims to proceed.[9]

## C. Count III

Count III alleges that the disclaimer requirements of Tenn. Code Ann. § 2-2-145 amount to government-mandated speech that serves no compelling or legitimate governmental function, in violation of the First Amendment. The defendants argue that the disclaimer requirements should be upheld under rational basis review, because they govern only "factual, commercial speech," and the disclaimer requirements are rationally related to the government's interest in ensuring that prospective voters are fully informed about the nature of the entities with which they are dealing. (Docket No. 22 at 15.) The plaintiffs respond that the defendants have misidentified the appropriate standard for reviewing the Act and that it should instead be evaluated pursuant to the standard for evaluating government-compelled speech on political matters.

The attempt to classify the plaintiffs' speech as commercial is certainly novel. "Commercial speech" has been "narrowly defined by the Supreme Court" as "'expression related solely to the economic interests of the speaker and its audience' or 'speech proposing a commercial transaction.'" *Karhani v. Meijer*, 270 F. Supp. 2d 926, 931 (E.D. Mich. 2003) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (intermediary citations omitted)). The Act, in contrast, requires disclaimers attached to all "public communication[s] regarding voter registration status made by a political committee

---

[9] The same defendants have raised a more substantive response to similar claims in another challenge to the Act, *League of Women Voters of Tennessee v. Hargett*, Docket No. 3:19-cv-385 (M.D. Tenn.). The court addresses those substantive arguments on the docket of that case.

or organization"—that is, political, noncommercial speech on an issue of significant public concern. Tenn. Code Ann. § 2-2-145(a). The defendants' argument, as far as the court can tell, seems to be that communications about voter registration status are, in some sense, 'commercially' advertising the participation in elections, which the First Amendment should treat no differently than an advertisement for shoes or hamburgers.

It is not entirely clear that the defendants themselves even consider their "commercial speech" argument colorable, as the phrase appears nowhere in their Reply, despite the fact that the rest of their argument on Count III is unchanged. (*See* Docket No. 33 *passim*.) In any event, political speech regarding voter registration is not commercial speech for First Amendment purposes. The case on which the defendants chiefly rely in support of their argument, *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012), is, therefore, inapposite. The Sixth Circuit in *Discount Tobacco City* expressly premised its reasoning on the conclusion that the challenged law regulated only commercial speech, leaving the plaintiffs' "ability to make 'direct comments on public issues' . . . untouched." *Id.* at 533 (quoting *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 537 n.15) (1987)). *Discount Tobacco City*, therefore, does not provide the appropriate standard for considering Count III.

"The First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley*, 487 U.S. at 796–97. A law that "compel[s] individuals to speak a particular message" by following a "government-drafted script" that "alte[rs] the content of [their] speech" is a "content-based regulation of speech" and, therefore, "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Riley*, 487 U.S. at 795; *Reed v. Town of Gilbert, Ariz.*, 135

S. Ct. 2218, 2226 (2015)). Such laws "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *Reed*, 135 S. Ct. at 2226). The defendants make little, if any, argument that the Act's disclaimer requirements meet this standard, particularly for the purposes of a motion to dismiss. The defendants posit that voters may be confused about whether regulated parties are affiliated with the Tennessee Secretary of State. In order for a compelled disclosure to pass constitutional muster, however, it must "remedy a harm that is," at the very least, "'potentially real[,] not purely hypothetical.'" *Id.* at 2377 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994)). If the defendants have evidence that the public is actually confused about whether private voter registration drives are performed by the Secretary of State *and* actually harmed by that confusion, then the defendants will be free to present that evidence at a later juncture. At this stage, however, the plaintiffs have pleaded a plausible claim that the disclaimer requirements are not directed at any compelling government interest.

Even if the defendants can establish that the disclaimers required by the Act are directed at a real problem, moreover, there is reason to doubt that the Act is appropriately tailored to that problem. The government's "simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348. If the state is concerned that the public is insufficiently informed or misinformed, then "more benign and narrowly tailored options are available" than compelled speech. *Riley*, 487 U.S. at 800. For example, the state could "communicate the desired information to the public" itself through a public awareness campaign. *Id.* If the Tennessee Department of State is concerned that the public is confused about its role in voter registration, it is free to communicate with the public of its own accord.

32

Finally, even if one accepts that the government's purpose is compelling *and* that disclaimers are an appropriate tool for furthering that purpose, the plaintiffs have raised persuasive objections to the tailoring of the particular disclaimer requirements in the Act. For example, the disclaimer requirement reaches all "public communication regarding voter registration status made by a political committee or organization," not merely any particular subset of communications that is actually likely to result in public confusion. Tenn. Code Ann. § 2-19-145(a). This requirement, as written, would reach any number of wholly innocuous communications, including communications that, based on their content, present no threat of confusion whatsoever with regard to whether the government is involved.

Moreover, the requirement that the disclaimers be "conspicuous and prominently placed" in a way that is not "difficult to read or hear" and cannot "be easily overlooked," Tenn. Code Ann. § 2-19-145(d), read literally, sets an almost impossible standard. If, for example, an organization operates a website that includes multiple pages, it is unclear what form of disclaimer would be sufficiently prominent. For example, a disclaimer only on the site's main page would be missed by anyone who came to the site by a link to another page. Another option would be to place the disclaimer at the bottom of every page, like a copyright notice. That placement, however, could be "easily overlooked." The organization, lacking a good option, might force every user that accesses its site to acknowledge the disclaimer before going further. Even then, though, it is probably true, as a factual matter, that a user could "easily overlook" the disclaimer, just as users routinely skip quickly past terms of service and end user license agreements to get to the information and features they want in other websites and applications. People, particularly those living in a media environment that inundates them with information, are very good at overlooking things. Requiring a disclaimer that is incapable of being "easily

33

overlooked" is, in practice, requiring a disclaimer so intrusive that it would threaten to swallow the communication that it is attempting to clarify.[10]

The defendants, as the parties defending a policy of government-compelled speech, "ha[ve] the burden to prove that the [challenged requirement] is neither unjustified nor unduly burdensome." *Becerra*, 138 S. Ct. at 2377 (citing *Ibanez*, 512 U.S. at 146). The plaintiffs have pleaded a plausible claim that the Act's disclaimer requirements clear neither bar. The court, accordingly, will not dismiss Count III.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Docket No. 39) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[10] The defendants may protest that they would never suggest enforcing the disclaimer requirement so aggressively. But it is not up to them. By making a violation of the disclaimer requirement a Class A misdemeanor, Tenn. Code Ann. § 2-9-145(e), Tennessee has given any local prosecutor the power to enforce the disclaimer requirement to the full extent of its text.

34