# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., DEMOCRACY NASHVILLE-DEMOCRATIC COMMUNITIES, THE EQUITY ALLIANCE, and THE ANDREW GOODMAN FOUNDATION,

    Plaintiffs,

v.

TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, GREG DUCKETT, MIKE MCDONALD, JIMMY WALLACE, TOM WHEELER, and KENT YOUNCE, in their official capacities as members of the State Election Commission,

    Defendants.

Case No. 3:19-cv-00365
Judge Aleta A. Trauger

## MEMORANDUM

The plaintiffs have filed a Motion for Preliminary Injunction (Docket No. 39), to which the defendants have filed a Response (Docket No. 41), and the plaintiffs have filed a Reply (Docket No. 47). For the reasons set out herein, that motion will be granted.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Voting in Tennessee

A more detailed discussion of the procedural history of this case and the legal context of the underlying enactment can be found in the court's Memorandum of September 9, 2019.

(Docket No. 48.) In short, "[o]nly qualified voters who are registered . . . may vote at elections in Tennessee," Tenn. Code Ann. § 2-1-105, and the only way to be registered is if one "applies to register." Tenn. Code Ann. § 2-2-104(1). A voter registration application can be completed in person at various government offices, online, or by mail. *See* Tenn. Code Ann. §§ 2-2-108(a)(1), 2-2-111(a), 2-2-112, 2-2-115(a), 2-2-201, 2-2-202. Unless a prospective voter applies to register at least thirty days before an election day, the voter will not appear on the voter rolls for that election. Tenn. Code Ann. § 2-2-109(a).

A number of organizations and individuals, recognizing that a lack of registration is the only legal obstacle preventing many Tennesseans from voting, engage in activities intended to assist unregistered qualified voters in filing registration applications. Some of those efforts are small and informal, between friends, family, neighbors, and coworkers. Other efforts to assist in voter registration are larger and directed at the broader public, such as the operation of voter registration desks at schools, community centers, concerts, and other locations frequented by unregistered prospective voters. These efforts historically have involved collecting paper registration forms, although modern technology also allows organizations to assist voters in registering electronically.

On April 29, 2019, the Tennessee General Assembly passed a new law governing, among other things not at issue in this case, "voter registration drives" and "public communication[s] regarding voter registration status." ELECTION OFFENSES, 2019 Tenn. Laws Pub. ch. 250 (H.B. 1079) (hereinafter, the "Act"). On May 2, 2019, Governor Bill Lee signed the Act into law, and its provisions are slated to "take effect" on October 1, 2019. 2019 Tenn. Laws Pub. ch. 250, § 9. On May 2, 2019, the plaintiffs filed a Complaint in this court challenging the constitutionality of several portions of the Act under 42 U.S.C. § 1983. (Docket No. 1.) The

defendants then moved the court to dismiss the plaintiffs' claims based on either a lack of jurisdiction or a failure by the plaintiffs to articulate plausible challenges to the Act's constitutionality. (Docket No. 21.) The court denied that motion, concluding that, for the purposes of the Motion to Dismiss, (1) the plaintiffs had standing to bring their claims, (2) the plaintiffs' claims were ripe, and (3) the plaintiffs had articulated a plausible basis for their claims. (Docket No. 48.) The plaintiffs now seek a preliminary injunction enjoining some of the Act's provisions. The defendants oppose the motion.

**B. Relevant Provisions of the Act[1]**

*1. Pre-Drive Registration and Training Requirements*

The Act requires prior registration, with the state's Coordinator of Elections, by private organizations and individuals planning a voter registration drive in which the party will "attempt[] to collect voter registration applications of one hundred (100) or more people." Tenn. Code Ann. § 2-2-142(a).[2] "Voter registration drive" is not defined. As part of that pre-drive registration, the registrant must complete government-provided training and ensure that all of its voter registration workers also complete that training. Tenn. Code Ann. § 2-2-142(a)(1)(C), (E). The Coordinator of Elections is forbidden from charging a fee for the government-administered training and is required to "offer the training online." Tenn. Code Ann. § 2-2-142(e). The pre-registration must be accompanied by a "sworn statement stating that the person or organization

---

[1] Several key provisions of the Act contain ambiguities that, the plaintiffs argue, run afoul of the Fourteenth Amendment's protection against unconstitutionally vague statutes under the Due Process Clause. For ease of discussion, the court's summary of the Act's provisions may ignore a few ambiguities for the sake of providing a general picture of the structure of the Act.

[2] For ease of reading, the court will cite the Act using the section designations that it will have when included in the Tennessee Code Annotated.

Case 3:19-cv-00365   Document 53   Filed 09/13/19   Page 3 of 42 PageID #: 647

shall obey all state laws and procedures regarding the registration of voters." Tenn. Code Ann. § 2-2-142(a)(1)(D).

These requirements include an exception for "individuals who are not paid to collect voter registration applications or . . . organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications." Tenn. Code Ann. § 2-2-142(g). An organization is also excepted if it has been "designated" by the county election commission as the county designee for the purposes of operating certain county-supervised voter registration activities. Tenn. Code Ann. § 2-2-142(a).

Violation of any of these requirements, if done "intentionally or knowingly," is a Class A misdemeanor, and "each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-142(f).

### 2. Mandatory 10-Day Turn-In and Civil Penalties for Incomplete Forms

The Act requires any person or organization that performs a voter registration drive for which registration was required to "deliver or mail completed voter registration forms within ten (10) days of the date of the voter registration drive; provided[] that if the date of the voter registration drive is within ten (10) days of the voter registration deadline, the completed forms must be delivered or mailed no later than the voter registration deadline." Tenn. Code Ann. § 2-2-142(a)(2). The only exception within the text of the Act is that "[a] person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission." Tenn. Code Ann. § 2-2-143(b). A knowing or intentional violation of this provision is a Class A misdemeanor, with "each violation constitut[ing] a separate offense." Tenn. Code Ann. § 2-2-142(f).

Tenn. Code Ann. § 2-2-142(a)(2) is not the only statute bearing on a person's obligation to turn in voter registration applications that have been entrusted to her. Tenn. Code Ann. § 2-19-

103, for example, generally makes it a crime to knowingly interfere in a person's rights under the state's election laws. Accordingly, if a prospective voter entrusted a middleman with her voter registration application, and that middleman knowingly discarded the application or failed to turn it in as a way to disenfranchise the voter, that failure would likely already be a violation of Tennessee law, regardless of the Act.

The plaintiffs, however, take issue with the inflexibility of the 10-day rule and, in particular, with the turn-in requirement's relationship to another of the Act's key provisions, its system of civil penalties related to the submission of "incomplete" voter registration applications. Pursuant to Tenn. Code Ann. § 2-2-143(a), "any person or organization" that "conducts voter registration drives under" the registration scheme is subject to a civil penalty if the person or organization, "within a calendar year, files one hundred (100) or more incomplete voter registration applications." The Act defines "incomplete voter registration application" as "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b). This provision does not include a requirement that the violation be knowing or intentional.

County election commissions are required to "file notice with the state election commission, along with a copy of each voter registration application deemed to be incomplete and identifying information about the person or organization that filed the incomplete applications." Tenn. Code Ann. § 2-2-143(c)(2). The state election commission then "shall make a finding on the number of incomplete forms filed" and "may impose civil penalties for Class 1 and Class 2 offenses." Tenn. Code Ann. § 2-2-143(c)(3). "'Class 1 offense' means the filing of one hundred (100) to five hundred (500) incomplete voter registration applications," and such an offense is "punishable by a civil penalty of one hundred fifty dollars ($150), up to a maximum of

two thousand dollars ($2,000), in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(A). "'Class 2 offense' means the filing of more than five hundred (500) incomplete voter registration applications," and such an offense is "punishable by a civil penalty of not more than ten thousand dollars ($10,000) in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(B).

### *3. Mandatory Disclaimers for Communications "Regarding Voter Registration Status"*

Pursuant to Tenn. Code Ann. § 2-2-145(a)(1), any "public communication regarding voter registration status made by a political committee or organization must display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state." *Id.* "The disclaimer must be clear and conspicuous and prominently placed. A disclaimer is not clear and conspicuous if it is difficult to read or hear, or if its placement can be easily overlooked." Tenn. Code Ann. § 2-2-145(d). If a "person or organization . . . establishes a website for voter registration purposes," it must display such a disclaimer and, if the site "captures or collects the voter's information or data," it must include an additional notice "disclos[ing] on the website the person's or organization's name and the purpose for which the voter information is captured or collected." Tenn. Code Ann. § 2-2-145(b)(1)–(2). The same is true for a website created to allow users to look up registration information. Tenn. Code Ann. § 2-2-145(c)(1)–(2). "Any person who intentionally and knowingly violates" these provisions "commits a Class A misdemeanor and each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-145(e).

**C. This Litigation**

*1. The Plaintiffs*

The plaintiffs are all organizations involved in voter registration activities in Tennessee. Although they employ different strategies and work with different populations, all have expressed fear that it will be difficult or even impossible to continue their activities while complying with the Act.

**a. Tennessee NAACP.** Gloria Jean Sweet-Love, the president of the Tennessee State Conference of the N.A.A.C.P. ("Tennessee NAACP"), has provided a Declaration describing the organization's long history of voter registration work and the likely effects of the Act on that work going forward. (Docket No. 39-2.) The Tennessee NAACP's "mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons." (*Id.* ¶ 7.) According to Sweet-Love, the Tennessee NAACP "believes voting is one of the few societal levers that is available to almost everyone, even the underserved," and, therefore, the organization "views voter registration as a core activity fundamental to the advancement of the rest of the organization's mission." (*Id.* ¶ 13.) Sweet-Love explains that the Tennessee NAACP's voter registration activities have historically been performed hand-in-hand with its education and advocacy work, meaning that its voter registration drives involve more than merely "handing someone a form." (*Id.* ¶ 15.) The organization's voter registration efforts are overseen by two chairs with decades of experience between them. In the past, those chairs have, when possible, received small stipends, as have some of the group's voter registration workers. (*Id.* ¶¶ 17–18.) Sweet-Love explains that the organization takes the integrity of its voter registration activities seriously and, accordingly, provides extensive training to its staff and volunteers. (*Id.* ¶ 41.)

7

According to Sweet-Love, the Act, if it takes effect, will require the Tennessee NAACP to "scale back 2019 [voter registration] efforts considerably." (*Id.*) For example, many personnel who have already been extensively trained by the Tennessee NAACP will have to receive new government training under the Act. (*Id.* ¶¶ 42–43.) The organization has also expressed concern that it will have no idea which of its voter registration drives will require pre-registration. As Sweet-Love explains, the organization never knows how many new voters may decide to register at one of its many events. Therefore, it is possible that more than 100 voters will register at essentially any such event, even if it is unlikely. The uncertainty about when registration will be required, Sweet-Love suggests, is only exacerbated by uncertainty about what it means for a group or volunteer to be "paid" under the Act. (*Id.* ¶¶ 45, 47.)

Sweet-Love further complains that the sheer volume of the Tennessee NAACP's legitimate voter registration activities will make it particularly susceptible to the possibility of civil penalties for the submission of incomplete applications. (*Id.* ¶ 49.) The only way to reliably avoid penalties, Sweet-Love suggests, would be to "dramatically reduce the amount of voter registration [the group] attempt[s]." (*Id.*)

Finally, Sweet-Love complains about both the lack of clarity in the disclaimer requirements and the damage that the disclaimers could do to the Tennessee NAACP's reputation. She explains that the Tennessee NAACP has, historically, "always strived to work with government at every level when doing voter registration and voter protection work," including by working directly with county election commissions. (*Id.* ¶ 52.) The group is concerned that the required disclaimers might make their efforts seem illegitimate or give the impression that the group will not work with appropriate authorities to ensure that applications are processed. (*Id.*) Sweet-Love also notes that there may be technical obstacles to providing the

disclaimers in some media, particularly text messages, which the group uses in support of its voter registration activities. (*Id.* ¶¶ 52–53.)

 **b. Democracy Nashville.** The plaintiffs have also produced a Declaration by Sekou Franklin, a co-founder and co-coordinator of Democracy Nashville-Democratic Communities ("Democracy Nashville"), an "an African-American-led organization that works closely with a constellation of Tennessee organizations focused on racial justice." (Docket No. 39-3 ¶¶ 3, 6.) Franklin explains that voter registration is a "critical component" of Democracy Nashville's work, but the group "rarely, if ever, ha[s] events that focus solely on voter registration." (*Id.* ¶ 8.) Rather, opportunities for voter registration are integrated into Democracy Nashville's broader education and advocacy, such as, for example, through the operation of voter registration booths at issue-focused events. Democracy Nashville also engages in issue-based canvassing that includes assistance in voter registration. (*Id.* ¶¶ 9, 15.) Accordingly, much of Democracy Nashville's voter registration activity has been performed in conjunction with advocacy for specific issues, including, for example, Nashville's adoption of a police Community Oversight Board and a "Ban-the-Box" policy limiting the use of criminal history in applications for city employment. (*Id.* ¶ 15.) Democracy Nashville is mostly volunteer-run, but it sometimes offers stipends for part-time staff to participate in activities including voter registration. (*Id.* ¶ 10.)

 Democracy Nashville shares many of the Tennessee NAACP's concerns about its continuing activities under the Act, including with regard to the difficulty of determining when the Act will apply to particular activities. Franklin expresses particular concern about the compliance costs associated with the Act and the possibility that the Act's criminal provisions and civil fines could deter individuals from assisting in the group's voter registration activities. (*Id.* ¶¶ 44–46, 58.) According to Franklin, "[t]he law's financial penalties, if assessed against

9

[Democracy Nashville], would force [the group] to dissolve, given [its] limited funding." (*Id.* ¶ 48.) Franklin also attests that Democracy Nashville has spent resources on text message campaigns that included discussion of voter registration, and the cost of those campaigns would be increased by the Act's disclaimer requirements. (*Id.* ¶ 57.) According to Franklin, Democracy Nashville has considered a moratorium on voter registration activities and will, at the very least, be forced to "significantly scale back" its activities under the Act. (*Id.* ¶¶ 61–63.)

    **c. Equity Alliance.** Equity Alliance President Charlane Oliver has also provided a Declaration attesting to the obstacles that the Act will pose to her organization, which "advocates for African-Americans and other communities of color, with the goal of ensuring that they have a fair and just opportunity at realizing the American dream." (Docket No. 39-4 ¶¶ 3, 5.) The Equity Alliance engages in voter registration at issue-based events, at churches, and through door-to-door canvassing, and its voter registration efforts sometimes rely on grants and involve providing workers with stipends. (*Id.* ¶¶ 10, 14, 16.) Oliver shares the concerns expressed by Sweet-Love and Franklin, including with regard to the compliance costs associated with the Act and the chilling effect that penalties will have on potential staff and volunteers. (*Id.* ¶¶ 49, 51.)

    Oliver further explains that Equity Alliance often organizes its voter registration activities on short notice, when it has, for example, learned of an event, such as a neighborhood block party, that would present the opportunity to register new voters. Oliver states that the Act's training and registration requirements will make it difficult to staff and establish compliance for these last-second events. (*Id.* ¶¶ 52–53, 56–57.) Oliver states that the Equity Alliance takes its responsibilities in assisting with voter registration seriously and that it, therefore, takes steps to try to ensure that applications are completed fully and accurately. Nevertheless, she explains, some incomplete applications are inevitable, and even a very low error rate can lead to the

submission of many incomplete forms, if a group's voter registration efforts are wide-ranging enough. The Equity Alliance will, she suggests, be at risk of incurring civil fines even if it takes all possible steps to identify incomplete forms and alert authorities to their existence. (*Id.* ¶¶ 60, 64.) The Equity Alliance, like the other groups, uses text messages to communicate with voters regarding voter registration and shares those groups' concerns about the Act's required disclaimers. (*Id.* ¶ 69.)

      **d. Andrew Goodman Foundation.** Finally, the plaintiffs have provided a Declaration by David Goodman, the President of the Andrew Goodman Foundation ("AGF") and the brother of the late Andrew Goodman, who, in 1964, was kidnapped and murdered along with two other men while participating in voter registration efforts in neighboring Mississippi. (Docket No. 39-5 ¶¶ 3, 6.) AGF operates an initiative known as "Vote Everywhere," through which it works with colleges and universities, as well as student leaders at those colleges and universities, to encourage and facilitate voter registration by young people. (*Id.* ¶ 8.) Vote Everywhere is active on the campus of Tennessee State University ("TSU"). (*Id.* ¶ 17.) AGF's activities on the TSU campus have been extensive and have included operating voter registration tables during meals and at events such as homecoming and freshman orientation. AGF also assists the Equity Alliance with its door-to-door canvassing efforts. (*Id.* ¶ 38.) AGF provides stipends to its student leaders. (*Id.* ¶ 22.) AGF also maintains an online voter registration portal and communicates with potential voters by text message. (*Id.* ¶¶ 30, 32.)

      According to Goodman, "AGF will be forced to significantly reduce or halt altogether its voter registration activities" because of its potential exposure under the Act. (*Id.* ¶ 43.) AGF shares the other groups' aforementioned concerns, particularly with regard to the difficulty of ascertaining when the Act's registration and training requirements will apply to its activities, the

11

chilling effects of the Act's penalty provisions, and the challenges of revising its materials and messages to include required disclaimers. (*Id.* ¶¶ 43, 48, 53.)

### *2. The Defendants*

The plaintiffs have named as defendants various Tennessee officials who will play roles in administering the Act, each of whom is sued in his or her official capacity only. Tre Hargett is the Tennessee Secretary of State. Under the Tennessee Constitution, the Secretary of State is appointed by a joint vote of the General Assembly, whose members are elected. Tenn. Const. art. III, § 17. The Secretary of State, in turn, appoints the state's Coordinator of Elections, who serves at the pleasure of the Secretary. Tenn. Code Ann. § 2-11-201(a). Defendant Mark Goins is the Coordinator of Elections. The Coordinator "is the chief administrative election officer of the state" and is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." Tenn. Code Ann. § 2-11-201(b). Among the Coordinator's responsibilities under the Act is that he is the official who "administer[s]" the mandatory government training, without which individuals cannot participate in a covered voter registration drive, and he is the official with whom individuals and organizations must register. Tenn. Code Ann. § 2-2-142(a)(1). Coordinator of Elections Goins has provided a Declaration stating that he has not yet promulgated any regulations pursuant to the Act and cannot begin the rulemaking process until October 1, after which the rulemaking process will take at least five months. (Docket No. 41-1 ¶¶ 7, 9.) He also has not yet created an online training program as required by the Act. (*Id.* ¶ 10.)

Herbert H. Slatery III is the Attorney General and Reporter (hereinafter, "Attorney General") of Tennessee. Tennessee's Attorney General is appointed by the judges[3] of its

---

[3] The Tennessee Constitution refers to the members of the judiciary who sit on the Tennessee Supreme Court, other than the Chief Justice, as "judges," although the court takes judicial notice that they are all

Supreme Court, who are, under current law, appointed by the Governor and confirmed by the General Assembly, after which the judges are subject to retention elections. Tenn. Const. art. VI, §§ 3, 5. The Attorney General is empowered to request that the Coordinator conduct investigations of alleged violations of the election code, including the Act. Tenn. Code Ann. § 2-11-202(a)(5)(C).

Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are the members of the State Election Commission. Members of the Commission are elected by a joint resolution of both houses of the General Assembly. Tenn. Code Ann. § 2-11-104(b). The Act adds a provision allowing the General Assembly to remove a member for cause or if he or she becomes unqualified. 2019 Tenn. Laws Pub. ch. 250, § 8. Under the Act, the Commission is the body to which incomplete registrations are reported and the body that "may" impose fines based on the incomplete forms. Tenn. Code Ann. § 2-2-143(c). The members of the Commission have provided Declarations stating that they do not intend to enforce Tenn. Code Ann. § 2-2-143 or refer anyone for prosecution under Tenn. Code Ann. § 2-2-142 until administrative rules are finalized under the Act. (*E.g.*, Docket No. 41-2 ¶¶ 10–12; *accord* Docket Nos. 41-3 to -7 ¶¶ 10–12, Docket No. 41-8 at 2–3.)

### 3. The Plaintiffs' Motion

The plaintiffs ask the court to "enjoin the implementation of [the Act], to be codified as Sections 2-2-142, 2-2-143, 2-19-145 of the Tennessee Code," which would include both the provisions that the plaintiffs have expressly challenged as well as a few additional provisions that have been codified alongside them, such as the Act's prohibition on paying voter registration workers on a per-registration basis. *See* Tenn. Code Ann. § 2-2-142(c). (Docket No. 39 at 1.)

---

commonly referred to as "justices." The court has used the term "judge" merely to reflect the constitutional text.

## II. LEGAL STANDARD

The Sixth Circuit has held that the district court must balance four factors when considering a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citing *PACCAR Inc. v. TeleScan Techs.*, LLC, 319 F.3d 243, 249 (6th Cir. 2003)).

## III. JURISDICTION

The defendants renew their objections that the plaintiffs lack standing to bring their claims and that the claims are not ripe for adjudication. The court addressed the appropriate legal standard for evaluating these arguments at length in its Memorandum of September 9, 2019 (Docket No. 48 at 16–23) and will not reiterate the entirety of that legal analysis here. Rather, the court incorporates its prior legal conclusions by reference and will apply that analysis to the factual record now before it.

### A. Standing

As the court previously concluded, the plaintiffs may establish that their claims are premised on an actual or imminent injury-in-fact in several ways relevant to this case. First, they may establish injury-in-fact based on the Act's actual or imminent "costly, self-executing compliance burdens." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (finding standing because

14

"plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an injury in fact.") (citing *All. for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)). Second, the plaintiffs can establish standing based on the fact that, but for the Act, they would behave in ways that the Act proscribes, and they, therefore, will imminently be forced to alter their behavior in response to the Act. *See Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding standing where plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). Third, the plaintiffs can establish an injury-in-fact by establishing that the Act will imminently "restrict[] the plaintiffs' political activities within the state" and "limit[] their ability to associate as political organizations." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014). The court held that, for the purposes of the facial challenge to jurisdiction raised in the defendants' Motion to Dismiss, the allegations in the plaintiffs' Amended Complaint were sufficient to establish standing in any of those three ways.

Nothing about the evidence now before the court causes it to revise its conclusion with regard to standing. The defendants now offer declarations from the Coordinator of Election and members of the State Election Commission to the effect that they have not yet issued any regulations pursuant to the Act and do not intend to penalize anyone until those regulations are issued, which will take several months. (*See* Docket Nos. 42-2 to -8.) The provisions of the Act, however, are self-executing. They go into effect regardless of whether there has been any rulemaking and regardless of what the defendants say in non-binding statements offered in the

context of their trying to escape judicial review. As the Supreme Court has observed, First Amendment caselaw recognizes "the danger in putting faith in government representations of prosecutorial restraint" where protected speech is concerned. *United States v. Stevens*, 559 U.S. 460, 480 (2010). The courts, accordingly, will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001)). The defendants, moreover, are not even the only parties in charge of enforcing many of the Act's provisions, which can be enforced by local district attorneys general, so the defendants' statements are especially immaterial.

Aside from that, an individual who wishes to engage in voter registration activities in Tennessee will still need to take steps to be ready to comply with the Act whenever authorities do start enforcing it. The need to prepare for the Act's enforcement, whether in a month or six months, is an actual injury sufficient to confer standing, just as the soon-to-take-effect commands of the Act pose an imminent injury sufficient to confer standing in their own right.

**B. Ripeness**

As the Sixth Circuit has observed, "[t]he line between Article III standing and ripeness in preenforcement First Amendment challenges" is so slim that it has, in effect, "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165–67 (2014)). Unsurprisingly, then, the defendants' ripeness arguments are largely just an echo of their standing arguments. At the motion to dismiss stage, the court held that the plaintiffs' allegations were sufficient to meet the constitutional requirements of ripeness, and that, insofar as it mattered, they also presented no prudential obstacles to adjudication. As with standing, the evidentiary record confirms the court's earlier analysis.

## IV. PRELIMINARY INJUNCTION FACTORS

### A. Likelihood of Success on the Merits

#### *1. Challenges to Tenn. Code Ann. §§ 2-2-142 & 2-2-143*

**a. Governing Standard.** The plaintiffs argue that the Act's registration and training requirements, 10-day turn-in requirement, and penalties for incomplete applications unconstitutionally burden their First Amendment rights of speech and association. They argue next that, insofar as those requirements are not entirely unconstitutional on the merits, they are unconstitutionally overbroad and vague. With regard to the constitutionality of the challenged provisions under the First Amendment, the defendants dispute the plaintiffs' conclusions, focusing, in large part, on the standard by which the court should consider the constitutionality of the Act's requirements. Specifically, the plaintiffs argue that the requirements should be subject to "exacting scrutiny," whereas the defendants argue that the requirements should be subject to a significantly more deferential standard of review.

The defendants first question whether the plaintiffs have identified any First Amendment rights burdened by the Act. As the court explained in its Memorandum of September 9, 2019, the defendants' argument that the plaintiffs' Complaint is unclear in this regard is baseless. (Docket No. 48 at 28–29.) "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (citing *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)). As the plaintiffs write in the third paragraph of their Complaint, "the collection and submission of voter registration drives is intertwined with speech and association" and therefore "comes within the protections of the First Amendment." (Docket No. 1 ¶ 3 (quoting *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) (emphasis added)). In particular, a

voter registration drive, as described by the plaintiffs and as the term is ordinarily used, involves "encourag[ing] . . . citizens to register to vote." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006). "[E]ncouraging others to register to vote" is "pure speech," and, because that speech is political in nature, it is a "core First Amendment activity." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012).

Moreover, insofar as some discrete, purely logistical aspects of the voter registration process might be "separable" from the expressive, informational, and associational aspects of a voter registration drive, *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013), that is not the case here. The court is skeptical that the First Amendment would countenance "slic[ing] and dic[ing] the activities involved in the plaintiffs' voter registration drives" for constitutional purposes, both because doing so would allow the government to burden the protected aspects of the drive indirectly and because the "entire voter registration activity" implicates the "freedom of the plaintiffs to associate with others for the advancement of common beliefs [that] is protected by the First and Fourteenth Amendments." *Id.* at 401, 404 (Davis, J., dissenting). Even if that type of disjointed analysis were permissible, however, the plaintiffs have demonstrated how each of the challenged provisions bears directly on the expressive and associational aspects of a voter registration drive. The prior registration and training requirements are directed at the entirety of the drive, not some discrete aspect; the training requirement, moreover, involves inserting the government, as a speaker, into the associational activity between voter registration workers, directly implicating core First Amendment interests; and, while the civil penalties for incomplete applications are directed only at the paperwork produced by a drive, the threat of penalties is likely to have a chilling effect on the entirety of the drive, including its communicative aspects.

18

The defendants have suggested that the Act does not regulate expressive, informational, or associational aspects of voter registration, because the plaintiffs could still promote registration without collecting the applications themselves. The General Assembly, however, did not adopt the Act in a vacuum, and the plaintiffs now have provided a significant factual record of the practices that the Act will reach. Voter registration drives, as a practice, existed well before the Act, and, as the General Assembly was no doubt aware, those drives historically have involved both encouraging and facilitating registration, including, at least in many cases, by physically transporting applications. As a matter of simple behavioral fact that long pre-dates the enactments at issue here, "the collection and submission of" the applications gathered in a voter registration drive "is intertwined with speech and association." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006). The defendants are not free to rewrite the way democracy has been practiced for decades to create a hypothetical world where the Act is arguably less constitutionally problematic. Because the Act regulates these traditional voter registration drives, which include central elements of expression and advocacy, it does not matter that the Act would not apply to some other hypothetical activity that a group might concoct specifically to evade the Act's requirements.[4]

---

[4] The majority of a divided panel of the Fifth Circuit adopted an argument similar to the defendants' in *Voting for America, Inc. v. Steen*, which the court finds equally unpersuasive. That court concluded that a challenged provision did not burden core First Amendment interests, because groups seeking to engage in protected activity could avoid the provision "with an appropriate division of labor and organizational forethought." *Steen*, 732 F.3d at 390. But increasing the logistical and planning burdens of engaging in protected speech *is* placing a burden on that speech. One might as well say that a fine imposed directly on political speech is unproblematic because the fine can be rendered ineffective with an "appropriate" amount of money. In any event, the defendants are cautioned that, if they succeed on this line of argument, focusing on how easily the Act can be bypassed, they may well be obtaining a slightly more forgiving standard of review only to ensure that the Act will not pass it. If, in fact, the Act can be circumvented as easily and painlessly as the defendants suggest, then its requirements will be wholly ineffective at combating the risks that the defendants have identified as justification for the Act's existence. A statute that burdens First Amendment activity without anything to show for it would be unlikely to survive even a somewhat more relaxed standard of review.

19

The mere fact that First Amendment interests are touched on by the Act, however, does not necessarily render the Act unconstitutional or even dictate the standard by which the Act must be reviewed. Courts have often struggled with the unique difficulties posed by First Amendment challenges to election laws. In most areas of the law, the government can avoid the First Amendment just by taking the Amendment's advice and "mak[ing] no law" that bears on a potentially protected subject matter. U.S. Const. amend. I. On the topic of elections, however, making no law is not an option. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). For that reason, the Supreme Court has held that First Amendment challenges to "election code provisions governing the voting process itself" require a specialized inquiry beyond a simple "'litmus-paper test' that will separate valid from invalid restrictions." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (citation omitted). In such cases, the Supreme Court has "pursued an analytical process" that considers "the relative interests of the State and the injured voters, and . . . evaluate[s] the extent to which the State's interests necessitated the contested restrictions." *Id.* (citation omitted).

The "flexible balancing approach" endorsed by the Supreme Court—known generally as the *Anderson-Burdick* framework, after *Burdick v. Takushi*, 504 U.S. 428 (1992), and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1982)—can sometimes make it hard to fit First Amendment challenges to election laws into ordinary constitutional categories. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016). When a state's law "'severely' burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (quoting *Burdick*, 504 U.S. at 534). In cases with no actual burden on a right to vote or other constitutional right, "a straightforward rational

20

basis standard of review should be used." *Id.* (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807–09 (1969); *Biener v. Calio*, 361 F.3d 206, 214–15 (3d Cir. 2004)). "The distinction between 'severe burdens' and 'lesser' ones," however, "is often murky," *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (citation omitted), and "most cases fall in between these two extremes." *Obama for Am.*, 697 F.3d at 429. Both sides of the *Anderson-Burdick* balancing formula, moreover, can be fact-intensive, requiring the court to evaluate the severity of actual burdens and the importance of actual state interests. In this particular case, the plaintiffs have provided a great deal of evidence of the Act's burdens, but the defendants, despite having had an opportunity to do so, have produced little, if any, evidence of the importance of the state's interests.

Before a court even begins the *Anderson-Burdick* balancing process, however, it must conduct the threshold inquiry of whether that framework actually applies—which is not necessarily a given merely because the challenged law pertains to elections. As the Sixth Circuit has observed, the rationale for *Anderson-Burdick* assumes that "'election cases rest at the intersection of two competing interests,' namely, an individual's right to vote versus a state's prerogative to regulate the right to vote." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 349 (6th Cir. 2018) (quoting *Ohio Democratic Party*, 834 F.3d at 626). Some election-related laws, however, implicate more than those two sets of concerns. Specifically, laws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where "the First Amendment 'has its fullest and most urgent application.'" *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971); citing *Mills v. Alabama*,

384 U.S. 214, 218 (1966)). The Supreme Court, accordingly, has applied "exacting scrutiny"—not *Anderson-Burdick*—to cases governing election-related speech rather than "the mechanics of the electoral process*." McIntyre*, 514 U.S. at 345, 347 (reviewing law banning the circulation of anonymous literature intended to affect an election).

Left with this sometimes bewildering array of standards to choose from, it is probably best to eschew the abstract in favor of the specific, look to the details of the challenged scheme, and see how similar laws have been reviewed by the Supreme Court when challenged. Neither party has identified a Supreme Court case specifically addressing voter registration drive restrictions of the type at issue here. The plaintiffs, however, liken their challenge to those raised in two Supreme Court cases involving a different type of canvassing, the circulation of petitions in support of ballot initiatives, *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). In *Meyer*, the Supreme Court struck down Colorado's prohibition on the use of paid petition circulators. 486 U.S. at 428. In *Buckley*, the Supreme Court struck down three more Colorado restrictions on petition circulators: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the circulator's name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186, 205 (citations omitted).

The Supreme Court concluded that the regulation of the petition-drive activities at issue "involve[d] a limitation on political expression subject to exacting scrutiny." *Meyer*, 486 U.S. at 420 (citing *Buckley v. Valeo*, 424 U.S. 1, 45 (1976)). The Court explicitly rejected, moreover, the argument that the logistical aspects of collecting signatures could be easily separated from the regulation of speech, because "[t]he circulation of an initiative petition of necessity involves both

22

the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421. "[T]he First Amendment," the Court explained in *Buckley*, "requires us to be vigilant" when such activities are regulated, "to guard against undue hindrances to political conversations and the exchange of ideas." 525 U.S. at 192 (citing *Meyer*, 486 U.S. at 421). The Court held that the prohibitions were unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change, and [were] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Id.*

The Supreme Court noted, in particular, the laws' tendency to result in "speech diminution" by "decreas[ing] the pool of potential circulators" of petitions. *Id.* at 194; *see also Bailey v. Callaghan*, 715 F.3d 956, 969 (6th Cir. 2013) (referencing *Meyer* as an example of the rule that the First Amendment applies "not only to laws that directly burden speech, but also to those that diminish the amount of speech by making it more difficult or expensive to speak") (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337 (2010); *Meyer*, 486 U.S. at 424)). Based on the factual record provided by the plaintiffs and largely unrefuted by the defendants, the same speech diminution rationale can easily be applied to the Act's restrictions on voter registration drives, particularly those involving prior registration, mandatory attendance at state-provided training, and the threat of criminal prosecution. If, therefore, *Meyer* and *Buckley* apply, they pose a substantial obstacle to the constitutionality of the Act.

The Sixth Circuit has recognized that the standard set forth in *Meyer* and *Buckley* is not limited to the circulation of initiative petitions. *See Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 316 (6th Cir. 1998) (applying *Meyer-Buckley* framework to law governing solicitation of political contributions). The defendants nevertheless argue that those cases should not apply

here because voter registration drives, unlike petition drives for ballot initiatives, do not involve "communication with voters about proposed political change" and, therefore, are entitled to less First Amendment protection. *Buckley*, 525 U.S. at 192. But, as the court has already observed in other opinions involving the Act, the creation of a new voter *is* a political change—no less so than the inauguration of a new mayor or the swearing-in of a new Senator. The often-repeated premise that voting is the "political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), is not just a comforting aphorism; it reflects an acknowledgment that, in the American system of governance, every decision to grant, preserve, or take away a right can be traced, in at least some partial way, back to an election. If anything, a person's decision to sign up to vote is more central to shared political life than his decision to sign an initiative petition. A petition in support of a ballot initiative might lead to a change in one law or a few laws, but a change in the composition of the electorate can lead to the change of *any* law.[5]

A discussion of whether or not a person should register to vote, moreover, inherently "implicates political thought and expression." *Buckley*, 525 U.S. at 195.[6] Registering to vote is not a politically neutral act, and neither is declining to. A person seeking to register voters may, for example, find herself confronted with people who, based on their beliefs about politics and

---

[5] It is also mistaken to suggest, as some have, that becoming a voter is not associational in the same way as signing a petition, because petitions involve citizens acting in concert whereas the right to vote is individual. *See Steen*, 732 F.3d at 390. For one thing, the right to sign a petition is also an individual right. A petition, in practice, is little more than several individual votes in favor of a course of action in the same stack of papers. Moreover, the conception of voting as purely individual misconceives of the nature of the right. One becomes a voter in order to join the electorate and to vote in concert with like-minded people. The individual right to make one's own small voice heard is just one side of the right to vote; the other side is the power to add that voice to others in order to actually effect change—in other words, to act in political association.

[6] Although *Buckley* was not itself about restrictions on voter registration efforts, it did discuss voter registration, because the challenged law limited circulating petitions to registered voters. That discussion in *Buckley* leaves little doubt that the Supreme Court understood the political dimensions of voter registration. 525 U.S. at 194–96.

24

government, consider voting to be unimportant, a waste of time, or even a pernicious tool for lending legitimacy to an intolerable system. *See id.* (discussing reasons individuals have refused to register to vote). Even if a prospective voter does not explicitly voice those concerns, the operator of the registration drive will no doubt know that sincere reasons for refusing to vote exist and pose an obstacle to his efforts. The way that the person encouraging registration responds to or preempts the objections people have to voting will, therefore, often bear on fundamental questions at the heart of the political system. The court sees no reason that the First Amendment would treat that discussion as somehow less deserving of protection than, for example, a discussion about whether or not there should be a ballot initiative about property taxes. The court, therefore, finds *Meyer* and *Buckley* to provide the appropriate standard for considering the plaintiffs' challenges.

The Sixth Circuit's recent opinion in *Schmitt v. LaRose*, ___ F.3d ___, 2019 WL 3713886 (6th Cir. Aug. 7, 2019), provides a useful framework for distinguishing between cases in which *Anderson-Burdick* is appropriate and cases in which a more demanding First Amendment framework should apply. In *Schmitt*, the plaintiffs challenged Ohio's system of reviewing whether to allow a ballot initiative to proceed—specifically, the state's mechanism for rejecting initiatives that propose "administrative" rather than "legislative" changes. *Id.* at *1. The plaintiffs sought to proceed under ordinary First Amendment principles, but the Sixth Circuit rejected their argument on the ground that the challenged laws "regulate the process by which initiative legislation is put before the electorate, which has, at most, a second-order effect on protected speech." *Id.* at *4. The court further explained that, "although the Supreme Court has acknowledged that a person or party may express beliefs or ideas through a ballot, it has also stated that '[b]allots serve primarily to elect candidates, not as forums for political expression.'"

*Id.* at *5 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997)). Accordingly, *Anderson-Burdick* applied. *Id.*; *see also Comm. to Impose Term Limits on Ohio Supreme Court & to Preclude Special Legal Status for Members & Emps. of Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018) (applying *Anderson-Burdick* in challenge to Ohio's rule limiting initiatives to a single topic). The Sixth Circuit, in *Schmitt*, expressly declined to apply *Meyer*, because the "statute in *Meyer* targeted Coloradans' ability to advocate for initiative petitions, which amounted to regulation of political speech." *Id.* at *9. This case, unlike *Schmitt*—but like *Meyer* and *Buckley*—involves more than merely the composition of a ballot or some other matter of election administration with a "second-order effect on protected speech." It involves the direct regulation of communication and political association, among private parties, "advocat[ing] for" a particular change, namely the creation of new registered voters and, by extension, a change in the composition of the electorate. Because the regulation of First Amendment-protected activity is not some downstream or incidental effect of the Act, *Meyer* and *Buckley* provide the appropriate standard.[7]

    **b. Registration, Training, and Information Retention Requirements.** In order to survive the "exacting scrutiny" of *Meyer* and *Buckley*, a law must, at least, be "substantially related to important governmental interests." *Buckley*, 525 U.S. at 202 (citing *Valeo*, 424 U.S. at 66–68). Even if important governmental interests are present, moreover, the court must consider whether those interests can be served by "less problematic measures." *Buckley*, 525 U.S. at 205.

---

[7] The distance between the *Meyer-Buckley* framework and the *Anderson-Burdick* framework is not, however, necessarily far. The standard of review under *Anderson-Burdick* only recedes to its lowest level when the challenged law is "minimally burdensome" on the exercise of constitutional rights. *Ohio Democratic Party*, 834 F.3d at 627 (citation omitted). But if the burden is "severe," then *Anderson-Burdick* is just another road to strict scrutiny. *Schmitt*, 2019 WL 3713886, at *5. The plaintiffs have produced evidence of significant burdens associated with the Act's provisions, and the defendants have conspicuously failed to provide much, if any, factual basis for disputing the plaintiffs' claims in that regard. Therefore, the plaintiffs have, at the very least, shown enough of a burden to justify a significantly more demanding standard of review than the forgiving standard advocated for by the defendants.

As the Supreme Court has observed, election authorities "retain[] an arsenal of safeguards" through which they can encourage compliance with election laws. *Id.* "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted).

There can be little doubt that there is an important government interest in voter registration being done properly, including when a third party is involved. The court, however, sees very little basis for concluding that the provisions of the Act governing registration and training are truly necessary or substantially related to that interest. For one thing, the defendants, despite having been given the opportunity to provide factual support for the Act, have offered no evidence of any reason to require the operator of a voter registration drive to report his activities to the government. Moreover, even if one assumes that it is necessary for the operator of a voter registration drive to provide certain information to the state, it is not clear why it is necessary that the information be provided to the coordinator of elections before a drive, rather than afterwards, either as part of handing in forms or as a timely separate submission. If anything, post-drive disclosures would be more likely to be accurate. Requiring the information up front and in every case simply requires more prior planning with little, if any, benefit.

Particularly without justification is the requirement that the operators of voter registration drives file sworn statements confirming that they will comply with the law. The law is the law already; no one has to swear to follow it in order for it to apply. As a practical matter, this requirement merely adds an additional regulatory hoop for the operator of a voter registration drive to jump through, while also perhaps sending her an intimidating message about the

possibility of prosecution. There is simply no persuasive reason to force someone to swear that she will abide by laws that already bind her regardless.

The defendants have also wholly failed to provide evidence justifying the policy of imposing the Act's reporting and training requirements only on people or organizations who have received some remuneration for their voter registration work. *See Project Vote*, 455 F. Supp. 2d at 705 (discussing impropriety of "assum[ing] that compensated workers would be more ill equipped to assist in filling out the registration forms than uncompensated voter registration workers" (internal quotation marks omitted)). The imposition of the registration requirement on some voter registration drives and not others, based on whether work is paid, moreover, will inevitably lead to harsher treatment for some types of organizations— specifically, those less capable, perhaps due to the nature of their mission, of summoning numerous enthusiastic volunteers. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799 (1988) (noting that a requirement targeting only paid personnel making charitable solicitations "necessarily discriminates against small or unpopular" causes and groups that must rely on paid assistance). The Act's two-tiered system both lacks justification in its own right and undermines any claim that its provisions are truly necessary.

Finally, the current record reflects no sufficient basis for requiring that registration workers and volunteers receive mandatory government training prior to assisting with voter registration. The State of Tennessee does not require individuals to undergo any kind of government training before filling out their own voter registration forms. Undoubtedly, some such people fill out their forms incorrectly, just as some people who fill out their forms as part of a voter registration drive do. The state's interest in avoiding errors might, therefore, justify a simpler application form or a public education program, but there is substantial reason to doubt

28

that it can justify the unusually aggressive insertion of government speech into private political association that the Act contemplates. Requiring a group seeking to effect political change to be a captive audience for a government-sponsored message before it can engage in constitutionally protected activity would plausibly have a chilling effect, particularly given that the Coordinator of Elections appears to possess broad discretion over the content of the training, including the severity of any warnings about workers' legal exposure as well as simply the amount of time that the training will take. The court, accordingly, concludes that the plaintiffs have demonstrated a strong likelihood of success with regard to their argument that the registration and training requirements for voter registration drives are substantively unconstitutional.

Moreover, the plaintiffs have also demonstrated a strong likelihood of success on the merits of their claims that these provisions are unconstitutional for a second reason—namely, the vagueness of the scope and the nature of their requirements. Admittedly, some degree of ambiguity is unavoidable in statutory drafting, and even a well-drafted statute may be "susceptible to clever hypotheticals testing its reach." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 251 (6th Cir. 2018). However, basic principles of due process set an outer limit for how vague a statutory command can be if a person is going to be expected to comply with that command. Specifically, a statute is unconstitutionally vague under the Fourteenth Amendment if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Id.* at 246 (6th Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'[A] more stringent vagueness test should apply' to laws abridging the freedom of speech . . . ." *Id.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). That standard can be "relaxed somewhat" if the law at

29

issue "imposes civil rather than criminal penalties and includes an implicit scienter requirement." *Id.* (citing *Hoffman Estates*, 455 U.S. at 499). These provisions of the Act, however, impose criminal liability.

Particularly troubling is the uncertain scope of the scheme's exception for individuals and some organizations that are not "paid to collect voter registration applications."[8] Tenn. Code Ann. § 2-2-142(g). Specifically, it is not clear what types of arrangement qualify as 'payment' under the Act. Being "paid to collect voter registration applications" presumably covers individuals paid an hourly wage to collect registrations and organizations that have entered into contracts specifically to collect registrations for an identified price. It is unclear, however, if the language applies to, for example, individuals receiving a stipend or organizations that receive grants to engage in voter registration activities generally. *See Project Vote*, 455 F. Supp. 2d at 707 (noting difficulty of determining which voter registration workers are "compensated"). Without some clarity about the type of payment contemplated by the Act, it is impossible for a person or organization to know if it is covered. Accordingly, the plaintiffs have shown a high likelihood that their claims will succeed, both with regard to the provisions' substantive commands and the vagueness of their scope and requirements.

**c. Penalties Based on Incomplete Applications.** As restrictions on voter registration drive activity, the civil penalties based on the filing of 100 or more incomplete registration applications are subject to the same *Meyer-Buckley* standard as the registration and training provisions. Admittedly, this aspect of the Act is, at least by comparison to the other requirements, more focused on the logistical aspects of voter registration drives—that is to say,

---

[8] The plaintiffs, in their Declarations, identify other aspects of these provisions that present significant vagueness concerns. The plaintiffs' Complaint, however, did not specifically challenge those terms on vagueness grounds. The court, therefore, will focus on the provisions specifically mentioned in the Complaint.

30

the actual filling out and turning in of forms. Nevertheless, as the court has already discussed, "the collection and submission of applications is inextricably intertwined with" the expressive and advocacy aspects of the drive, and it is impossible to burden one without, in effect, burdening the other. *Cobb*, 447 F. Supp. 2d at 1332.

The plaintiffs point out several aspects of the civil penalties regime related to incomplete applications that allegedly impose burdens far out of proportion to their supposed benefits. Most obviously, the combination of the 10-day hand-in requirement and the penalties for incomplete forms put the plaintiffs in an unnecessary double bind. There are good reasons to require operators of voter registration drives to turn in all of their collected applications and to do so in a timely manner. But by imposing the 10-day requirement, the Act is also, by necessity, requiring people and organizations to turn in applications that they know to be incomplete. The Act, therefore, punishes a person or organization for doing too much of something that it requires them to do.

The defendants would presumably respond that the Act only punishes those whose voter registration efforts result in an unacceptable rate of error. That, though, is not how the Act is structured. The Act does not punish anyone for the *rate* of incomplete forms he turns in. If an organization turns in 10,000 applications, 1% of which are incomplete, it is penalized, even if it made all reasonable efforts to perform its voter registration drive competently. If an organization turns in a stack of 150 applications, 66% of which are incomplete, that organization is in the clear. The result is that the Act holds an organization to an increasingly more onerous standard the more effective it is at recruiting new voters.

That penalty for effectiveness is only exacerbated by the Act's provisions imposing an additional penalty "in each county where the violation occurred." Tenn. Code Ann. § 2-2-

143(c)(4)(A), *accord* Tenn. Code Ann. § 2-2-143(c)(4)(B). For example, if an organization operates across 20 counties and turns in 5 incomplete forms from each county, for a total of 100 incomplete forms, it can be fined up to $2,000. If an organization operates in one county and turns in 500 incomplete forms, it can only be fined $150. Just as the decision to punish by volume rather than rate punishes an organization for identifying more prospective voters, the county-by-county fine requirement punishes an organization for having a wider geographic scope. The unluckiest organization of all is one that seeks to register a large number of Tennesseans across a large number of counties. In other words, the Act falls hardest not on bad actors but on organizations with the most ambitious and inclusive voter registration efforts. The state's interest in drives being performed competently does not justify such a regime, under exacting scrutiny or some lesser balancing analysis. The court has little trouble, therefore, concluding that the plaintiffs are likely to succeed on this aspect of their claim.

    **d. Disclaimer Requirements.** The Act's required disclaimers implicate not only the principles discussed in *Meyer* and *Buckley* but also the well-developed caselaw regarding government-compelled speech. "The First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.*" Riley*, 487 U.S. at 796–97. A law that "compel[s] individuals to speak a particular message" by following a "government-drafted script" that "alte[rs] the content of [their] speech" is a "content-based regulation of speech" and, therefore, "presumptively unconstitutional."[9] *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Riley*, 487 U.S. at 795; *Reed v.*

---

[9] The defendants suggest, instead, that the disclaimer requirement is subject only to rational basis review, based on *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012), a case involving, among other things, required warnings on tobacco packaging. The Sixth Circuit in *Discount Tobacco City*, however, expressly premised its reasoning on the courts' "longstanding approach" of treating commercial speech as entitled to lesser protection than other forms of political speech. *Id.* at 522. *Discount Tobacco City* is, therefore, inapposite.

*Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015)). Such laws "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *Reed*, 135 S. Ct. at 2226). The defendants, as the parties defending a policy of government-compelled speech, "ha[ve] the burden to prove that the [challenged requirement] is neither unjustified nor unduly burdensome." *Becerra*, 138 S. Ct. at 2377 (citing *Ibanez*, 512 U.S. at 146).

The defendants suggest that all of these bedrock First Amendment principles fall by the wayside, as long as the disclaimer that a person is being required to utter is "factual." The Supreme Court, however, has flatly rejected the argument that merely because a statement is technically true then the government can force a person to make that statement without offending the constitution. *See id.* at 2372. Quite to the contrary, the Supreme Court has recognized that, if left unchecked, the government can use mandatory disclaimers—even truthful ones—as a means of "manipulat[ing] the content of . . . discourse" on issues of profound importance, placing the thumb on the scale in favor of the government's preferred viewpoints and speakers. *Id.* at 2374 (citation omitted). That risk is especially acute where, as here, the disclaimer is designed to highlight the speaker's lack of authority on the issue she wishes to address. As the court has already held, the speech touched on by the Act falls within the highest level of constitutional protection. Interfering with that speech is constitutionally suspect, whatever tool is used. The court, accordingly, will not ignore the well-established constitutional standards for evaluating compelled speech.

The plaintiffs have demonstrated a likelihood of success in establishing that the disclaimer requirements serve no compelling state interests. The defendants offer hypothetical situations in which individuals might be harmed by their confusion regarding whether a voter

33

registration entity is actually government-affiliated or not. They provide, however, no evidence that such situations are likely or common. In order for a compelled disclosure to pass constitutional muster, it must "remedy a harm that is," at the very least, "'potentially real[,] not purely hypothetical.'" *Id.* at 2377 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994)).

Even if the defendants could establish that the disclaimers required by the Act are directed at a real problem, there is reason to doubt that the Act is appropriately tailored to that problem. The government's "simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348. If the state is concerned that the public is insufficiently informed or misinformed, then "more benign and narrowly tailored options are available" than compelled speech. *Riley*, 487 U.S. at 800. For example, the state could "communicate the desired information to the public" itself through a public awareness campaign. *Id.* If the Tennessee Department of State is concerned that the public is confused about its role in voter registration, it is free to communicate with the public of its own accord.

The defendants dismiss plaintiffs' concerns that the disclaimers will cause a stigmatic injury by making voter registration activities seem somehow illegitimate. To that end, the defendants imagine a particularly unusual hypothetical member of the public—one too unsophisticated to discern that, for example, the Tennessee NAACP is not a division of the Secretary of State, yet somehow sophisticated enough not to misinterpret the Act's required disclaimers. The content of the required disclaimers, however, is confusing, at best, and quite likely to be misleading. A group must explain that its communication is "not made in conjunction with or authorized by the secretary of state." But the Secretary of State has no power

to "authorize[]" or not "authorize[]" anyone to engage in voter registration-related communications. The plaintiffs' communications, moreover, are authorized—authorized by the First Amendment and authorized because, consistently with the First Amendment, nothing in Tennessee law forbids them. Moreover, it is simply untrue, as a practical matter, that voter registration-related communications, particularly ones made in the context of voter registration drives, are not made "in conjunction with" the proper government authorities. The government dictated the content of the forms prospective voters fill out. The forms are sent to the county election commission, which then has a legal duty to process them. A voter registration drive is performed "in conjunction with" the proper authorities in every meaningful sense. Indeed, the authorities have no choice in the matter.

Indeed, even if one accepts that the government's purpose is compelling *and* that disclaimers are an appropriate tool for furthering that purpose, the plaintiffs have raised persuasive objections to the particular disclaimer requirements in the Act. For example, the disclaimer requirement reaches all "public communication regarding voter registration status made by a political committee or organization," not merely any particular subset of communications that is actually likely to result in public confusion. Tenn. Code Ann. § 2-19-145(a). This requirement, as written, would reach any number of wholly innocuous communications, including communications that, based on their content, present no threat of confusion whatsoever with regard to whether the government is involved.

Finally, even if the disclaimer requirements were otherwise constitutional, they, like the Act's registration requirements, would likely be unconstitutionally vague. Specifically, the phrase "a public communication regarding voter registration status," Tenn. Code Ann. § 2-2-145(a)(1), is ambiguous in at least two major ways. The Act explains that "'public

communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," Tenn. Code Ann. § 2-2-145(a)(2), but it is impossible to discern what other communications it includes. A conversation between a volunteer and a potential voter in the park, for example, is simply the equivalent of a "phone bank . . . message," without the phone, so there is no assurance, in the statute, that the conversation would be exempt from the disclaimer requirement. The Act also gives no guidance with regard to whether this provision applies to billboards or other signage—an application that might be particularly challenging, given that signage is generally intended to be legible from a distance, and it would be difficult to integrate a disclaimer that would be similarly legible. Even when one resolves the question of medium, the phrase "regarding voter registration status" could be read to reach any conversation that even touches on the issue of individual voting and eligibility. A person or organization operating under the Act would live with the possibility of arbitrary enforcement with regard to virtually any communication in which voter registration came up, even passingly. The plaintiffs, therefore, have demonstrated a strong likelihood of success that their constitutional challenge to Tenn. Code Ann. § 2-2-145 is likely to succeed.

**e. Cumulative Burdens of the Act/Viability Under *Anderson-Burdick*.** Finally, in addition to the substantive unconstitutionality of the aforementioned individual provisions, the plaintiffs have demonstrated that these aspects of the Act, functioning together, create a cumulative burden that is even more difficult to justify as a constitutional matter. Each of the plaintiffs appears to be a substantial organization with an established history of encouraging voter registration. When it comes to personnel and budgets, though, their vulnerability is striking. The organizations operate on limited budgets and resources, which the Act would attack their limited resources from all sides. The disclaimer and registration requirements produce

36

compliance costs for what might be an already cash-strapped organization. The training and penalty provisions hamper the organization's ability to recruit qualified volunteers and registration workers. Then, when the voter registration drive is done, the organization's already-depleted resources may be drained by fines. The plaintiffs have provided detailed information regarding their budgets and resources, and it is plain, from that information, that they and organizations like them are not equipped to operate in a regulatory environment involving either complex compliance burdens or a routine risk of penalties.[10]

The Act's burdens, moreover, are avoidable. If Tennessee is concerned that voter registration drives are being done incompetently, it can engage in public education efforts without relying on a complex and punitive regulatory scheme. If it is concerned that the drives are being done fraudulently—for example, by a person or organization collecting forms and never turning them in—it can punish the fraud rather than subjecting everyone else to an intrusive prophylactic scheme that true bad actors would likely evade regardless. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 388 (6th Cir. 2008) (noting that Ohio law governing petition circulators was unnecessary, in part due to preexisting prohibition on election fraud). If the state is concerned about incomplete voter registration forms, it can devote resources to identifying them quickly and working with voters to complete them. If it is concerned that processing a large number of registration applications is too costly and difficult, it can make registration simpler. And if, after that, Tennessee is still concerned about the cost, then, as understandable as that concern may be, bearing the cost is what the Constitution requires.

Moreover, in light of the Act's burdens and the availability of alternative methods for pursuing its objectives, the court concludes not only that the plaintiffs are likely to succeed on their claims under *Meyer*, *Buckley*, and the caselaw governing compelled speech, but also that

---

[10] Democracy Nashville's entire 2018 budget, for example, was just $31,000. (Docket No. 39-3 ¶ 38.)

they would be likely to succeed under the *Anderson-Burdick* balancing framework. The *Anderson-Burdick* balancing process requires the court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed." *Anderson*, 460 U.S. at 789. In so doing, the court must "not only determine the legitimacy and strength of each of those interests," but "also . . . consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Miller v. Lorain Cty. Bd. of Elections*, 141 F.3d 252, 256 (6th Cir. 1998) (quoting *Anderson*, 460 U.S. at 789). The Act creates an onerous and intrusive regulatory structure for problems that, insofar as they are not wholly speculative, can be addressed with simpler, less burdensome tools. Even accounting for the possibility that the plaintiffs might not prevail with regard to the applicability of *Meyer* and *Buckley*, then, this factor favors granting a preliminary injunction.

## B. Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). Even if one rejects that categorical approach, the plaintiffs have shown that, if the Act goes into effect, they will almost certainly suffer significant, irreparable injuries. The unrefuted evidence before the court suggests that the defendants will be required or are likely to curtail their voter registration efforts in response to the Act. They may even be forced to discontinue some activities altogether. The nature of elections, moreover, is that time is of the essence. It is not uncommon in Tennessee for the voters of a community to have multiple opportunities to go to the polls in a year, between primaries, general elections, runoffs, and special elections. But when each chance is gone, it is gone. The court, moreover, is aware that multiple election days are approaching, including a presidential

38

primary in March and a general election encompassing numerous offices later in that year. Forcing the plaintiffs to wait while a case winds its way through litigation would mean taking away chances to participate in democracy that will never come back. The likelihood of irreparable injury to the plaintiffs, therefore, strongly supports granting their requested preliminary injunction.

## C. Substantial Harm to Others/Public Interest

Generally speaking, "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). Nevertheless, enjoining officials from pursuing their chosen policies is not without costs. The court, therefore, must consider whether any harm to the public interest associated with enjoining the Act would outweigh the benefit.

The Defendants first argue that enjoining the challenged provisions of the Act will "strip Tennessee citizens of the benefits the Act will provide." (Docket No. 41 at 24.) That argument, however, fails for much the same reason that the defendants' substantive defense of the Act fails. There is simply no basis in the record for concluding that the Act will provide much benefit to Tennesseans, and even less reason to think that any benefit will come close to outweighing the harms to Tennesseans (and non-Tennesseans) who merely wish to exercise their core constitutional rights of participating in the political process by encouraging voter registration.

The Defendants next argue that an injunction will "represent[] a line in the sand" that, by preventing the Act from going into effect, will also rob the public and the court of the opportunity to see whether the harms that the plaintiffs have predicted will, in fact, come to pass. (*Id.*) In other words, the defendants argue that, even if the court concludes that the challenged provisions are likely unconstitutional, it should allow those provisions to go into effect in order

to see just how badly the plaintiffs' and others' First Amendment rights will end up being burdened. This aspect of the defendants' argument is conspicuously unsupported by citation to caselaw. The court declines to find that the public interest would be served by treating people and organizations that wish to participate in democracy as test subjects for empirical inquiry, at least in this instance.

Finally, the defendants argue that an injunction would be "an affront to [Tennessee's] sovereignty." (Docket No. 41 at 24.) But insofar as complying with the Constitution impairs Tennessee's sovereignty, the defendants' complaint is with their forebearers, not the court. "When a State enters the Union, it surrenders certain sovereign prerogatives." *Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007). It does so voluntarily, as Tennessee has done twice—first in 1796, when the state, in the words of its first Constitution, asserted its "right of admission into the General Government as a member State thereof, consistent with the Constitution of the United States," Tenn. Const. of 1796, prmbl., and then again in 1866, when it sought and received full recognition as a readmitted state after the Civil War, *see* 39 Res. No. 73, July 24, 1866, 14 Stat. 364. The U.S. Constitution to which Tennessee twice assented specifically provided, as it still provides, that it would be the "supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Tennessee, in its sovereignty, chose to bind itself to the Constitution. It is no affront to that sovereignty to hold the state to its commitments. The latter two preliminary injunction factors, therefore, favor granting a preliminary injunction.

## D. Balancing of Factors/Scope

Each of the preliminary injunction factors favors granting the plaintiffs relief. The court, therefore, will order the defendants to refrain from implementing or enforcing the provisions of

40

the Act that the plaintiffs have challenged. The court, however, sees little reason for enjoining any other of the Act's provisions. The General Assembly, presumably foreseeing the likelihood of a constitutional challenge to the Act, specifically provided that, "if any provision of [the Act] . . . is held invalid, then the invalidity shall not affect other provisions . . . that can be given effect without the invalid provision . . . , and to that end the provisions of this act shall be severable." 2019 Tenn. Laws Pub. ch. 250, § 7. Moreover, even if the court were ultimately to conclude that the remaining provisions of the Act were not severable, the plaintiffs have not identified any basis for enjoining them at this time. Accordingly, the court will limit its injunction to Tenn. Code Ann. § 2-2-142(a), Tenn. Code Ann. § 2-2-142(e)–(g), Tenn. Code Ann. § 2-2-143, and Tenn. Code Ann. § 2-19-145.[11]

The court will also make clear that its injunction will not restrict any official's actions to enforce any of the state's other election laws, including Tenn. Code Ann. § 2-19-103's prohibition on knowing interference in the election code rights of individuals. Accordingly, if a person, for example, performs ostensible voter registration activities in a way calculated to disenfranchise others by not transmitting their application forms, then that person can be prosecuted to the full extent of the law without running afoul of the court's preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Preliminary Injunction (Docket No. 54) will be granted.

_____

[11] The court will, therefore, be enjoining any formal rulemaking under the Act. The court's injunction will not, of course, enjoin any preliminary drafting of rules, to be made subject to the rulemaking process if the injunction is eventually lifted.

41

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge