**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

TENNESSEE STATE CONFERENCE OF
THE N.A.A.C.P., *et al.*,

        *Plaintiffs*,

v.

TRE HARGETT, in his official capacity as
Secretary of State of the State of Tennessee, *et al.*,

        *Defendants*.

_____

LEAGUE OF WOMEN VOTERS OF
TENNESSEE, *et al.*,

        *Plaintiffs*,

v.

TRE HARGETT, *et al.*,

        *Defendants*.

Civil Nos. 3:19-cv-365
Hon. Aleta A. Trauger

**SECOND AMENDED COMPLAINT OF PLAINTIFFS**
**LEAGUE OF WOMEN VOTERS OF TENNESSEE et al.**

Plaintiffs League of Women Voters of Tennessee, League of Women Voters of Tennessee Education Fund, American Muslim Advisory Council, Mid-South Peace & Justice Center, Memphis Central Labor Council, Rock the Vote, and HeadCount ("Plaintiffs"), bring this action against Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; Herbert H. Slatery III, in his official capacity as Attorney General of the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald,

1

Jimmy Wallace, Tom Wheeler, and Kent Younce, in their official capacities as members of the State Election Commission, ("Defendants"), and allege the following:

## INTRODUCTION

1.      This is a lawsuit challenging harsh, unnecessary, and irrational restrictions on community-based voter registration speech and activity, in violation of the First and Fourteenth Amendments.

2.      Plaintiffs bring this action to prevent enforcement of a new Tennessee law that unconstitutionally burdens and chills their core political speech and associational rights, diminishing their efforts—and the efforts of other individuals and community-based groups—to encourage civic engagement and democratic participation by assisting Tennessee citizens in registering and exercising their fundamental right to vote.  Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  Plaintiffs' endeavors to assist others in registering to vote are themselves political and philosophical statements, signaling that they value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government.  This untailored, vague, and overbroad law cannot possibly survive the exacting scrutiny applied to such restrictions on political speech.

3.      The right to vote is "a fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  And "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections."  House Rep. 103-9 (1993).  Such registration laws "disproportionately harm voter participation by various groups, including the disabled and racial minorities."  *Id.*

4.     Civic organizations have routinely taken steps to assist individuals in registering to vote in order to ensure broad participation in elections.  These community-based voter registration efforts are particularly important in Tennessee.  With 37 percent of its eligible citizens not registered to vote, Tennessee has the 44th lowest registration rate in the country.

5.     Instead of enacting sensible regulations regarding voter registration and encouraging the registration of all eligible Tennessee voters, on May 2, 2019, Governor Bill Lee signed House Bill 1079 / Senate Bill 971 into law (the "Law").  The Law adds new sections to Title 2 of the Tennessee Code Annotated, namely §§ 2-2-142, 2-2-143, and 2-19-145[1], and imposes a host of burdens on organizations and individuals that assist their fellow citizens in registering to vote, including provisions that make Tennessee stand alone among the states.

6.     The Law levies criminal penalties upon civic organizations and civic-minded individuals who encourage political participation through voter registration drives if they fail to comply strictly with numerous burdensome regulations.  The Law requires the pre-registration of every voter registration activity.  It requires state training not only of those organizing a voter registration drive but of every volunteer that chooses to participate.  It places responsibility for the state-imposed training of all volunteers on the organization coordinating the effort.  It further requires the submission of sworn statements prior to conducting voter registration activity.  And it forbids civic organizations from retaining the contact information of those whom they try to help register without separately obtaining their consent, preventing follow-up with individuals who decide to submit voter registration forms through the civic organizations and hindering attempts to convince these individuals to vote in the election.

---

[1] Plaintiff Rock the Vote is only challenging the disclaimer and disclosure requirements under Section 2-19-145.  To the extent the term "Plaintiffs" is used throughout to refer to the other challenges brought in this action, it excludes Rock the Vote in those contexts.

3

7.     The Law requires civic organizations and those who carry out their work conducting voter registration—upon threat of criminal sanction—to make a specified disclaimer anytime any organization makes any "public communication regarding voter registration status." This broad restriction on all public communications concerning voter registration is imposed despite a lack of any meaningful evidence of voter or registrant confusion.

8.     The Law imposes substantial civil fines for the submission of "incomplete" forms while at the same time requiring those conducting voter registration drives to submit each application they collect within 10 days, thus limiting opportunities for follow-up on "incomplete" forms.  As a result, the Law leaves Plaintiffs with no ability to conduct voter registration activity at any significant scale without risking civil sanctions when registrants fail to fully complete their registration forms.  The Law provides no exceptions to the 10-day deadline for extenuating circumstances.

9.     Because some number of "incomplete" forms is inevitable even following good training and best practices, the penalties for "incomplete" forms under the Law put Plaintiffs in an impossible position by penalizing them for submission of "incomplete" forms while also penalizing them criminally for *not* submitting any form collected, with the sole exception of those that only contain a name or initial.

10.     Exacerbating the Law's harsh penalties, the commands of the Law are impermissibly vague and overbroad, such that the regulated individuals and organizations do not know which provisions apply to them and what steps to take in order to be in proper compliance with the Law.  The Law's vague and overbroad provisions will diminish the participatory message of Plaintiffs, other civic organizations, and civic-minded individuals and chill constitutionally protected core political speech.

4

11.     On their own, and in the aggregate, these regulations are inordinately burdensome and will render Plaintiffs' voter registration activities more costly and resource-intensive and less effective.  Coupled with criminal liability and civil penalties that could consume large portions of some of these civic organizations' budgets, these regulations carry devastating consequences and violate Plaintiffs' constitutional rights.

12.     Even prior to the effective date of the Law, Plaintiffs will be compelled to expend resources in preparation for attempting compliance with the Law's onerous provisions.

13.     As a whole, the Law transforms core civic expression and constitutionally protected activity into an extraordinarily risky enterprise.  Encouraging volunteers to participate in voter registration activity is an important part of the Plaintiffs' associational activity and their organizational missions.  But in light of the significant exposure to civil and criminal liability created by the Law, Plaintiffs anticipate a decline in their ability to recruit volunteers and paid staff to convey the value of participation in the democratic process and conduct their voter registration work.

14.     Because Plaintiffs' voter registration efforts will be deterred, burdened, or scaled back as a result of these requirements, the Law will result in an overall reduction in the total quantum of speech, expression, and association engaged in by Plaintiffs.

15.     These onerous, overbroad, and vague requirements do not serve, and cannot be justified by, any compelling or even legitimate interest.  Indeed, the Law's own terms are conflicting, overly broad, and yet simultaneously underinclusive, demonstrating that the Law does not rationally advance any state interest.

16.     Unless the challenged provisions of the Law are enjoined, Plaintiffs' constitutionally protected political speech and activity will continue to be chilled.  Plaintiffs, as

well as many other individuals and groups, will be forced to communicate fewer civic and nonpartisan political messages and to refrain from engaging in associational activity important to advancing their missions and beliefs. The public will receive less information about how to participate in the democratic process, will have fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful civic activities.

17. Additionally, the Law violates the National Voter Registration Act ("NVRA"), a statute designed to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), and "enhance[] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2). The Law not only inhibits those goals, it runs afoul of and frustrates the purpose of specific NVRA provisions aimed at promoting registration opportunities through "organized voter registration programs," *id.* § 20505(b), and operates in a non-uniform and discriminatory way by targeting groups who receive or use any sort of funding to conduct voter registration activities, *id.* § 20507(b)(1). It also conflicts with NVRA provisions that put the onus of making determinations about application sufficiency and completeness on governmental election authorities by instead foisting that role upon organizations like Plaintiffs under threat of monetary penalties. *See id.* § 20507(a)(2).

18. For these reasons, and those specifically alleged herein, Plaintiffs seek declaratory judgment and an injunction prohibiting Defendants from enforcing the challenged provisions of the Law, and permitting Plaintiffs' constitutionally protected community-based voter registration speech and activities to continue.

## JURISDICTION AND VENUE

19. This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C.

§ 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

20.     This Court has personal jurisdiction over each Defendant because each is a citizen of Tennessee and their principal places of business are in Nashville.

21.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because some Defendants reside in this District and all Defendants reside in Tennessee, and because a substantial portion of the events giving rise to these claims occurred in the Middle District of Tennessee.

## PARTIES

**League of Women Voters of Tennessee**

22.     The League of Women Voters of Tennessee and the League of Women Voters of Tennessee Education Fund (collectively, the "League" or "LWVTN") are a pair of non-partisan, non-profit organizations, each structured under Section 501(c) of the Internal Revenue Code: a 501(c)(3) organization—the League of Women Voters of Tennessee Education Fund—and a 501(c)(4) arm. The former conducts most of its voter registration activities. The League seeks to promote civic engagement through informed and active participation in government. It accomplishes this mission, in part, by helping Tennessee citizens register to vote. LWVTN also regularly engages in other activities, including community outreach, education, and direct advocacy on local and statewide ballot initiatives. As part of its work to educate voters, LWVTN regularly conducts candidate forums. LWVTN is part of the League of Women Voters of the United States.

23.     LWVTN is a volunteer organization, relying both on dues-paying members and other, non-member volunteers to conduct almost all its activities, with no paid staff other than

two temporary consultants hired on a limited basis to help with advocacy during the legislative session and provide limited administrative support.

24.     LWVTN currently has approximately 775 dues-paying members.  LWVTN's annual budget for the last fiscal year was approximately $36,000, and LWVTN anticipates that its budget for the next few years will be similar.  The budget for LWVTN in recent years has always been less than $50,000.  The League of Women Voters of Tennessee Education Fund does not maintain any separate budget.  It receives specific grants for voter registration activities as well as other donations.

25.     LWVTN currently has nine local Leagues, including Blount County, Chattanooga, Hendersonville, Jefferson County, Knoxville-Knox County, Memphis-Shelby County, Murfreesboro/Rutherford County, Nashville, and Oak Ridge (collectively "local Leagues").  The League of Women Voters Education Fund occasionally provides grants for some of the voter registration activities of the local Leagues.  The average annual budget for these local Leagues varies, but the average budget for the largest local League, the Nashville League, is approximately $35,000 per year.

26.     These local Leagues regularly conduct voter registration drives throughout Tennessee.  For example, in the last year, they conducted approximately 122 voter registration events and engaged 277 volunteers in these efforts.  These activities include regular registration drives at local high schools and community colleges, local libraries, public housing offices, the YMCA, local utility offices, naturalization ceremonies, and events like the Nashville Art Crawl. Each year, the local Leagues also conduct a number of different voter registration events on National Voter Registration Day.

27.     Before the passage of the Law, LWVTN planned to continue all this voter registration work and planned to expand its voter registration work in the coming years, including efforts to engage more diverse communities.  The local Chattanooga League is new and is in the process of expanding and developing more partnerships for its voter registration work.

28.     During voter registration events, League members and other volunteers always interact with multiple individuals and collect voter registration forms, which they then deliver to local election officials.  The League always aims to collect as many voter registration applications as possible and, as a whole, collects a significant number of voter registration applications.  Over the course of a given year, the League usually collects and submits several thousand voter registration forms, collecting nearly 3,000 in 2018.  Most of these voter registration applications are collected in the counties where the local Leagues are located, but applications are also collected at events in counties without local Leagues.  For example, the League is currently conducting regular voter registration drives for the Franklin Housing Authority in Williamson County, where there is no local League.  The League also collects voter registration forms at events like the Nashville Art Crawl, where it collects voter registration forms from people from all over the surrounding areas.  In a given year, the League ordinarily collects voter registration forms from eligible citizens living in approximately one-third of all the counties in Tennessee.

29.     LWVTN encourages all of its members and any other interested volunteers to participate and provide assistance during these voter registration drives.  It does not require any pre-registration for such individuals to help with any given event.  Encouraging volunteers to participate in voter registration activity is an important part of the League's associational activity

and its organizational mission.  In the League's experience, the more volunteers present to help with a voter registration drive, the more effective the drive.

30.    The League regularly receives grants to help fund its voter registration activity and plans to continue seeking such grants.  For example, this past year, the Chattanooga League received a Youth Voter Grant to encourage participation in the electoral process through voter registration and voter education in high schools, community colleges, and vocational schools, resulting in the registration of 316 individuals in the last year.  As another example, in recent years, the Oak Ridge League has received grants to conduct voter registration at naturalization ceremonies.  And the Hendersonville League has been paid by the local county election commission to conduct voter registration at the local high schools, earning an average revenue of $350 a year.

31.    Local Leagues have regularly conducted voter registration drives at local high schools in Tennessee in cooperation with county election officials.  However, neither LWVTN nor any of its local Leagues has been "designated" or "deputized" to conduct voter registration by the local county election commissions.  This is true despite numerous requests in recent years from the League for such a designation.  LWVTN, therefore, is paid to collect voter registration applications and has not been "designated" to conduct these activities.

32.    LWVTN and the local Leagues plan to continue to conduct voter registration drive activities in the future, with the aim of collecting as many voter registration applications as possible, and to continue to seek and collect grants to support this voter registration work.  Based on its past experiences conducting voter registration drives in Tennessee, LWVTN expects that through these future activities, it would collect well over 100 voter registration applications in a voter registration drive.

33.    When conducting voter registration, LWVTN is beginning to retain information collected from voter registration applications.  This information allows civic organizations like the League to engage in follow-up communications with voters after they are registered in order to provide these voters with additional information about voting and to encourage them to vote. LWVTN has plans to increase its efforts to contact individuals it assists in registering to vote at high schools and community colleges to encourage them to vote and to provide them with information about voting including polling place locations.  These follow-up communications further the League's overall mission to promote democracy and civic participation.

34.    LWVTN volunteers and members also regularly engage in communications with members of the Tennessee public using a variety of media on issues related to elections, voting, voter registration, and a voter's registration status.  LWVTN volunteers and members also regularly communicate with the public about voter registration, voter registration status, and polling place locations at their regular public events, such as candidate forums, public events, registration events, and when engaged as poll watchers.  In the coming year, LWNTN plans on rolling out a text messaging campaign to communicate with individuals about voter registration—a process that the Law would regulate by requiring a lengthy disclaimer with each text message.  These disclaimers will significantly add to the cost of a text messaging campaign, and could render it entirely unfeasible.

35.    The League of Women Voters Education Fund runs the website, VOTE411.org. This website provides individuals with access to polling place information and information about voter registration, including an opportunity to register to vote (or if a registrant cannot complete the transaction online, at least initiate a voter registration application).  Using the Rock the Vote voter registration portal, VOTE411.org is designed to collect information from individuals who

use the system, including information provided during voter registration. This information is collected so that potential voters can be contacted in the future to provide them with information about voting and encourage them to vote. The system does not retain social security numbers. LWVTN plans to expand its work to include outreach activities using the information collected through the VOTE411.org system from Tennessee voters. LWVTN and the local Leagues actively work to promote VOTE411.org within Tennessee. In the past, this has included handing out materials providing information about the website, such as on literature handed out during voter registration drives and other events, and palm cards. In 2018, LWVTN, with assistance from the League of Women Voters Education Fund, was able to expand the coverage of VOTE411.org to the entire state.

36. To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, LWVTN would have to expend resources to complete much of the necessary work to develop new materials, develop new processes and make technical changes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**American Muslim Advisory Council**

37. The American Muslim Advisory Council ("AMAC") is a 501(c)(3) non-profit organization based in Nashville, Tennessee, which seeks to empower Muslims across Tennessee through civic engagement and community building to protect all Tennesseans from prejudice and targeted violence. AMAC works within the Muslim community across the state to facilitate collaboration across mosques to increase civic engagement, and collaborates with government entities, allied nonprofits, and other communities for events and actions that advance justice.

38.     Voter engagement and particularly voter registration form an important part of AMAC's mission to empower Muslims in Tennessee and to better the political and social climate in the state for not only Muslims, but all Tennesseans.  In 2018, AMAC reached over 2,000 Muslim Tennesseans through voter registration drives, get-out-the-vote events, meet-the-candidate forums, and outreach through text messaging, phone banking, and rides to the polls. Through this outreach, AMAC communicates with the Tennessee public, and in particular, members of the Tennessee Muslim community, on issues concerning elections, voting, voter registration, and voters' registration status.

39.     AMAC has conducted and plans to continue conducting voter registrations drives across the state this year and in 2020, with the aim of collecting as many voter registration applications as possible for the purpose of facilitating as many new voters to participate as they can.  In 2018, AMAC assisted a significant number of individuals in registering to vote at mosques in Nashville, Antioch, Murfreesboro, Memphis, and Knoxville, as well as at events co-hosted by groups like the Vanderbilt Muslim Student Association.

40.     AMAC is a small, non-profit organization with only one full-time and one part-time staff member.  It relies on paying student interns by the hour to conduct voter registration activities.

41.     In addition to voter registration drives, AMAC volunteers and employees regularly engage in communications with members of the Tennessee public using a variety of media on issues related to elections, voting, and voter registration, and has helped voters ascertain their registration status and polling location in the weeks leading to an election.

42.     Its budget for voter registration activities in 2018 was approximately $1,000, and its total budget for all activities in 2018 was approximately $120,000.  While AMAC intends to

expand its voter registration efforts in 2020, its budget for these activities will remain limited. The total budget includes costs such as paying staff members' salaries. Even a small fine would impose substantial hardship on AMAC's ability to operate.

43. To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, AMAC would have to expend resources to complete much of the necessary work to develop new materials and develop new processes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**Mid-South Peace and Justice Center**

44. Mid-South Peace and Justice Center ("MSPJC"), based in Memphis, Tennessee, is a multi-issue, multi-race 501(c)(3) non-profit organization whose mission is to engage, organize, and mobilize communities to realize social justice through nonviolent action. For over 37 years, it has educated and trained new community leaders to lead campaigns for racial, economic, environmental, and social justice in Tennessee and beyond. MSPJC works with and is led by grassroots leaders from the low-income communities of color most impacted by the issues with which it engages. While MSPJC has about 90 monthly dues-paying members, it also works with a number of volunteers and student interns who assist with speech-related activities including tabling and voter registration.

45. Voter registration activities are an important part of MSPJC's mission to engage local communities in pursuing social justice. In the past, MSPJC has received grants to conduct voter registration drives, and it plans to continue pursuing and receiving such grants to support its voter registration work.

46.     MSPJC participates in voter registration efforts in multiple different ways. For one, it engages community members to help voters register in their neighborhoods by encouraging applicants to fill out forms and then submitting the voters' registration forms on their behalf. For example, in 2018, MSPJC organized low-income youth and adults to complete community service hours by distributing ballot information and helping individuals in Binghampton, a low-income neighborhood that has historically had low voter turnout, register to vote.

47.     MSPJC volunteers and staff members also conduct voter registration activities. MSPJC plans on continuing such voter registration activities in the future with the aim of facilitating as many voters registering as possible by collecting and submitting their applications.

48.     When conducting voter registration, MSPJC regularly retains information collected from voter registration applications. This information allows MSPJC to engage in follow-up communications to provide these voters with additional information about voting and to encourage them to vote. These follow-up communications are a vital component of MSPJC's overall mission to promote democracy and civic participation.

49.     MSPJC staff members and volunteers also regularly engage in communications with members of the Tennessee public, and particularly those in the low-income communities of color most impacted by the issues with which it engages, using a variety of media on issues related to elections, voting, registration, and voters' registration status.

50.     MSPJC is a small, non-profit organization with only three full-time and three part-time staff members, and it relies in part on both grants and volunteers to conduct voter registration activities. With an annual operating budget of approximately $235,000—a

substantial portion of which pays staff salaries—even a small fine would likely lead it to suspend all voter registration activities.

51.     To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, MSPJC would have to expend resources to complete much of the necessary work to develop new materials and develop new processes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**Memphis Central Labor Council**

52.     Memphis Central Labor Council ("MCLC"), also known as the Central Labor Council of Memphis and West Tennessee, is the western Tennessee labor council of the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO").  MCLC is a union headquartered in Memphis, Tennessee, that acts as an umbrella organization for 41 affiliate unions based in western Tennessee, which include, for instance, the local affiliates of the International Brotherhood of Electrical Workers and the American Federation of State, County and Municipal Employees, among others.  In total, MCLC encompasses approximately 16,000 union members.

53.     MCLC operates a broad-ranging, multi-part political program, which has become increasingly active in the last two years.  Under this program, MCLC helps union members and their householders register to vote through extensive canvassing and voter turnout efforts.  As part of this political program, MCLC also announces candidate endorsements in advance of federal, state, and local elections.  Because MCLC's voter registration efforts involve canvassers going door to door from one union household to another, *see infra* ¶ 54, MCLC's goal is to assist both union members and all eligible members of their households in registering to vote.  For the

purposes of voter engagement activities, MCLC receives union membership lists from certain local unions that are formally affiliated with MCLC as well as from certain national unions that are affiliated with the national AFL-CIO organization. In total, approximately 41,000 union members and householders in western Tennessee are not registered to vote. MCLC intends to establish a target of registering more than one thousand union members and householders in each of the next several election cycles.

54. The primary way in which MCLC registers union members and householders to vote is door-to-door canvassing. In the weeks leading up to every major federal, state, and local election, MCLC has field organizers who go door to door between union households. The duration of the canvassing varies by election cycle. At each household, the organizers identify the candidates whom MCLC has endorsed for the upcoming election and ask the union members and their household members if they are registered to vote. The organizers then help any eligible but unregistered individuals register to vote. In 2018, these organizers primarily helped people register to vote using paper registration forms. Starting in 2019, MCLC organizers will offer to help prospective voters register to vote online or by paper.

55. In the 2018 election cycle, MCLC hired approximately 15 paid field organizers to do this canvassing. These organizers used the state voter registration form to help eligible voters register to vote. MCLC anticipates hiring the same number of field organizers for voter registration and outreach in upcoming election cycles. These field organizers are typically hired by MCLC's political program on a temporary basis in the weeks leading up to an election. MCLC is concerned about its ability to hire field organizers in light of the potential liability that these individuals may face once the Law goes into effect. MCLC believes that it will be more

difficult to hire effective field organizers for its political program and voter registration activities because of the civil and criminal penalties threatened by the Law.

56.     In addition to these field organizers, MCLC's political program receives "released staff" from its affiliate unions.  These are staff members paid by the individual affiliate unions who are, in essence, loaned to MCLC for its political program.  During a major election cycle, MCLC typically receives between five and ten released staff members from its affiliate unions for its political program.

57.     In addition to door-to-door canvassing, MCLC generally sets up voter registration tables at union halls, where it provides the staff and resources for union members and their household members to register to vote.  MCLC will often engage in voter registration activities of this nature upon request at regular meetings or special events held by its affiliate unions, such as Labor Day barbecues.  MCLC will typically send paid MCLC staff, political program field organizers, or released staff to conduct voter registration and outreach at these events.  In the past, these events and meetings have yielded a substantial number of voter registrations.

58.     MCLC receives basic membership lists from the unions with which it is connected, which provide the information needed for door-to-door canvassing.  However, MCLC has found that many of these union membership lists contain information that is out of date. MCLC is beginning to collect information from the people whom it helps register to vote with the goal of building and updating these membership lists.  This may involve collecting information directly from voter registration forms when individuals register to vote using paper forms provided by MCLC staff or field organizers.  This information allows MCLC to more effectively connect with individuals who are members of its affiliate unions and convey its political endorsements and other communications to these members.  MCLC also intends to

provide the updated information collected by its political program staff back to its affiliate unions. A requirement that each person who registers to vote separately consent to the information being collected would be onerous and would substantially impede and slow down the organization's information collection and voter registration work.

59.     Although MCLC is headquartered in Memphis, its membership spans all of western Tennessee. However, it maintains a limited budget for its political program. The budget for the political program is approximately $40,000 this year, and MCLC expects it to be approximately the same amount moving forward. MCLC's overall annual budget is no more than $200,000. Even a small fine would impose a severe hardship on MCLC's ability to operate its political program.

60.     To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, MCLC would have to expend resources to complete much of the necessary work to develop new materials and new processes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**Rock the Vote**

61.     Rock the Vote is a national, non-partisan 501(c)(3) non-profit organization based in Washington, D.C., that is dedicated to building long-term youth political power. Since 1990, Rock the Vote has pioneered innovative ways to mobilize young voters, revolutionizing the use of culture, music, art, and technology to engage youth in the political process.

62.     Voter registration and engagement is at the core of Rock the Vote's mission. Rock the Vote prioritizes proactively reaching out to and mobilizing young voters, whose voices are often left out of the political process. To effectively register and turn out voters, Rock the

Vote utilizes and maintains its own online voter registration platform that is used for free by partners across the country and in Tennessee. The tool, which is available in 13 languages, helps a person determine whether they are eligible for online voter registration, and then directs the person to the appropriate state website as available, or alternatively, assists the person with completing the federal mail-in voter registration form. Rock the Vote also offers a voter lookup tool, which allows voters to check their registration status before prompting them to register to vote through Rock the Vote's online tool.

63. Tennessee citizens who seek to register to vote using Rock the Vote's online voter registration tool are directed to register to vote using the Tennessee Secretary of State's Online Voter Registration System if they have a Tennessee driver's license or Tennessee Department of Safety and Homeland Security ID. If a Tennessee citizen lacks the photo ID required to register to vote online, Rock the Vote's online voter registration tool will assist the person with completing the federal mail-in voter registration form. The online tool will ask the person for the information needed to complete the form and then use that information to generate a completed federal mail-in voter registration form as a PDF document. The completed PDF document is then available for the registrant to download and is e-mailed to the registrant with instructions about mailing in the form. These instructions include the appropriate mailing address for the registrant's local election office.

64. During the last seven presidential elections, Rock the Vote and its partners coordinated the largest voter registration efforts for young people in the country, adding nearly 8 million new voters to the rolls. In 2018, approximately 834,000 people registered to vote using Rock the Vote's online platforms. Of those, approximately 11,150 registrations were in Tennessee. In 2016, approximately 1.7 million people registered to vote using Rock the Vote's

online platforms. Of those, approximately 31,200 registrations were in Tennessee. These numbers include those individuals who started the process through Rock the Vote's online voter registration tool and either proceeded to register to vote through the Tennessee Secretary of State's online voter registration tool or completed a federal mail-in voter registration form that they signed and mailed to local election officials.

65. Rock the Vote currently employees five, full-time individuals, plus one part-time paid intern. These paid staff work on Rock the Vote's programs across the country, including outreach and programming focused on potential voters in Tennessee. Rock the Vote also leverages its volunteer network to boost youth voter registration across the country using its online tool. Rock the Vote provides tools for its volunteers to host voter registration drives using the online tool via tablets or SMS short codes.

66. Rock the Vote relies heavily on its website and digital communications methods, such as social media, email, text messages, and digital advertising to reach and mobilize young people across the country and to encourage them to register to vote. Rock the Vote's online registration tool also allows voters to opt into targeted, non-partisan election reminders via email and text messaging to ensure they are prepared to vote. As a result, Rock the Vote's registrants turn out at much higher rates than the national youth average.

67. Rock the Vote is only challenging the disclaimer and disclosure requirements under Section 2-19-145. These requirements will impose a substantial burden on Rock the Vote's ability to help voters register to vote using its online tools and communications. Prior to October 1, 2019, Rock the Vote will need to make enhancements to its existing online voter registration tool to comply, including translating the required disclaimer and disclosure text into all 13 languages Rock the Vote currently supports, redesigning its user-flow and interface,

updating its website, and evaluating potential changes to its digital voter registration communications strategy and program.  All changes to Rock the Vote's platform will need to be reviewed and thoroughly tested on both desktop and mobile devices.  This will include updating all of the Rock the Vote online voter registration tools used by Rock the Vote's partners.  These changes will be significant and will cause Rock the Vote to incur significant costs.  Some of Rock the Vote's public communications may be impracticable or impeded by a lengthy disclaimer.  Simply determining the full scope of the changes necessary to Rock the Vote's online tools and public communications for Rock the Vote to attempt to comply with the Law imposes a substantial burden on Rock the Vote given its limited staff capacity and resources.

68.     To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, Rock the Vote would have to expend resources to complete much of its work to make the required technical changes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**HeadCount**

69.     HeadCount is a national 501(c)(3) non-profit, non-partisan organization with a small full-time staff based in New York City.  HeadCount's mission is to work with musicians and other popular influencers to promote participation in democracy, including through conducting voter registration drives.  To that end, HeadCount operates voter registration drives at concerts and music festivals nationwide and runs programs that connect the popularity and power of music with action.  By reaching young people and music fans where they already are— at concerts and online—HeadCount makes civic participation accessible and compelling. HeadCount's organizational message is that people must speak to be heard.

70.     HeadCount has assisted approximately 500,000 voter registration applicants nationwide since 2004 and has built a network of 20,000 volunteers nationwide.  The organization has conducted more than 6,000 in-person field events nationally since 2004.  During these field events, HeadCount collects voter registration applications, and then delivers them to election officials.  HeadCount has helped over 3,000 Tennessee voters register by collecting and delivering their applications through their work in the field since 2014.

71.     HeadCount promotes partnerships between musicians, concert promoters, and volunteers.  When artists affiliated with HeadCount play a concert in a major city, HeadCount helps voters register, and rallies music fans to participate in democracy and increase their participation and voice in government.  These live music events with voter registration facilitated by HeadCount take place all over the country and, during busy times in the election cycle, almost every night of the week.  HeadCount also works directly with many festivals, concert venues, and partners to help extend their reach.  At every event, HeadCount offers voter registration for residents of 45 states using the federal mail-in voter registration form.

72.     HeadCount receives grant money, direct donations, and sponsorships to fund voter registration activities, which include registration activities at concerts, festivals, and other events in Tennessee.

73.     The bulk of HeadCount's work nationally is done by thousands of volunteers.  Some volunteers help voters register at concerts by engaging potential voters, assisting them with filling out forms, and collecting their applications for submission to election officials.  Other volunteers take on leadership roles in the organization.  As part of HeadCount's core mission, the organization builds civic volunteerism focused on young people and others who have not previously engaged in civic engagement work.

74.    HeadCount has no full-time paid staff in Tennessee.  While HeadCount occasionally hires a Tennessee-based independent contractor for particular events, HeadCount generally relies on volunteer team leaders in order to conduct registration drives at events in Tennessee.  While national paid staff members sometimes attend major music tour or festival events and help with voter registration efforts, generally voter registration is offered only when one or more volunteer team leaders are available to staff an event.  Staffing the event with at least one volunteer team leader is required so that HeadCount can maintain the security of voter registration applications in the field to ensure that they are properly collected and delivered to election officials.

75.    HeadCount has four volunteer team leaders in Tennessee and is seeking additional team leaders in Tennessee.  HeadCount has over 2,000 field volunteers in Tennessee who are managed by the volunteer team leaders.

76.    HeadCount requires all team leaders to review the organization's Team Leader manual.  After review, they receive a video-call field training and a separate training call on their systems.

77.    HeadCount has paid stipends to volunteer team leaders in Tennessee in the past and plans to continue doing so in the future.

78.    HeadCount's other volunteers are not compensated with money, but they are given free access to the concert or festival at which they are conducting voter registration.

79.    HeadCount generally requires all volunteers to participate in a one-hour training session before each show, and rare exceptions are only made when a volunteer has previously taken the training already.  A significant number of volunteers are first-time volunteers, who are trained when they arrive for the event.  They are required to receive HeadCount's training before

they begin helping people register to vote. Training covers how to engage people to register to vote, ensuring that applicants complete the forms, and emphasizing the importance of turning in all forms to the organization unaltered. Training also includes information about upcoming elections so that volunteers can spread an effective message about participating in elections.

80. HeadCount's planning for 2020 is already underway, including planning for artist partnerships, materials, and processes. HeadCount produces a festival kit for events and reuses signage and other materials for festivals at which voter registration is conducted during the course of the year. These materials are used nationally. Some expenses for 2020 voter registration materials have already been paid. Redesigning and reprinting the materials for 2020 would be costly. For this reason, the vagueness of the Law does not give the organization a reasonable opportunity to plan its activities and simultaneously ensure compliance.

81. HeadCount also utilizes a text messaging program where potential voters can sign up for election alerts via text message and register to vote via TurboVote or Rock the Vote's online tool if needed. HeadCount is working to expand the text messaging program's functionality to increase civic engagement opportunities, such as contacting elected officials. However, field registration using paper forms is the most effective means of promoting voter registration at events and festivals.

82. HeadCount team leaders independently source community events such as street festivals, voter registration drives at schools or colleges, and other community gatherings. While events are generally input into the HeadCount database for volunteer recruitment, volunteers for such events are sometimes independently sourced by volunteer team leaders. HeadCount provides materials, information, and email templates for such events.

83.     Following each HeadCount event, the registration forms and any other information collected from applicants are sent to the organization's office.  The forms are centrally received and processed, and then sent to the election officials.  Where possible, the forms are copied, and the information is used to verify that applicants have indeed been added to the state's official voter registration list.  HeadCount's verification serves multiple purposes: it furthers the core mission of the organization to promote effective registration and democratic participation, and also allows the organization to demonstrate to funders and partners that its program is effective in accomplishing that mission.  It also promotes relationship-building between HeadCount and the voters it helps register; often new registrants prefer to follow up with HeadCount with any questions or concerns about their registration rather than directly contact election officials.

84.     Bonnaroo is a popular, well-attended annual music festival held outside of Nashville, Tennessee, and is a major national event for HeadCount's voter registration activities.  If HeadCount is unable to conduct voter registration activities at Bonnaroo, it would be a significant loss to the organization's core mission, message, and partner relationships.

85.     HeadCount is also working on increasing civic engagement outreach at the University of Tennessee, Knoxville, working on shows around the campus community to increase outreach to young people.  Through these efforts, HeadCount particularly intends to reach first-time voter registration applicants and transient voters under the age of 35.  College campuses are an important place for the organization to have its desired impact.

86.     In addition to its field activities, HeadCount utilizes a broad array of digital tools and social media to promote and facilitate voter registration.  Over 50 percent of HeadCount's national voter registration activity is conducted online.

87.     Along with collecting voter registration applications, HeadCount volunteers seek to have applicants sign up for election alerts via text message and/or email.  Individuals who submit a registration also receive a "thank you for registering" card, which is standardized across the organization's activity nationally and provides information about the organization, including contact information in the event they have any questions or concerns about their registration.  Under the Law, HeadCount would have to change the content for these materials to comply.

88.     HeadCount utilizes other organizations' tools in its digital voter registration efforts, including partnerships with Plaintiff Rock the Vote as well as TurboVote, another organization that provides digital voter registration tools.  Determining compliance with the Law's disclosure and disclaimer requirements would demand significant time and resources.

89.     HeadCount generally creates social media tools for all states conducting a primary election on the same day and for states that share a voter registration deadline, including Tennessee, which shares its registration deadline of 30 days before Election Day with a number of states.  The disclosure and disclaimer requirements of the Law would require removing Tennessee from the organization's general media plan and writing custom materials specific to the state, which would require additional expenditures.

90.     Customizing and redesigning HeadCount's festival kits which are generally produced for national use to specifically comply with the disclosure and disclaimer requirements of the Law will cost significant funds due to staff time to develop materials specific to the state, designer time, and printing costs that HeadCount would not otherwise incur.

91.     The disclaimer and disclosure requirements in the Law will diminish HeadCount's message because, despite using lawful methods of registration including state and federal mail-in voter registration forms, the organization will be required to indicate that it is not

conducting official voter registration activities. HeadCount believes this disclaimer will reduce the faith its registrants have in its voter registration program.

92.     The additional disclaimers and disclosures required by the Law will make the digital tools used by the organization less relevant and less effective by, among other things, making it less accessible to potential voters while not adding any necessary information.

93.     HeadCount would also be required to produce new training materials specific to Tennessee to comply with the Law whereas currently, training materials are created for national use so that registration can be facilitated using the federal mail-in voter registration form. Volunteers would have to be specially trained on the Law's disclosure requirements.

94.     HeadCount also maintains a voter hub with information regarding voting and registration in all 50 states. To comply with the Law, HeadCount will have to change its existing voter information hub to ensure that it is compliant with the Law. Changes to the website to comply with the Law's disclosure and disclaimer requirements would require coding and technical changes including special wire-framing to support the changes, which would require an additional associated cost.

95.     To the extent compliance is even possible given the Law's vagueness, in order to implement the many changes required by the Law, HeadCount would have to expend resources to complete much of their work to produce materials, prepare training processes, and make technical changes prior to October 1, 2019, including incurring related expenses, in order to ensure that changes would be implemented by October 1, 2019.

**Defendants and Procedural History**

96.     Tre Hargett is the Secretary of State of the State of Tennessee and is sued in his official capacity. The Secretary appoints the Coordinator of Elections who serves "at the

pleasure of the secretary of state" and may only make regulations necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code Ann. § 2-11-201(a), (c).

97. Mark Goins is the Coordinator of Elections for the State of Tennessee and is sued in his official capacity. The Coordinator is "the chief administrative election officer of the state," charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." *Id.* § 2-11-201(b); *see also id.* §§ 2-11-202, 2-2-115. As Coordinator, Goins is also authorized to investigate or direct local authorities to investigate "the administration of the election laws." *Id.* § 2-11-202(a)(5).

98. Herbert H. Slatery III is the Attorney General of the State of Tennessee and is sued in his official capacity. The Attorney General is authorized to investigate or prosecute violations of the election code and to request that the Coordinator conduct investigations. *Id.* § 2-11-202(a)(5)(A)-(C).

99. The State Election Commission ("Commission") is charged with all duties of the board of elections of the state. *Id.* § 2-11-101(b). Under the Law, the Commission is authorized to impose civil fines upon individuals and organizations who submit incomplete voter registration forms. *Id.* § 2-2-143(c). The Commission is authorized to review "incomplete" forms, make a finding of the number of "incomplete" forms submitted, combine the number of "incomplete" forms across counties in order to impose penalties, and fine individuals and organizations up to $10,000. *Id.*

100. Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are the members of the State Election Commission and are sued in their official capacities.

101.    To ensure compliance, the NVRA provides that "[a] person who is aggrieved by a violation [of the NVRA] may provide written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1).  If the violation is not corrected within a set period of time (ordinarily 90 days), "the aggrieved person may bring a civil action . . . for declaratory or injunctive relief . . . ."  52 U.S.C. § 20510(b)(2).

102.    On May 9, 2019, counsel for Plaintiffs sent a letter to the Defendants Tennessee Secretary of State Tre Hargett and Tennessee Coordinator of Elections Mark Goins notifying them of the violations of the NVRA alleged herein.  A copy of this letter is attached as EXHIBIT A.

## FACTS

**Voter Registration in Tennessee**

103.    Tennesseans need more, not fewer voter registration opportunities.  According to U.S. Census Bureau *Current Population Survey* ("CPS") data, approximately 3,183,000 Tennessee citizens were registered to vote as of November 2018, out of a citizen voting age population of 4,872,000.  Therefore, as of November 2018, approximately 37 percent of eligible citizens in Tennessee were not registered to vote.  And Tennessee's voter registration rate is decreasing rather than increasing.  In 2016, according to the CPS, 33 percent of eligible citizens in Tennessee were not registered to vote.  Another federal survey, from the U.S. Election Assistance Commission ("EAC"), establishes that Tennessee's voter registration numbers are among the worst in the country when compared to other states.  In 2016, according to EAC data, Tennessee ranked 44th in the percentage of its citizen voting age population registered to vote out of all 50 states and the District of Columbia.

104.     Voter registration drives play an important role in facilitating voter registration of eligible citizens.  Community-based voter registration drives are a particularly important tool for members of marginalized communities to register to vote, especially racial minority voters and those with lower incomes.  According to the CPS, voters of color are more likely to identify as having registered at a registration drive or at a school, hospital, or campus compared with white voters.  For example, in the 2018 election cycle, while 3.1 percent of white voters reported registering through a drive, the percentage increased to 5.3 voters identifying as Black and 5.5 percent for those identifying as Hispanic.  Similarly, in 2018, 4.1 percent of white registrants reported registering at a school, hospital, or campus, compared with 7.5 percent of those identifying as Black and 7.1 percent of those identifying as Hispanic.

105.     Plaintiffs conduct voter registration drives throughout Tennessee during which they interact with potential voters face-to-face to encourage them to participate in the political process and to register to vote.  These conversations take place at schools and universities, community events, religious services, workplaces, malls, conferences, and public gatherings, as well as in parking lots, transportation hubs, and on city streets.  These initial interactions culminate when Plaintiffs collect voter registration applications from potential voters and submit them on their behalf.  Plaintiffs sometimes continue to communicate with the individuals identified through their voter registration activity to promote civic engagement, for example through get-out-the-vote drives.  Plaintiffs intend to continue these activities, but the Law has placed those important plans in jeopardy.  Indeed, the Law is already affecting Plaintiffs as they work to plan and prepare for their voter registration activities in the near future.

106.     Plaintiffs' voter registration staff and volunteers educate non-voters not only about how political participation can lead to social change and make democratic institutions

more responsive to community needs, but also how the act of registering to vote helps underrepresented persons and communities establish their political worth, standing, and right to speak at the polls. This builds the political respect and power of a citizen's community by making elected officials and candidates for elected office attentive to the citizen's community. Fostering political and civic engagement in this manner is a central part of Plaintiffs' voter registration activity.

107. Numerous Tennesseans who register to vote each year do so through interactions with their fellow citizens at voter registration drives, including those conducted by Plaintiffs.

108. These drives are an important service rendered to other citizens and critical to Plaintiffs' core political speech and associational rights.

109. The right to vote is far from universally exercised. Through their voter registration work, Plaintiffs express the importance of civic engagement and political participation, particularly among politically underrepresented groups. By ensuring people's voter registration forms are properly submitted, Plaintiffs ensure the fullest expression of their communities and voters' views on issues such as government responsiveness, racial justice, and policies that promote religious tolerance and acceptance. Plaintiffs' assistance to others in registering to vote is a political statement in and of itself: that they value the democratic process and the rights of all eligible citizens to access the franchise.

110. By engaging in voter registration activities, Plaintiffs express their faith in democracy, the importance of civic engagement, and their belief that politically underrepresented groups should be empowered. Their voter registration activities are among the most effective and credible means of expressing these views.

111.    The Law's restrictions constitute a substantial burden on Plaintiffs' expressive activities.  The burdens of the Law are especially severe because Plaintiffs are non-profit organizations with limited resources.  The Law's substantial civil and criminal penalties will chill Plaintiffs' speech, expression, and associational activities, leading some Plaintiffs to cut back or entirely cease their Tennessee voter registration efforts, depending on the ultimate meaning of the Law's vague provisions.  This will harm the organizational mission of each Plaintiff by minimizing each Plaintiff's ability to rally its community and use the franchise to weigh in on issues of importance, including the importance of participation itself.

**Enactment of the Challenged Law**

112.    Going into the 2018 election cycle, civic organizations across Tennessee, including Plaintiffs, made a concerted push to register thousands of eligible but unregistered Tennessee citizens.  Much of this community-based voter registration activity took place among communities of color and other underserved populations.

113.    It was against this backdrop of increased voter registration that Tennessee enacted the Law.

114.    Although the state has suggested that the Law was necessary to prevent fraudulent voter registration, on information and belief, this justification merely serves as pretext for a more insidious purpose: to inhibit successful voter registration efforts by community-based organizations.

115.    Statements made during the legislative proceedings support this conclusion.  For example, during the March 27, 2019 hearing before the House Elections & Campaign Finance Subcommittee, Representative Tim Rudd said that the problem the bill sought to address arose in the 2018 election cycle in Shelby County where "we had a lot of outsiders, contractors and other

people coming in and flooding the local election commission and the state with ballots [sic] right before the election." On April 9, 2019, during a hearing before the Senate State and Local Committee, Senator Ed Jackson stated, without offering any evidence to support his claim, that "groups that seek to register large numbers of voters"—which the bill targets—"potentially put legitimate registrations at risk."

116.    Indeed, further statements from the House floor indicate that the true purpose of the bill was to retaliate against a single organization whose mission was focused on increasing the turnout of Black voters in the state. In an op-ed supporting Senate Bill 971 and House Bill 1079, Secretary Hargett described how the bills would address the scenario created in the 2018 election by one voter "activist" group that submitted a large number of voter registration forms.

117.    Despite complaints of a deluge of incomplete or erroneous registration forms, Tennessee certified to the EAC in 2016 that it received "zero" registration forms from voter registration drives held by third-party groups or parties in the 2016 election cycle. While Tennessee's statement to the EAC was plainly false, this submission underscores that the state has no concept of how many voter registration applications it receives from civic groups, let alone any high rate of error that needs to be fixed through draconian measures.

118.    During the hearings on the bill, there was no evidence presented to indicate that the rate of error on registration forms is or was higher for registrations submitted through voter registration drives than from any other source. Nor was there any evidence of intentional or knowing voter registration fraud, or any other intent to interfere with the voter registration process.

119.    Nonetheless, in the run-up to the passage of the Law, the Speaker of the Tennessee House posted the following statement on Twitter: "Last election cycle there was an

attempt from outside groups to flood the ballot box with fraudulent votes to try & prevent @VoteMarsha from becoming our next U.S. Senator. Proud of the House for passing a new bill to prevent this. Thanks to Rep. @TimRudd34 for running it! #TNleg," contemporaneously illustrating that the impetus behind the Law was not any legitimate government interest, but rather an explicit attempt to fence out certain eligible Tennessee voters.

120. On May 2, 2019, Governor Bill Lee signed House Bill 1079 / Senate Bill 971 into law, imposing a host of burdens on organizations and individuals that conduct voter registration drives, including provisions that are unique to Tennessee alone.

**Challenged Provisions and Their Impacts**

121. The Law imposes severe burdens on the voter registration activities and communications engaged in by Plaintiffs and similar groups and individuals. These requirements are each individually burdensome and add up to a high aggregate burden that will limit Plaintiffs' effectiveness in promoting democratic participation, make it more costly and resource-intensive to conduct voter registration, and chill speech because they impose more risk than many individuals are reasonably willing to take.

122. These restrictions include, most notably:

    a. Large civil penalties for turning in 100 or more "incomplete" registration application forms, even though the Law also requires covered organizations to turn in all forms they receive with the exception of those that contain only a name or initial;

    b. The requirement to turn forms in within 10 days without any exception or regard for the need for organizations to scrutinize the completeness of each form and conduct potential follow up to limit the number of "incomplete" forms they must submit or face civil penalties;

    c. Requirements that each individual participating in voter registration activities, even on a volunteer basis, receive training directly from the state, and that organizations, like Plaintiffs, assume responsibility for their volunteers or paid canvassers doing so;

d.  The requirement of a sworn statement of compliance with all state registration laws despite this Law containing vague and ambiguous requirements as well as conflicting provisions with its own and other requirements;

e.  The prohibition of retention of basic voter information to ensure that each individual has been properly registered and can be provided additional voting information prior to elections; and

f.  Burdensome disclaimer requirements for each registration-related communication in almost all forms, and criminal penalties for noncompliance.

Vague Scope of Coverage of the Law

123.    As an initial matter, it is not clear when or to whom the Law's restrictions apply.

124.    Sections 2-2-142 and 2-2-143, without defining any terms, apply to any "person or organization who has not been designated by the county election commission under § 2-2-111 and who conducts a supplemental voter registration drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people."

125.    It is unclear whether a person or organization designated under Section 2-2-111 is exempt from these Sections for all otherwise-covered supplemental voter registration drives conducted by that person or organization or for only those supplemental voter registration drives for which that person or organization serves as the county election commission's designee.  *See* Tenn. Code Ann. § 2-2-111(b), (d).

126.    In addition, the statute defines neither what activity constitutes a voter registration drive nor what it means to "conduct[]" such a drive.  It also does not define what activity constitutes an "attempt[] to collect" 100 or more voter registration applications, and there is no time period to guide whether the "attempt to conduct" a drive collecting 100 applications must be made within a day, a month, a year or is subject to any other constraint.  It also confusingly refers to "the voter registration drive" and "drives" in both the singular and plural, further confusing organizations as to what specifically is being regulated.

127.    Sections 2-2-142 and 2-2-143 also exempt certain otherwise covered persons or organizations from their requirements.  Specifically, the requirements of Section 2-2-142 and 2-2-143 do not apply "to individuals who are not paid to collect voter registration applications or to organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications."  However, the law does not define what it means to be "paid" or "unpaid."  As a result, it is unclear whether those requirements apply, for example, to organizations that receive grants to conduct voter registration activities; organizations that provide stipends to interns or volunteers to conduct voter registration activities; and organizations that use only unpaid volunteers to engage directly with prospective voters but rely on paid staff or a mix of paid and unpaid staff to supervise, coordinate, or direct voter registration activities, including collecting applications.  It may even apply to organizations that use a small part of general, non-targeted grant funds to support voter-registration activities.

128.    Coordinator Goins's testimony on the bill during the committee process underscores this lack of clarity.  During his testimony, Coordinator Goins was unable to articulate clear answers as to what constitutes "paid" and "unpaid" activities.  However, his testimony opined that the exemption for Sections 2-2-142 and 2-2-143 would not extend to a paid staff member whose job description included duties related to a voter registration drive, or a non-profit organization that received a financial grant for registration even if conducted entirely by unpaid volunteers.[2]

---

[2] Tenn. Senate State and Local Govt. Comm. Hearing on SB0971 (Apr. 9, 2019), *available at* http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17123.  This testimony was given in relation to an earlier version of the exemption, but the interpretation given by Mr. Goins does not appear to be affected by the change because the testimony related to whether an organization used only unpaid volunteers.  *Compare* HB 1079 (2019) (enacted) *with* Amd. 2 to HB 1079, *available at* http://www.capitol.tn.gov/Bills/111/Amend/HA0285.pdf.

129.     In any event, this exemption for organizations and individuals who are "unpaid" shows that the Law on its face advances no state interest.  There is no evidence that organizations with paid canvassers or funding to conduct voter registration activity, like Plaintiffs, need to be more regulated than other organizations that have no paid canvassers and do not receive said funding.  Nor is there any evidence that paid voter registration workers who receive flat or hourly rates need to be regulated to a greater degree than unpaid voter registration workers.  There is no rational reason why only those paid to conduct voter registration would need to be regulated in a manner unrelated to the means of payment.  If the restrictions served any state interest, both paid and unpaid canvassers, and organizations that receive grants and those that rely upon their own funds or unpaid volunteers, would be equally subject to their terms.

130.     Underscoring the Law's overbreadth, the Law does not contain any provisions that explicitly limit its territorial reach to the State of Tennessee.  Rather, its provisions may attempt to reach voter registration drives and activities that take place anywhere in the nation if Tennessee voters register to vote through such drives.

Requirements of Section 2-2-143

131.     Section 2-2-143 imposes civil monetary penalties on any individual or organization that submits 100 or more "incomplete voter registration applications" within a calendar year.

132.     Under the Law, an incomplete registration is "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b).  The Law does not indicate whether incorrect, inaccurate, or illegible information in any of these categories provided by an individual who is registering to vote renders the form "incomplete" under its terms.  *Id.* § 2-2-143.

133. The Law also does not indicate whether the omission of part of one of the required elements will render a registration "incomplete." For example, it is not clear whether the exclusion of one element of an address—such as an apartment number, city or county name, state (which is an included field on the Tennessee state voter registration form), or zip code— would render the residential address "incomplete." Likewise, it is not clear whether the inclusion of month and year but not day would render the date of birth "incomplete."

134. If a field of the voter registration form is filled out, but the information is incorrect—for example, a nickname is used instead of the person's legal name, or there is a misspelling or error in the address—Plaintiffs would have no way of determining the accuracy of the information. To the extent that such errors would lead to a field being deemed "incomplete," such errors would be completely outside the control of the organization and therefore imposing penalties on that basis would be particularly irrational and burdensome.

135. An overbroad and strict interpretation of this statute's requirement is not far-fetched. In the name section of the National Mail-In Voter Registration Application, a voter can indicate their personal title—Mr., Miss, Mrs., or Ms.—as well as their first, last, and middle names and any suffix. According to news reports in 2018, the Shelby County Election Commission considered an application incomplete if it excluded the citizen's title.

136. The Law further provides that a "person or individual who collects an application that only contains a name or initial is not required to file the application with the election commission." *Id.* Presumably, all other forms—even if "incomplete"—must be submitted. Thus, this penalty punishes civic organizations and others engaged in community-based voter registration activity for the errors of applicants, over which they have little control.

137.     The combination of this penalty with the 10-day return requirement further burdens Plaintiffs by limiting their ability to conduct a review of registration forms and attempt to conduct follow-up with applicants to "cure" their registration forms.

138.     Under the Law, the State Election Commission will review the forms identified by the county election commissions as deficient and impose civil penalties of up to $10,000 based on the number of "incomplete" forms identified. *Id.* § 2-2-143(c)(3)-(4).

139.     The Law provides that the State Election Commission "may combine the number of incomplete forms filed by a person or organization in multiple counties when determining the total number of incomplete forms," *id.* § 2-2-143(c)(3), and that civil penalties may be assessed "in each county where the violation occurred," *id.* § 2-2-143(c)(4). Taken together, these provisions appear to indicate that individuals and organizations who reach the threshold of 100 "incomplete" voter registration forms statewide could be subject to fines from multiple counties and could be subject to a fine from a county in which they submitted only one incomplete form.

140.     The fines imposed by the Law threaten the Plaintiffs, their members, their volunteers, their organizers, and their staff with substantial monetary liability, which will chill their voter registration speech and activities and is already affecting their planning for 2019-2020.

141.     Under the Law, if an organization presents to election officials between 100 and 500 incomplete voter registration forms, the organization will be subject to a fine of $150 up to a maximum of $2,000 in *each* county where a violation occurs within a calendar year. *Id.* § 2-2-143(c)(4)(A). Additionally, if an individual or an organization submits more than 500 voter registration forms that are deemed "incomplete," they will face a fine of up to $10,000 in *each* county where a violation has occurred. *Id.* § 2-2-143(c)(4)(B).

142.    Because there are 95 counties in Tennessee, each of these fines could be imposed as many as 95 times against one individual or organization within each calendar year.  The Law, therefore, creates a risk of financial penalties of up to one million dollars.  This is a substantial amount of money that would create a chilling effect on any individual or organization.

143.    And there is a real threat of significant financial penalties.  The Law allows for a penalty of up to $2,000 in each county for the offense of more than 100 "incomplete" forms.  LWVTN, therefore, faces a significant threat of incurring such a penalty in each of the approximately 14 counties where the local Leagues regularly conduct voter registration drives.  That would result in fines totaling $28,000 in any given year, which is almost LWVTN's entire annual budget.

144.    For small organizations like AMAC, with a voter registration budget of only $1,000, even the smallest financial penalty of $150 would be substantial.

145.    AMAC believes that it will additionally face risks from the fines because, based on its experience working in immigrant communities, new citizens are more likely to leave fields incomplete on voter registration forms, thus creating a greater risk of AMAC collecting forms that will be deemed "incomplete."

146.    Individuals such as the League's members and its volunteers, as well as students hired by AMAC to conduct voter registration drives, could also potentially be fined under Section 2-2-143(a), which states that "any person . . . is subject to civil penalty."  Many of the League's members and volunteers are senior citizens, and the students working for AMAC are on limited budgets.  The same is true of many of MCLC's staff and field organizers.  A fine of any amount would be devastating to such individuals, not to mention the threat of fines of $2,000 or more.

147.     MSPJC depends on grant funding to conduct significant voter registration drives. However, under the Law, this funding will expose MSPJC to criminal penalties, as well as substantial fines if it turns in more than 100 forms deemed incomplete under the law—a situation MSPJC believes may occur based on its experience working with individuals in low-income communities who have often never registered to vote before and are therefore more likely to make inadvertent mistakes on their forms.  Even the Law's lowest financial penalty ($150) would significantly harm MSPJC as a small organization and impede its activities.

148.     For HeadCount, once an applicant fills in a form at a music event and turns it in to a HeadCount volunteer, it is often difficult to reengage that person if a field is not completed, given the nature of the event.  HeadCount cannot continue to help Tennessee voters register in the field by collecting their forms and submitting them if HeadCount will be subject to financial penalties.

149.     To the extent it is possible for Plaintiffs to check that forms are complete and "cure" any incomplete forms through outreach to voters all within the 10-day window created by the Law, this would impose a substantial burden and divert scarce resources from Plaintiff organizations' core voter registration activity as well as other mission-advancing activities.

150.     If "incomplete" is deemed to include inaccuracies with respect to address fields, these issues would have a particular impact on Plaintiffs helping students registering to vote using campus addresses, which are often confusing for voter registration purposes.

151.     Finally, Plaintiffs are concerned that if they do not turn in "incomplete" voter registration forms, the lack of follow-up by county election commissions that do not receive the forms will prevent the community members from exercising their right to vote.  *See* Tenn. Code § 2-19-103 (making it a crime to knowingly do any act for the purpose of preventing the exercise

of someone's rights under Tennessee election law); *id*. § 2-2-120 (requiring the coordinator of elections to audit at least ten (10) county election commissions annually to ensure among other things that voters with deficient registrations are being given the opportunity to correct incorrect or omitted information); *id*. § 2-2-142(a)(2) (requiring the return of voter registration applications in 10 days); 52 U.S.C. § 20507(a)(2) (requiring election officials to notify applicants of the disposition of their applications).

152.     The Law does not mandate that implementing regulations be enacted for this Section.  Tenn. Code Ann. § 2-2-143(f).

Requirements of Section 2-19-145

153.     Section 2-19-145 compels organizations that make any "public communication regarding voter registration status" to "display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state."  Tenn. Code Ann. § 2-19-145(a)(1). Under the Law, a "public communication" includes, but does not limit its terms to, "communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites."  *Id*. § 2-19-145(a)(2).  The Law does not define the contours of content that constitutes "voter registration status."

154.     Section 2-19-145 also compels individuals or organizations that establish "a website for voter registration purposes" to "display on such website a disclaimer that the voter registration is not made in conjunction with or authorized by the secretary of state."  *Id*. § 2-19-145(b)(1).  Section 2-19-145 further compels individuals or organizations that establish "a voter registration website and captures or collects the voter's information or data" to "disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected."  *Id*. § 2-19-145(b)(2).

155.     Section 2-19-145 also compels individuals or organizations that establish "a voter lookup website" to "display on such website a disclaimer that the voter lookup is not made in conjunction with or authorized by the secretary of state." *Id*. § 2-19-145(c)(1). Section 2-19-145 further compels individuals or organizations that establish "a voter lookup website and captures or collects the voter's information or data" to "disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected." *Id*. § 2-19-145(c)(2).

156.     For all of these compelled "disclaimer[s]," the Law requires that they "must be clear and conspicuous and prominently placed." *Id*. § 2-19-145(d). The Law does not define what this requirement constitutes.

157.     Section 2-19-145 criminalizes a "person . . . intentionally or knowingly" violating any part of the Section and each violation constitutes a separate offense. *Id*. § 2-19-145(e). The Law does not indicate who faces the criminal penalty if an organization undertakes a covered "public communication" or establishes a covered website without the requisite disclaimers.

158.     Section 2-19-145 does not authorize any government entity or actor to enact implementing regulations. *See id*. § 2-19-145.

159.     Section 2-19-145 is a solution looking for a problem. There is no evidence that there has been confusion among Tennessee citizens about the nature of community-based voter registration activity. There is no suggestion that Plaintiffs or any other similar organizations have implied that they conduct their community-based activity in coordination with the Secretary of State or that Plaintiffs or any other similar organizations have misled anyone regarding the nature of their efforts.

44

160.     Plaintiffs undertake substantial efforts to help eligible Tennesseans register to vote, to educate such individuals on voter registration, and to provide resources to check on voter registration status, including through mailings, websites, printed materials, billboards, emails, and other electronic communications.  Certain methods by which Plaintiffs undertake public communications, including text messages and social media, contain limited space in which to disseminate messages, which would be entirely overrun by the disclaimers of Section 2-19-145.

161.     The overly broad language regarding "public communications" is likely to affect all voter registration activities undertaken by Plaintiffs: even asking someone if they are registered to vote would compel Plaintiffs to provide the required disclaimer.

162.     Additionally, for Plaintiffs that have already printed materials that provide information about voter registration and polling place locations, these materials would have to be re-printed at considerable costs.

163.     That Section 2-19-145 criminalizes each violation as a separate offense by organizations like Plaintiffs creates a particular chilling effect because the organizations cannot be sure that every volunteer in every interaction provides the disclaimer.  By their nature, Plaintiffs' communications are often dynamic and interactive, and Plaintiffs cannot be expected to regulate every interaction or communication they have with the public during their voter registration activities.

164.     Compliance with the Law is particularly burdensome for organizations that use national websites providing voter registration and other voter education for all states, as well as produce other national materials.  For example, LWVTN uses and promotes the VOTE411.org website, a vital source of voter information for Americans across the country, which is managed by the League of Women Voters Education Fund.  The Law would arguably require the inclusion

of this Tennessee-specific disclaimer on every page of its website that could communicate voter registration and polling place information to Tennessee voters. Additionally, while VOTE411.org includes information about its retention policy, it is unclear whether it would be considered "conspicuously and prominently placed" as required by Section 2-2-145(d).

165. Given the League's concerns about whether the VOTE411.org website complies with the Law, the League would stop all its efforts to support, promote, and encourage use of the website in the state of Tennessee.

166. Moreover, even if it was possible to make changes to the VOTE411.org website to include the Tennessee-specific disclaimer and ensure that the retention of information disclaimer is more "prominently" displayed, the League believes these disclaimers would unnecessarily confuse potential voters and cause a chilling effect, discouraging use of the website.

167. LWVTN also plans to participate in the national Get Out the Vote Program of the League of Women Voters Education Fund, which will include a text messaging program for Tennessee citizens to encourage voter registration and provide information about participating in elections, including information about how to register to vote and to locate a polling place. The League believes that it would be impossible or ineffective to send such text messages with the required disclaimer. Unless the Law is enjoined, the League will not pursue these plans any further.

168. Similarly, Rock the Vote will need to make substantial changes to its website and online tools in order to comply with the disclaimer requirements. The Law would arguably require the inclusion of this Tennessee-specific disclaimer on every page of its website that could communicate voter registration and polling place information to Tennessee voters. Rock the

Vote expects that the disclaimer requirements for communications related to voter registration and turnout are likely to confuse individuals attempting to register to vote in Tennessee through Rock the Vote's website and dissuade them from using the online tool.

169. Rock the Vote also operates an election reminder program via email and text messaging, which involves sending registrants reminders about upcoming deadlines and elections. Even if the required disclosure could fit in these digital communications, Rock the Vote would have to incur the substantial burden of modifying these digital communications to include the required disclosures and disclaimers and anticipates that these new requirements will limit the effectiveness of these reminders and the organization's efforts to mobilize voters.

170. Additionally, MSPJC often uses social media and other electronic media to communicate about finding one's voter registration status and polling place, and sometimes helps individuals identify their polling place during in-person interactions. The Law's disclaimer and disclosure provisions would significantly hamper their ability to engage in these types of services to the community.

171. Similarly, MCLC contacts union members and other individuals whom it helps register to vote with information about upcoming elections, candidate endorsements, and other Election Day details. The Law's disclaimer and disclosure provisions would significantly burden MCLC's communications and ability to associate, help its members register to vote, and express its views as an organization.

172. HeadCount uses text messaging, social media, and other electronic media to communicate with individuals whom it helps and encourages to register to vote. The Law's disclaimer and disclosure provisions would significantly burden HeadCount's communications and ability to associate, help citizens register to vote, and express its views as an organization.

Additionally, including disclosures in every text message sent through HeadCount's social media activities would result in significant increased cost to the organization.

Requirements of Section 2-2-142

173.    Section 2-2-142 requires that any covered "person or organization" comply with a number of burdensome and vaguely defined conditions before engaging in voter registration activity.  Tenn. Code Ann. § 2-2-142(a)(1).

174.    First, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive" provide the name and contact information for "the person conducting the voter registration drive or . . . the officers of the organization conducting the voter registration drive."  *Id.* § 2-2-142(a)(1)(A).  The Law does not define what constitutes a "voter registration drive."

175.    Second, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [c]omplete training, which is administered by the coordinator of elections, on the laws and procedures governing the voter registration process," *id.* § 2-2-142(a)(1)(C), and "[e]nsure that individuals, whether volunteer or paid, who conduct voter registration for an organization have completed the training," *id.* § 2-2-142(a)(1)(E).  The Law does not further define when and how frequently training must be completed.  It is thus ambiguous whether, for example, an individual must complete a training each time that individual participates in any kind of voter registration activity, even if only hours or days apart.

176.    Third, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [f]ile a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters."  *Id.* § 2-2-142(a)(1)(D).  The statute does not further delineate when, how frequently, and by whom

48

such a sworn statement must be signed.  It is thus not clear whether, for example, every volunteer who participates in a covered voter registration drive coordinated by an organization must sign the sworn statement or whether only the agent of the organization must do so.

177.    Fourth, the "person or organization" covered by that Section "shall deliver or mail completed voter registration forms within ten (10) days of the date of voter registration drive." *Id*. § 2-2-142(a)(2).  There are no exceptions provided for extenuating circumstances nor any recognition of the Catch 22-regime created by the confluence of this requirement with the incomplete-forms penalty under which organizations, through no fault of their own, could be left with abandoned forms they must promptly turn in and which count toward a potential fine. These conflicting duties create another paradoxical situation for Plaintiffs under Section 2-19-103, which makes it a Class A misdemeanor if "[a] person who knowingly does any act for the purpose of preventing any person's performance of such person's duties under this title or exercise of such person's rights under this title."  Plaintiffs believe they must turn in every registration form, even those that are incomplete, in part so they do not run the risk of potentially inadvertently preventing an applicant from exercising their right to register and vote.

178.    Fifth, the Law prohibits the "person or organization" from retaining *any* "voter information and data collected on the voter registration application, unless the applicant consents."  *Id*. § 2-2-142(b).  Presumably, this consent goes beyond the consent inherent in turning in a voter registration form to a community-based organization.  However, the statute does not delineate if such consent must be written and, if so, in what form.

179.    Sixth, the text of the Law does not explicitly limit its reach only to activities that occur within the State of Tennessee.  To the extent it does not intend to regulate extraterritorial

conduct, which is likely to occur as the federal mail-in voter registration form is intended to allow voter registration to take place wherever a voter might be, the Law is impermissibly vague.

180. The Law does not mandate that implementing regulations be enacted for this Section. *Id.* § 2-2-142(e).

181. Intentional and knowing violations of the provisions of Section 2-2-142 are a Class A misdemeanor, and each violation constitutes a separate offense. *Id.* § 2-2-142(f).

182. Plaintiffs will either have to curtail their voter registration activities, and/or divert scarce resources to comply with the myriad regulations this section of the Law imposes. LWVTN does not have full time permanent staff and relies on volunteers. AMAC has only one full-time staff person. MSPJC is also a small non-profit with limited staff. HeadCount does not have any paid staff in Tennessee and relies on volunteers and volunteer team leaders for field operations, and would have to assign national staff members to attempt to comply with the law. MCLC has a limited political program that hires field organizers for voter registration and outreach in advance of major elections. These organizations do not have the staff resources to effectively comply with the reporting, training, and affirmation requirements of Section 2-2-142(a) and continue their current levels of voter registration activities. These requirements would significantly and unnecessarily burden Plaintiffs' scarce organizational resources that would otherwise be spent helping voters register, following up with voters, and undertaking other activities to advance their missions. Additionally, the League would only be able to attempt to comply with these requirements if it has funds available to pay for additional time of its consultant who provides limited temporary administrative support.

183. The requirement to pre-register a voter registration drive with specific contact information and location of voter registration drives will make it significantly harder to conduct

voter registration drives and will severely chill the volunteerism that is essential for Plaintiffs'
activities. For example, this requirement would prevent Plaintiffs and similar organizations from
undertaking impromptu voter registration efforts and from making changes to plans: for
example, if a planned staff member were ill, this pre-registration requirement would prevent
organizations from sending someone else to cover the drive. This hampers the flexibility that is
critical to effective voter outreach programs. The Law impedes Plaintiffs' ability to respond
positively to late requests for voter registration tables at community events.

184.    As grassroots organizations, the nature of Plaintiffs' voter registration activity is
to reach out to and involve people in the democratic process where they are, which can include
campus events and other last-minute requests for assistance with voter registration, as well as
recruiting last-minute volunteers. The Law severely burdens Plaintiffs' ability to engage their
communities in this way.

185.    Plaintiffs believe that there is a significant risk that they will have difficulty
recruiting new volunteers and/or volunteer team leaders because potential volunteers will be
unable or unwilling to be exposed to the risk of criminal liability associated with the Law and
that, consequently, the organizations may have to significantly curtail their core mission
activities in Tennessee.

186.    Even if compliance is possible, it will cost significant staff, volunteer, and
leadership resources for Plaintiffs to comply with the Law. For example, it would take
significant time and resources that these organizations do not have to register every single
Tennessee event with the state. The registration requirement will also likely lead to Plaintiffs'
inability to respond to last-minute requests for events.

187.    Plaintiffs believe that a substantial number of their members, volunteers, and staff would be unlikely to sign the required sworn statement due to the broad nature of the requirement (to obey all state laws when the Law itself conflicts with other state law), the vagueness of the Law's requirements, and threatened criminal penalties.  This requirement therefore will severely chill the volunteerism that is essential for Plaintiffs' activities.

188.    The Law's vagueness results in particular risk to Plaintiffs including exposure to criminal penalties when they sign a sworn statement affirming that they will ensure compliance with the Law.

189.    LWVTN, AMAC, MSPJC, MCLC, and HeadCount are all highly reluctant to sign an affidavit of compliance with state law when they believe that the Law is vague and conflicts with other law that requires them to turn in even incomplete registrations.  *See, e.g.*, Tenn. Code Ann. § 2-19-103.  The provision also makes these Plaintiffs potentially responsible for things beyond their control—for example, when a voter hands back a voter registration application that is already sealed and closed, or when an individual leaves a mostly complete voter registration application on the table at a voter registration event and then walks away.

190.    Plaintiffs believe that to retain any information from the voter registration applications they collect under Section 2-2-142(b) they will likely have to either obtain consent in writing in order to protect themselves from criminal liability, adding to the administrative tasks that have to be completed during the interaction with the potential voter and their own recordkeeping costs and requirements, or forgo such retention and related follow-up entirely because they are unable to add the additional layer of paperwork to their interactions.

191.    Ceasing collection entirely would prevent Plaintiffs from conducting any of their regular follow-up with voters for whom they use this information to provide additional election

information, to encourage participation, and/or to ensure that voters are added to the rolls in furtherance of Plaintiffs' missions. And, even where Plaintiffs continue to collect this information, the extra time to fill out additional paperwork will discourage potential voters from participating in the voter registration drive and slow down the entire registration process which will impair the effectiveness of the efforts.

192.    Further, this consent requirement is particularly unnecessary and irrational because the information retained by Plaintiffs is required to be made public upon request under the NVRA. *See* 52 U.S.C. § 20507(i)(1); *Project Vote/Voting for America v. Long*, 682 F.3d 331 (4th Cir. 2012) (stating that rejected voter registration applications must be made publicly available with Social Security numbers redacted).

193.    Under the Law, HeadCount will cease retaining information, which will impair their ability to assist voters in making sure they are added to the rolls, and will harm their organizational mission by making it more difficult to assess and demonstrate their effectiveness in the field.

194.    Finally, conducting same-day online training for volunteers onsite can often be difficult because Plaintiffs often hold grassroots trainings in locations without easily accessible internet. The training requirement will therefore make it impossible to continue to accept walk-up volunteers for Tennessee events. A reduction in the number of volunteers will impair the organizational missions of certain Plaintiffs both by reducing the number of voters reached by the organizations as well as by reducing the volunteer engagement and encouragement of volunteerism that is critical to Plaintiffs' organizational missions.

**Overall Impact on Plaintiffs**

195.    In response to threats created by the Law of financial risks and risks of criminal prosecution, some Plaintiffs are considering imposing a moratorium on all of their voter registration activities after October 1, 2019.

196.    Even if Plaintiff organizations do not impose a complete moratorium on all voter registration activities, they are likely to significantly scale back the volume of voter registration drives they conduct to help Tennessee voters register, either by design or simply due to the fact that conducting voter registration drives will require greater resources, which are finite. This scaling back of voter registration activity will be necessary because voter registration activities will be more burdensome and resource-intensive given the Law's restrictions; some Plaintiffs will need to control their level of risk of potential financial liability due to incomplete forms; and some Plaintiffs anticipate a decline in staff and volunteer engagement or difficulty recruiting new staff or volunteers to engage in these activities given their new attendant risks. Plaintiffs are not sure that full compliance—including the return of all voter registration forms collected and the submission of less than 100 "incomplete" applications—can ever be assured except on a very small scale of voter registration.

197.    Given the vagueness of the Law and the criminal liability and financial penalties associated with the Law, HeadCount is seriously considering cutting back its voter registration activities in Tennessee, or even ending them depending on the circumstances. HeadCount would not be able to pay fines for "incomplete" applications, and if its programs were subject to the Law, it would be forced to stop collecting applications for Tennessee registrants.

198.    Under the new Law, AMAC believes it will struggle to convince even paid interns to participate in voter registration activities. Therefore, AMAC will be forced to divert more organizational time and resources from other organizational priorities to identify and convince

individuals to help with its voter registration activities, while still likely finding fewer individuals to participate.

199.    Likewise, MSPJC and HeadCount will struggle to find students and other community members to participate in voter registration activities if those individuals must participate in state-sponsored training before each voter registration drive and these organizations will be unable to continue conducting ad hoc voter registration drives because of the burdensome pre-registration requirements of the law.

200.    Additionally, the League and HeadCount also believe that they will have to further scale back their priority voter registration drive work focused on some of the communities with the greatest need, like more transitional communities with lower incomes or students, because they believe there would be challenges that increase the likelihood of incomplete forms and thus increase their risk of penalties.

201.    Finally, to the extent national organizations assist Tennessee voters in registering to vote in voter registration drives outside of the state, through use of either a Tennessee state voter registration form or, more likely, the federal form, this out-of-state activity may be subject to the provisions of the Law.

## Claim I: Free Speech and Association
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

202.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

203.    The First Amendment to the United States Constitution prohibits abridgment of freedom of speech.

204.     The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

205.     The Law directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government.  Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political and philosophical statement.  Moreover, the Law implicates Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

206.     Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).  Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions."  *Id*. at 421; *see also Buckley v. Am. Constitutional Law Found*., 525 U.S. 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422).

207.     The onerous requirements of Sections 2-2-142, 2-2-143, and 2-19-145, coupled with substantial civil and criminal penalties, burden Plaintiffs' political expression, diminishing their ability to convey their message and further it by engaging more individuals in the political process.

208.     The threat of criminal penalties for failure to pre-register each and every voter registration drive in which Plaintiffs merely attempt to collect 100 or more voter registration applications, *id.* § 2-2-142(a)(1)(A); (f), is a severe burden on Plaintiffs' First Amendment rights.

56

209.	The threat of criminal penalties for failure to ensure that each and every individual, both paid and volunteer, conducting a voter registration drive has undergone training by the state prior to the drive, *id.* § 2-2-142(a)(1)(C), (E); (f), is a severe burden on Plaintiffs' First Amendment rights.  These provisions prevent Plaintiffs from recruiting volunteers immediately before a drive begins or from having volunteers join in their work once a drive is underway.  Moreover, requiring training before each voter registration drive puts stress on the limited resources of the Plaintiff organizations, particularly their volunteer hours.

210.	The threat of criminal penalties for failure of each individual and organization completing and then filing sworn statements that they will follow all state laws prior to each and every voter registration drive in which Plaintiffs merely attempt to collect 100 or more voter registration applications, *id.* § 2-2-142(a)(1)(D); (f), is a severe burden on Plaintiffs' First Amendment rights.

211.	The imposition of substantial financial penalties for the submission of 100 or more "incomplete" voter registration forms, including a financial penalty "in each county where the violation occurred," *id*. § 2-2-143(c)(4), severely burdens Plaintiffs' First Amendment rights. These financial penalties constitute a large percentage of Plaintiffs' budgets and when imposed would decimate their ability to conduct any of their civic work.

212.	Moreover, Section 2-2-143 in conjunction with Section 2-2-142(2) places Plaintiffs in an untenable position.  They will suffer criminal penalties for not submitting "completed" voter registration forms within 10 days on the one hand, while simultaneously risk incurring substantial civil penalties if they submit too many "incomplete" voter registration applications on the other.

213.     These conflicting duties place Plaintiffs in yet another Catch-22 under Tennessee Code Annotated § 2-19-103, which makes it a Class A misdemeanor if "[a] person . . . knowingly does any act for the purpose of preventing any person's performance of such person's duties under this title or exercise of such person's rights under this title."

214.     Therefore, Plaintiffs will not be able to simultaneously comply with all provisions of Tennessee law.

215.     The threat of criminal penalties for failure to include disclaimers on any public communications or websites regarding voter registration, *id.* § 2-19-145(a)-(e), is a severe burden on Plaintiffs' First Amendment rights.

216.     Section 2-19-145 severely burdens Plaintiffs' First Amendment rights by diminishing the value and nature of their expression by delegitimizing the content of their organizational message and their ability to communicate with their chosen audience through threat of criminal sanctions.

217.     The Law is an impermissible content-based restriction on speech because speakers who discuss voter registration are subject to restrictions and criminal penalties that other speakers are not.

218.     Criminal prosecution contemplated by statutes that govern expression, as do Sections 2-2-142 and 2-19-145, inhibits the full exercise of First Amendment freedoms.  Punitive civil sanctions, such as those imposed by Section 2-2-143, also inhibit the exercise of First Amendment freedoms.

219.     Because of the chilling effect of the risk of criminal prosecution or punitive civil sanction, Sections 2-2-142, 2-2-143, and 2-19-145, individually and collectively, unconstitutionally infringe upon the First Amendment rights of Plaintiffs.  By chilling Plaintiffs'

voter registration activities, Sections 2-2-142, 2-2-143, and 2-19-145 will each "reduce[] the voices available to convey political messages." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring). Restrictions on voter registration drives in Sections 2-2-142, 2-2-143, and 2-19-145 will reduce the total voices available to speak in favor of political participation and voter registration and therefore run afoul of the First Amendment.

220. Moreover, the risk of criminal prosecution not just on the organization itself, but on the individuals who conduct voter registration or make public communications regarding voter registration, unconstitutionally infringes on the associational rights of Plaintiffs. The risk of criminal prosecution makes it less likely that individuals will be willing to undertake voter registration activities and advocate for political participation during and through these activities, thus impeding Plaintiffs' associational rights and expressive conduct.

221. These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest, and serve little purpose other than to dissuade civic organizations and individuals from engaging in voter registration activity. Under the exacting scrutiny applied in *Meyer*, or any other level of judicial scrutiny, these requirements fail.

## Claim II: Compelled Speech
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

222. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

223. The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

59

224.     Section 2-19-145 compels government speech by Plaintiffs and other individuals or organizations that make public communications or establish websites and look-ups related to voter registration and thus undermine Plaintiffs' core political speech.

225.     The disclaimers required by Section 2-19-145 pejoratively emphasize that the Plaintiffs' speech is "not made in conjunction with or authorized by the secretary of state." Such a disclaimer—prominently displayed—suggests that filling out a voter registration application is an activity that should be done only in conjunction with the Secretary of State and undermines a voter's confidence that their voter registration will be official and effective.

226.     Thus, these disclaimers—which would have to be repeated in all covered materials and communications—will undermine the credibility of Plaintiffs, which are legitimate civic organizations that provide important services to Tennesseans. These disclaimers, moreover, will not be entirely accurate since under the Law, Plaintiffs will have to coordinate their voter registration activities with the State by undergoing state-mandated training and reporting on their activities in order for them to be authorized under the Law. Plaintiffs offering voter registration also do so using forms authorized by state law, *see* Tenn. Code Ann. § 2-2-115, or forms required to be accepted and used by the state under the National Voter Registration Act of 1993, 52 U.S.C. § 20505.

227.     These disclaimers serve no legitimate governmental function since there is no evidence that Tennesseans have been confused about the nature of community-based voter registration activity. There is no suggestion that Plaintiffs or other similar voter registration groups have suggested that their community-based activity is done in coordination with the Secretary of State or have misled anyone regarding the nature of their efforts.

228.     To the extent the government thinks that the message required by Section 2-19-145 is needed, the government must speak for itself.  Defendants must not co-opt Plaintiffs' and other civic organizations speech to further their own government message.

229.     The Law unconstitutionally forces Plaintiffs, at the risk of criminal penalty, to speak for the government, making disclaimers that Plaintiffs would not otherwise recite.

230.     Laws compelling speech are subject to strict scrutiny, and this remains the case in the election context.

231.     Section 2-19-145 is not narrowly tailored to serve any compelling government interest and is thus unconstitutional.

### Claim III: Substantial Overbreadth
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

232.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

233.     The First Amendment to the United States Constitution prohibits abridgment of freedom of speech.

234.     The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

235.     The Law directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government.  Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political and philosophical statement.  Moreover, the Law implicates Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

236.    Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer*, 486 U.S. at 422–23.  Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions."  *Id*. at 421; *see also Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422).

237.    Sections 2-2-142 and 2-19-145 are unconstitutionally overbroad, as they regulate a substantial amount of constitutionally protected expression.  To the extent the Law purports to reach out-of-state conduct, including registration of Tennesseans outside the State of Tennessee, this too is unconstitutionally overbroad.

238.    Criminal prosecution contemplated by statutes that governs expression, as do Sections 2-2-142 and 2-19-145, inhibits the full exercise of First Amendment freedoms.

**Claim IV: Due Process**
**(Violation of Plaintiffs' Fourteenth Amendment Due Process**
**Rights Pursuant to 42 U.S.C. § 1983)**

239.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

240.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a law that imposes penalties gives ordinary people reasonable notice of what conduct it prohibits and guard against arbitrary and discriminatory enforcement.

241.    The applicability of the void for vagueness doctrine is heightened both when criminal sanctions are attached to a vague law and whenever the First Amendment is implicated.  Here, the Law does both.

242.    The Law creates a complex web of interrelated vague provisions that build upon each other, causing an extreme burden in the aggregate in addition to the severe burden caused by each particular provision.

243.    The application of Sections 2-2-142 and 2-2-143 to a "person or organization who . . . conducts a supplemental voter registration drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people" is vague because it fails to define what activity constitutes a voter registration drive and what it means to "conduct[]" such a drive, and because it fails to define what activity constitutes an "attempt."

244.    Relatedly, the requirement of Section 2-2-142 to register "the voter registration drive" is vague because it fails to define what particular activities must be registered with the state, and because it also ambiguously refers to "the voter registration drives," Tenn. Code Ann. § 2-2-142(a)(1)(B), adding to the confusion regarding what activities must be registered and when.

245.    In addition, the application of Sections 2-2-142 and 2-2-143 to a "person or organization who has not been designated by the county election commission under § 2-2-111" is vague because it is not clear whether a person or organization designated under Section 2-2-111 is exempt from the Law's provisions for all otherwise covered supplemental voter registration drives conducted by that person or organization or for only those supplemental voter registration drives for which that person or organization serves as the county election commission's designee.  *See* Tenn. Code Ann. § 2-2-111(b), (d).

246.    Sections 2-2-142 and 2-2-143's exemptions for "individuals who are not paid" and "organizations that are not paid . . . and that use only unpaid volunteers" are confusing and ambiguous because they fail to define what it means to be "paid" or "unpaid."

63

247.    Sections 2-2-142 and 2-2-143 are also impermissibly vague to the extent that they do not intend to regulate voter registration activity for Tennessee citizens that occurs outside the State of Tennessee.  On its face, the Law does not restrict its reach to voter registration activities conducted with the State of Tennessee.

248.    Due to these vague provisions, the Law fails to give civic organizations and persons that participate in covered voter registration activities fair notice of who must comply with the Law's requirements and under what circumstances.  That the Coordinator of Elections could not articulate what constitutes "paid" or "unpaid" activities exacerbates the vagueness of the text of the Law.

249.    Section 2-2-142's requirement that any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [c]omplete training" is vague because it fails to make clear when and how frequently training must be completed.

250.    Section 2-2-142's requirement that any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [f]ile a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters" is vague because it fails to make clear when, how frequently, and by whom such a sworn statement must be signed.

251.    Section 2-2-143's imposition of civil penalties on "any person or organization" who "conducts voter registration drives under § 2-2-142 and . . . files one hundred (100) or more incomplete voter registration applications," defined as "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature," is vague because the terms "incomplete" and "lacks" are ambiguous.  The ambiguity in these phrases is exacerbated by the fact that Section 2-2-143 also provides that a "person or individual who

64

collects an application that only contains a name or initial is not required to file the application with the election commission." This provision, along with the Section 2-2-142(a)(2)'s requirement to "deliver or mail completed registration forms within ten (10) days of the date of the voter registration drive," suggests that the Law mandates the filing of any form that contains any other information in addition to a name or initial, regardless of the completeness of the application in other respects—despite simultaneously contemplating that some of these forms would be incomplete and subject to the Law's civil penalties.

252.    Section 2-19-145's disclaimer requirement for any "public communication regarding voter registration status" is vague because it is unclear what the terms "public communication" and "regarding voter registration status" mean. In addition, while the Section states that a "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," the use of "includes" indicates that this list is not exhaustive, and that there is therefore additional unknown conduct that may be prohibited.

253.    Section 2-19-145(d)'s requirement that compelled "disclaimer[s]" "must be clear and conspicuous and prominently placed" is ambiguous and indeterminate because it is unclear what qualifies as "conspicuous and prominent[]" placement, an eminently subjective determination subject to arbitrary and discriminatory enforcement.

254.    Sections 2-2-142 and 2-2-143 do not mandate that implementation procedures be enacted. And Section 2-2-145 contains no permission to enact implementation procedures, so that there is no regulatory avenue by which this Section might possibly be fleshed out.

255.    Due to these vague provisions, the Law also fails to give civic organizations and persons that participate in covered voter registration activities, including Plaintiffs, reasonable notice of what constitutes prohibited conduct.

256.    Violations of Section 2-2-142 and 2-19-145 are subject to criminal penalties.

257.    Violations of Section 2-2-143 are subject to civil penalties.  However, it is not clear how to ascertain the extent of that monetary liability because the Law is ambiguous as to whether civil penalties for the submission of 100 or more incomplete forms may be assessed once or multiple times if the 100 or more incomplete forms are comprised of forms submitted in more than one county.  *Id.* § 2-2-143(c)(4).

258.    As a result of this ambiguity, the Law also fails to provide civic organizations and persons that participate in covered voter registration activities with reasonable notice of the extent of the potential penalties, and thus provides no guard against arbitrary enforcement of the Law.

259.    The vagueness of the Law heightens the likelihood of arbitrary or discriminatory enforcement since the provisions could be variously read to reach certain conduct or not.

260.    Because of the burdens that the Law will put on the voter registration activities of Plaintiffs, Plaintiffs will have to expend additional resources to conduct voter registration.  But for the burdens imposed by the Law, these resources otherwise could be spent on other activities of Plaintiffs.  Even with additional diverted resources, Plaintiffs believe their voter registration efforts will be less effective because of the burdens the Law will impose.

**Claim V: Burden on Political Speech and Association in Connection with the Fundamental Right to Vote**
**(Violation of Plaintiffs' First and Fourteenth Amendment Rights**
**Pursuant to 42 U.S.C. § 1983)**

261.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

262.    Voter registration is a pre-requisite to exercising the fundamental right to vote in Tennessee.

263.    The Law directly interferes with the fundamental right to vote by frustrating efforts to help individuals register who are otherwise often left out of government-run registration processes.

264.    The Law also directly interferes with the ability of members of MCLC to register to vote through voter registration efforts by MCLC.

265.    The Law directly restricts Plaintiffs' voter registration activity, which is protected by the First Amendment, and thus, in turn, implicates the right to vote.

266.    The Law also directly interferes with the ability of unregistered members of MCLC and its affiliates to register to vote.

267.    The burdens placed upon Plaintiffs—and the fundamental voting rights of the individuals in the communities they serve—by the Law are substantial.

268.    Compliance with the Law, to the extent it could even be achieved, would require the expenditure of substantial additional resources by Plaintiffs, diverting resources from other core organizational activities.  Plaintiffs would have to expend substantial additional staff and volunteer time and additional person and financial resources, much of which they simply do not have.  Meanwhile, compliance with the Law would hamper MCLC's ability to operate its

political program, thereby interfering with its unregistered union members' right to vote by making it harder for them to register through MCLC's political program.

269.     The State does not have interests that make these substantial burdens on Plaintiffs' rights necessary. In addition to their being no state interests that make the particular regulations of the Law necessary regardless of their reach, that Sections 2-2-142 and 2-2-143 do not apply to individuals not paid to collect voter registration applications demonstrates that these regulations are not necessary to advance any interests of the state. At a minimum, were the regulations necessary, they would apply to all those collecting voter registration applications.

<u>**Claim VI: Conflict (Obstacle) Preemption through**</u>
<u>**Frustration of Statutory Purpose**</u>
**(Violation of 52 U.S.C. § 20501(b), 52 U.S.C. § 20505)**

270.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

271.     Congress passed the NVRA in order to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), and to make governments implement procedures that "enhance[] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2). Indeed, "maximiz[ing] such opportunities" is the "primary emphasis" of the NVRA. *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1324 (N.D. Ga. 2016).

272.     The NVRA designed several methods to help maximize these opportunities. It mandates the acceptance of a mail voter registration form as well as the creation and acceptance of a federal mail voter registration form. 52 U.S.C. § 20505; *see also id.* § 20508(b). In doing so, the NVRA places "particular emphasis on making" those forms "available for organized voter registration programs" by nongovernmental groups such as Plaintiffs. *Id.* § 20505; *see also*

*id.* § 20508(b).  Thus, because the NVRA limits the state's ability to reject forms and emphasizes making such forms available for voter registration programs like the ones run by Plaintiffs, the organization and execution of voter registration activities by Plaintiffs and similar organizations constitutes a "legally protected interest."  *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005); *see also League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1163 (N.D. Fla. 2012).

273.    The Law substantially interferes with that interest through its threats of civil penalties and criminal liability, burdensome training and pre-registration requirements, and restraint on Plaintiffs' ability to deliver their messages through drives without carrying the State's own disclaimers that would discourage potential voters from participating, among other things.  Indeed, the primary proponents of the Law have admitted that they designed the Law to "go after" the ability of groups like Plaintiffs to conduct substantial voter registration activities.[3]

274.    The Law interferes with Plaintiffs' voter registration activities to such an extent that each Plaintiff will either need to cut back or completely cease such activities should the Law go into effect.  Because the Law substantially interferes with Plaintiffs' NVRA-protected rights by hampering their ability to conduct voter registration activities as contemplated by Section 6 of the NVRA, and because the Law directly runs afoul of the NVRA's purposes while falling within its scope, it conflicts with and is preempted by the NVRA.

<u>**Claim VII: Conflict (Obstacle) Preemption through**</u>
<u>**Frustration of Purpose of Section 8(a)(2) of the NVRA**</u>
**(Violation of 52 U.S.C. § 20507(a)(2))**

275.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

---

[3] *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (testimony of Coordinator of Elections Mark Goins, at 1:17:57 to 1:18:19), *available at* http://tnga.granicus.com/MediaPlayer.php? view_id=439&clip_id=17123.

276.    Section 8(a)(2) of the NVRA provides that "[i]n the administration of voter registration for elections for Federal office, each State shall . . . require the appropriate State election official to send notice to each applicant of the disposition of the application."  52 U.S.C. § 20507(a)(2).  This provision necessarily contemplates the submission of incomplete and/or invalid registrations and gives rise to a requirement that the State notify individuals of such a disposition.

277.    Yet the Law frustrates the very purpose of that provision by foisting the responsibility for reviewing the completeness (and potentially correctness) of a voter registration form onto Plaintiffs and similar groups and individuals when they help people attempt to register.  By threatening to impose civil penalties on groups which submit 100 or more incomplete voter registration forms, the Law seeks to commandeer Plaintiffs' resources to do the jobs of election officials under threat of civil penalties.

278.    By forcing Plaintiffs and other voter registration groups to play the role of the State in determining the completeness and/or accuracy of the information, the Law prevents the State from performing its statutorily mandated role in determining voter eligibility. More importantly, the Law is designed to chill the submission of incomplete forms.  Therefore, it frustrates the purpose of the provision by circumventing the NVRA mechanism by which all incomplete voter registration applications are meant to trigger a state notice to cure.

279.    Because of this, Plaintiffs will be harmed by a significant threat of civil penalties if they nonetheless turn in every voter registration form their collect, the risk of violating Tennessee law and facing criminal penalties for not turning in voter registration forms they collect within ten days, and/or a diminution of the speech and associational rights as well as the rights of the voters they would register if they are forced to significantly curtail or cease voter

registration activities altogether. *See* Tenn. Code Ann. § 2-2-142(a)(2). The Law also forces Plaintiff organizations to divert resources to navigate this quagmire, including taking on the *State's* responsibility for assessing the accuracy and completeness of the forms and within the proscribed time limits, if they do continue voter registration activities.

280. Union members of Plaintiff MCLC's affiliate unions, moreover, face harm to their right to vote because of this violation because if they do not receive notice of an incomplete voter registration from the State, they may miss the opportunity to register.

### Claim VIII: Discriminatory/Non-Uniform Attempt at Voter Registration Roll Maintenance
### (Violation of 52 U.S.C. § 20507(b))

281. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-201 as if fully set forth herein.

282. Section 8(b) of the NVRA requires that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).

283. Defendants have asserted that the Law intends to "ensure that voter registration is done *properly*," ECF No. 59 at 14, with then-Speaker of the Tennessee House Glen Casada adding that the Law seeks to prevent "an attempt from outside groups to flood the ballot box with fraudulent votes,"[4] and Governor Lee elaborating that the Law is intended to "make sure we don't clog the system."[5] These and similar statements and the Law's regulation of the voter roll by attempting to restrict the types and quantities of registration forms submitted by using

---

[4] Rep. Glen Casada, Twitter (Apr. 16, 2019 4:45 pm), https://twitter.com/GlenCasada/status/1118254038162837505.

[5] Jonathan Mattise & Elaina Sauber, The Tennessean, *Federal judge blocks Tennessee voter registration law, citing harm to 'constitutional rights,'* (Sept. 12, 2019), available at https://www.tennessean.com/story/news/2019/09/12/tennessee-voter-registration-law-blocked-judge-citing-harm/2300293001/.

financial penalties demonstrate that the Law constitutes activities or a program which Defendants believe will protect the electoral integrity with regard to the voter rolls. While Plaintiffs dispute that the Law will in fact advance electoral integrity, because its aim is purportedly to protect electoral integrity through regulation of how groups attempt to add people to the rolls is its aim, the Law is covered by Section 8(b) of the NVRA.

284. The Law, however, does not advance these supposed purposes through uniform and nondiscriminatory measures. Rather, as Defendants Goins has stated, it "goes after" groups such as Plaintiffs which receive funding to conduct voter registration activities or use their budgets to compensate those who participate in their registration activities while exempting similar activities that lack funding or organizational monetary support. There is no reason for this discriminatory treatment of Plaintiffs and similarly situated groups. By subjecting Plaintiffs and similar groups to civil and criminal penalties and burdensome training and preregistration requirements, the Law discriminates against Plaintiffs and similarly situated groups and individuals by imposing these non-uniform requirements. The Law thus violates Section 8(b) of the NVRA.

285. This discriminatory application of the Law's procedures will harm Plaintiffs by diminishing their speech and associational activities, impairing their ability to promote the right to vote, harming their missions, and causing them to divert resources from other important programmatic activities to address the Law's mandates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.      Declare that Sections 2-2-142(a)-(b), (e)-(g), 2-2-143, and 2-19-145 violate the First and Fourteenth Amendments and the National Voter Registration Act;

B.      Preliminarily and permanently enjoin Defendants from enforcing Sections 2-2-142(a)-(b), (e)-(g), 2-2-143, and 2-19-145, particularly the civil and criminal penalties contained therein;

C.      Retain jurisdiction to render any and all further orders that this Court may deem necessary;

D.      Award Plaintiffs their attorneys' costs and fees pursuant to statute; and

E.      Grant any and all other relief this Court deems just and proper.

Dated: December 4, 2019                          Respectfully submitted,

Sophia Lin Lakin*                                /s/ Thomas H. Castelli
Theresa J. Lee*                                  Thomas H. Castelli, BPR#024849
Davin M. Rosborough*                             Legal Director
Dale E. Ho*                                      ACLU Foundation of Tennessee
American Civil Liberties Union Foundation        P.O. Box 120160
125 Broad Street, 18th Floor                     Nashville, TN 37212
New York, NY 10004                               Tel.: 615-320-7142
Tel.: (212) 549-2500                             tcastelli@aclu-tn.org
slakin@aclu.org
tlee@aclu.org
drosborough@aclu.org                             Danielle Lang*
dho@aclu.org                                      Molly Danahy *
                                                 Campaign Legal Center
Sarah Brannon*, **                               1101 14th Street NW, Suite 400
American Civil Liberties Union Foundation         Washington, DC 20005
915 15th Street, 6th Floor                       Tel.: (202) 736-2200
Washington, DC 20005                             dlang@campaignlegal.org
Tel.: (202) 544-1681                             mdanahy@campaignlegal.org
sbrannon@aclu.org
** not admitted in DC; DC practice limited to federal court only
                                                 Michelle Kanter Cohen*
William H. Harbison, BPR#7012                    Cecilia Aguilera*
C. Dewey Branstetter, Jr. BPR#9367               Jon Sherman*
Hunter C. Branstetter, BPR#32004                 Fair Elections Center
Sherrard Roe Voigt & Harbison                    1825 K Street NW, Suite 450
150 3rd Avenue South, Suite 1100                 Washington, DC 20006
Nashville, TN 37301                              Tel.: (202) 331-0114

Tel.: (615) 742-4200
bharbison@srvhlaw.com
dbranstetter@srvhlaw.com
hbranstetter@srvhlaw.com

mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
jsherman@fairelectionscenter.org

*Attorneys for Plaintiffs*
*admitted *pro hac vice**