IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., *et al.*,<br><br>      *Plaintiffs*,<br><br>v.<br><br>TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, *et al.*,<br><br>      *Defendants*.<br> <hr>LEAGUE OF WOMEN VOTERS OF TENNESSEE, *et al.*,<br><br>      *Plaintiffs*,<br><br>v.<br><br>TRE HARGETT, *et al.*,<br><br>      *Defendants*. | Civil Nos. 3:19-cv-365; 3:19-cv-385<br>Hon. Aleta A. Trauger |

## <u>FIRST AMENDED COMPLAINT OF PLAINTIFFS TENNESSEE NAACP ET AL.</u>

Plaintiffs Tennessee State Conference of the NAACP, Democracy Nashville-Democratic Communities, The Equity Alliance, and The Andrew Goodman Foundation (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendants Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; Herbert Slatery III, in his official capacity as Attorney General of the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy

1

Wallace, Tom Wheeler, and Kent Younce, in their official capacities as members of the State Election Commission (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1. This action challenges Tennessee's new restrictive voter registration law, Tenn. Code. Ann. Section 2-2-142(a)–(b) and (e)–(g), Section 2-2-143(a)–(f), and Section 2-19-145(a)–(f), which was signed into law by Governor Bill Lee on May 2, 2019 and scheduled to take effect October 1, 2019. The law is codified at ELECTION OFFENSES, 2019 Tenn. Laws Pub. ch. 250 (H.B. 1079) (hereinafter, the "Act").

2. The Act places onerous, unnecessary, burdensome, and unconstitutional obstacles on people who want to help others register to vote and subjects such people to harsh civil and criminal penalties based on vague, overbroad, and unduly burdensome terms and standards. The challenged provisions of the Act violate the due process clause of the Fourteenth Amendment and the National Voter Registration Act of 1993 ("NVRA") and have a chilling effect on the exercise of fundamental First Amendment rights.

3. "The right to vote freely for the candidate of one's choice is of the essence in a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The right to vote is a "fundamental political right" that is "preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

4. Voter registration is the prerequisite to exercise this cherished franchise. Helping someone register to vote not only furthers the essence of our democracy, but also implicates the fundamental First Amendment rights of the person helping the voter register. "The interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society." *Project Vote v. Blackwell*,

2

455 F. Supp. 2d 694, 706 (N.D. Ohio 2006). "Because the collection and submission of voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006).

5.     In many communities, voter registration is done in conjunction with everyday social activities. It takes place at town halls, church events, door-to-door canvassing, in front of supermarkets, at the mall, in laundromats, on party buses, and at a range of community events. A voter registration worker meets voters where they are, and this face-to-face interaction facilitates civic engagement.

6.     Voter registration activities are viewed in many communities as a way to build alliances, bring in members who had been on the fringes of the community, work in a nonpartisan manner, and encourage greater engagement in our democracy. This is particularly true in minority communities, which historically have had stumbling blocks placed in their way in registering to vote.

7.     Many voter registration groups, including Plaintiffs Tennessee State Conference of the NAACP, Democracy Nashville-Democratic Communities, The Andrew Goodman Foundation, and The Equity Alliance, also work and communicate directly with prospective voters prior to and on Election Day, advising voters on how to register, helping voters look up their registration status, sharing information on voter registration on their websites, reminding newly registered voters to cast their ballots, and helping voters find their correct polling place, through social media, live events, and town hall trainings.

8.    The Act targets voter registration groups and imposes criminal penalties for failure to pre-register.  That pre-drive registration includes submitting a sworn statement, obtaining consent for the retention of voter information, and receiving government training before embarking on voter registration drives.  But the Act is unconstitutionally vague in key provisions, failing to define adequately who is and who is not subject to such requirements and what conduct comes within the scope of the statute.  The Act leaves Plaintiffs and others who want to engage in voter registration activities uncertain as to what steps, if any, they must take to comply with the Act, discourages Plaintiffs and others who want to engage in voter registration drives from undertaking activities protected by the First Amendment, and creates an unacceptable risk that they will be subject to arbitrary and discriminatory law enforcement.

9.    The Act subjects a selected group of persons—paid voter registration volunteers, workers, and staff—to criminal penalties for failure to follow a host of requirements, including pre-drive registration, voter information retention restrictions, and government training, without any justification for singling them out, thus violating their First Amendment associative rights and the NVRA.

10.    The Act imposes criminal penalties for failure to comply with preregistration and training requirements prior to a voter registration drive. But it does not adequately define a "voter registration drive" for the purposes of determining how to calculate an organization's "attempts to collect voter registration applications of one hundred (100) or more people" or knowing how frequently an organization must re-file its pre-registration with the Coordinator of Elections. The Act also imposes criminal penalties for failing to receive an applicant's "consent" before "copying, photographing, or in any way retaining the voter information and data collected on the voter registration application" without specifying whether "consent" must be written. Not only

4

are these requirements vague, they are overly burdensome and will have the effect of hampering Plaintiffs' ad hoc and often large scale voter registration efforts.

11. The Act imposes stiff financial penalties for the submission of 100 or more "incomplete" registration applications, but does not adequately define what constitutes an "incomplete" application and leaves Plaintiffs and others engaging in voter registration drives at the risk of civil fines no matter what actions they take with respect to a registration application. Given the civil penalties imposed for submission of "incomplete" applications, this provision is at odds with the stringent and inflexible 10-day requirement that Plaintiffs deliver or mail "completed" voter registration forms "within ten (10) days of the date of the voter registration drive." The Act places Plaintiffs in a catch 22 situation in which they are penalized for submitting "incomplete" forms but are also penalized for not submitting "complete" forms within the prescribed period.

12. The Act imposes criminal penalties for any "public communication regarding voter registration status" that is unaccompanied by a disclaimer that the communication is not made in conjunction with or authorized by the Secretary of State. The vagueness and overbreadth of this prohibition potentially brings within its ambit virtually every statement made by Plaintiffs relating to "voter registration." This provision of the Act is also an impermissible content-based regulation that compels Plaintiffs to speak a specific state-imposed message in violation of their First Amendment rights.

13. The Act requires that a disclaimer must be "clear and conspicuous and prominently placed" and that the disclaimer be given a "placement" that "cannot be overlooked." This requirement is vague and overbroad because it fails to give Plaintiffs sufficient warning of what they must do to comply with the Act. Because of their vagueness, overbreadth, and undue burden, these provisions will chill Plaintiffs' voter registration efforts, which have focused on

5

traditionally disenfranchised communities—African-Americans and other minorities, college students, and low-income voters.

## JURISDICTION AND VENUE

14.    This action arises under the First Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the NVRA, 52 U.S.C. § 20501 *et seq.*, and 42 U.S.C. § 1983.

15.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (jurisdiction over civil rights actions).

16.    This Court has authority to grant both declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 (authority to grant declaratory relief) and § 2202 (authority to grant relief ancillary to declaratory judgment), in addition to its authority under the Civil Rights Act and its inherent equitable powers.

17.    This Court has personal jurisdiction over Defendants Secretary Tre Hargett, Coordinator Mark Goins, Attorney General Herbert Slatery III, the State Election Commission, and the members of the State Election Commission because their principal offices are in Nashville, Tennessee.

18.    Venue lies in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b) because all Defendants are residents of Tennessee, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred and will occur in this judicial district.

19.    An actual and justiciable controversy exists between Plaintiffs and Defendants.

**PLAINTIFFS**

20.　Plaintiff Tennessee State Conference of the NAACP (hereinafter, "Tennessee NAACP") is a nonpartisan, interracial, nonprofit membership organization headquartered in Nashville. The mission of the Tennessee NAACP is to eliminate racial discrimination through democratic processes and to ensure the equal political, educational, social, and economic rights of all persons, in particular including African Americans. The Tennessee NAACP has more than 10,000 members across the State of Tennessee, primarily African-Americans, other people of color, and their allies. The Tennessee NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach. The Tennessee NAACP is primarily funded through grants, and a considerable amount of the Tennessee NAACP's work and resources are devoted to promoting voter registration, voter education, get-out-the-vote efforts, election protection, and census participation. The Tennessee NAACP, along with its 33 local branch units and 22 youth and college councils regularly conducts year-round voter registration drives and other activities to help Tennesseans in both urban and rural parts of the State to vote, by absentee ballot or in person throughout Tennessee. The Tennessee NAACP views voter registration as a core activity fundamental to the advancement of the organization's mission. The Tennessee NAACP's civic engagement activities are primarily funded through grant awards. In 2018, the Tennessee NAACP received several grants to register voters, including a grant from the Tennessee Black Voter Project. Many events hosted by the Tennessee NAACP have a voter registration and voter education component. As an example, Tennessee NAACP works with faith-based groups across the religious community to host voter registration drive Sundays. The Tennessee NAACP was very active in voter registration in 2018 and has, in past years, registered

7

more than 100 voters per year. The Tennessee NAACP anticipates that it will attempt to register more than 100 voters in the upcoming year.

21. As a result of the Act, including its harsh criminal and civil penalties, the Tennessee NAACP will be forced to significantly reduce or halt altogether its voter registration activities. The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-drive registration, consent, and government training requirements, and does not and cannot know what conduct will result in civil and criminal sanctions. For many events, the Tennessee NAACP does not and cannot know how many voter registration forms they may collect, and does not and cannot know what constitutes a "voter registration drive" under the Act.

22. In addition, it is unclear how or to what extent the Act will apply to the Tennessee NAACP. The Tennessee NAACP uses a network of paid and unpaid volunteers to collect voter registration applications, which would appear to make it ineligible for the Act's exemption for unpaid volunteers. The Tennessee NAACP's unpaid volunteers who collect voter registration applications are ultimately supervised by paid staff, and it is again unclear whether having paid staff would disqualify the organization from the Act's exemption of unpaid volunteers. The Tennessee NAACP funds some of its voter registration efforts through grant awards, and it is unclear whether this funding could subject the organization and its paid and non-paid volunteers and staff to the requirements of the Act. The Tennessee NAACP also issues many public communications concerning voter registration status generally, which may subject the Tennessee NAACP to criminal sanctions depending on how the Act's mandatory disclaimer provision is construed. As the Act now stands, the Tennessee NAACP does not and cannot know whether and which of its public communications regarding voter registration status are subject to the

8

mandatory disclaimer provision. The Tennessee NAACP also believes the mandatory disclaimer requirement will damage the credibility and effectiveness of its communications with individuals across the state.

23. Plaintiff Democracy Nashville-Democratic Communities (hereinafter, "Democracy Nashville") is a nonpartisan organization registered under Tennessee law as a public benefit corporation. Democracy Nashville raises donations from citizens through GoFundMe, relies on grants, and receives funding from the Tennessee NAACP to conduct civic engagement activities, including conducting voter registration drives and collecting voter registration applications in primarily African-American communities in Nashville. When it is financially able to do so, it pays its staff on a salaried basis to run canvassing drives in the African-American community. Democracy Nashville has a network of paid and unpaid volunteers who help voters register to vote at petition drives, coalition events, churches, and door-to-door canvassing events. Registering voters has become a critical part of its town hall and outreach events. As part of its door-to-door strategy, Democracy Nashville workers take paper registration forms with them to register low-income voters of color in the housing projects of Nashville, where many residents do not have access to computers. Democracy Nashville views voter registration work as an essential element of its program of social activism and engagement. Democracy Nashville views voter registration work as a critical component to achieving success in its mission regarding policing, workers' rights, and economic justice. Democracy Nashville also views voter registration as an essential first step in engaging with Tennesseans and encouraging them to become activists. Democracy Nashville trains its staff and volunteers to understand the fields that must be completed in the voter registration forms before every event, and pairs first-time volunteers with more experienced volunteers or staff during voter registration activities.

9

Democracy Nashville anticipates that it will attempt to register more than 100 voters in the upcoming year.

24. As a result of the Act, Democracy Nashville will be forced to significantly reduce or halt altogether its voter registration activities. Democracy Nashville engages in voter registration work in conjunction with issue-oriented advocacy and does not and cannot know whether this type of work would constitute a "voter registration drive." The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-drive registration, consent, and training requirements, and does not and cannot know what conduct will result in civil and criminal sanctions. Democracy Nashville has a network of paid and unpaid volunteers who collect voter registration applications. Those who are "paid" may receive stipends as compensation for activities, of which voter registration work is just a component, such as managing an entire community engagement project or initiative. Because of the mix of voter registration and non-voter registration work of individuals receiving stipends, it is unclear how or whether the Act will apply to Democracy Nashville, and ultimately, whether it will be subject to civil and criminal sanctions. In addition, Democracy Nashville issues public communications concerning voter registration status generally, which may subject the Democracy Nashville to criminal sanctions depending on how the mandatory disclaimer provision of the Act is construed. As it stands, Democracy Nashville does not and cannot know whether and which of its public communications regarding voter registration status are subject to the mandatory disclaimer provision.

25. Plaintiff The Equity Alliance is a nonpartisan, grassroots organization registered under Tennessee law as a public benefit corporation. The Equity Alliance seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action on issues

10

affecting their daily lives. The Equity Alliance aims to expand the electorate by engaging low

propensity voters and members of disenfranchised communities to participate in the democratic

process. It educates communities of color about the political process, relevant economic, social,

and political issues, and the impact of impending legislation on their lives. The Equity Alliance

is primarily run by volunteers, and since its founding has engaged approximately 1,200

volunteers from Tennessee communities. The Equity Alliance funds some of its voter

registration efforts through grant awards, individual contributions, and, on a few occasions,

community business sponsorships, Year-round voter registration activities lie at the heart of The

Equity Alliance's work, and the organization uses many different approaches to meet voters

where they are—at laundromats, churches, clubs, their homes, and the supermarket—in pursuing

its voter registration activities, including collecting voter registration applications. Before each

voter registration event, the Equity Alliance provides training to its volunteers, which can take

several forms, including classroom-style training, web-based video training, or one-on-one

briefing, depending on the needs of the event. The Equity Alliance has received grant funding to

carry out its organizational mission, which allowed the Equity Alliance to hire organizers who

work on its civic program, including its voter registration activities. The Equity Alliance also

uses a text-messaging platform that links voters to the Secretary of State's website so that they

can check their voter registration status, as well as an online portal that links voters to the

Secretary of State's voter registration website.

26.   In 2018, The Equity Alliance was an organizational member of, and received grant

funding from, the Tennessee Black Voter Project. The Equity Alliance submitted at least a few

hundred or more voter registration applications in 2018 and plans to continue its voter registration activities in the upcoming year.

27.    As a result of the Act, The Equity Alliance will be forced to significantly reduce or halt altogether its voter registration activities.  The Equity Alliance does not and cannot know what constitutes a "voter registration drive" under the Act. Volunteers often separately canvass different neighborhoods on the same day, and cannot know, under the Act, whether that constitutes a single "drive." The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-drive registration, consent, and training requirements, and does not and cannot know what conduct will result in civil and criminal sanctions.  Because The Equity Alliance has a network of paid and unpaid volunteers who collect voter registration applications, it is unclear how or whether the Act will apply to the organization, which may subject the organization to civil and criminal sanctions. The Equity Alliance also issues many public communications concerning voter registration status generally, which may subject The Equity Alliance to civil and criminal sanctions depending on how the mandatory disclaimer provision of the Act is construed.  As it stands, The Equity Alliance does not and cannot know whether or which of its public communications regarding voter registration status are subject to the mandatory disclaimer provision.

28.    Plaintiff the Andrew Goodman Foundation (hereinafter, "AGF") is a nonpartisan, nonprofit organization with the mission of making young voices and votes a powerful force in democracy.  AGF was founded by the mother of Andrew Goodman, who was one of the three young men (along with James Chaney and Michael Schwerner) killed in 1964 in Mississippi, where they had traveled to help a voter registration drive.  AGF's Vote Everywhere initiative is a national, nonpartisan, civic engagement movement of volunteer student leaders ("AGF

Ambassadors") and university partners. The program provides extensive training and resources, as well as a peer network to support its AGF Ambassadors while they work to register voters, remove voting barriers, organize Get Out The Vote ("GOTV") activities, and tackle important social justice issues on their college campuses. Vote Everywhere is located on 59 campuses in 25 states plus the District of Columbia, impacting approximately one-million students across the country, including students at Tennessee State University ("TSU")—the largest and only state-funded historically black university in Tennessee. As part of its program, AGF engages with university administrators and offers a stipend to each AGF Ambassador to conduct voter registration, civic engagement, and social justice work. At the TSU campus, Vote Everywhere offers stipends to two AGF Ambassadors in part to help carry out voter registration, including regularly setting up tables at the student center and residence halls, registering students during high-interest events such as freshman orientation, Homecoming, and National Voter Registration Day, and institutionalizing voter registration on campus. AGF maintains an online voter registration portal which includes a link that directs students to the Secretary of State's website to both check their registration status and/or to register to vote. In conjunction with the web portal, AGF rolled out a texting program to all 59 campus partners in Fall 2019, which is now available to all Vote Everywhere campuses and is in the process of being implemented. At each participating campus, students can sign up to receive reminders to vote by text message, geared toward voters on that campus. The AGF Vote Everywhere team on each participating campus will draft reminders with information relevant to their campus, such as when and where to vote, available transportation from campus to the polls, and other civic engagement opportunities beyond voting. AGF has also expanded recently with the hire of a regional program manager based in Tennessee to facilitate access to the ballot for marginalized youth here and in other

13

states throughout the Southeast. To achieve its mission of making youth voices and votes a powerful force in democracy, AGF devotes substantial time, effort, and resources to training and supporting AGF Ambassadors, who work on their home campuses and at times throughout the state to encourage voting, register voters, and advocate for the voting rights of their communities.

29.    AGF anticipates that it will attempt to register more than 100 voters in the upcoming year, particularly given the heightened interest among youth surrounding the upcoming 2020 election, and the added support of the Tennessee-based AGF Regional Program Manager.

30.    In the 2018–19 academic school year, TSU's AGF Vote Everywhere campus team collaborated with co-Plaintiff The Equity Alliance, such as via door-to-door canvassing efforts and call-ins to Get Out the Vote, volunteer voter education trainings, and promoting civic education on college campuses such as through panel discussions.

31.    As a result of the Act, AGF will be forced to significantly reduce or halt altogether its voter registration activities. The organization does not and cannot know what constitutes an incomplete application, does not and cannot know how to comply with the pre-drive registration, consent, and training requirements and does not and cannot know what conduct will result in civil and criminal sanctions. Because AGF has a network of unpaid volunteers including some who receive a stipend, it is unclear how or whether the Act will apply to the organization, which may subject the organization to civil and criminal sanctions. AGF also issues many public communications concerning voter registration status generally, which may subject AGF to criminal sanctions depending on how the public communication compelled disclosure provision is construed. As it stands, AGF does not and cannot know whether or which of its public communications about voter registration status are subject to the mandatory disclaimer provision.

With the heightened interest among youth surrounding the upcoming 2020 election, and the added support of the Tennessee-based AGF Regional Program Manager, AGF anticipates that, but for the new law, significant numbers of voter registration forms will be collected from students at TSU and across the state, and significant numbers of youth voters will seek voter registration opportunities, including, as described above, on AGF platforms and the SimpleTexting program.

## DEFENDANTS

32.    Defendant Tre Hargett is the Secretary of State of the State of Tennessee and is sued in his official capacity.  In that capacity, he appoints the Coordinator of Elections, who is the state's chief election officer and who serves "at the pleasure of the secretary of state." Tenn. Code Ann. § 2-11-201(a).  The Coordinator, "subject to the concurrence" of the Secretary, has the authority to make rules and regulations as necessary to carry out the provisions of the Election Code.  *Id.* § 2-11-201(c).

33.    Defendant Mark Goins is the Coordinator of Elections of the State of Tennessee and is sued in his official capacity.  The Coordinator is "the chief administrative election officer of the state."  *Id.* § 2-11-201(b).  The Coordinator "[g]enerally supervise[s] all elections" and has a myriad of responsibilities including "prepar[ing] instructions for the conduct of registration" and "[a]uthoritatively interpret[ing] the election laws for all persons administering them."  *See id.* §§ 2-11-201, 2-11-202, 2-2-115.  The Coordinator is further authorized to investigate or have investigated "the administration of election laws." *Id.* § 2-11-202(a)(5)(A)(1).  In conducting an investigation, the Coordinator is authorized to "issue subpoenas and summon witnesses, administer oaths to such witnesses, take the depositions of witnesses, compel the production of

15

documents, exhibits, records or things, and require testimony on any issue related to the investigation or review." *Id.* § 2-11-202(a)(5)(B).

34. Defendant Herbert Slatery III is the Attorney General of the State of Tennessee and is sued in his official capacity. The Attorney General is empowered to request that the Coordinator conduct an investigation. *Id.* § 2-11-202(a)(5)(C). In addition, "if a state or county official determines that there is a pattern of fraudulent registration, or any activities on the part of any individuals to vote who are not qualified voters, the Coordinator can request that the attorney general within whose district these actions may occur, to bring action." *Id.* § 2-2-115(b)(6).

35. Defendant the State Election Commission and its individual members, Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce, are sued in their official capacity. Under the Act, the State Election Commission has the authority to review any "incomplete" voter registration application submitted by county election commissioners, review each application presented, make a finding on the number of incomplete applications, and, based on that finding, "impose civil penalties for Class 1 and 2 offenses." *Id.* § 2-2-143(c)(3). Under the Act, the State Election Commission can combine the number of "incomplete" forms submitted in each county to calculate the total number of "incomplete" forms. *Id.* For any offense, the State Election Commission is authorized to send an assessment letter detailing the violation and penalty, review waiver requests from violators, and promulgate all rules necessary to implement the provisions of the Section. *Id.* §§ 2-2-143(c)(5)–(6), 2-2-143(e).

## FACTUAL ALLEGATIONS

### Voter Registration Activities Strengthen Democracy

16

36.   Tennessee has a voter registration rate of 78.52%, and currently ranks 45th in the nation in voter registration.  Tennessee ranks 49th in the nation for voter turnout, according to Pew's Election Performance Index.  Pew Charitable Trusts, Elections Performance Index, Pew (2016), https://elections.mit.edu/#indicator;  Pew Charitable Trusts, State Profiles, Pew (2016), https://elections.mit.edu/#state-TN.

37.   Voter registration rates among Tennessee citizens who live in predominantly low-income and minority communities are lower than those for more affluent citizens and lower than the statewide average.  Citizens in predominantly low-income and minority communities tend to change addresses more frequently, visit state motor vehicle offices (where many Tennessee citizens register to vote) less frequently, have lower literacy rates, less internet access, and be more dependent on public transportation (making it difficult to travel to register at a government office).  Thom File, *Characteristics of Voters in the Presidential Election of 2016*, U.S. Census Bureau (Sept. 2018), *8–9, https://www.census.gov/content/dam/Census/library/publications/2018/demo/P20-582.pdf.

38.   The Tennessee Secretary of State has encouraged residents to use Tennessee's online voter registration form, and Election Coordinator Goins stated that this Act will "encourage" people to register to vote "through the online voter registration" system.  *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123 (last visited Dec. 2, 2019).

17

39. According to the Census Bureau, people of color report at higher rates than other demographic groups that they are not registered to vote because they did not know where or how to register. *See* File, *supra* ¶ 37 at *15.

40. A substantial number of Tennessee citizens who register to vote each year are registered with the assistance of private citizens and groups engaging in voter registration drives, including the drives held by Plaintiffs.

41. Plaintiffs' voter registration activities focus on minority, student, and low-income communities because they rely more on voter registration drives than do other communities. According to the U.S. Census Bureau *Current Population Survey* ("CPS") data, voters of color are more likely register to vote through a voter registration drive or other community-based event, such as an event at a school, the hospital, or on a college campus.

42. Plaintiffs' voter registration activities have resulted in a significant expansion of the franchise in Tennessee. There were 545,243 new registrations in advance of the 2018 election—almost 20,000 more than in 2014. U.S. Election Comm'n, *Election Administration and Voting Survey 2018: NVRA Table 2b*, *69, https://www.eac.gov/assets/1/6/2018_EAVS_Report.pdf (last visited Dec. 2, 2019). In part as a result of Plaintiffs' efforts, the 2018 midterm election in Tennessee experienced the highest midterm turnout rate in 24 years. Tenn. Sec'y of State, Statistical Analysis of Voter Turnout for the November 6, 2018 Election as Submitted by the Counties, https://sos-tn-gov-files.tnsosfiles.com/2018%20November.pdf (last visited Dec. 2, 2019). Turnout in Shelby County increased by more than 100,000 voters from 2014 to 2018—almost a 60% increase. Turnout in Davidson County also increased by more than 100,000 voters from 2014 to 2018—a 74% increase. *Id.* And turnout among African-American voters in Tennessee rose almost 14 percentage points in the same time period—from approximately 31%

18

in 2014 to 45% in 2018. Similarly, youth turnout increased in Tennessee 13.1 points from 2014 to 2018, from 9.2% to 22.3%. *See* The Center for Information & Research on Civil Learning and Engagement, *State by State Turnout Estimates*, https://civicyouth.org/2018-youth-turnout-increased-in-every-state-for-which-we-have-data/ (last visited Dec. 2, 2019).

### Plaintiffs' Voter Registration Activities Are Core Political Speech and Associational Activity

43. Plaintiffs and other similar organizations rely on voter registration activities to reach citizens who otherwise would likely not participate in the democratic process.

44. Plaintiffs have conducted and wish to continue conducting voter registration activities to engage diverse communities in the democratic process, including through face-to-face interactions at the supermarket, laundromat, peoples' homes, religious services, shopping malls, housing projects, college campuses, and a variety of other places.

45. These voter registration activities, during which Plaintiffs interact with the community and encourage civic participation, expand the franchise and strengthen democracy in Tennessee. These activities are protected by the First Amendment to the U.S. Constitution, and indeed are at the core of the activities protected by the First Amendment.

### Challenged Provisions and Their Impact on Plaintiffs' Voter Registration Activities

*A. Section 2-2-142: Pre-drive Registration, Consent for Retention of Voter Records, and Training Requirements*

46. Section 2-2-142 of the Act requires that any person or organization that conducts "voter registration drives" in Tennessee "that attempts to collect voter registration applications of one hundred (100) or more people" must comply with a set of requirements, including pre-registration requirements. Those requirements include that they file a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration

19

of voters, restrictions on the retention of voter information, and the completion of a government-run training program. Tenn. Code Ann. § 2-2-142(a)–(b), (e). Knowing and intentional violation of each requirement of this provision by any person or organization is a Class A misdemeanor punishable by 1 year in jail and/or a $2500 fine, and each violation constitutes a separate offense. *Id.* § 2-2-142(f).

47. Numerous terms in this Section of the Act are vague. "Voter registration drive," and "attempt" as it relates to a person or organization that "attempts" to collect 100 or more voter registration applications, are vague in violation of the Fourteenth Amendment of the United States Constitution. Plaintiffs have no way of calculating whether they will "attempt" to collect 100 or more applications for the purposes of a "voter registration drive." For example, the local units of the Tennessee NAACP host local functions and events at which they register potential voters. These events may occur at the different branches across the state on the same day. In such an instance, it is unclear whether the local units or the Tennessee NAACP bears the burden of complying with the Act's requirements. The Act fails to make clear whether each local unit of the Tennessee NAACP would be required to register its event separately, whether each event would be considered a "voter registration drive" "attempt[ing]" to collect more than 100 applications, or whether the Tennessee NAACP would be required to treat multiple local registration events as one "drive" subject to the law because they cumulatively "attempt" to collect more than 100 applications.

48. The Act's "prior" pre-drive registration and training requirements of Section 2-2-142(b), coupled with criminal penalties, burden Plaintiffs' First and Fourteenth Amendment rights by making it difficult or impossible to hold ad hoc voter registration drives and to recruit volunteers, which are often critical to reaching many of the low-propensity voters that Plaintiffs target.

20

When, for example, The Equity Alliance hears from a neighborhood resident on Saturday that they are having a block party on Sunday, the organization would not be able to notify the election commission that they planned to register voters at that party or have time to arrange authorized government training for volunteers. The Act unnecessarily subjects Plaintiffs to the unanticipated costs associated with ensuring and monitoring compliance with the pre-drive registration requirements. Plaintiffs' organizational structures are not equipped to bear the financial burdens of compliance. Thus, the Act has an overall effect of reducing or halting altogether Plaintiffs' voter registration activities in the state. These consequences are exacerbated by the broad discretion given the Coordinator over the content, form, and frequency of such trainings. *Id.* § 2-2-142(b).

49. The oath-taking provision under the pre-drive registration requires that operators of voter registration drives file sworn statements that they will obey the state laws and procedures regarding the registration of voters. Tenn. Code Ann. § 2-2-142(a)(1)(D). This provision adds an unnecessary regulatory burden on Plaintiffs and needlessly creates an atmosphere of fear among Plaintiffs for desiring to reach a larger number of potential voters through their registration drives.

50. Section 2-2-142(b)'s prohibition on the retention of voter information absent applicant consent is vague in violation of the Fourteenth Amendment to the United States Constitution. This provision of the Act is vague because it fails to provide any guidance on the manner of consent, i.e., written or oral, that would suffice to demonstrate compliance with the requirement. It is also burdensome because it makes it more difficult for Plaintiffs to follow up with registrants as a part of their fluid GOTV efforts.

51.     Section 2-2-142 ultimately has a chilling effect on Plaintiffs and associated individual persons including unpaid volunteers, stipend volunteers, and/or paid staff, due to its vagueness, burdensomeness, and the steepness of criminal penalties imposed on individuals where it is unclear what constitutes a violation, and where the threat of each violation is up to one year in jail and/or a $2,500 fine.

B.   *Section 2-2-143: Civil Penalties for Submission of "Incomplete" Forms*

52.     Section 2-2-143 of the Act (the "incomplete forms" provision) authorizes imposition of civil penalties ranging from $150 to $2000, assessable in each county where a violation has occurred, on any person or organization filing 100 to 500 "incomplete" voter registration applications within a calendar year.  For any person or organization filing more than 500 "incomplete" voter registration applications within a calendar year, this section of the Act authorizes imposition of a penalty up to a maximum of $10,000, again assessable in each county in which a violation occurs.  "Incomplete" is defined as any application "lacking" the "applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b).  The statute further states that "[a] person or organization who collects an application that only contains a name or initial is not required to file the application with the election commission."  *Id.*  The Act authorizes the State Election Commission to aggregate the number of "incomplete" forms filed by a person or organization in multiple counties when determining the total number of "incomplete" forms filed for the purpose of assessing civil sanctions.

53.     The Act's imposition of penalties for "incomplete" voter registration applications is vague, as it is unclear whether the term is intended to cover only applications that contain missing information or is also intended to apply to applications that contain incorrect

22

information. The Act also fails to make clear what defects in the information provided on the application are sufficiently significant to make the application "incomplete." While the text of the statute refers to "incomplete" applications, an earlier version of the bill included the word "deficient" instead of "incomplete," and comments on the Senate floor during debate on the Act suggest that lawmakers themselves were unclear on what the term "incomplete" means. The vagueness of the term "incomplete" was exacerbated by the comments of Senator Ed Jackson, the sponsor of the bill, during debate on the Senate floor on April 25, 2019. Senator Jackson repeatedly used the term "deficient" to refer to the provision of the Act providing for penalties for the submission of "incomplete" forms, and repeatedly gave examples of inaccurately filled-out forms as the sort that would trigger the civil penalties.

54. In addition, those charged with implementing the Act have suggested that "deficient" should be construed broadly, as including not only missing, but also incorrect, information. For example, Defendant Goins, who will be responsible for implementing the Act, testified before the Senate State and Local Committee that he interprets "deficient" to mean incomplete or incorrect. *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123 (last visited Dec. 2, 2019).

55. H.B. 1079 and S.B. 971, the bills that ultimately became the Act, initially provided that the civil penalty would apply to 100 or more "deficient" applications. "Deficient" was defined in the bills as "lacking information required" by the statute containing the voter registration form. Before passage, H.B. 1079 and S.B. 971 were amended, replacing "deficient" with "incomplete," and again defining "incomplete" as "lacking" information statutorily required on

23

the state voter registration form, the only difference being that the specific information required by the statute was spelled out in the amendment: applicant's name, residential address, date of birth, declaration of eligibility, or signature. The Act is unconstitutionally vague as to whether or not the statutory term "incomplete" includes "incorrect" or "inaccurate" information, and if so, what degree of incorrectness or inaccuracy would give rise to penalties. For example, if a registrant has listed his nickname ("Jim") instead of his given name ("James"), it is not clear whether the application would be deemed "incomplete" because it is missing the applicant's legal name; or whether it may be inaccurate but not "incomplete" under the Act's definition; or whether it would be viewed as accurate and complete. Similarly, if a registrant has listed her business address, but not her residential address, it is not clear whether the application would be deemed incomplete, i.e., missing the proper address necessary for voting eligibility, or whether the application would be considered inaccurate but not incomplete.

56. These concerns are heightened in connection with efforts to register college students. For example, it is entirely unclear how and whether the Act would apply to situations where a student fills out her dormitory name as her residence, rather than listing the dormitory's street address; where she overlooks listing her dorm room number on her voter registration form; or where she accidentally inverses the address information by listing her dorm as her mailing address and her campus mailbox as her residence.

57. In addition, there is no way for a voter registration volunteer to know whether the information provided by the voter is completely correct. If the Act extends the definition of "incomplete" to include inaccurate information, it is unfair to penalize an individual or organization that has no way of evaluating the accuracy of the information the registrant has included on the form. The threat of penalty for the submission of these forms would impose an

24

unconstitutional burden on the constitutionally-protected activity of soliciting, collecting and submitting voter registration applications.

58. The Act's inclusion of "declaration of eligibility" in the list of requirements that must be met for an application not to be deemed "incomplete" raises additional issues of vagueness. Under governing federal law, voters may register to vote by using either the Tennessee state voter registration form or the federal voter registration form. The Tennessee voter registration form contains a separate "voter declaration of eligibility" requirement, requiring applicants to swear that they plan to remain at their residence for an "undetermined period of time," But there is no similar "voter declaration" on the federal voter registration form. Thus, for Plaintiffs using the federal form, the Act could penalize them for turning in "incomplete" forms. *See* Tennessee Secretary of State, *Tennessee Mail-In Application for Voter Registration*, https://sos-tn-gov-files.s3.amazonaws.com/forms/ss-3010.pdf.   *See* U.S. Election Assistance Commission, *National Voter Registration Form for U.S. Citizens*, https://www.eac.gov/assets/1/6/Federal_Voter_Registration_ENG.pdf.  Thus, the Act could unlawfully penalize Plaintiffs for using the federal form that does not include the Tennessee form's "voter declaration" in their voter registration activities.

59. Moreover, the Act could unfairly penalize Plaintiffs using the state form because "undetermined period of time" is vague and does not comport with the legal requirements for the determination of residency for purposes of voter registration under Tennessee law. *See* Tennessee Secretary of State, *Guidelines for Determining Residency*, https://sos.tn.gov/products/elections/guidelines-determining-residency.This could particularly impact high-mobility voters, who tend to be lower income, people of color, young voters, and students.  https://sos.tn.gov/products/elections/guidelines-determining-residency.

60. These vagueness issues are exacerbated because the officials responsible for implementing the Act have required voter registration groups, such as Plaintiffs, to deliver *all* "complete" applications to state election officials. Tennessee regulations require that "voter registrations which are complete upon receipt [by the county election commission] or those which have been completed by inquiries on or before the deadline . . . will be considered as persons registered to vote in the election." Tenn. Comp. R. & Regs. 1360-02-11-.08(1). Defendant Goins has stated that Tennessee law requires third-party voter registration groups to deliver all "complete" applications. *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (statement of Mark Goins, Tennessee Coordinator of Elections), http://tnga.granicus.com/ MediaPlayer.php?view_id=439&clip_id=17123http://tnga.granicus.com/MediaPlayer.php?view_ id=439&clip_id=17123 (last visited Dec. 2, 2019). This places the burden on Plaintiffs to determine what constitutes a "complete" application, at risk of violating the law if they fail to turn in any "complete" applications, but also at risk of violating the law if they turn in more than 100 applications across the state that are later deemed "incomplete."

61. The Act's inclusion of a provision that a person or organization that collects an application which has only the applicant's name or initials is not required to file the application with the State Election Commission does nothing to cure the vagueness of the Act's reference to "incomplete" applications, and indeed only increases ambiguity, because this provision can be read to mandate by implication that a voter registration worker is required to file all other "incomplete" applications, even though the individual or organization may be penalized for doing so.

26

62. Another provision of the Act, Section 2-2-142(a)(2) has the potential to be at odds with the stringent and harsh penalties for turning in "incomplete" forms. This Section requires a person or organization to mail or deliver "completed" applications within 10 days of a voter registration drive (10-day turnaround requirement). The combination of the 10-day hand-in requirement of completed forms and the penalties for incomplete forms places Plaintiffs in a catch 22 situation because they must comply with a tight timeline, which requires them to hand in complete forms even if Plaintiffs know that such forms may be incomplete. In addition, the prohibition on retention of voter records hampers Plaintiffs' ability to follow up with registrants whose forms may be deemed "incomplete" upon inspection by Plaintiffs' volunteers and workers within the 10-day timeline.

63. Section 2-2-143 has a chilling effect on Plaintiffs and associated individual persons including unpaid volunteers, stipend volunteers, and/or paid staff, due to its vagueness, burdensomeness, and the steepness of the civil penalties imposed on individuals and organizations where it is unclear what constitutes a violation, and where the threat of filing 100– 500 "incomplete" forms or over 500 forms statewide will incur a civil penalty of $150–$2,000 or $10,000 in each county where a violation occurs. The Act's penalties on organizations that collect a certain volume of voter registration applications makes it difficult for Plaintiffs for to conduct large-scale voter registration activities. In addition, the Act's penalties, assessed based on county-by-county violations, chill the voter registration activities of Plaintiffs, such as the Tennessee NAACP, which operates across the state and has wide geographic influence. The Act punishes Plaintiffs for aiming to conduct larger-scale and inclusive voter registration drives across the state in an effort to engage more African-American, minority, and youth voters.

*C. The "Unpaid Volunteer" Exemption in Sections 2-2-142 and 2-2-143*

64.     Sections 2-2-142 and 2-2-143 of the Act exempt individuals who are "not paid to collect voter registration applications," and organizations that "use only unpaid volunteers to collect" voter registration applications.

65.     The statute's exemption of "individuals who are not paid to collect voter registration applications" and "organizations that are not paid to collect voter registration applications and use only unpaid volunteers to collect voter registration applications" effectively establishes the statutory threshold for determining which individuals or organizations are subject to the primary substantive requirements of the Act—namely Sections 2-2-142 and 2-2-143—that subject violators to civil and criminal penalties.

66.     The Act does not define what is meant by "individuals who are not paid" or "organizations that are not paid . . . and only use unpaid volunteers" to collect voter registration applications.  On the face of the Act, it is unclear whether it applies to any of the following situations:  organizations that receive grants to conduct their activities generally, which may include sending volunteers to collect voter registration applications as a part of these activities; organizations that use unpaid volunteers to collect applications, but may give those volunteers gifts to thank them; organizations that provide basic stipends to volunteers to conduct voting-related activities, which may include collecting voter registration applications; or organizations that use only unpaid volunteers to engage directly with prospective voters and collect voter registration applications, but rely on paid staff or a mix of paid and unpaid staff to supervise, coordinate, manage, or direct the collection of voter registration forms.

67.     There is no basis for the Act to differentiate between paid and unpaid voter registration workers with respect to mandating compliance with the requirements of Sections 2-2-142 and 2-2-143.

68. Moreover, Sections 2-2-143 and 2-2-143 ultimately has a chilling effect on Plaintiffs and all associated individual persons including unpaid volunteers, volunteers who receive gifts, stipend volunteers, and paid staff, due to its vagueness, burdensomeness, and the steepness of civil and criminal penalties imposed on both associated individual persons and organizations.

   D. *Section 2-19-145: Mandatory Disclaimers for Communications "Regarding Voter Registration Status"*

69. Section 2-19-145(a)(1) prohibits "any public communications regarding voter registration status by a political committee or organization" if it does not "display a disclaimer that such communication is not made in conjunction with or authorized by the Tennessee Secretary of State. A "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites." Tenn. Code Ann. § 2-19-145(d). The communication must be "conspicuous and prominently placed" such that it is not "difficult to read or hear" and cannot "be easily overlooked." *Id.* at § 2-19-145(a)(2). Any person who "intentionally or knowingly" violates any of the provisions of Section 2-19-145 is subject to a Class A misdemeanor for each violation, which constitutes a separate offense —punishable by 1 year in jail and/or a $2500 fine. *Id.* at § 2-19-145(e).

70. Section 2-19-145 is vague because it is unclear from the face of the Act whether the phrase "voter registration status" includes any general discussion of "voter registration" or is limited to the discussion of the "voter registration status" of a particular individual. The requirement that communications are "conspicuous" and "prominently placed" in a way that is not "difficult to read or hear" or cannot be "easily overlooked" is also vague because it creates an impossible standard.

29

71. Section 2-19-145 is overbroad because it criminally penalizes Plaintiffs or any organization or associated individual persons that refer to voter registration status, including in Plaintiffs' public education communications, if they fail to include the required disclaimer. Plaintiffs expend substantial efforts to educate the public on how to register to vote and how to check their voter registration status, including dissemination of written information through mailings, handouts, other printed literature, posting statements on their websites, and making other forms of "public communication." And this Section impedes their ability to communicate with potential voters about voter registration status, which is relevant to whether the person seeking to register is already on the rolls.

72. Section 2-19-145 also imposes an unconstitutional burden on Plaintiffs' First Amendment right to free speech, which should be unburdened by unjustified and untailored government intrusion. By compelling Plaintiffs to convey a particular message, Section 2-19-145 impermissibly alters the content and effectiveness of Plaintiffs' speech and constitutes compelled speech in violation of the First Amendment.

73. Further, the mandatory disclaimer requirement has a chilling effect on Plaintiffs and associated individual persons due to its vagueness, burdensomeness, and the steepness of penalties imposed on individuals and organizations where it is unclear what constitutes a violation and whether the threat of each violation is up to a year in jail and/or a $2,500 fine. *Id.* at 2-19-145(e).

E. *Cumulative Impact of the Act*

74. The cumulative impact of the Act as felt by the Plaintiffs is apparent from the burdens described in the paragraphs above. Plaintiffs operate on limited budgets and resources and the Act would attack Plaintiffs from all sides and prohibit them from doing their work.

30

75. The Act creates complex compliance costs that Plaintiffs' are ill-equipped to manage with their limited operating budgets, including costly pre-drive registration and disclaimer requirements.

76. The training and penalty provisions curtail Plaintiffs' ability to recruit qualified volunteers and registration workers. At the completion of voter registration drives, Plaintiffs already-depleted resources may be drained by fines as a result of turning in a certain number of "incomplete" forms.

77. Plaintiffs do not have the resources or budgets "to operate in a regulatory environment involving either complex compliance burdens or a routine risk of penalties." *See Tenn. State Conf. of the NAACP v. Hargett*, No. 3:19-cv-00365, Prelim. Inj. Order, Dkt. 53 at 37.

### NVRA Notice of Noncompliance

78. Plaintiffs' voter registration efforts are consistent with the goals of the NVRA, which was enacted by Congress in part to "increase the number of eligible citizens to register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). Courts have recognized that the NVRA "encourages" private voter registration drives like those conducted by the Plaintiffs. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1163 (N.D. Fla. 2012)).

79. On May 14, 2019, Plaintiffs sent a letter to Defendants Secretary Hargett and Coordinator Goins pursuant to 52 U.S.C. § 20510(b) to notify Defendants that the Act violates the NVRA (the "NVRA letter"), attached as Exhibit A.

80. The NVRA requires that any "[s]tate program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll

for elections for Federal office…shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. § 20507(b)(1).

81.   The Act is plainly a "program or activity" subject to this provision, because its alleged purpose is to prevent voter registration fraud and any potential confusion that Plaintiffs are affiliated with the Secretary of State. The Act violates this provision of the NVRA by unjustifiably imposing requirements relating to voter registration on one class of persons—paid individuals and organizations engaged in voter registration activities.

82.   The Act subjects to its terms only organizations and individuals paid to collect voter registration applications, and it exempts those "that use only unpaid volunteers" to perform these activities. Tenn. Code. Ann. §§ 2-2-142(g); 2-2-143(e). The Act creates a two-tier system in which it only applies to organizations that rely on volunteers who are paid, either in whole or in part, to collect voter registration applications. Due to the fact that Plaintiffs receive funding in different forms and when funds permit, pay their volunteers stipends, Plaintiffs fall within the ambit of the Act's requirements.

83.   On August 13, 2019, Defendant Coordinator Goins responded to Plaintiffs' NVRA letter, attached as Exhibit B, but did not respond to the specific allegations at issue here, citing the fact that these issues were already before this Court in this case.

84.   More than 90 days have passed since receipt of the NVRA letter by Defendants without the correction of the violations cited by Plaintiffs. Plaintiffs are therefore entitled to bring a civil action for declaratory or injunctive relief pursuant to 52 U.S.C. § 20510(b)(2).

**COUNT I**

**42 U.S.C. § 1983**

**Infringement of the Due Process Clause in Violation of the Fourteenth Amendment as to Sections 2-2-142, 2-2-143, and 2-19-145**

85.   Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

86.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits laws that impose penalties but fail to provide a person of ordinary intelligence fair notice of what is prohibited, and laws that fail to set standards that are sufficient to guard against the arbitrary deprivation of rights. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

87.   The phrases "voter registration drive" and "attempts," as referenced in terms of "attempts" to collect 100 or more voter registration applications, are vague as used in Section 2-2-142(a) of the Act.

88.   The phrases individuals who are "not paid" to collect voter registration applications and organizations that are "not paid: to collect voter registration applications and that use only "unpaid volunteers" as used in Sections 2-2-142 and 2-2-143 of the Act are vague as they provide Plaintiffs with no reasonable opportunity to determine whether and under what circumstances they are subject to the provisions of Sections 2-2-142 and 2-2-143 of the Act, and provide no standards to guard against arbitrary application of the Act.

89.   Violations of Section 2-2-142 of the Act are subject to criminal penalties.

90.   Violations of Section 2-2-143 of the Act are subject to civil penalties.

91.   The phrases "incomplete" and "lacking," as used in Section 2-2-143 of the Act are vague and provide Plaintiffs with no reasonable ability to determine under what circumstances their

33

conduct would be subject to the provisions of Section 2-2-143 of the Act, and provide no standards to guard against arbitrary application of the Act.

92. Section 2-2-143(b), which requires that an individual or organization that collects an application "contain[ing] only a name or an initial" is not "required to file the application with the election commission," is vague because it fails to make clear whether it refers only to forms that contain no other information besides a name or initial and whether it mandates the filing of any form that contains any other information in addition to a name or initial, regardless of the completeness of the application in other respects, and provides no guidance as to what constitutes a "complete" application.

93. Section 2-2-143 of the Act subjects Plaintiffs to the threat of civil penalties for conduct which they are compelled to undertake, i.e., the submission of "complete" registration forms, when they have no ability to control and/or opportunity to cure incomplete or deficient forms or know whether forms are "complete" under the Act.

94. Section 2-19-145's prohibition against political committees or organizations making a "public communication regarding voter registration status" unless that communication is accompanied by a disclaimer that it is not made in conjunction with or authorized by the Tennessee Secretary of State violates the Due Process Clause because the phrases "public communication" and "regarding voter registration status" are vague.

95. In addition, Section 2-19-145(a)(2) provides that "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites." The use of "includes" indicates that this list is not exhaustive and other unspecified public communications may fall under the Act. Moreover, this listing includes many communications that would not ordinarily be considered "public" such

34

as emails and text messages. The term "includes" is therefore vague as Plaintiffs cannot know for what conduct they may be punished.

96.  Section 2-19-145(d)'s requirement that a disclaimer must be "clear and conspicuous and prominently placed" and that the disclaimer be given a "placement" that "cannot be overlooked" is vague because it creates an impossible and ambiguous standard that Plaintiffs cannot be expected to decipher without further guidance or clarifications.

97.  Violations of Section 2-19-145 of the Act are subject to criminal penalties.

98.  Sections 2-2-142, 2-21-143, and 2-19-145 violate the Due Process Clause of the Fourteenth Amendment.

## COUNT II

### 42 U.S.C. § 1983

**Infringement of First Amendment Expressive and Associative Rights of Paid Voter Registration Workers and Organizations Using Paid Voter Registration Workers as to Sections 2-2-142 and 2-2-143**

99.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

100.  Sections 2-2-142 and 2-2-143 would subject "paid" individuals, and potentially individuals that volunteer for organizations that are "paid" to collect voter registration applications, to burdensome requirements for pre-registration, training, and consent for retention of voter information and processes for affirmation, and make them subject to civil and criminal penalties for violations of these sections.

101.  There is no rational basis for differentiating between paid and unpaid voter registration workers for purposes of the Act.

35

102.  To the extent that Defendants claim that the differentiation between paid and unpaid individuals is necessary to stop fraud, there is no evidence that paid voter registration workers are more prone to commit fraud than unpaid volunteers.

103.  The Act imposes substantial burdens on the First Amendment expressive and associative rights of organizations such as Plaintiffs that provide stipends to voter registration workers and with whom they are affiliated and the workers themselves.

**COUNT III**

**42 U.S.C. § 1983**

**Infringement of the Free Speech Clause of the First Amendment as Incorporated in the Fourteenth Amendment as to Section 2-19-145**

104.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

105.  By compelling political committees and organizations to add a particular state-imposed message every time they make a public communication about voter registration status, Section 2-19-145 alters the content of their speech and impermissibly compels speech in violation of the First Amendment.  *See Nat'l Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).

106.  Such laws compelling speech are subject to strict scrutiny.  *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015).

107.  A strict scrutiny test applies in particular to infringements on speech in the elections context.  *See, e.g.*, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 461 (2007); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 658 (1990), *rev'd on other grounds, Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

108.  Section 2-19-145 of the Act is not narrowly tailored to serve a compelling governmental interest.  On its face, it would require Plaintiffs to add the required disclaimer any time they

36

make any "public communication" regarding voter registration status, including general statements about voter registration that Plaintiffs routinely make as part of Plaintiffs' voter education and voter outreach programs.

109.  Section 2-19-145 is a content-based regulation, compelling speech in a manner that violates the Free Speech Clause of the First Amendment.

## COUNT IV

## 42 U.S.C. § 1983

### Burdens on First Amendment in Connection to the Regulation of Political Speech and Fourteenth Amendment in Connection with the Fundamental Right to Vote

110.  Plaintiffs incorporate and re-allege each of the foregoing paragraphs. A court considering a challenge to a state election law that touches the right to vote must weigh "the character and magnitude of the asserted injury to the rights protected by the Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

111.  The individual and cumulative burdens imposed on Plaintiffs by Sections 2-2-142, 2-2-143, and 2-19-145 of the Act, including the threat of imposition of stiff civil penalties for submission of 100 or more "incomplete" registration forms, the threat of criminal penalties for failure to comply with onerous pre-drive registration, restrictions on retention of voter information, and training requirements, and the threat of criminal penalties on organizations that make a public communication "regarding voter registration status" without the required

37

disclaimer, constitute severe burdens on Plaintiffs' rights which must be narrowly drawn to advance a state interest of compelling importance.

112. These burdens have a chilling effect on Plaintiffs' and individual volunteers' exercise of their fundamental First Amendment rights.

113. The challenged provisions of the Act are not narrowly drawn to advance a state interest of compelling importance and therefore violate the First and Fourteenth Amendments.

114. Tennessee already has a statute criminalizing the submission of fraudulent voter registration applications, a Class D felony. Tenn. Code Ann. § 2-19-107. Thus, the Act is not necessarily tailored to the State's alleged interest in preventing fraud.

115. Even if a lesser standard under either the *Meyer-Buckley* framework or *Anderson-Burdick* balancing test is applied to the Act, the challenged provisions of the Act do not further an important or substantial governmental interest and therefore violate the First and Fourteenth Amendments.

## COUNT V

### 52 U.S.C. § 20507(b)(1)

**Violation of the National Voter Registration Act of 1993 Due to the Differential Treatment of Paid and Unpaid Individuals and Organizations**

116. Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

117. Under the NVRA, any "[s]tate program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office…shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. § 20507(b)(1).

38

118. As the Act regulates voter registration and public communications regarding voter registration status, it qualifies as a "program or activity" subject to this provision of the NVRA.

119. The alleged purpose of the Act is to maintain an accurate voter registration roll by eliminating fraudulent registrations and presumably protecting the integrity of the electoral process. Under the NVRA, the Act is a "program or activity" that seeks to "protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll." *See e.g.*, *Project Vote v. Blackwell*, 455 F. Supp. 694, 703 (N.D. Ohio 2006).

120. Because the Act falls within the ambit of this provision of the NVRA, it must be "uniform" and "nondiscriminatory."

121. The Act fails on both accounts because it creates a two-tier system that differentiates between organizations like Plaintiffs that use workers who may be considered "paid" versus workers who are "unpaid" to collect voter registration forms. This distinction is neither uniform nor a nondiscriminatory attempt to protect the integrity of the electoral process.

122. The Act conflicts with and is preempted by the NVRA, 52 U.S.C. § 20507(b)(1).

## COUNT VI

### 52 U.S.C. § 20507(a)(2)

### Violation of the National Voter Registration Act of 1993 Due to the Failure to Send Notices to Registration Applicants

123. Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

124. The NVRA, 52 U.S.C. § 20507(a)(2), requires that the appropriate State election official "send notice to each applicant of the disposition of the application" for voter registration, in order for an applicant to know the status of their voter registration application.

39

125. Under Section 2-2-143(b) of the Act, a person or organization "who collects an application that only contains a name or initial is not required to file the application with the election commission." Section 2-2-143(c) imposes significant financial penalties on organizations and individuals that submit a certain volume of incomplete voter registration forms. This creates a substantial disincentive for organizations to submit any forms that they suspect are "incomplete" even if, in reality, these forms may not be deemed "incomplete" by the state election commission (e.g., forms that have errors or inaccuracies).

126. By creating barriers to organizations to submit registration forms, the Act violates the NVRA's § 20507(a)(2), because it has the effect of stopping state election officials from sending notice to applicants stripping them of the disposition of their voter registration application. As a result, the applicant will not receive notice of disposition on their application and will not be able to take corrective action to complete their registration.

127. Plaintiffs will bear the financial costs and additional drain on their resources by having to train their volunteers and staff to let every registrant know that the form may not be delivered to the election commission if Plaintiffs, in order to avoid civil penalties, deem the form incomplete and decide not to submit it.

128. The Act conflicts with and is preempted by the NVRA, 52 U.S.C. § 20507(a)(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and enter an order:

(i)     Declaring that Section 2-2-142(a)–(b) and (e)–(g), Section 2-2-143, and Section 2-19-145 violate the Due Process Clause of the Fourteenth Amendment because

40

they are so vague that they do not allow Plaintiffs to determine whether and how they are subject to their provisions;

(ii)     Declaring that Section 2-19-145 violates the First Amendment because it impermissibly compels speech and constitutes a content-based restriction on free speech that is not necessary to further a compelling state interest;

(iii)    Declaring that Section 2-2-142(a)–(b) and (e)–(g), Section 2-2-143, and Section 2-19-145 violate the First and Fourteenth Amendments because they impose unreasonable burdens on Plaintiffs relating to the election process that are neither narrowly tailored to further a compelling governmental interest nor drawn in a way that is no more than essential to further an important or significant governmental interest;

(iv)    Declaring that Section 2-2-142(a)–(b) and (e)–(g) and Section 2-2-143 are a violation of and preempted by the NVRA, and the Act fails to impose its requirements in a uniform, nondiscriminatory manner.

(v)     Preliminarily and permanently enjoining Defendants from enforcing the Act, and specifically Section 2-2-142(a)–(b) and (e)–(g) and Section 2-2-143, and Section 2-19-145, and the civil and criminal penalties contained in those provisions;

(vi)    Retaining jurisdiction to render any and all further orders that this Court may deem necessary;

(vii)   Awarding Plaintiffs their reasonable attorney's fees and costs pursuant to statute; and

(viii)  Granting Plaintiffs such additional relief that this Court deems just and proper.

Respectfully submitted this 4th day of December, 2019.

*/s/ Ezra D. Rosenberg*
EZRA D. ROSENBERG*
JON GREENBAUM*
JULIE HOUK*
POOJA CHAUDHURI*
LAWYERS'COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

IRA M. FEINBERG*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3509
ira.feinberg@hoganlovells.com

ALLISON M. RYAN*
CAROLYN A. DELONE*
MADELINE GITOMER*
KYLE DRUDING*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-5600
allison.holt@hoganlovells.com
carrie.delone@hoganlovells.com
madeline.gitomer@hoganlovells.com
kyle.druding@hoganlovells.com

YAEL BROMBERG*
BROMBERG LAW LLC
The Andrew Goodman Foundation
10 Mountainview Road
Upper Saddle River, NJ 07458
(201) 995-1808
yaelbromberglaw@gmail.com

TAYLOR A. CATES, BPR No. 20006
BURCH, PORTER, & JOHNSON, PLLC
130 N. Court Avenue
Memphis, TN 38103
(901) 524-5165

tacates@bpjlaw.com
wirvine@bpjlaw.com
DANIEL AYOADE YOON, BPR No. 028798
2004 8th Ave S
Nashville, TN 37204
(615) 541-5141
danielayoadeyoon@gmail.com

*admitted pro hac vice*

*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify on the 4th day of December, 2019, that a true and correct copy of the

First Amended Complaint was transmitted via the Court's ECF/CM system to the following:

ALEXANDER S. RIEGER
Tennessee Attorney General's Office
Assistant Attorney General
Public Interest Division
War Memorial Building, 3rd Floor
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
alex.rieger@ag.tn.gov

KELLEY L. GROOVER
Tennessee Attorney General's Office
Assistant Attorney General
Public Interest Division
War Memorial Building, 3rd Floor
P.O. Box 20207
Nashville, TN 37202
(615) 741-2408
kelley.groover@ag.tn.gov

JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
Janet.Kleinfelter@ag.tn.gov
(615) 741-7403

ANDREW B. CAMPBELL
Senior Assistant Attorney General
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Andrew.Campbell@ag.tn.gov
(615) 532-0356

*Counsel for Defendants*

/s/ *Pooja Chaudhuri*
Pooja Chaudhuri

44