# EXHIBIT 2-1

## EZRA ROSENBERG DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., et al., <br><br>        Plaintiffs, <br><br> v. <br><br> TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, et al., <br><br>        Defendants. | Civil No. 3:19-cv-365 <br> Hon. Aleta A. Trauger |

## DECLARATION OF EZRA D. ROSENBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

I am Ezra D. Rosenberg. Pursuant to 28 U.S.C. §1746, I make the following declaration in support of an award of attorneys' fees and costs.

### I.    <u>Background on the case</u>

1.        I am the Co-Director of the Voting Rights Project of the Lawyers' Committee for Civil Rights Under Law (Lawyers' Committee), co-counsel along with the national law firm Hogan Lovells LLP, Yael Bromberg of Bromberg Law, and Burch, Porter & Johnson a Memphis-based law firm. Together with co-counsel, the Lawyers' Committee represents Plaintiffs the Tennessee State Conference of the NAACP ("Tennessee NAACP"), Democracy Nashville-Democratic Communities ("Democracy Nashville"), The Andrew Goodman Foundation ("AGF"), and The Equity Alliance ("TEA") in *Tennessee NAACP et al. v. Hargett et al.*, No. 3:19-cv-00365 (M.D. Tenn. 2019).

2.        I am presenting this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs and in particular for the fees and costs requested by the Lawyers' Committee. I am the lead counsel for the Lawyers' Committee on this case.

1

3.	On May 2, 2019, Governor Bill Lee signed into law H.B. 1079 (hereinafter, the "Act"), a piece of legislation that severely restricted the ability of civic engagement organizations to register voters through large-scale voter registration drives. The Act was to go into effect on October 1, 2019. What made the Act especially onerous and burdensome was that it subjected groups like Plaintiffs that conduct voter registration to harsh civil and criminal penalties based on vague, overbroad, and unduly burdensome terms and standards.

4.	Plaintiffs, organizations that conduct large-scale voter registration drives in low-income communities of color and among students. On their behalf, we and our co-counsel filed suit on May 5, 2020, literally minutes after the Act was passed to vindicate their constitutional rights under the First and Fourteenth Amendments of the United States Constitution. In particular, Plaintiffs challenged the criminal penalties for violating Section 2-2-142 (pre-registration and training requirements), the civil penalties for violating Section 2-2-143 (submission of "incomplete" voter registration forms), the differential application of these two provisions only to individuals or groups who were paid to conduct voter registration drives as opposed to those who were unpaid, and the criminal penalties for violating  Section 2-19-195 (requiring mandatory disclaimers for communications regarding "voter registration status").

5.	Plaintiffs also sent a 90-day notice of noncompliance under the National Voter Registration Act ("NVRA") on the grounds that the new law frustrated the purpose of the NVRA by unjustifiably imposing requirements related to voter registration on one class of persons— paid individuals and organizations engaged in voter registration activities.

6.	On August 16, 2019, Plaintiffs filed their Motion for a Preliminary Injunction and a Memorandum of Law in support and on September 13, 2019 secured a favorable ruling from this Court on all of their claims. Specifically, this Court held that the Act was vague and overbroad in violation of Plaintiffs' First and Fourteenth Amendment rights; that it violated Plaintiffs' First Amendment rights to free expression and association by imposing on them onerous and burdensome requirements that had the effect of chilling their core speech; and that the Act's mandatory disclaimer requirement violated the First Amendment because it constituted

2

compelled speech. This Court's ruling enjoined the law from going into effect on October 1, 2019.

7.      On November 4, 2020, the Court held a status conference among the two Plaintiff groups that challenged the law (the Tennessee NAACP Plaintiffs and the League of Women Voters of Tennessee Plaintiffs) and Defendants. After the status conference, this Court consolidated the two cases for the purpose of streamlining discovery and any post-discovery litigation.

8.      In March 2020, the Tennessee legislature repealed the challenged portions of the Act and Governor Lee signed into law an amended Act that removed the draconian criminal penalties and steep civil fines for failing to comply with the pre-registration, training, consent, collection of "incomplete' forms, and the mandatory disclaimer.

9.      The case was dismissed on October 26, 2020 and this Court gave Plaintiffs until December 21, 2020 to file their petition for attorneys' fees and costs.

10.      Plaintiffs now seek attorneys' fees for the bulk of their time spent litigating the case in the period covering the filing of the lawsuit through this Court's favorable ruling on the preliminary injunction. Plaintiffs have significantly cut down their time spent during the post-preliminary injunction phase, including eliminating completely their work on the amended complaint and reducing significantly their time spent during the discovery phase.

## II.      Background on the Lawyers' Committee

11.      Since 1963, the Lawyers' Committee has been a leading national civil rights organization and one of its core activities has been litigation. The Lawyers' Committee has several litigating projects, including Voting Rights, Criminal Justice, Educational Opportunities, Economic Justice, Fair Housing and Community Development, Special Litigation, and the North Carolina office. Voting Rights is the largest Project at the Lawyers' Committee and the Project has litigated more than 90 cases in just the last five to six years throughout the country. The Lawyers' Committee also has an extensive history in the South including in Tennessee. The Lawyers' Committee litigated *Hardeman Cty NAACP v. Frost*, No. 03-1041 (W.D. Tenn. Dec.

3

9, 2003), which involved a city council at-large redistricting scheme in Bolivar County that the plaintiffs alleged diluted the voting strength of African Americans in violation of Section 2 of the Voting Rights Act. The case resulted in a consent decree that created a new method of electing city council members from two super majority districts (one black and one white) consistent with Section 2.

### III. My Professional Background

12.     I have been a member of the Bar of the State of New Jersey since 1974, a member of the Bar of the District of Columbia since 1982, and a member of several federal court bars.

13.     I joined the Lawyers' Committee in November 2014, and since July 2015, I have served as co-Director of its Voting Rights Project, overseeing all voting rights and election protection litigation. — I have worked on more than 90 voting rights cases (many of them ongoing) in that capacity.  Prior to joining the Lawyers' Committee, as detailed below, I was in private practice, where I began working on voting rights cases. Among my most notable cases both in private practice and at the Lawyers' Committee, I served as lead counsel in *Tex. State Conf. NAACP v. Steen*, SD TX 2:13-cv-00291 filed Sept. 17, 2013 (Section 2 challenge to photo ID law, favorable judgment upheld by 5th Cir. sub. nom *Veasey v. Abbott*, Apr. 17, 2016, ultimately dismissed after new legislation passed in 2018. I also served as lead trial counsel in *City of San Jose v. Ross*, ND Calif. 5:18-cv-2279, filed April 17, 2018 (challenge to addition of citizenship question to 2020 Census). In 2020, I served as one of the lead counsel in *City of San Jose v. Trump*, ND Calif. 5:20-cv-05167, filed July 27, 2020 (challenge to President Trump's Executive Order excluding undocumented immigrant population from the 2020 census apportionment count) and *National Urban League v. Ross*, ND Calif. 5:20-cv-05799-LHK, filed Sept. 24, 2020, (pending challenge to failure of Census Bureau to extend enumeration and data processing).  I have actively supervised cases during my time at the Lawyers' Committee dealing with virtually every issue pertaining to voter rights, including voter registration issues, voter purge issues, absentee ballot issues, ballot drop box issues, and post-election challenges. Over this past year, I have overseen

the filing and litigation in numerous pandemic-related lawsuits to vindicate the rights of voters in state primary elections and the November 2020 general election as well as litigation in post-election lawsuits.

14.     Throughout my career and before joining the Lawyers' Committee, my focus has been on complex litigation, first with the Office of the New Jersey Public Defender, where I headed its Special Projects Section; then with the Land and Natural Resources Division of the Department of Justice, where I was a Senior Trial Attorney and Trial Team Leader; and then with the private law firms of Katzenbach, Gildea & Rudner in Trenton, NJ, Fox Rothschild in Lawrenceville, NJ, and Dechert LLP in Princeton, NJ.   At Dechert LLP, I was Co-Chair of the firm's Mass Torts/Products Liability Section which was named as the top products liability defense firm in the country by American Lawyer.

15.     I have been consistently ranked among the top litigators nationwide by numerous publications, including Chambers, The Legal 500 United States, Benchmark Litigation, and, in 2014, was named as one of the top 500 lawyers in the nation by Lawdragon. Throughout my career, I have been involved in significant civil rights cases, not only in the Section 2 and Section 5 Texas photo ID cases previously mentioned, but also serving as co-lead trial counsel in a school desegregation case tried in Pitt County, North Carolina in 2013; and supervising the advantageous settlements of a minority profiling case in New Jersey and of a prison conditions case in Passaic County, New Jersey.

16.     In 2014, I successfully argued an appeal on behalf of the NJ-ACLU before the New Jersey Supreme Court, dealing with the admissibility of a defendant's rap lyrics in his attempted murder trial, helping to persuade the court to adopt stringent standards before admitting such evidence. In 2014, I was named to The National Law Journal's "Pro Bono Hot List" for my role in significant public interest cases of national importance. In 2015, the New Jersey Legislature passed a Joint Resolution, honoring my pro bono service.

### IV.     My role and the Lawyers' Committee's role in this case

17.     Throughout this case, I served as one of the lead trial counsel along with Ira

5

Feinberg and Allison Holt-Ryan of Hogan Lovells LLP. In this role, I not only supervised the work of the other Lawyers' Committee attorneys, I drafted much of the arguments and briefs that are part of this record and reviewed and provided comments on drafts that were written by co-counsel.

18. Throughout the life of this case, our team—the Lawyers' Committee's attorneys and our lead co-counsel at Hogan Lovells as well as our other co-counsel[1]—worked together in a way to maximize the strengths and experiences of each professional and to minimize redundancy of effort. With respect to our billing, our entire team coordinated to ensure that duplicative hours and excessive hours were eliminated.

19. Given the complexity of the claims, it took some back and forth to refine theories and shepherd documents to their final stages. Nevertheless, at each stage of the litigation, the Lawyers' Committee and its lead co-counsel at Hogan Lovells were careful not to duplicate work.

20. The different phases of the case can be broken down as follows:

**A. Filing of the Complaint**

21. The Lawyers' Committee spent a significant amount of time developing the case for litigation. This phase involved tracking the progression of the bill through the Tennessee legislature and its various committees, closely following amendments to the bill, discussing the bill's implications with community members and listening to their concerns about the bill's impact on their civic engagement activities if it passed, writing letters to legislators urging them not to pass the bill on behalf of many of the groups that eventually became Plaintiffs. Throughout

---

[1] Yael Bromberg of Bromberg Law PLLC who is the Chief Counsel of Voting Rights at the Andrew Goodman Foundation (one of the plaintiffs in this case) participated and contributed to strategy meetings and developed the facts related to the Andrew Goodman Foundation. She helped develop the declaration of David Goodman and contributed a great deal in reviewing documents and making sure that they accurately reflected the student perspective. Ms. Bromberg has a breadth of experience litigating voting rights cases and her contributions, as outlined in her declaration and attached hours, were indispensable to the success of the case.

this phase I supervised junior attorneys at the Lawyers' Committee as they tracked the bill.

22. At this time, the Lawyers' Committee also began developing the underpinning legal theories that became the basis for the allegations in the Complaint and informed the team's approach to the rest of the case. I worked closely with junior attorneys at the Lawyers' Committee and supervised their research on issues including vagueness, burden on the right to vote, burden on the right to free expression and association, the differential treatment of paid versus unpaid voter registration volunteers, and compelled speech. When it looked as if the law would pass the Tennessee legislature, I supervised the Lawyers' Committee attorneys in drafting and finalizing the Complaint. I significantly revised the portions of the Complaint they drafted. I also worked with co-counsel, in particular, the attorneys at Hogan Lovells who provided helpful comments, edits, and revisions to the Complaint and helped to refine the legal theories.

### B. Motion to Dismiss

23. After Defendants filed their motion to dismiss, the Lawyers' Committee worked with the Hogan Lovells team on drafting the Opposition to the Motion to Dismiss. Lawyers' Committee and Hogan Lovells split up research and drafting on discreet issues such as standing, ripeness, vagueness, the right to vote, and the law's restrictions on expressive conduct, and curtailment of speech. Lawyers' Committee incorporated comments and revisions from co-counsel and together the two teams worked on finalizing the document. I supervised junior attorneys at the Lawyers' Committee in producing drafts of the Opposition and I drafted some of the substantive argument sections on standing and ripeness.

24. Hogan Lovells also spent a significant amount of time tracking recently decided cases such as a Seventh Circuit case (*Common Cause v. Lawson*) that supported Plaintiffs' position on ripeness and standing and drafted supplemental authority that Plaintiffs filed with this Court.

7

### C. Preliminary Injunction

25.     The Preliminary Injunction Motion and Memorandum of Law required not only legal research but also extensive factual development on how Plaintiffs were impacted by the law including the fact that they stood to lose funding and the ways they had already started curtailing their voter registration activities and plans to avoid criminal and civil prosecution. The Hogan Lovells and Lawyers' Committee teams worked closely to develop this factual record. Two associates from Hogan Lovells and an attorney from the Lawyers' Committee travelled to Tennessee to meet with leaders of three Plaintiff groups, Tennessee NAACP, Democracy Nashville, and TEA, to obtain the facts that supported Plaintiffs' legal theories. Hogan Lovells and Lawyers' Committee spent a considerable amount of time prepping for these client meetings and conducting interviews of the leaders of the organizations. Sometimes interviews went as long as eight hours because clients were so concerned about the ways that the Act would impact them.

26.     Hogan Lovells attorneys were the primary drafters of the Preliminary Injunction and my team worked closely with theirs to revise and refine the Memorandum of Law. The legal issues were complex and implicated different constitutional rights. I spent a significant amount of time revising drafts and refining arguments in the Memorandum of Law. Lawyers' Committee attorneys also spent a significant amount of time distilling the facts from the client interviews and working with the clients to help develop the declarations that were submitted along with the Preliminary Injunction Motion. Ms. Bromberg took the laboring oar on helping develop the fact declarations for Plaintiff Andrew Goodman Foundation.

### D. Post-Preliminary Injunction Order

27.     The bulk of the work on this case took place before this Court's Order on the Preliminary Injunction Motion. After the Court issued its Order enjoining the Act and the Court

held its case management conference on November 4, 2019, Hogan Lovells conducted the bulk of the work on the amended complaint and discovery. I joined and conferred with co-counsel at Hogan Lovells and the counsel representing the League of Women Voters plaintiffs on discovery calls. Lawyers' Committee's junior attorneys also joined these calls however, Lawyers' Committee has not billed for the time that junior attorneys spent on these calls.

### E.  Preparation of the Fee Petition

28.    Hogan Lovells took the laboring oar on drafting the fee petition. While the Lawyers' Committee spent a considerable amount of time drafting affidavits and reviewing the substantive briefs, in an exercise of billing judgment, we are not billing any time spent on the fee petition.

### V.    Role of additional members of the Lawyers' Committee team

29.    Besides portions of the time I expended on this matter, the Lawyers' Committee is also seeking fees for Pooja Chaudhuri. The Lawyers' Committee is not seeking fees on behalf of Chief Counsel Jon Greenbaum (4.5 hours), Managing Counsel Julie Houk (104.2 hours), Legal Fellow Jacob Conarck (107.8 hours), and legal intern Allison Walter (43 hours), even though each of these individuals spent a significant amount of their time on different phases of the litigation. Ms. Chaudhuri was a key participant in the development and litigation of this matter, the key point person with many of the clients, and was indispensable to the success of this case.

30.    Ms. Chaudhuri graduated from law school in 2016 and has been a member of the California State Bar since 2017 and the District of Columbia Bar since 2018. Throughout law school and after graduation from law school, Ms. Chaudhuri has been deeply involved in civil rights law and voting rights issues in particular. When she started working on this case, Ms. Chaudhuri had recently joined the Voting Rights Project of the Lawyers' Committee and before that worked at a nonprofit organization focusing on government accountability through the Freedom of Information Act and litigating in the Federal District Court for the District of

9

Columbia. Before that, she worked on the Educational Opportunities Project of the Lawyers' Committee where she spent most of her time working on a remedial trial in a higher education desegregation case in the Federal District Court for the District of Maryland. During law school Ms. Chaudhuri actively sought out litigation experiences in civil rights and public interest, for example serving clients in a health and welfare benefits clinic and working on employment discrimination cases during a summer internship. During her time with the Voting Rights Project, she has gained significant experience litigating voting rights cases in Mississippi, Tennessee, Ohio, California, and Alaska. During her time at the Lawyers' Committee Ms. Chaudhuri has worked on more than 7 voting rights related challenges brought under the United States Constitution, federal statutes such as the NVRA and Section 2 of the Voting Rights Act, and state constitutions and statutes.

31.     Ms. Chaudhuri spent a great deal of time working on this case under my supervision. She coordinated with our co-counsel at Hogan Lovells during each of the phases in this litigation. She spent a considerable amount of time drafting substantive briefs and motions including researching and drafting oppositions to Defendants' motions. She did most of the legal research for the filing of the Complaint, the Opposition to the Motion to Dismiss, and helped revise the Memorandum of Law for the Preliminary Injunction. She also spent many hours working with individual clients, gathering facts, and helping them develop their declarations. She conducted a great deal of discreet research on issues that cropped up throughout the litigation including but not limited to service of process and ripeness and standing for pre-enforcement challenges.

**VI.     Time**

32.     The members of the Lawyers' Committee team kept time contemporaneously with the work performed and usually recorded their time every day and to the tenth of the hour, in accordance with the Lawyers' Committee's pre-existing timekeeping practices. Attached to this Declaration (Exhibit A) is an accurate itemization for the hours claimed by the Lawyers' Committee staff, which includes both time expended for the fees being charged and the fees not being charged. As reflected in Exhibit A, the Lawyers' Committee's is charging for only a portion

10

of the time that Ms. Chaudhuri and I spent litigating the case—595.53 hours. Exhibit A to Rosenberg Declaration, pp. 17. In total, the Lawyers' Committee's full-time attorneys (excluding the hours for a legal intern) spent 865.43 hours litigating the case. *See id.* Lawyers' Committee is only charging for about 68% of the total time that was expended on the case. In addition, the Lawyers' Committee is only charging for part of the time Ms. Chaudhuri and I spent on the case and has eliminated travel time and any duplicative hours.

### A. Hourly rates for myself and Ms. Chaudhuri

33.     The Lawyers' Committee accepts voting rights cases on behalf of clients, such as Plaintiffs here, who are unable to pay for the legal services required to litigate their claims and vindicate their rights. We do not bill clients for our legal services, and we will not do so in this case; accordingly, we will obtain no compensation absent a fee recovery.

34.     I elected not to seek out-of-district rates, which are sometimes awarded in civil rights cases, which in this case would be hundreds of dollars an hour higher than the rates in the Middle District of Tennessee. The appropriate hourly rates for the Lawyers' Committee attorneys have been set in accordance with local rates, as elaborated in the attached Brief and supported by a Declaration from Wallace Dietz, a partner/member at the Nashville-based firm Bass, Berry & Sims LLP.

35.     Given my more than 45 years of experience in complex litigation and expertise in voting rights gained from litigating more than 90 cases at the Lawyers' Committee, I am billing at the hourly rate typically awarded to senior law firm partners. *See Tanco v. Haslam*, 2016 WL 1171058 (M.D. Tenn. Mar. 25, 2016). Ms. Chaudhuri is billing at a rate for mid-level associates given that she had experience in public interest and specialized experience in voting rights by virtue of her being an attorney on my team and working on voting rights cases—thus she came on to the team with a great deal of familiarity with voting rights challenges. *See* Decl. of Tricia Herzfeld,

11

Doc. 142-8, Oct. 30, 2019, *Thomas v. Purkey*, No. 3:17-cv-00005 (M.D. Tenn. 2019).

**Table 1: Hourly Rates**

| Name | Position | Law School Year (if applicable) | Rate Per Hour |
|---|---|---|---|
| Ezra Rosenberg | Co-Director, Voting Rights Project | 1974 | $700 |
| Pooja Chaudhuri | Associate Counsel, Voting Rights Project | 2016 | $400 |

### B. Reasonableness of time expended

36.     The overall lodestar request is, in my judgment, reasonable and necessary given the actual work performed on this case, including the results obtained; the importance of this case to the core civic engagement work of Plaintiffs; the significant First Amendment issues involved; and the overall time demands of the litigation. I supervised the allocation of work among the Lawyers' Committee team. I also sought to ensure an efficient distribution of labor and minimal duplication of work or effort.

37.     In reviewing these time records in preparation for this submission, I personally read each time entry of the Lawyers' Committee team and decided whether and how much of it to bill, considering the nature, complexity, and importance of the task, the role of the timekeeper in performing the task (e.g., primary drafter, reviewer, and so on.), and whether and how many other attorneys were performing similar tasks. I made judgment calls on whether the total time devoted to a task, such as the drafting of a specific brief, merited the time spent, given the above considerations.

38.     I eliminated completely the time that several of our senior members and some junior members spent on this case—including for the Lawyers' Committee's Chief Counsel Jon Greenbaum, Managing Attorney Julie Houk, Legal Fellow Jacob Conarck, and legal intern Allison Walter. See Exhibit A to Rosenberg Declaration pp.18-19. I further significantly discounted my time and Ms. Chaudhuri's time. I eliminated all time that both Ms. Chaudhuri and I spent on travel

12

(i.e., to client interviews and the case management conference). I discounted by 50% the time Ms. Chaudhuri spent on clerical and paralegal work. I discounted Ms. Chaudhuri's and my time spent on drafting the NVRA notice letter and reviewing the Amended Complaint that Hogan Lovells drafted. I eliminated Ms. Chaudhuri's time spent on post-Preliminary Injunction discovery matters but included some of my time spent on these meet and confers and motions to quash that were filed during the discovery stage. *See* Exhibit A to Rosenberg Declaration, pp. 1-17.

39.     I believe that the time recorded accurately reflects the time spent, and my decision to cut as much of the time that I have cut does not reflect any belief that the work done was unnecessary. Rather, it seeks to exercise reasonable billing judgment in light of these considerations.

40.     In the exercise of "billing judgment," *see Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983), the hours claimed by Lawyers' Committee staff exclude certain hours expended in relation to this matter from the lodestar request to obviate any question that the time claimed in Exhibit A of this Declaration is unreasonable. This includes not only time relating to tasks and time periods other than those set forth for Ms. Chaudhuri and myself above, but also time that was legitimately spent on tasks for which a fee would be due, but are not being charged in the exercise of my billing judgment.

41.     Exhibit A to my Declaration includes the total hours Lawyers' Committee staff expended on this matter, the total hours charged, and the total hours not charged. As mentioned earlier, the Lawyers' Committee seeks about 68% of its time spent litigating this case—the time and Ms. Chaudhuri and I spent on this case.

42.     As discussed in Paragraph 37, I made careful judgment calls on discounting time and removing duplicate efforts especially in light of the fact that we worked closely with our co-counsel at Hogan Lovells as well as Ms. Bromberg.

43.     In total, the Lawyers' Committee's attorneys' fees are summarized below (this excludes the 43 hours that legal intern Allison Walter spent on this matter):

13

**Table 2: Hourly Rates and Total Fees Sought**

| Name | Position (law school year) | Rate Per Hour | Total Hours | Hours Billed | Lodestar calculation (hours billed x rate) |
|------|---------------------------|---------------|-------------|--------------|--------------------------------------------|
| Ezra Rosenberg | Attorney (1974) | $700 | 165.6 | 158.4 | $110,880 |
| Pooja Chaudhuri | Attorney (2016) | $400 | 483.33 | 437.13 | $174,852 |
| Jon Greenbaum[2] | Attorney (1995) | $700 | 4.5 | 0 | 0 |
| Julie Houk[3] | Attorney (1984) | $700 | 104.2 | 0 | 0 |
| Jacob Conarck | (Attorney) (2018) | $350 | 107.8 | 0 | 0 |
| **Totals** | | | **865.43** | **595.53** | **$285,732** |

## VII.    Expenses and costs

44.     During this litigation, the Lawyers' Committee incurred minimal expenses including travel and meal costs for Ms. Chaudhuri and me, and delivery and courier costs related to mailing certain documents, and court costs, the type of out-of-pocket expenses ordinarily paid by a fee-paying client. These expenses are recorded in the Lawyers' Committee's accounting system and attached as Exhibit B. We did not include overhead expenses where the Lawyers' Committee pays flat fees such as telephone, electronic research ($2,342.13).

---

[2] Jon Greenbaum is the Chief Counsel of the Lawyers' Committee and oversees litigation in all project areas at the organization. He is also one of the preeminent voting rights litigators in the country having experience in district and appellate courts and the Supreme Court of the United States.

[3] Julie Houk is an expert in civil rights litigation and in particular voting rights litigation. As Managing Counsel of Election Protection, she has worked on virtually all types of voting rights issues and has served as lead counsel in cases such as *Georgia NAACP v. Kemp*, *Georgia NAACP v. Hancock County Board of Elections and Registrations*, and *Georgia Coalition for the People's Agenda v. Deal*.

**Table 4: Expense/Cost Totals Itemized by Category**

| Expense Category | Amount |
|---|---|
| Travel and Meals | $2,215.07 |
| Delivery and Courier | $52.80 |
| Court Costs (pro hac fees/certificates of good standing) | $38 |
| **Totals** | **$2,305.87** |

## VIII.   <u>Conclusion</u>

45.        In total, the Lawyers' Committee seeks **$285,732** in attorneys' fees and **$2,305.87** in costs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

December 21, 2020

_____

Ezra D. Rosenberg

# Exhibit A to Declaration of Ezra Rosenberg

## Lawyers' Committee Fees
## **FILED UNDER SEAL**

# Exhibit B to Declaration of Ezra Rosenberg

## Lawyers' Committee Expenses

**Lawyers' Committee Expenses**

| Account Category | Vendor | Company | Date | Comment | Amount |
|---|---|---|---|---|---|
| 00000 Default Task | | | | | |
| POSTAGE | AMERICAN EXPRESS | LAWYERSCOM | 5/18/2019 | Postage/Delivery | 52.80 |
| | | **Total  Postage** | | | **52.80** |
| | | | | | |
| COURT COSTS | LUIS PATINO III | LAWYERSCOM | 5/7/2019 | Court/Lit Costs | 38.00 |
| | | **Total  Court Costs** | | | **38.00** |
| 00100 Voting Litigation | | | | | |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/12/2019 | Taxi | 30.17 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/13/2019 | Dinner | 13.09 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/13/2019 | Taxi | 8.26 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/13/2019 | Taxi | 17.77 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/14/2019 | Dinner | 12.91 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/14/2019 | Taxi | 10.95 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/14/2019 | Taxi | 12.25 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/14/2019 | Taxi | 14.87 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/15/2019 | Airfare | 710.60 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/15/2019 | Dinner | 12.66 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/15/2019 | Lodging | 516.91 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 5/15/2019 | Taxi | 14.00 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 11/4/2019 | Airfare | 378.60 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 11/4/2019 | Taxi | 49.81 |
| TRAVEL & MEALS | POOJA CHAUDHURI | LAWYERSCOM | 11/4/2019 | Taxi | 1.15 |
| TRAVEL & MEALS | EZRA D. ROSENBERG | LAWYERSCOM | 11/4/2019 | Airfare | 18.49 |
| TRAVEL & MEALS | EZRA D. ROSENBERG | LAWYERSCOM | 11/4/2019 | Dinner | 27.36 |
| TRAVEL & MEALS | EZRA D. ROSENBERG | LAWYERSCOM | 11/4/2019 | Subway | 323.60 |
| TRAVEL & MEALS | EZRA D. ROSENBERG | LAWYERSCOM | 11/4/2019 | Taxi | 19.46 |
| TRAVEL & MEALS | EZRA D. ROSENBERG | LAWYERSCOM | 11/4/2019 | Taxi | 22.16 |
| | | **Total Travel & Meals** | | | **2,215.07** |
| | | | | | |
| | | **Total Expenses Lawyers' Committee** | | | **2,305.87** |

**Expenses Not being charged by LC - Westlaw and Pacer**

| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 6/17/2019 | VWES01 April-Chaudhuri | 384.69 |
|-----------|----------------------|------------|-----------|------------------------|--------|
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 6/17/2019 | VWES01 April-Houk | 171.36 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 6/17/2019 | VWES01 May-Chaudhuri | 313.55 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 6/17/2019 | VWES01 May-Houk | 67.77 |
| TELEPHONE | | LAWYERSCOM | 6/30/2019 | June fees-Chaudhuri | 760.49 |
| TELEPHONE | | LAWYERSCOM | 6/30/2019 | June fees-Rosenberg | 21.22 |
| TELEPHONE | | LAWYERSCOM | 6/30/2019 | Pacer-04/19-06/19 | 47.40 |
| TELEPHONE | | LAWYERSCOM | 7/31/2019 | July fees--Rosenberg | 0.90 |
| TELEPHONE | | LAWYERSCOM | 7/31/2019 | July fees-Chaudhuri | 123.50 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 9/10/2019 | VWES01 August fees-Chaudhuri | 72.29 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 9/10/2019 | VWES01 August fees-Greenbaum | 0.91 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 9/10/2019 | VWES01 August fees-Rosenberg | 0.91 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 10/16/2019 | VWES01 Sept fee- Chaudhuri | 61.27 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 10/16/2019 | VWES01 Sept fee- Greenbaum | 4.74 |
| TELEPHONE | PACER SERVICE CENTER | LAWYERSCOM | 10/22/2019 | VPSC01 Services for 7/01-9/30/ | 2.70 |
| TELEPHONE | PACER SERVICE CENTER | LAWYERSCOM | 10/22/2019 | VPSC01 Services for 7/01-9/30/ | 42.60 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 11/19/2019 | VWES01 JGreenbaum-Oct | 4.74 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 11/19/2019 | VWES01 PChaudhuri-Oct | 61.27 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 1/9/2020 | VWES01 Pooja Chaudhuri | 69.77 |
| TELEPHONE | PACER SERVICE CENTER | LAWYERSCOM | 1/23/2020 | VPSC01 pacer 10/01/19-12/31/19 | 25.70 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 2/12/2020 | VWES01 Pooja Chaudhuri | 8.77 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 3/26/2020 | VWES01 E. Rosenberg | 13.18 |
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 3/26/2020 | VWES01 P. Chaudhuri | 62.23 |
| TELEPHONE | PACER SERVICE CENTER | LAWYERSCOM | 4/15/2020 | VPSC01 Jan - March services | 3.00 |

2

| | | | | | |
|---|---|---|---|---|---:|
| TELEPHONE | THOMSON REUTERS-WEST | LAWYERSCOM | 10/15/2020 | VWES01 E. Rosenberg | 12.57 |
| TELEPHONE | PACER SERVICE CENTER | LAWYERSCOM | 10/22/2020 | VPSC01 July-Sept fees | 4.60 |
| | **Total Westlaw/Pacer** | | | | **2,342.13** |