## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **TENNESSEE STATE CONFERENCE OF THE N.A.A.C.P., DEMOCRACY NASHVILLE-DEMOCRATIC COMMUNITIES, THE EQUITY ALLIANCE, and THE ANDREW GOODMAN FOUNDATION,** | ) ) ) ) ) ) ) |  |
| **Plaintiffs,** | ) ) |  |
| **v.** | ) ) | **Case No. 3:19-cv-00365** **Judge Aleta A. Trauger** |
| **TRE HARGETT, in his official capacity as Secretary of State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, GREG DUCKETT, MIKE MCDONALD, JIMMY WALLACE, TOM WHEELER, and KENT YOUNCE, in their official capacities as members of the State Election Commission,** | ) ) ) ) ) ) ) ) ) ) ) ) |  |
| **Defendants.** | ) ) ) |  |
| **LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS TENNESSEE EDUCATION FUND, AMERICAN MUSLIM ADVISORY COUNCIL, MID-SOUTH PEACE & JUSTICE CENTER, ROCK THE VOTE, MEMPHIS CENTRAL LABOR COUNCIL, and HEADCOUNT,** | ) ) ) ) ) ) ) ) ) |  |
| **Plaintiffs,** | ) ) |  |
| **v.** | ) ) | **Case No. 3:19-cv-00385** **Judge Aleta A. Trauger** |
| **TRE HARGETT, in his official capacity as Secretary of State of Tennessee,** | ) ) |  |

**MARK GOINS, in his official capacity** )
**as Coordinator of Elections for the State** )
**of Tennessee, the STATE ELECTION** )
**COMMISSION, and DONNA BARRETT,** )
**JUDY BLACKBURN, GREG DUCKETT,** )
**MIKE MCDONALD, JIMMY WALLACE,** )
**TOM WHEELER, and KENT YOUNCE,** )
**in their official capacities as members of** )
**the State Election Commission,** )
)
**Defendants.** )

## MEMORANDUM

The League of Women Voters, League of Women Voters Tennessee Education Fund, American Muslim Advisory Council, Mid-South Peace & Justice Center, Rock the Vote, Memphis Central Labor Council, and HeadCount (collectively, the "League Plaintiffs") have filed a Motion for Attorneys' Fees, Costs and Expenses. (Doc. No. 100.)[1] The Tennessee State Conference of the NAACP, Democracy Nashville-Democratic Communities, the Equity Alliance, and the Andrew Goodman Foundation (collectively, the "NAACP Plaintiffs") have also filed a Motion for Attorneys' Fees, Costs, and Expenses. (Doc. No. 103.) The defendants filed a Response addressing both motions (Doc. No. 105), and each set of plaintiffs filed a Reply (Doc. Nos. 112, 113). For the reasons set out herein, the motions will be granted, as modified by the court.

## I. BACKGROUND

On April 29, 2019, the Tennessee General Assembly passed a new law governing, among other things, "voter registration drives" and "public communication[s] regarding voter registration status." ELECTION OFFENSES, 2019 Tenn. Laws Pub. ch. 250 (H.B. 1079)

---

[1] Unless otherwise indicated, all citations are to the consolidated docket that can be found under Docket No. 3:19-cv-00365.

(hereinafter, the "Act"). On May 2, 2019, Governor Bill Lee signed the Act into law, and its provisions were slated to take effect on October 1, 2019. 2019 Tenn. Laws Pub. ch. 250, § 9. The court has recounted the various relevant provisions of the Act a number of times and will not do so again here. (*See, e.g.*, Doc. No. 53 at 3–6.) In short, the Act imposed a complex and onerous scheme regulating the actions of an ill-defined set of individuals and entities that wished to engage in voter registration drives. The details of the Act's mandates were set out in language that was, at times, so inescapably vague that even the attorneys tasked with defending the Act appear to have been unable to explain what the provisions actually required. (*See* Doc. No. 41 at 2–6 (resorting to a series of lengthy block quotes to describe the Act's contents).)

Before the law was slated to go into effect, two sets of organizations—the League Plaintiffs and the NAACP Plaintiffs—filed claims under 42 U.S.C. § 1983 alleging that the relevant provisions of the Act violated the First Amendment.[2] (Doc. No. 1; Case No. 3:19-cv-385, Doc. No. 1.) The plaintiffs stated that they wanted to ensure that the Act did not hamper their voter registration activities, particularly leading up to the 2020 election cycle. In each case, the court granted a preliminary injunction against the defendants' taking any "steps to implement, enforce, conduct investigations pursuant to, or assist in any prosecution under" the relevant provisions of the Act. (Doc. No. 54; Case No. 3:19-cv-385, Doc. No. 61.) The court eventually consolidated the cases. (Doc. No. 70.) As litigation proceeded, the defendants complied with the preliminary injunctions, meaning that, as a practical matter, the status quo within the State of Tennessee continued as if the challenged provisions had never been enacted. Then, before the cases could proceed to a stage at which the entry of a judgment would have been proper, the Tennessee General Assembly enacted, and the Governor signed, 2020 House

---

[2] Two of the League Plaintiffs were not named in the initial Complaint but were added at a later date. (*See* Case No. 3:19-cv-385, Doc. No. 37.)

Bill 2363, which repealed the challenged provisions.[3] (Doc. No. 97 at 2; Doc. No. 97-1.) With no

laws left to challenge, the plaintiffs had no claims left to pursue, and they filed a Stipulation of

Voluntary Dismissal Without Prejudice, which the defendants supported by stipulation. (Doc.

No. 97.)

On December 21, 2020, each set of plaintiffs filed a motion requesting attorney's fees

and costs associated with the litigation. (Doc. Nos. 100, 103.) The League Plaintiffs request the

following fees:

| Firm | Biller | Title | Hourly Rate | Hours | Fee |
|---|---|---|---|---|---|
| ACLU-TN | Thomas Castelli | Legal Director | $475 | 40.30 | $19,142.50 |
| ACLU Voting Rights Project | Sarah Brannon | Managing Attorney | $475 | 93.43 | $44,379.25 |
| | Davin Rosborough | Senior Staff Attorney | $425 | 122.72 | $52,156.00 |
| | Theresa Lee | Staff Attorney | $410 | 215.06 | $88,174.60 |
| | Sophia Lin Lakin | Deputy Director | $400 | 145.71 | $58,284.00 |
| | Lila Carpenter | Paralegal | $150 | 33.67 | $5,050.50 |
| Campaign Legal Center | Danielle Lang | Program Co-Director | $400 | 45.60 | $18,240.00 |
| | Molly Danahy | Attorney | $335 | 66.30 | $22,210.50 |
| | Urja Mittal | Attorney | $310 | 115.60 | $35,836.00 |
| | Jeffrey Zalesin | Attorney | $270 | 25.40 | $6,858.00 |
| Sherrard Roe Voigt & Harbison, PLC | William Harbison | Member | $700 | 34.40 | $24,080.00 |
| | Dewey Branstetter | Member | $500 | 39.30 | $19,650.00 |
| | Hunter Branstetter | Associate | $325 | 157.70 | $51,252.50 |
| Fair Elections Center | Cecilia Aguilera | Counsel | $290 | 14.10 | $4,089.00 |
| | Jon Sherman | Senior Counsel | $450 | 7.80 | $3,510.00 |
| | Michelle Kanter Cohen | Senior Counsel | $450 | 58.20 | $26,190.00 |
| **Total** | | | | **1215.29** | **$479,102.85** |

(Doc. Nos. 100-3 to -9.) The NAACP Plaintiffs request the following fees:

---

[3] A February 14, 2020 letter from Tennessee Secretary of State Tre Hargett to State Senator Jeff Yarbro appears to confirm that the repeal was part of a conscious attempt to replace the challenged policies with alternatives consistent with this court's ruling. (Doc. No. 100-2 at 2.)

| Firm | Biller | Title | Hourly Rate | Hours | Fee |
|------|--------|-------|-------------|-------|-----|
| Hogan Lovells US LLP | Ira Feinberg | Senior Partner | $700 | 211.7 | $148,190.00 |
| | Allison Holt Ryan | Junior Partner | $500 | 53.4 | $26,700.00 |
| | Madeline Gitomer | Senior Associate | $450 | 239.5 | $107,775.00 |
| | Kyle Druding | Mid-Level Associate | $400 | 66.3 | $26,520.00 |
| | Joe Charlet | Junior Associate | $300 | 212.3 | $77,640.00 |
| | Marlan Golden | Junior Associate | $300 | 106.8 | $32,040.00 |
| | Alicia Balthazar | Paralegal | $200 | 27.7 | $5,540.00 |
| Lawyers' Committee for Civil Rights Under Law | Ezra Rosenberg | Project Co-Director | $700 | 158.4 | $110,880.00 |
| | Pooja Chaudhuri | Associate Counsel | $400 | 437.13 | $174,852.00 |
| Burch, Porter & Johnson PLLC | Taylor A. Cates | Member | $395 | 21.6 | $8,532.00 |
| | William D. Irvine Jr. | Associate | $240 | 32.3 | $7,752.00 |
| | Karah Bartlett | Paralegal | $185 | 1.3 | $240.50 |
| Bromberg Law LLC | Yael Bromberg | Principal | $380 | 30.8 | $11,704 |
| **Total** | | | | **1,599.23** | **$724,415.50** |

(Doc. Nos. 103-2 to -6.) In addition to those amounts, the League Plaintiffs request $5,274.04 in costs, and the NAACP Plaintiffs request $3,928.49. The defendants respond that the plaintiffs are not entitled to attorney's fees because they did not "prevail" in the underlying litigation. (Doc. No. 105 at 1.) In the alternative, they argue that the fee request is excessive and insufficiently documented. (*Id.*)

## II. LEGAL STANDARD

### A. Entitlement to and Scope of Fees

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses." *Fox v. Vice*, 563 U.S. 826, 832,

(2011). Thus, courts do not award "fees to a prevailing party absent explicit statutory authority." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (citation omitted). In 42 U.S.C. § 1988(b), Congress "explicitly empowered the courts to grant fees to parties who win § 1983 actions." *Id.* Under § 1988(b), the "prevailing party" in an action to enforce civil rights under § 1983 may recover "a reasonable attorney's fee as part of the costs" of litigation. *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 552 (6th Cir. 2014) ("*Green Party II*"). To be considered a prevailing party, a litigant must have "receive[d] at least some relief on the merits of his claim" amounting to "a court-ordered change in the legal relationship between the plaintiff and the defendant." *Buckhannon Bd. & Care Home*, 532 U.S. at 603–04 (internal quotation marks and alterations in original omitted).

A plaintiff need not succeed on every claim in order to recover attorney's fees. Success on a single claim is sufficient to render it a prevailing party. *McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010). However, if a plaintiff's unmeritorious claims are "based on different facts and different legal theories" than his meritorious claims, then the court must treat them "as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim[s]." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). On the other hand, if both the meritorious and unmeritorious claims "arise out of a common core of facts, and involve related legal theories," a court should not exempt from its fee award the hours spent on the claims that did not succeed. *Id.* at 789. Instead, the court should consider "the degree of success obtained." *Id.* (quoting *Hensley*, 461 U.S. at 436). An attorney who achieves "excellent results" is entitled to a full fee, regardless of whether she succeeds on every related claim raised. *Waldo v. Consumers Energy, Co.*, 726 F.3d 802, 822 (6th Cir. 2013). However, when the plaintiff's

6

success is "limited," the court may "exercise [its] equitable discretion . . . to arrive at a reasonable fee award" in light of the hours expended. *Tex. State Teachers Ass'n*, 489 U.S. at 789.

## B. Fee Amount

The Supreme Court has cautioned that a request for attorney's fees "should not result in a second major litigation." *Hensley*, 461 U.S. at 437. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. This two-step calculation, known as the lodestar amount, provides an "initial estimate of the value of a lawyer's services." *Id.* However, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Id.* at 434. After determining the lodestar amount, the court may adjust the fee upward or downward "to reflect relevant considerations peculiar to the subject litigation." *Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). However, "trial courts need not, and should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838. "The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Id.* Therefore, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*

## III. ANALYSIS

## A. Prevailing Party Status

Section 1988(b) grants the right to recover attorney's fees in a § 1983 case only to "the prevailing party." But litigation is not like a sport in which one can easily classify every match as a win, a loss, or a draw. For example, a plaintiff may obtain a judgment in its favor on one claim, while the defendant successfully defends itself on others. Or a plaintiff may obtain a judgment in its favor but be denied some or even most of the relief it wanted, making its supposed victory

7

pyrrhic, at best, while the defendant's loss looks suspiciously like a win. Or, to give another common example, a claim may be raised and litigated in such a tight time window—for example, in the runup to a fixed, irrevocable deadline, such as an election—that no party *ever* had a meaningful chance of obtaining a judgment in its favor. Rather, a typical plaintiff with a meritorious claim in such a case will merely obtain a preliminary injunction that remains in force for the period of time in which the plaintiff actually needs protection, only for the underlying claims, quite expectedly, to then become moot and be dismissed. In light of these complexities, the Sixth Circuit has endorsed a "contextual and case-specific inquiry" governing prevailing party status that, among other things, "does not permit [the court] to say that preliminary-injunction winners" who do not receive any judgment or further relief "always are, or never are, 'prevailing parties.'" *McQueary*, 614 F.3d at 600.

There are, of course, limits to what kind of partial success will count as "prevailing." For example, the Supreme Court has held that "a judicial pronouncement that the defendant has violated the Constitution, unaccompanied by an enforceable judgment on the merits"—or other enforceable, judicially imposed duty—"does not render the plaintiff a prevailing party." *Farrar v. Hobby*, 506 U.S. 103, 113 (1992). Rather, for a plaintiff to be said to have succeeded on a claim, the plaintiff typically must have obtained at least a "material alteration of the legal relationship between the parties." *Id.* That alteration, moreover, cannot merely be a provisional change that was later revoked; rather, the caselaw of this circuit recognizes that, in order for a party to be considered as having prevailed, it must have obtained relief that was not only (1) "court-ordered" and (2) "material," but also (3) "enduring." *McQueary*, 614 F.3d at 598–99.

Before the plaintiffs filed their claims, they were about to be subjected to the already-enacted, soon-to-go-into-force requirements of the Act. Those requirements would have directly

hampered the plaintiffs' voter registration activities, almost certainly resulting in fewer registrations being enabled by the plaintiffs. However, by obtaining a preliminary injunction, the plaintiffs were effectively freed from any enforceable obligation to comply with the challenged provisions, and that status quo continued for the entire time in which those provisions remained on the books. Finally, the plaintiffs' freedom from the challenged provisions became permanent—or, at least, as permanent as any change in the law can be—when the Tennessee General Assembly and the Governor repealed the constitutionally suspect regulations regarding voter registration drives. To the ordinary observer, then, it would certainly seem like the plaintiffs prevailed, and enduringly so. That said, it is true that the plaintiffs, unlike most prevailing parties, were never "entitled to enforce a judgment, consent decree, or settlement against the defendant." *Farrar*, 506 U.S. at 113. There is, therefore, at least a colorable argument that, appearances aside, the plaintiffs were not prevailing parties.

The defendants point out that the Supreme Court has rejected the theory, advanced in some earlier cases, that a plaintiff can become a prevailing party merely by being the "catalyst" for a change in the law or the defendant's behavior, even if that plaintiff never actually obtained legal relief from a court. *See Buckhannon*, 532 U.S. at 605. But these plaintiffs did obtain legal relief from a court in the form of the preliminary injunctions. The significance of the repeal of the challenged provisions is not that the plaintiffs *caused* the repeal (although it appears that they did), but rather that the repeal is a contextual fact relevant to—and, in fact, ultimately determinative of—the question of how much judicial relief was necessary in order for the plaintiffs' claims to be considered successful. The question at the core of the prevailing party inquiry is whether the plaintiffs "receive[d]" from the court what they had "asked for in the lawsuit." *McQueary*, 614 F.3d at 599. The plaintiffs asked for an order enjoining the defendants

9

from enforcing the challenged provisions of the Act for as long as those provisions remained duly enacted Tennessee statutes, whether that was for a few months or a hundred years. The repeal meant that a permanent injunction was unnecessary to accomplish that end, because even an ostensibly "permanent" injunction against enforcing a law can only last as long as the law itself does. But the relief that the court granted in the preliminary injunction did everything that a permanent injunction would have done: prevented the challenged laws from being enforced until, through the ordinary operation of the state's legislature, the laws were repealed and ceased to exist.

The Sixth Circuit addressed the issue of how a party's prevailing party status is affected by an amendment of the challenged statute during litigation in *Green Party of Tennessee v. Hargett*, 767 F.3d 533, which the court has designated as "*Green Party II*" for the purposes of this litigation. The plaintiff in that case had challenged two aspects of Tennessee's election laws, respectively referred to as the state's "ballot-access" and "ballot-ordering" laws. The plaintiff initially prevailed on its challenges by obtaining summary judgment in the district court. Then, "[i]n the spring of 2012, while the defendants' appeal was pending, Tennessee amended its ballot-access statutes." *Id.* at 541. The Sixth Circuit concluded that, in light of the change in law, "the district court should be given the opportunity" to consider the claims anew, given that the underlying laws had "fundamentally changed since the district court decided the case." *Green Party of Tennessee v. Hargett*, 700 F.3d 816, 824 (6th Cir. 2012) ("*Green Party I*"). The Sixth Circuit accordingly "REVERSE[D] the judgment of the district court and REMAND[ED] the case for further proceedings consistent with" its opinion. *Id.* at 829.

On remand, the court again granted summary judgment to the plaintiff. The court also awarded the plaintiff attorney's fees—including fees related to the already-reversed challenge to

the original version of the ballot-access provisions. The defendants appealed, and, in *Green Party II*, the Sixth Circuit again reversed the award of summary judgment to the plaintiff. *Green Party II*, 767 F.3d at 549. The court, however, upheld the award of attorney's fees with regard to the original challenge, despite the fact that the court had technically reversed that holding:

> We conclude that the plaintiffs qualify as prevailing parties because the district court initially ruled that Tennessee's then-current ballot-access scheme . . . was unconstitutional, and the court ordered declaratory and injunctive relief to remedy the violation. The plaintiffs have not been stripped of their prevailing party status by the legislature's decision to amend the relevant statutes two months after the district court issued its order but before the defendants' appeal was heard. Moreover, this court never reached the merits of Tennessee's old ballot-access scheme and has done nothing to disturb the original judgment of the district court.

*Id.* at 553 (citations omitted). The Sixth Circuit recently confirmed the validity of this approach in *Thomas v. Haslam*, No. 20-6188, 2021 WL 3754240 (6th Cir. Aug. 25, 2021), in which another set of plaintiffs who challenged a Tennessee law, only for the law to be repealed and the judgment in their favor vacated while an appeal was pending, were awarded attorney's fees. *Id.* at *2; *see also Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 542 (6th Cir. 2019) (holding that party that obtained preliminary injunction was a prevailing party, despite the fact that its claims were rendered moot during litigation by a nonparty government agency).

Although this case is not precisely like the prior ones considered by the Sixth Circuit in the context of other amended or repealed statutes, those cases adopted an approach—focused on the existence of a lasting, court-ordered change in the legal relationship between the parties but flexible with regard to how that change occurred—that would also favor these plaintiffs. Early in the underlying litigation, the League and NAACP Plaintiffs obtained more or less everything they wanted, except for the entry of a judgment, an order making permanent the preliminary relief that they had already received, and a declaration memorializing the reasoning that the court had already utilized. Then, the State of Tennessee simply *gave up* on trying to infringe on the

plaintiffs'—or anyone's—constitutional rights in the manner at issue, rendering those final steps unnecessary. And while the injunction itself did not end up needing to last any longer than it did, the results that it obtained were irrevocable. The plaintiffs were free to perform the voter registration drives that they wished to perform, and votes have almost certainly been cast pursuant to registrations enabled by the court's preliminary injunctions. Neither those votes nor the registrations themselves ever can or will be rescinded based on the Act; the votes are on the books, and the registrations are now just as valid as every other voter registration in Tennessee. That is the success that the plaintiffs wanted, and they both got it and kept it. The plaintiffs' success, in other words, was, as required, court-ordered, material, and enduring.

For the defendants to nevertheless succeed on their argument that the plaintiffs are not prevailing parties, then, the defendants would need to identify some basis, in either the caselaw or the text of § 1983 and § 1988(b), for concluding that the concept of "prevailing party" is not only highly formalistic, but formalistic in a particular way that *would* exclude these plaintiffs but *would not* exclude the other plaintiffs whom the Sixth Circuit has concluded did prevail, despite similar deficiencies. The defendants have failed to identify any such persuasive basis. There are small, technical differences between these plaintiffs and other plaintiffs that have been recognized as prevailing, but none of them undermines the core similarities. The defendants concede—as they must, under the law of this circuit, *see McQueary*, 614 F.3d at 600—that there is no categorical requirement that a party receive a judgment in its favor in order to become a "prevailing party" and that merely obtaining a preliminary injunction may, depending on the case, be sufficient. (*See* Doc. No. 105 at 6.) And, as the court has already discussed, there is similarly no rule against concluding that a plaintiff prevailed even though the government repealed the law that the plaintiff challenged while litigation was ongoing. If there is (1) no rule

12

against awarding fees to a party based on its obtaining a preliminary injunction but not a judgment or a permanent injunction and (2) no rule against awarding fees to a party whose claims became moot due to repeal of the challenged law during litigation, then what reason could there be for denying fees here, where the plaintiffs' victory was, in every other sense, so total and decisive? The court holds that the League and NAACP Plaintiffs prevailed for the purposes of § 1988(b), just as they prevailed in the ordinary sense of the word, and the court, accordingly, will award them fees and costs.

**B. Adequacy of Documentation of Fees**

"The party requesting fees bears the burden to submit adequate documentation of the hours reasonably expended." *Plumbers & Pipefitters Local No. 396 Combined Fund v. State Line Plumbing & Heating, Inc.*, No. 4:10 CV 1936, 2011 WL 1769085, at *2 (N.D. Ohio May 9, 2011) (citing *Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist, Co.*, 2011 WL 204750 (E.D. Mich. January 21, 2011)). Included in that burden is the obligation to provide "billing time records that are sufficiently detailed to enable the courts to review the reasonableness of the hours expended." *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990). There are, of course, limits to that requirement. No ordinary time entry is likely to be sufficient to allow a court to perform an exhaustive—or even particularly deep— analysis into the necessity of the specific work performed. Still, however, the defendants are correct that a plaintiff has an obligation to provide documentation that at least allows the court to make a general assessment of the reasonableness of the hours claimed, in the context of ordinary conventions of attorney work logs.

The defendants have provided an omnibus compilation of the plaintiffs' time entries, with the defendants' objections, including a number of objections for vagueness. (Doc. Nos. 105-1,

107.) Among the entries objected to as too vague are 0.83 hours for "emails about discovery issues," 0.6 hours for "Review appeal and case management deadlines," 0.2 hours for "Emails about case with [named attorney]," 0.3 hours for "Reviewing team emails," and multiple entries of 0.5 hours for "Emails." (Doc. No. 105-1 at 15, 45, 48, 52, 58–59.) One entry for 0.5 hours is merely described as representing "[w]ork on an anti-voter registration lawsuit." (Doc. No. 107 at 29.) The entries objected to as vague represent a small fraction of the hours claimed, and some of the entries to which the defendants have objected do not strike the court as inadequate. Nevertheless, the defendants' objection that some of the descriptions are insufficient is persuasive.

The defendants also object to a number of entries for so-called "block billing"—that is, the inclusion of two or more discrete tasks in a single time entry. The Sixth Circuit, however, has held that, "so long as the description of the work performed is adequate, block-billing can be sufficient" to support an award of fees. *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 371 (6th Cir. 2014). Some of the entries objected to as block billing suffer from the vagueness issues that the court has discussed, but, those issues aside, the court does not find any additional problem related to block billing that would warrant a reduction in fees.

"When confronted with a request for the award of attorney's fees in the face of inadequate billing records, courts in the Sixth Circuit often apply across-the-board fee reductions." *Potter v. Blue Cross Blue Shield of Mich.*, 10 F. Supp. 3d 737, 748 (E.D. Mich. 2014) (citing *Grant v. Shaw Envtl., Inc.*, No. 3:08-CV-350, 2013 WL 1305599, at *7 (E.D. Tenn. Jan. 30, 2013), *report and recommendation adopted*, No. 3:08-CV-350, 2013 WL 1305596 (E.D. Tenn. Mar. 28, 2013)); *see Heath v. Metro. Life Ins. Co.*, 2011 WL 4005409, at *10 (M.D. Tenn. Sept. 8, 2011) (Nixon, J.); *Helfman v. GE Group Life Assurance Co.*, 2011 WL 1464678 (E.D.

14

Mich. April 18, 2011). The defendants have identified a limited but real issue of vagueness in the defendants' entries. The court, accordingly, will consider that defect in the context of calculating an overall reduction in fees, in light of any other defects.

## C. Lodestar Calculation

Aside from the issues related to documentation, the defendants object to the fees requested on the following grounds: (1) both sets of plaintiffs overstaffed the case; (2) the plaintiffs request payment for pre-litigation activities such as vetting potential plaintiffs; and (3) some of the fees requested involved work unnecessary to the actual litigation of the case, including drafting press releases. The defendants request that, in light of these issues, the court grant fees no greater than 50% of the lodestar amount.

### 1. Number of Attorneys Involved

Courts in this circuit have recognized that "[p]laintiffs are not entitled to have any number of well-qualified attorneys reimbursed for their efforts, when fewer attorneys could have accomplished the job." *Ky. Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 419 (6th Cir. 2004) (quoting district court). Of course, the number of attorneys who worked on a case is a far less important fact to the reasonableness inquiry than the aggregate number of hours expended or the rates claimed. Nevertheless, it is true that excessive staffing can introduce elements of inefficiency that may improperly increase costs. As anyone with experience working with a team of attorneys can attest, every new addition is another person who has to be brought up to speed, at least with regard to the portion of the litigation to which he or she is contributing. Moreover, a larger team, particularly one that involves multiple firms, means more time devoted to coordination. *See Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 14 (1st Cir. 2011) (noting that, even "where the deployment of multiple attorneys on a single project is reasonable, that

15

staffing pattern inevitably results in a need for some amount of coordination, including intramural conferencing"). Indeed, as the defendants have pointed out, the time entries in this case do, in fact, reveal that a significant amount of time was devoted to coordination between co-counsel. (*See* Doc. Nos. 105-1, 107 *passim* (including objections based on time spent on planning between co-counsel).)

A total of 26 attorneys worked for the plaintiffs in these cases—15 for the League Plaintiffs and 11 for the NAACP Plaintiffs. Those are undoubtedly large teams. That said, the differences in individual attorneys' rates suggest that at least some of the additional staffing may have saved money. For example, the Lawyers' Committee for Civil Rights Under Law is claiming fees on behalf of two attorneys, but far more work was performed by the significantly less expensive of those two. Surely it would not have been better to have only the more senior, more expensive attorney involved. The court, moreover, acknowledges that some of the plaintiffs' attorneys have attested that they already reduced their requests in light of their own billing judgment, including, in some instances, by omitting work of even more additional attorneys. There is, therefore, at least some mitigation to the raw staffing numbers themselves.

Ultimately, the court concludes that the sheer number of attorneys—and particularly the sheer number of *firms*—involved in this litigation does warrant a reduction from the lodestar amount. The court notes that the public interest firms involved appear to have had significant overlap in their expertise—specifically, expertise in election law—that raises questions regarding whether it was necessary for every firm to be involved. One of the primary benefits of assembling a large team is the potential for amassing a diverse range of expertise on matters such as constitutional law, state and local government law, and litigation practice, all of which may be implicated by a set of claims. These plaintiffs, however, appear to have built their teams by

16

adding election lawyer upon election lawyer upon election lawyer. And maybe that is exactly what they needed—the plaintiffs' representation in this case does appear to have been excellent. But the apparently narrow range of attorney expertise necessary to pursue these claims undermines the argument that teams of this size were reasonable. The court, accordingly, will consider the fact that the teams appear to have been at least somewhat overstaffed in making its final fee determination.

### 2. Press-Related Activities

The defendants object that both sets of plaintiffs have sought fees for work related to the drafting and reviewing of press releases, which some courts have held to be an improper subject for the recovery of fees in a § 1983 case. *See, e.g.*, *Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995) ("It is particularly inappropriate to allow public relations expenses in the case at hand while it was pending before the district judge who had approved the consent decree and subsequent settlement agreement."); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994) ("While the district court gave no explanation for its decision not to award fees and expenses incurred in connection with public relations efforts, we nevertheless agree with its decision in the circumstances of this case."); *Greater Los Angeles Council on Deafness v. Cmty. Television of S. Cal.*, 813 F.2d 217, 221 (9th Cir. 1987) ("The court reasonably disallowed time spent on publicity, lobbying, and unrelated claims . . . .").

This court agrees that "[t]he legitimate goals of litigation are almost always attained in the courtroom, not in the media," *Rum Creek*, 31 F.3d at 176, and that, therefore, activities by attorneys focused on press coverage or publicity will typically not be recoverable. Indeed, the court's Local Rules recognize that statements to the press, if anything, risk complicating the administration of justice, and the Rules limit extrajudicial statements accordingly. *See* LR83.04.

There may be some cases in which press attention so significantly intrudes upon the litigation process that it is a reasonable, ordinary, and appropriate part of litigation to take steps to manage the role of the press in relation to the case. There is, however, no evidence that this was such a situation. Unless there is some particular, litigation-related reason why press-focused efforts were necessary, time spent dealing with or planning to address the press is likely better categorized as part of the plaintiff organizations' general advocacy objectives, not the litigation itself. That does not mean that there is anything wrong with drafting press releases; it does, however, mean that that work was distinct from the litigation-focused work that is actually covered by § 1988(b). The court, accordingly, will decrease the fees awarded based on the improper inclusion of some limited publicity-related expenses.

### 3. Pre-Litigation Activities

The defendants next object that the plaintiffs have improperly sought attorney's fees related to pre-litigation activities, including, in particular, screening of potential plaintiffs. Recruitment and selection of appropriate plaintiffs is an indispensable part of much public interest litigation. Indeed, it is rare for this court to see a case such as this one in which the government official defendants do not raise issues of, for example, standing and mootness that directly bear on whether an appropriate plaintiff has been chosen to bring the substantive claims at issue. Simply because certain work is important, however, does not mean it is compensable for the purposes of § 1988(b). The court therefore must determine whether there is a basis for awarding attorney's fees for such pre-litigation activities here.

The caselaw on this issue is somewhat mixed. *See Case v. Unified Sch. Dist.* No. 233, 157 F.3d 1243, 1251 (10th Cir. 1998) ("In some instances, such as when the litigation involves particularly difficult questions of standing, mootness, or ripeness, attorneys may be awarded time

necessary to determine who should be the appropriate plaintiffs or whether the suit may even be brought. Pre-recruitment time also may be awarded where attorneys have done pre-recruitment work with an advocacy group representing a class."); *Kelly v. Corrigan*, 890 F. Supp. 2d 778, 786 (E.D. Mich. 2012) ("The subject matter of the work done prior to agreeing to represent an actual client may be relevant to the litigation ultimately initiated but . . . it is not something that should be included in the attorney fee award under § 1988."); *Gratz v. Bollinger*, 353 F. Supp. 2d 929, 944 (E.D. Mich. 2005) ("[T]he Court does not believe that § 1988 contemplates an award of fees related to an attorneys' search for clients who will serve as model plaintiffs."). Ultimately, however, this court is not persuaded that allowing such recovery is consistent with § 1988(b). The amount of fees recoverable is determined, not by abstract principle alone, but in the context of ordinary practices in the legal community, which set the baseline for reasonableness. If, therefore, charging a client for pre-litigation client recruitment activities were standard practice, the defendants would have little ground for objecting to the inclusion of those fees here. The court, however, is not convinced that that is, in fact, ordinary practice in this district. The plaintiffs, therefore, have failed to establish that such fees were reasonable.

The plaintiffs in these cases are entitled to attorney's fees, not because the court agreed with their legal positions or because the public interest firms involved furthered their missions, but because the *plaintiffs themselves* prevailed with regard to their own specific claims. Client recruitment activities, however, are not made in furtherance of the claims of any individual client, but rather are done in furtherance of the organizational mission for which the eventual plaintiffs' claims will serve as a vehicle. The court, accordingly, will reduce the requested fees to

19

reflect the inappropriate inclusion of pre-litigation activities that lack a sufficient relationship to the particular plaintiffs' claims.[4]

### 4. Additional Issues

Although the defendants raise objections to numerous time entries, they do not generally challenge the rates claimed. Nevertheless, the plaintiffs still bore a burden to support those fees, and the court concludes that they have failed to do so with regard to two particular sets of rates. First, the court notes that the hourly rates claimed by the paralegals in these cases—$150, $185, and $200—are above the upper limit of what this court has typically held to be supported in comparable cases, and the court does not find a reason to depart from that upper limit here. The court, accordingly, will reduce those rates to $125/hour.

More consequentially, the court finds that there is insufficient support for the $700/hour rates claimed by Ira Feinberg, Ezra Rosenberg, and William Harbison. All three lawyers have lengthy and impressive qualifications,[5] and the court has little doubt that they can charge considerable fees, particularly in expensive legal markets and/or on cases in which the dollar amounts at stake are high. The relevant figure for lodestar purposes, however, is the "prevailing market rate in the relevant community"—meaning the community in which the litigation occurred. *Dowling v. Litton Loan Servicing LP*, 320 F. App'x 442, 447 (6th Cir. 2009) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)) (alteration omitted). In the court's extensive experience—including experience resolving numerous § 1988(b) motions in complicated, high-stakes, and well-litigated cases—even a highly qualified lawyer in this jurisdiction is unlikely to

---

[4] The defendants have objected to some additional legal tasks that were not, in fact, pre-litigation as nevertheless unnecessary. With the exception of the aforementioned issues related to publicity-related work, the court does not find that reduction is necessary based on these miscellaneous additional objections.

[5] Of course, the court is personally familiar with Mr. Harbison's sterling credentials and standing in the Nashville legal community.

charge $700/hour, at least in relation to a case that, like this one, is not about large monetary obligations. The court, therefore, will reduce those three attorneys' rates to $500/hour.

## D. Calculation of Award

As prevailing parties, the plaintiffs are entitled to attorney's fees and costs, and the court accepts their claimed fees as a starting point for its calculation. As the court has held, however, it will make the following adjustments: (1) reductions of all attorney's fees based on rates over $500/hour and a reduction of all paralegal rates to $125/hour; (2) a reduction based on a smattering of insufficiently documented time entries on behalf of both sets of plaintiffs' attorneys; (3) a reduction made to reflect the fact that the court will not award fees based on work related to publicity or other non-litigation-related activities; (4) a reduction reflecting the fact that the court will not award fees based on pre-litigation actions that were not directly preparatory of these plaintiffs' claims; and (5) a reduction to reflect overstaffing.

The rate-related reductions are as follows:

### League Plaintiffs

| Firm | Biller | Title | Hourly Rate | Hours | Fee | Difference |
|------|--------|-------|-------------|-------|-----|------------|
| ACLU Voting Rights Project | Lila Carpenter | Paralegal | ~~$150~~ $125 | 33.67 | ~~$5,050.50~~ $4,208.75 | -$841.75 |
| Sherrard Roe Voigt & Harbison, PLC | William Harbison | Member | ~~$700~~ $500 | 34.40 | ~~$24,080.00~~ $17,200.00 | -$6,880.00 |
| Total | | | | | | -$7,721.75 |

| Firm | Biller | Title | Hourly Rate | Hours | Fee | Difference |
|------|--------|-------|-------------|-------|-----|------------|
| Hogan Lovells US LLP | Ira Feinberg | Senior Partner | ~~$700~~ $500 | 211.7 | ~~$148,190.00~~ $105,850.00 | -$42,340.00 |
| | Alicia Balthazar | Paralegal | ~~$200~~ $125 | 27.7 | ~~$5,540.00~~ $3,462.50 | -$2,077.50 |
| Lawyers' Committee | Ezra Rosenberg | Project Co-Director | ~~$700~~ $500 | 158.4 | ~~$110,880.00~~ $79,200.00 | -$31,680.00 |
| Burch et al. | Karah Bartlett | Paralegal | ~~$185~~ $125 | 1.3 | ~~$240.50~~ $162.50 | -$78.00 |
| Total | | | | | | -$76,175.50 |

The court will refer to these lodestar amounts that reflect those adjustments as the "Adjusted Amounts."

The entries to which the defendants have objected as involving pre-litigation activities are relatively limited. By the court's rough count, the defendants object to about 22 hours of billing on behalf of attorneys for the League Plaintiffs, which amounts to about 1.8% of the total hours. (*See* Doc. No. 105-1 *passim*.) With regard to the NAACP Plaintiffs, the defendants object to about 105 hours on this basis, accounting for about 6.6% of the total hours. (*See* Doc. No. 107 *passim*.) The court, however, does not find every objection to be supported. The court, accordingly, will impose an overall 1.5% reduction to the League Plaintiffs' Adjusted Amount and a 6.5% reduction to the NAACP Plaintiffs' Adjusted Amount based on pre-litigation activity.

The entries to which the defendants have objected as devoted to press-related activities are even more limited. By the court's rough count, the defendants object to about 3.25 hours with regard to the League Plaintiffs, accounting for about 0.27% of the total hours. With regard to the

NAACP Plaintiffs, the defendants object to about 11 hours on this basis, accounting for about 0.69% of the total hours. The court will add 0.25 and 0.5 percentage points to the aforementioned reductions, making for reductions of 1.75% and 7.0%.

Finally, the court must account for the issues of insufficient documentation and overstaffing. Quantifying the effect of overstaffing, in particular, is an inherently imprecise task, because the court cannot simply chop off the work performed by attorneys in excess of a certain number. Although overstaffing likely made representing the plaintiffs more complicated and time-consuming than it needed to be, the court has not seen evidence that the additional attorneys were engaged in busywork or some other form of unnecessary task. If those extra attorneys had not done their work, in all likelihood someone else would have had to do it, at least in most instances. The court, accordingly, must exercise its judgment to reach what it believes is a reasonable reduction, in light of the work performed and the relief obtained. Ultimately, the court will add an additional 25 percentage points to the reductions of the Adjusted Amounts to reflect issues related to overstaffing and documentation, making for final percentage reductions of 26.75% and 32.0%, respectively.

The League Plaintiffs' initial lodestar amount was $479,102.85. After a rate-related reduction of $7,721.75, that makes for an Adjusted Amount of $471,381.10. After reducing that Adjusted amount by 26.75%, the court is left with a final fee amount of $345,286.66 for the League Plaintiffs. The NAACP Plaintiffs' initial lodestar amount was $724,415.50. After a rate-related reduction of $76,175.50, that makes for an Adjusted Amount of $648,240.00. After reducing that Adjusted amount by 32.0%, the court is left with a final fee amount of $440,803.20 for the NAACP Plaintiffs.

Finally, the two sets of plaintiffs, between them, request $9,202.53 in costs, to which the defendants do not specifically object. The court, accordingly, will award those full requested costs, $5,274.04 to the League Plaintiffs and $3,928.49 to the NAACP Plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, the League Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses (Doc. No. 100) and the NAACP Plaintiffs' Motion for Attorneys' Fees, Costs, and Expenses (Doc. No. 103) will be granted, as modified consistently with this opinion. The League Plaintiffs will be awarded $368,855.71 in attorneys' fees and $5,274.04 in expenses, and the NAACP Plaintiffs will be awarded $473,215.20 in attorneys' fees and $3,928.49 in expenses.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge